IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| Linda Tirado, | Case No. |
| | |
| | **COMPLAINT** |
| Plaintiff, | |
| | **DEMAND FOR JURY TRIAL** |
| v. | |
| | |
| City of Minneapolis; Minneapolis Chief of Police Medaria Arradondo, *in his official capacity*; Minneapolis Police Lieutenant Robert Kroll, *in his official capacity*; Minnesota Department of Public Safety Commissioner John Harrington, *in his official capacity*, Minnesota State Patrol Colonel Matthew Langer, *in his official capacity*; and John Does 1-4, *in their official and individual capacities*, | |
| | |
| Defendants. | |

## INTRODUCTION

1.     Linda Tirado, the plaintiff in this case, is an internationally renowned journalist who is now completely blinded in one eye. She lost her sight because police officers, who are the individual defendants, shot her at the Mr. George Floyd demonstrations in Minneapolis. On Friday evening of May 29, 2020, Ms. Tirado stepped in front of the protesting crowd and aimed her professional Nikon camera at the police officers to take a picture of the police line. Ignoring the press credential

she wore around her neck, police officers marked her with a ballistic tracking round. Then, with a bright green target on her, the police shot her in her face with foam bullets.  With blood dripping down her face, she cried out repeatedly, "I'm press!", but the police ignored her.  By the time protestors got her to the hospital, Ms. Tirado's left eye was permanently destroyed.

2.      Until recently, few Americans could have imagined police officers shooting at journalists reporting on civil protests.  The dark irony of this brutal police attack on the free press is made all the more grim because the media played a key role in bringing the horrific killing of Mr. George Floyd to the attention of all Americans.  At issue in this case is Ms. Tirado's irreparable injury, the protections owed to the media when journalists report on Americans exercising their free speech rights through protests, and what orders were given to the police officers who targeted Ms. Tirado and other reporters.

3.      On May 25, 2020, former Minneapolis Police Department Officer Derek Chauvin ("Officer Chauvin") pinned Mr. George Floyd—an unarmed black man who was becoming increasingly immobile, unresponsive, and eventually unconscious—to the ground with his knee on Mr. Floyd's neck.  Two other former Minneapolis Police Department officers continued to hold Mr. Floyd down, and a third former Minneapolis Police Department officer stood by to ensure that those recording the altercation did not interfere with Officer Chauvin's killing of Mr.

2

Floyd.  Mr. Floyd pleaded for his life, gasping: "*I can't breathe*."  Eight minutes and forty-six seconds later, Mr. George Floyd died while in custody of the Minneapolis Police Department.

4.      In the wake of the recording of Mr. George Floyd's killing going viral, protests against police brutality were, and, at the time of the filing of this Complaint, still are, occurring across the country.  Members of the press have been working to cover these protests and are risking their lives to do so.  In a counterproductive approach, various States and the District of Columbia responded to its citizens' complaints about police brutality by state sanctioned increased police presence, which effectively facilitated more acts of police brutality, including against the press.  In response to building tensions in the Twin Cities, the Governor of the State of Minnesota, Tim Walz, activated the Minnesota National Guard on May 28, 2020.  By 11:30 pm on May 28, 2020, the Minnesota State Patrol announced that its troopers and Department of Natural Resources Conservation officers were actively supporting efforts in Minneapolis and St. Paul.  The next day, the Governor imposed a nighttime curfew in Minneapolis and St. Paul, and later extended the curfew through the morning of June 5, 2020.  The curfew prohibited persons from traveling on any public street or any public place between the hours of 8:00 pm and 6:00 am.  Notably, all news media was exempt from the curfew's

restrictions. Somehow, members of the Minneapolis Police Department and Minnesota State Patrol did not faithfully honor the news media exemption.

5. On the evening of May 28, Ms. Tirado, like many journalists across the country, rushed to Minneapolis to cover the civil uprisings. Ms. Tirado chose to head to the scene of the crime to take pictures of the protest demonstrations and law enforcement. She did not anticipate being shot instead. On May 29, moments before the first night of curfew began, law enforcement fired tear gas, unprovoked, in the direction of the nonviolent, peaceful protestors. Law enforcement did not administer any prior warnings, dispersal orders, or demands for protestors to go home.

6. As an experienced internationally renowned journalist who has for decades covered similar protests involving law enforcement, Ms. Tirado ensured her press credentials were displayed prominently around her neck, secured her respirator and goggles on her face, and began to photograph law enforcement's tactics.

7. While setting up her shot with her Nikon camera, and facing the direction of the police, Ms. Tirado felt an impact on the left side of her face and immediately felt blood gushing down her face and the burn of tear gas in her eyes. Ms. Tirado simultaneously realized that her goggles had been shattered by a projectile, and began crying out "*I'm press! I'm press!*" She stood there, blinded and

bleeding.  No law enforcement personnel tried to help her or attempted to provide aid.

8.      After several minutes, protestors assisted her and brought her to the medics on site.  After receiving a bandage from the medics, Ms. Tirado was transported to a local hospital.  Upon arrival, Ms. Tirado went into surgery.  When she awoke from surgery, the doctors told her that she was now permanently blind in her left eye.

9.      Whatever one's view of police conduct in relation to the protestors, and of protestors' actions, there can be no doubt that under the United States Constitution and the First Amendment, the police must not shoot journalists reporting on civil protests.  Journalists, like Linda Tirado, cover the protests and capture any tactics employed by law enforcement.  If the press is silenced, the story does not get amplified, and nobody can see the police violence committed against citizens for exercising their First Amendment rights to freedom of speech, freedom of press, and freedom to peacefully assemble.  What is more, the public could not learn about any incidents of law enforcement's deliberate use of excessive force in violation of the Fourth Amendment.  Indeed, the Governor himself recognized that the people of Minneapolis who were exercising their First Amendment rights to protest could rightfully assume that, "if they see a reporter being arrested . . . it's because something's going to happen that they don't want to be seen.  And so that

is unacceptable." Law enforcement must face repercussions for blinding the very people they are supposed to protect.

10. Accordingly, Linda Tirado is entitled to a declaration from the Court to enjoin Defendants[1] from furthering their custom and practice of using excessive force to stifle coverage of the protests, along with punitive and compensatory damages for law enforcement's egregious conduct.

## PARTIES

11. Plaintiff Linda Tirado, also known as Linda Eaton, is a resident of Tennessee, who works as a freelance journalist for international and national media publications.

12. Defendant City of Minneapolis is a municipality incorporated in the State of Minnesota.

13. Defendant Medaria Arradondo is a resident of Minnesota. Arradondo serves as the Minneapolis Chief of Police for the Minneapolis Police Department.

---

[1] City of Minneapolis, Minneapolis Chief of Police Medaria Arradondo, Minneapolis Police Lieutenant Robert Kroll, Minnesota Department of Public Safety Commissioner John Harrington, and Minnesota State Patrol Colonel Matthew Langer acting in their official capacities, are collectively referred to herein as "State and Municipal Defendants." "Defendants" include the State and Municipal Defendants, as well as John Does 1-4, in their individual and official capacities.

14.     Defendant Robert Kroll is a resident of Minnesota.  Kroll serves as the Lieutenant of the Minneapolis Police Department and the president of the Minneapolis Police Federation.

15.     Defendant John Harrington is a resident of Minnesota.  Harrington serves as the Minnesota Commissioner of Public Safety with supervisory responsibility over Colonel Matthew Langer and the Minnesota State Patrol.

16.     Defendant Colonel Matthew Langer is a resident of Minnesota.  Langer commands the Minnesota State Patrol.

17.     Defendants John Does are unidentified individuals who committed the acts set forth below, including as agents of Defendants City of Minneapolis and Minnesota State Patrol.

## JURISDICTION

18.     Pursuant to 28 U.S.C. § 1331, this Court has original jurisdiction over this matter, which arises under 42 U.S.C. § 1983.

## BACKGROUND

## I.     MR. GEORGE FLOYD IS KILLED BY MINNEAPOLIS POLICE AND THE PUBLIC RESPONDS

19.     On May 25, 2020, Mr. George Floyd, a 46-year-old black man, died in Minneapolis, Minnesota after Minneapolis Police Officer Derek Chauvin rested his knee on Mr. Floyd's neck and upper back until long after Mr. Floyd lost consciousness.  In addition to Officer Chauvin, former Minneapolis Police Officers

Thomas Lane and J. Alexander Keung continued to pin Mr. Floyd to the ground, ignoring the sixteen times Mr. Floyd cried "I can't breathe" before losing consciousness.[2]

20.    While Officer Chauvin and the two other officers ensured that the unconscious Mr. Floyd could not move, a third Minneapolis Police Officer, Tou Thao, kept a watchful eye on the individuals recording Officer Chauvin killing Mr. Floyd.

21.    During the eight minutes and forty-six seconds that Officer Chauvin was killing Mr. Floyd, a small number of people began to gather and attempted to de-escalate Officer Chauvin by telling Officer Chauvin to "Get off of him!" and asking "Did they [expletive] kill him, bro?"   The group of observers also recorded the interaction.   At one point, in apparent fear of young adults with recording devices, Officer Chauvin reached for his mace and pointed it towards the observers.   A little over twenty minutes into the arrest, Mr. Floyd was loaded into an ambulance.   Mr. Floyd was pronounced dead at a nearby hospital around 9:25 pm.

---

[2] Evan Hill et al., *8 Minutes and 46 Seconds: How George Floyd Was Killed in Police Custody*, NY Times, June 8, 2020, https://www.nytimes.com/2020/05/31/us/george-floyd-investigation.html.

22.     Video recordings of Officer Chauvin's killing of Mr. Floyd soon went viral, and were spread across social media platforms and played on primetime network as breaking news.

23.     Protests ignited across the United States.   Eventually, at least one protest occurred in every state in the country.[3]   The protests even spread internationally, as citizens of other countries began to protest in solidarity with the Black Lives Matter movement.[4]   All four officers involved were fired by the Minneapolis Police Department.   On May 29, 2020, Officer Chauvin was charged with third-degree murder and second-degree manslaughter.   On June 3, 2020, the charge against Officer Chauvin was elevated to second-degree murder.   On that same day, Officers Lane, Keung, and Thao were charged with aiding and abetting murder.[5]

24.     The protests against police brutality only seemed to grow in size over the next several days, which correspondingly attracted additional attention from the

[3] Jiachuan Wu et al., *Map: Protests and rallies for George Floyd spread across the country*, NBC News, June 6, 2020, https://www.nbcnews.com/news/us-news/map-protests-rallies-george-floyd-spread-across-country-n1220976.
[4] Damien Cave et al., *Huge Crowds Around the Globe March in Solidarity Against Police Brutality*, NY Times, June 8, 2020, https://www.nytimes.com/2020/06/06/world/george-floyd-global-protests.html.
[5] *George Floyd death: New charges for all four sacked officers*, BBC, June 6, 2020, https://www.bbc.com/news/world-us-canada-52915019.

media, which, in turn, led to more on the ground journalists covering the story of the protests.

25.     Minneapolis in particular is experiencing a surge in protests and press coverage, as thousands flock to the scene of the crime.

## II.     GOVERNOR WALZ IMPOSES A CURFEW EXEMPTING THE PRESS

26.     In response to the growing tensions between law enforcement and the protestors and the press, the Governor signed Executive Order 20-64, and declared a peacetime state of emergency which activated the National Guard.[6]  The National Guard confirmed that more than 500 soldiers would respond to Minneapolis, St. Paul, and surrounding communities.[7]

---

[6] Emergency Executive Order 20-64, Activating the Minnesota National Guard and Declaring a Peacetime Emergency to Provide Safety and Protection to the People of Minneapolis, St. Paul, and Surrounding Communities, May 28, 2020, https://mn.gov/governor/assets/EO%2020-64%20Final_tcm1055-433855.pdf.
[7] *Over 500 National Guard soldiers activated to amid protests regarding George Floyd's death; Frey declares a state of emergency in Minneapolis*, KTSP News, May 28, 2020, https://kstp.com/news/minnesota-national-guard-activated-to-control-protests-following-george-floyds-death/5743967/.

27.   Over the next few days, the Governor issued a series of executive orders, on May 29,[8] May 31,[9] June 1,[10] and June 3,[11] all implementing curfews for the cities of Minneapolis and St. Paul (the "Executive Orders").

28.   Notably, each of the Executive Orders exempted "[*a*]*ll...members of the news media*" from the nighttime curfew prohibiting persons from travel on any public street or place.

29.   Upon information and belief, there is no system in place for members of the media to apply for or obtain official credentials from the State of Minnesota and the Minneapolis Police Department.

---

[8] Emergency Executive Order 20-65, Implementing a Temporary Nighttime Curfew in the Cities of Minneapolis and Saint Paul, May 29, 2020, https://mn.gov/governor/assets/EO%2020-65%20Final_tcm1055-434635.pdf.

[9] Emergency Executive Order 20-68, Extending the Temporary Nighttime Curfew in the Cities of Minneapolis and Saint Paul, May 31, 2020, https://mn.gov/governor/assets/EO%2020-68%20Final_tcm1055-434305.pdf.

[10] Emergency Executive Order 20-69, Extending the Temporary Nighttime Curfew in the Cities of Minneapolis and Saint Paul, June 1, 2020, https://mn.gov/governor/assets/EO%2020-69%20Final_tcm1055-434605.pdf.

[11] Emergency Executive Order 20-71, Extending the Temporary Nighttime Curfew in the Cities of Minneapolis and Saint Paul, June 3, 2020, https://mn.gov/governor/assets/EO%2020-71%20Final_tcm1055-434632.pdf.

## III.   DEFENDANTS' DELIBERATE INDIFFERENCE TO THE VIOLATIONS OF THE CONSITUTIONAL RIGHTS OF THE MEMBERS OF THE PRESS

30.   Defendants did not welcome the press with open arms.  In fact, there is a growing concern that there are superior orders for law enforcement to target mainstream media.[12]

31.   As tensions escalated in Minneapolis, and coverage of law enforcement misdoings began to grow, Minneapolis Police Department and Minnesota State Patrol did not hesitate to respond by attacking the press through arrests and the deployment of tear gas and less-lethal projectiles.  When doing so, they did not provide warnings.

32.   On May 26, 2020 (three days before Plaintiff was blinded with the projectile), in widely-publicized incidents, other journalists were struck by projectiles by Minneapolis Police officers while covering protests in Minneapolis.[13]  Andy Mannix, the federal courts reporter for the Star Tribune, was shot in the thigh

---

[12] Kenneth Li, *Open Season on the Free Press: Journalists Targeted in Attacks as U.S. Protests Rage*, Reuters, May 31, 2020, https://www.reuters.com/article/us-minneapolis-police-protests-press/open-season-on-the-free-press-journalists-targeted-in-attacks-as-u-s-protests-rage-idUSKBN2370T5; Marc Tracy & Rachel Abrams, *Police Target Journalists as Trump Blames 'Lamestream Media' for Protests*, NY Times, June 1, 2020, nytimes.com/2020/06/01/business/media/reporters-protests-george-floyd.html.

[13] *Journalists struck by projectiles while covering Minneapolis protest*, U.S. Press Freedom Tracker, May 26, 2020, https://pressfreedomtracker.us/all-incidents/journalists-struck-projectiles-while-covering-minneapolis-protest/.

with a projectile.  He was leaning against a tree a block away from a police precinct attempting to post a video to Twitter when he was hit,[14] and tweeted at 8:00 pm that evening a photograph of the object with the caption "I was just shot with this in the thigh." That tweet was retweeted over 1,000 times.[15]  The next day he posted a photo of the large bruise on his thigh, which was retweeted over 11,000 times.[16] His story was picked up by Time Magazine and covered in an online article dated May 27, 2020, two days before Plaintiff was injured.[17]  "Another unidentified journalist carrying a camera was struck multiple times in the throat by an officer carrying a baton despite being identified to officers as a reporter."[18]  The City of Minneapolis and supervisory officials at its police department were on notice of these pre-existing violations of journalists' constitutional rights before Plaintiff was

---

[14] *Id.*

[15] Andrew Mannix (@AndrewMannix), Twitter, (May 26, 2020 8:00 pm), https://twitter.com/AndrewMannix/status/1265447846079315973.

[16] Andrew Mannix (@AndrewMannix), Twitter, (May 27, 2020 5:25 pm), https://twitter.com/AndrewMannix/status/1265756101057957890.

[17] Mahita Gajanan, *Minneapolis Police Fire Tear Gas, Rubber Bullets as Crowds Protesting George Floyd Killing*, Time Magazine, May 27, 2020 at https://time.com/5843070/george-floyd-minneapolis-protest-police-death/ ("A Minneapolis Star Tribune reporter said he was shot in the thigh with what appeared to be a foam bullet.").

[18] May 26, 2020 U.S. Press Freedom Tracker, *supra* note 12.

blinded by the projectile, in time to have prevented it from happening through appropriate supervision and training.

33.     On May 27, 2020 (two days before Plaintiff was hit with the projectile), "[t]wo journalists were shot with crowd control ammunition, or less lethal rounds fired by police, at different times of the day in Minneapolis, Minnesota."[19]   One of the two journalists hit in the eye was freelance journalist Jared Goyette.[20]   On May 27, 2020 at 6:27 pm, he tweeted a photo of his facial injuries with the caption "I got hit in the eye and then tear gassed."[21]   The same evening at 11:32 pm, Reporter Max Nesterak of the Minnesota Reformer news organization tweeted "I got hit in the chest by a rubber bullet from police."[22]   The timing of these incidents and their circumstances reflect that the actions were taken by Minneapolis Police officers.

34.     On May 29, 2020, Omar Jimenez, a CNN reporter, was "reporting in front of a line of Minnesota state police" regarding the protests.   The "scene was calm . . . [w]hich made what happened next bizarre."   Mr. Jimenez "was arrested on

---

[19] *Journalists hit with 'less lethal' rounds during second day of Minnesota protests*, U.S. Press Freedom Tracker, May 27, 2020, https://pressfreedomtracker.us/all-incidents/journalists-hit-less-lethal-rounds-during-second-day-minnesota-protests/.

[20] May 27, 2020 U.S. Press Freedom Tracker, *supra*.

[21] Jared Goyette (@JaredGoyette), Twitter,    (May 27, 2020 6:27 pm), https://twitter.com/JaredGoyette/status/1265786797650558976.

[22] Max Nesterak (@MaxNesterak), Twitter, (May 27, 2020 11:32 pm), https://twitter.com/maxnesterak/status/1265863514754813952.

the job" by the state police, even after asking why he was under arrest and offering to record in a different location."[23]

35.    The City of Minneapolis and supervisory officials at its police department were on notice of these pre-existing violations of journalists' constitutional rights before Plaintiff was blinded by the projectile, in time to have prevented it from happening through appropriate supervision and training.  Indeed, in its May 27, 2020 account, U.S. Press Freedom Tracker stated, "[t]he Minneapolis Police Department did not immediately respond to the U.S. Press Freedom Tracker's request for comment."[24]

36.    Minnesota law enforcement has a history of unconstitutional actions toward journalists seeking to report on protests regarding deaths caused by police.

37.    On August 17, 2017, the Minnesota State Patrol jailed and charged journalists Susan Du of City Pages and David Clarey of the Minnesota Daily during the protests following the Philando Castile killing.[25]    Both were swept up

---

[23] Paul Farhi, *Never seen anything like this': A CNN journalist's arrest on live television shocks nation and inflames racial wounds*, The Washington Post, May 29, 2020, https://www.washingtonpost.com/lifestyle/media/cnn-reporter-arrested-omar-jimenez-minneapolis/2020/05/29/90832de6-a1cc-11ea-b5c9-570a91917d8d_story.html.

[24] May 27, 2020 U.S. Freedom Press Tracker, *supra* note 18.

[25] *Journalists Arrested*, 2017 WLNR 19368214, Minneapolis Star Tribune at 8A, (June 18, 2017); Bella Dally-Steele, *Journalists among those arrested as Castile rally*, Minnesota Daily, June 8, 2020, https://www.mndaily.com/article/2017/06/journalists-among-those-arrested-at-

indiscriminately as part of an effort by the Minnesota State Patrol to round up and jail those present at the scene of the protest.  They were handcuffed, taken to Ramsey County jail, booked, and charged with unlawful assembly and being a public nuisance.  Du's laptop, keys, and other equipment were seized.  The State Patrol detained Du and Clarey for more than eight hours.  On information and belief, no troopers were investigated or disciplined for these unlawful arrests.  The Minnesota State Patrol and supervisory officials at its police department were on notice of these pre-existing violations of journalists' constitutional rights before Plaintiff was blinded by the projectile, in time to have prevented it from happening through appropriate supervision and training.

38.    Defendants' actions against the press have also included, but have not been limited to, arresting a veteran WCCO-TV cameraman while covering the protest; hitting a CBS photographer with a projectile, forcing them to the ground and into custody; firing tear gas at a group of journalists near the Fifth Precinct at "point blank range"; and separately hitting another sound engineer with a rubber bullet, who was reporting 500 feet away from demonstrators, with their press

---

castile-rally; *Student Journalist arrested while covering protest in Minnesota*, https://pressfreedomtracker.us/all-incidents/student-journalist-arrested-while-covering-protest-minnesota/ (published July 28, 2017); *Minnesota journalist arrested while covering protest*, https://pressfreedomtracker.us/all-incidents/minneapolis-journalist-arrested-while-covering-protest/ (published July 28, 2017).

credentials displayed.[26]  To explain this pattern of behavior, Defendant "Col. Matt Langer, chief of Minnesota State Patrol, said officers working under the orders of the governor, were trying to function in a 'dynamic, dangerous situation,' wearing heavy gear and helmets, with bottles of gas or urine and other things being thrown at them."[27]  Langer added that their use of less-lethal projectiles and tear gas "aren't particularly pretty actions that we take."[28]

39.     In April 2002, Minneapolis Police Department officers used excessive force against journalists after a victory celebration became a riot at or near the University of Minnesota campus.   Mike Wereschagin, then the editor of the Minnesota Daily, said one Minnesota Daily reporter and three of its photographers were singled out and sprayed with a chemical irritant, and that Minneapolis police hit them with batons.  As he explained at the time, "journalists were being targeted as if [they had] thrown a bottle at police officers.'"  "They were taking pictures and notes, talking to people; just doing their jobs," and "they were stopped from doing

---

[26] Torey Van Oot, *Media members injured, one arrested while covering unrest in Minnesota*, Star Tribune, June 6, 2020, https://www.startribune.com/wcco-cameraman-arrested-on-video-while-covering-unrest-in-minnesota/570902742/?refresh=true.

[27] Patrick Condon, *Massive show of force in Minneapolis, St. Paul shifts momentum on streets*, June 6, 2020, https://www.heraldmailmedia.com/news/nation/minn-governor-praises-citizens-help-in-stemming-twin-cities-violence/article_cc665f98-ae48-524e-ac62-a6bc77f94058.html.

[28] *Id.*

their jobs by police officers." The City's mayor, and its police chief, were on actual notice of this because they met with Wereschagin about these incidents.[29] The complaint filed by the newspaper with the Minneapolis Police's Internal Affairs Department also indicated that two photographers had press passes displayed in the middle of their chests, and others told police officers they were members of the press. On information and belief, none of the officers involved in this conduct were disciplined pursuant to this investigation.

40.     Driving home the impression that the Minneapolis Police Department members are openly hostile to members of the news media and their coverage of the Department, Defendant Lt. Bob Kroll, Head of the Minneapolis Police Union released a statement on June 2, 2020 to Federation members that states: "I've noted in press conferences from our mayor, our governor, and beyond, how they refuse to acknowledge work of MPD and continually shift blame to it. It is despicable behavior. How our command staff can tolerate it and live with themselves I do not know."[30]

---

[29] Chris Graves, Mary Jane Smetanka, "Growing fire drove chief's order to act," at Minneapolis Star Tribune, at A1, 2002 WLNR 12194995 (Apr. 9, 2002); Chris Graves, "5 charged in hockey celebration melee," Minneapolis Star Tribune, at 2B, 2002 WLNR 12195226 (Apr. 10, 2002); Rochelle Olson, "City reviewing use of force by police," Minneapolis Star Tribune at 1b, 2002 WLNR 12195426 (Apr. 11, 2002).

[30] Libor Jany (@StribJany), Twitter, (June 1, 2020 11:02 AM), https://twitter.com/StribJany/status/1267471624397361162?s=20.

41.     In a press conference in April 2020, upon being told that he and a majority of the Minneapolis Police Officers' Federations board have been involved in police shootings, Defendant Kroll responded that he's "been involved in three shootings . . . and not one of them" has bothered him.   He adds, "maybe I'm different."   Defendant Kroll clocked at least twenty internal affairs complaints during his three decades in the Minneapolis Police Department.   All but three were closed without discipline.[31]

42.     In addition to this disrespect for the U.S. Constitution, Defendants also flagrantly disregard their own rules and regulations to further their violations against members of the press.   The Minneapolis Police Department's use of force policy specifically states that "[o]fficers shall not deploy 40mm launchers for crowd management purposes."   The use of force policy also advises that where the 40mm launchers are deployed, the head should be avoided and "unless deadly force is justified, officers should avoid the delivery of 40mm impact projectiles[.]"[32]   Ms. Tirado experienced first-hand Defendants' indifference to this policy.

---

[31] Ryan Grim & Aida Chavez, *Minneapolis Police Union President: "I've Been Involved in Three Shootings Myself and Not A One of Them Has Bothered Me"*, June 6, 2020, https://theintercept.com/2020/06/02/minneapolis-police-union-bob-kroll-shootings/.
[32] Police Department, Police & Procedure Manual, 5-300 Use of Force, June 6, 2020, http://www.minneapolismn.gov/police/policy/mpdpolicy_5-300_5-300.

## IV.   LESS-LETHAL PROJECTILE FIRED BY LAW ENFORCEMENT BLINDS TIRADO

<u>MS. TIRADO'S EXPERIENCE DURING PROTEST</u>

43.     On May 29, 2020, the first night of the curfew, Ms. Tirado ventured out in the early evening to observe the protests.  She was clearly identifiable as a member of the news media.  Ms. Tirado had her press credential around her neck, a black backpack, and was carrying her professional-grade Nikon camera and lens. Throughout the day, she interacted with many of the protestors, who often inquired what news outlet she was with.  Ms. Tirado also was wearing her respirator and goggles, which protestors do not ordinarily wear.

44.     After ensuring that her press credential was displayed, and securing her respirator and goggles, Ms. Tirado darted in the direction of the Minneapolis Police Department's Third Precinct, which had been headquartered at the intersection of Lake Street and Minnehaha Avenue.

45.     Approximately fifteen minutes prior to the beginning of the curfew, Ms. Tirado heard protestors screaming that law enforcement was employing tear gas.  There was no initial dispersal order from law enforcement that was audible to the protestors.

46.     The protestors did not have weapons, but they occasionally threw water bottles at law enforcement.  In response to being pelted with water bottles

and chanting, the officers became progressively more aggressive in their tactics with the protestors and news media.

47.    Approximately ten or thirty minutes after curfew, she stepped in front of the protesting crowd to begin setting up her shot of the police lineup.  As Ms. Tirado aimed her camera at the police officers, she was hit with a less-lethal projectile on the left side of her face that came from the direction of the police lineup in front of her. [33]  Ms. Tirado instantly felt blood rushing down her face and tear gas in her eyes.  Realizing that her goggles had slipped from her face, she quickly squeezed her eyes shut.

48.    Upon seeing that Ms. Tirado was in need of medical attention, protestors assisted her in reaching the medic.  The medics put a bandage on Ms. Tirado's left eye, and eventually coordinated her transportation to the hospital.

49.    Ms. Tirado realized at the hospital that at some point during the protest her backpack had been hit with a ballistic tracking round.  It is a standard counter-protest policing tactic to mark protestors with a ballistic tracking round when they are making an individual arrest.

50.    Below is an image of Ms. Tirado's backpack after being marked with the ballistic tracking round, as well as her Nikon camera lens.

---

[33] Such action may have been performed recklessly, negligently, without proper regard, or even possibly intentionally.

21



MS. TIRADO'S MEDICAL CONDITION

51.     Ms. Tirado was quickly sent into surgery upon entering the hospital. As a direct result of the less-lethal projectile hitting her face, Ms. Tirado was told by doctors that she is now permanently blind in her left eye.  In connection with her injury, she now has a flat aspect and no depth perception.

52.     Below is an image of Ms. Tirado's injuries after law enforcement hit her with a less-lethal projectile.



53.     Since leaving the hospital, Ms. Tirado has also become aware of decreased hearing in her left ear, and plans to visit the doctor to get a hearing test.

<u>MS. TIRADO'S OUTLOOK</u>

54.     Being blind in her left eye has permanently altered Ms. Tirado's life. Because she must continue to heal and learn to adapt to a new way of life, Ms. Tirado

does not anticipate returning to anything approaching her usual work life for at least six months.  Ms. Tirado is considering therapy to assist with these adjustments.

55.     The majority of her journalistic works have been at flash points in situations involving civil unrest and potential violence, and, in the longer term, Ms. Tirado is no longer confident that she will have the ability to engage in this work now that half of her field of vision is gone.  For instance, she is concerned she would not be able to see an oncoming vehicle in her left field of vision.[34]

56.     Due to her injury, Ms. Tirado does not plan to return to Minneapolis to cover the current protests.  She is not medically cleared to visit the protests because the tear gas utilized by law enforcement is a chemical irritant, and may further damage her eye.  This condition may be chronic.  Ms. Tirado is considering returning to Minneapolis to cover the aftermath of the protests.

57.     Ms. Tirado is a mother of two, and this injury will have a long-term effect on her children.  Ms. Tirado's oldest child, nine, is autistic and will need therapy to work through her trauma associated with her mother's injury.  The youngest child, seven, may also need therapy.

---

[34] Phil Helsel, *Large Truck Drives Through Crowd of Protestors in Minneapolis*, June 6, 2020, https://www.nbcnews.com/news/us-news/large-truck-drives-through-crowd-protesters-minneapolis-nl220586.

## FIRST CAUSE OF ACTION

### *42 U.S.C. § 1983 – First Amendment Free Speech, Free Press, Free Assembly*

58.    Plaintiff restates and realleges paragraphs 1-57 as if fully set forth herein.

59.    Plaintiff was lawfully exercising her First Amendment rights to free press, speech and the right to peacefully assemble.  She was reporting on matters of public concern, including the protests and the responses by the police department.

60.    Plaintiff repeatedly informed Defendants of her press membership and wore her press credentials to differentiate herself from the protestors.

61.    Defendants used excessive force against Plaintiff to prevent her coverage of the matters of public concern.  The repeated use of excessive force targeting Plaintiff, as a member of the press, violated her right to engage in constitutionally protected activities.

62.    Plaintiff, while wearing her press credentials and professional camera and lawfully engaging in the right to report on the protests and law enforcement, was shot by Defendants with a less-lethal projectile in her left eye.  Defendants' use of excessive force violated Plaintiff's constitutional rights.

63.    Defendants acted under color of law.  Defendants acted with deliberate indifference to the constitutional rights of the members of the press as evidenced by the recurring use of excessive force against them, chilling the press' ability to cover

the matters of public concern, including law enforcement's tactics during the protests.

64.     State and Municipal Defendants have a custom and practice of targeting members of the press using excessive force, such as firing less-lethal projectiles and tear gas while at close range, interfering with the constitutional right to record the protests and law enforcement tactics.  A pre-existing pattern of such violations put State and Municipal Defendants on notice that a course of training or supervision was deficient in a particular respect. The State and Municipal Defendants failed to supervise, train and correct this wrongful conduct.  This custom and practice was the moving force behind the constitutional violations.

65.     This custom and practice evidences State and Municipal Defendants' deliberate indifference to the violations of the constitutional rights of members of the press.

66.     Defendants' unlawful use of excessive force was willful and recklessly indifferent to the constitutional rights of Plaintiff as evidenced by the repeated violations of the constitutional rights of Plaintiff and other members of the press that circulated across international and national media publications.

67.     Plaintiff suffered physical injury as a direct and proximate result of Defendants' violations of her First Amendment rights.

68.     Defendants are jointly and severally liable to Plaintiff.

## SECOND CAUSE OF ACTION

### *42 U.S.C. § 1983 – First Amendment Retaliation*

69.    Plaintiff restates and realleges paragraphs 1-68 as if fully set forth herein.

70.    Plaintiff was engaged in the lawful exercise of the constitutional right to attend, record, and report on matters of public concern.  Plaintiff recorded the Mr. George Floyd protests and the police tactics employed in response thereto.

71.    Defendants retaliated against Plaintiff and other members of the press by use of excessive force in response to the exercise of their constitutional rights. Defendants lacked probable cause to use such force against Plaintiff and other members of the press.

72.    Plaintiff will continue to observe and record the protests, the response of law enforcement, or any aftermath.

73.    Defendants followed a custom and practice of retaliation against Plaintiff's exercise of her constitutional rights that will continue without intervention by this Court.

74.    Plaintiff's constitutional rights were violated when Defendants, despite Plaintiff's easily recognizable actions as a journalist and identifiable press credentials, fired a less-lethal projectile that blinded Plaintiff in her left eye and dispersed chemical irritants.  Plaintiff reasonably fears the continued violation of her constitutional rights by the Defendants.

75.     Defendants' use of excessive force, including the shooting of less-lethal projectiles and dispersal of chemical irritants, would chill a person of ordinary firmness from continuing to exercise their First Amendment rights.  These acts did chill the Plaintiff from exercising her constitutional rights.

76.     Defendants acted under color of law.  Defendants acted with reckless indifference to the federally protected rights of Plaintiff.

77.     State and Municipal Defendants have a custom and policy of targeting members of the press using excessive force, including but not limited to less-lethal projectiles, without justification or warning to prevent freedom of movement and deny the right to record, and in response to the exercise of their constitutional rights.  A pre-existing pattern of such violations put State and Municipal Defendants on notice that a course of training or supervision was deficient in a particular respect.  The State and Municipal Defendants failed to supervise, train and correct this wrongful conduct.  This custom and practice was the moving force behind the constitutional violations.

78.     State and Municipal Defendants were deliberately indifferent to Defendants' recurring violations of the constitutional rights of Plaintiff.  The injuries suffered by members of the press as a result of Defendants' use of force received widespread media coverage.  Yet, the State and Municipal Defendants failed to

adopt any measures to address these violations and failed to supervise, train and investigate and discipline such behavior.

### THIRD CAUSE OF ACTION

*42 U.S.C. § 1983 – Fourth Amendment Use of Excessive Force*

79.     Plaintiff restates and realleges paragraphs 1-78 as if fully set forth herein.

80.     Defendants' use of the aforementioned tactics against nonviolent, readily identifiable members of the press, such as firing less-lethal projectiles, violated the Fourth Amendment rights of Plaintiff.

81.     Defendants' use of excessive force against Plaintiff, without warning or dispersal order, prevented her freedom of movement and the exercise of her constitutional rights.  The Executive Order exempted Plaintiff and other members of the press from the curfew.  Plaintiff was not posing a threat to the safety of Defendants or others, had not committed any severe or violent crime, and was neither actively resisting arrest nor attempting to evade arrest by flight.  In light of the relationship between the need, if any, for the use of force to the amount of force used, the extent of the injuries to Plaintiff, the inadequacy of the efforts, if any, by Defendants to temper or limit the amount of force used against members of the press, the absence of a security problem posed by Plaintiff, the absence of conduct from Plaintiff that was capable of being reasonably perceived by Defendants as a threat, and the absence of efforts by Defendants to arrest Plaintiff met with active

resistance, the Defendants' use of excessive force against Plaintiff was objectively unreasonable.

82.    Defendants acted under color of law.

83.    Defendants' actions constituted an unlawful seizure in violation of Plaintiff's Fourth Amendment rights.

84.    The State and Municipal Defendants have a custom and practice of targeting members of the press, who lawfully cover the Mr. George Floyd protests, by utilizing excessive force, such as firing less-lethal projectiles, without justification or warning.  State and Municipal Defendants failed to supervise, train and correct the use of objectively unreasonable force against members of the press even after reports of this violative conduct circulated.  A pre-existing pattern of such violations put State and Municipal Defendants on notice that a course of training or supervision was deficient in a particular respect.  The State and Municipal Defendants failed to supervise, train and correct this wrongful conduct.  This custom and practice was the moving force behind the constitutional violations.

85.    The recurring unlawful seizures and use of excessive force against members of the press covering the Mr. George Floyd protests evidences that the Defendants acted with deliberate indifference to the constitutional rights of Plaintiff.  Defendants' failure to train, supervise or discipline regarding the Fourth Amendment rights, even after the constitutional violations came to light also

evidences the deliberate indifference of the State and Municipal Defendants described above.

86.    Defendants violated Plaintiff's Fourth Amendment rights by shooting a less-lethal projectile at Plaintiff, without forewarning, while Plaintiff lawfully recorded the Mr. George Floyd protests.

87.    Defendants willfully engaged in the unconstitutional conduct.

88.    As direct and proximate result of Defendants' violations of Plaintiff's constitutional rights, Plaintiff has suffered physical injury.

89.    Plaintiff reasonably fears further violations of her Fourth Amendment rights in the future if she continues to provide media coverage of the protests and its aftermath.

## FOURTH CAUSE OF ACTION

*42 U.S.C. § 1983 – Civil Conspiracy to Violate Plaintiff's Constitutional Rights*

90.    Plaintiff restates and realleges paragraphs 1-89 as if fully set forth herein.

91.    Defendants conspired, under color of law, to deprive Plaintiff her First and Fourth Amendment rights.

92.    Defendants acted in concert and committed overt acts in furtherance of the conspiracy.  Defendants targeted members of the press and repeatedly utilized excessive force to interfere with their exercise of the constitutionally protected right to record the protests and law enforcement response.

31

93.     Defendants did, in fact, violate Plaintiff's First and Fourth Amendment rights by using excessive force to stifle her ability and right to record police activity during the protests.  Plaintiff, while attempting to record law enforcement activity during the protests, was shot in the left eye by a projectile.  Plaintiff was prevented from continuing her recording of the protests and law enforcement.

94.     Defendants acted with deliberate indifference to the constitutional rights of Plaintiff as evidenced by the recurring constitutional violations by law enforcement against her and other members of the press.

95.     Plaintiff suffered physical injury as a direct and proximate result of Defendants' conspiracy to violate her constitutional rights.

96.     Plaintiff reasonably fears that Defendants will further conspire to violate her constitutional right to record the protests and law enforcement response in the future.

## FIFTH CAUSE OF ACTION

### *State Law Claim - Assault*

97.     Plaintiff restates and realleges paragraphs 1-96 as if fully set forth herein.

98.     Defendants' use of excessive, unprovoked, unreasonable force to prevent Plaintiff from exercising her constitutional rights was intended to cause imminent harmful and offensive contact.

99.     Plaintiff had a reasonable apprehension and fear that firing the less-lethal projectile would and did occur.

100.     Defendants had the apparent ability to cause Plaintiff harm. Defendants' actions were unlawful and unjustified.

101.     As a direct and proximate result of these actions, Plaintiff suffered physical injury.

## SIXTH CAUSE OF ACTION

### *State Law Claim - Battery*

102.     Plaintiff restates and realleges paragraphs 1-101 as if fully set forth herein.

103.     Defendants intentionally caused harmful or offensive contact with Plaintiff by using excessive force to prevent Plaintiff from exercising her constitutional rights.  Defendants fired a less-lethal projectile, blinding Plaintiff in her left eye.

104.     As a direct and proximate result of Defendants' actions, Plaintiff suffered physical injury.

## PRAYER OF RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

1.  A declaration that Defendants' use of excessive force against Plaintiff, preventing media coverage of the Mr. George Floyd protests and law enforcements' response violated the First and Fourth Amendments;

2. A declaration that Defendants' use of excessive force to violate the constitutional rights of Plaintiff is unconstitutional;

3. Permanently enjoining Defendants from engaging in the use of excessive force against Plaintiff in violation of her constitutional rights;

4. Damages compensating Plaintiff for her injuries against all Defendants, jointly and severally;

5. Punitive damages;

6. Prejudgment interest;

7. Reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

8. Such other further relief as this Court may deem just and proper.

Dated:  June 10, 2020          **GREENE ESPEL PLLP**


   s/ John M. Baker
Clifford M. Greene, Reg. No. 0037436
John M. Baker, Reg. No. 0174403
Davida S. McGhee, Reg. No. 0400175
222 S. Ninth Street, Suite 2200
Minneapolis, MN  55402
(612) 373-0830
cgreene@greeneespel.com
jbaker@greeneespel.com
dwilliams@greeneespel.com

-and-

Tai-Heng Cheng (*pro hac vice* pending)
Margaret Hope Allen (*pro hac vice* pending)
Patricia Butler (*pro hac vice* pending)
Kierstin S. Fowler (*pro hac vice* pending)
**SIDLEY AUSTIN LLP**
787 Seventh Avenue
New York, NY 10019
(212) 839-5661
tcheng@sidley.com
margaret.allen@sidley.com
pbutler@sidley.com
kfowler@sidley.com

*Attorneys for Plaintiff Linda Tirado*

35