IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| Linda Tirado, | Case No. 0:20-cv-01338-JRT-ECW |
| Plaintiff, | **FIRST AMENDED COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| City of Minneapolis; Minneapolis Chief of Police Medaria Arradondo, *in his official capacity*; Robert Kroll, *in his individual capacity*; and Minneapolis Police Department Officers John Does 1-4, *in their official and individual capacities*, | |
| Defendants. | |

## INTRODUCTION

1. Plaintiff Linda Tirado is an internationally renowned journalist who is now completely blinded in one eye. She lost her sight because officers of the Minneapolis Police Department shot her as she documented protests against the police killing of George Floyd. In the early morning hours of Saturday, May 30, 2020, Ms. Tirado stepped in front of a protesting crowd and aimed her professional Nikon camera to photograph the police line. Ignoring the press credential she wore around her neck and other indications that she was a journalist and not a protestor,

police shot her in the face with a foam bullet and marked her with a ballistic tracking round.  With blood dripping down her face, she cried out repeatedly, "I'm press!" while immediately placing her hands in the air, but the police ignored her.  By the time protestors got her to the hospital, Ms. Tirado's left eye was permanently destroyed.

2.     Until recently, few Americans could have imagined police officers shooting at journalists in the act of reporting.  The dark irony of this brutal police attack on the free press is made all the more grim because the media played a key role in bringing the horrific killing of George Floyd to the attention of all Americans. At issue in this case is Ms. Tirado's irreparable injury, the protections owed the media when journalists report on Americans exercising their free speech rights through protests, and what orders were given to the police officers who targeted Ms. Tirado as part of a policy and custom of targeting reporters covering the George Floyd protests.

3.     On May 25, 2020, Minneapolis Police Department Officer Derek Chauvin pinned George Floyd—an unarmed black man who was becoming increasingly immobile, unresponsive, and eventually unconscious—to the ground with his knee on Mr. Floyd's neck.  Two other Minneapolis Police Department officers continued to hold Mr. Floyd down, and a third Minneapolis Police Department officer stood by to ensure that those recording the altercation did not

interfere with Officer Chauvin's killing of Mr. Floyd.  Mr. Floyd pleaded for his life, gasping: "*I can't breathe*."  Eight minutes and forty-six seconds later, George Floyd died in the custody of the Minneapolis Police Department.

4.    After a citizen recording of George Floyd's killing spread across the world, protests against police brutality occurred and are still occurring across the country.  Members of the press have been working to cover these protests and are risking their lives to do so.  In a counterproductive approach, various States and the District of Columbia have responded to their citizens' complaints about police brutality by state sanctioned increased police presence, which effectively facilitated more acts of police brutality, including against the press.  In response to building tensions in the Twin Cities, the Governor of the State of Minnesota, Tim Walz, activated the Minnesota National Guard on May 28, 2020.  By 11:30 pm on May 28, 2020, the Minnesota State Patrol announced that its troopers and Department of Natural Resources Conservation officers were actively supporting efforts in Minneapolis and St. Paul.  The next day, the Governor imposed a nighttime curfew in Minneapolis and St. Paul, and later extended the curfew through the morning of June 5, 2020.  The curfew prohibited persons from traveling on any public street or any public place between the hours of 8:00 pm and 6:00 am.  Notably, all news media was exempt from the curfew's restrictions.  Somehow, members of the Minneapolis Police Department did not faithfully honor the news media exemption.

5.     On the evening of May 28, Ms. Tirado, like many journalists across the country, rushed to Minneapolis to cover the civil uprisings. Ms. Tirado chose to head to the scene of the crime to take pictures of the protest demonstrations and law enforcement. She did not anticipate being shot instead. On May 29, moments before the first night of curfew began, law enforcement fired tear gas, unprovoked, in the direction of the nonviolent, peaceful protestors. Law enforcement did not administer any prior warnings, dispersal orders, or demands for protestors to go home.

6.     As an experienced journalist who has covered similar protests involving law enforcement, when she arrived on location on May 29 Ms. Tirado ensured her press credentials were displayed prominently around her neck, secured her respirator and goggles on her face, and began to photograph law enforcement's tactics. Ms. Tirado distanced herself physically from protestors in order to emphasize her status as a member of the press and listened closely for any orders from law enforcement. Ms. Tirado covered the protests for approximately four hours on May 29.

7.     After midnight on May 30, Ms. Tirado remained in front of the police line for several minutes while taking dozens of photographs. Around 12:34 am, while continuing to photograph protestors and the police line as she had been doing for several minutes, Ms. Tirado felt an impact on the left side of her face and

immediately felt blood gushing down her face and the burn of tear gas in her eyes. Ms. Tirado simultaneously realized that her goggles had been knocked off by a projectile, and began crying out "*I'm press! I'm press!*" while throwing her hands into the air. She stood there, blinded and bleeding. To her knowledge, no law enforcement personnel tried to help her.

8.     Instead, protestors assisted her and brought her to the medics on site. After receiving a bandage from the medics, Ms. Tirado was transported to a local hospital. Upon arrival, Ms. Tirado went into surgery. When she awoke from surgery, the doctors told her that she was now permanently blind in her left eye.

9.     Whatever one's view of police conduct in relation to the protestors and of protestors' actions, there can be no doubt that the Constitution prohibits shooting journalists for reporting on protests. Journalists, like Linda Tirado, cover the protests and capture any tactics employed by law enforcement. If the press is silenced, the story does not get amplified, and nobody can see the police violence committed against citizens for exercising their First Amendment rights to freedom of speech, freedom of press, and freedom to peacefully assemble. What is more, the public could not learn about any incidents of law enforcement's deliberate use of excessive force in violation of the Fourth Amendment. Indeed, the Governor himself recognized that the people of Minneapolis who were exercising their First Amendment rights to protest could rightfully assume that, "if they see a reporter

being arrested . . . it's because something's going to happen that they don't want to be seen.  And so that is unacceptable."  Law enforcement must face repercussions for blinding the very people they are supposed to protect.

## PARTIES

10.    Plaintiff Linda Tirado, also known as Linda Eaton, is a citizen of Tennessee, who works as a freelance journalist for international and national media publications.

11.    Defendant City of Minneapolis is a municipality incorporated in the State of Minnesota and is therefore a citizen of Minnesota.  The Minneapolis Police Department (the "Department") is an agency of the City of Minneapolis.

12.    Defendant Medaria Arradondo is a citizen of Minnesota.  Arradondo serves as Chief of the Minneapolis Police Department and is sued in his official capacity.

13.    Defendant Robert Kroll is a citizen of Minnesota sued in his individual capacity.

14.    Defendants John Does #1-4 are as-yet unidentified officers of the Minneapolis Police Department sued in their individual and official capacities.  On information and belief, they are citizens of Minnesota.

## JURISDICTION

15.     This Court has original jurisdiction under 28 U.S.C. § 1331 because this case arises under the First, Fourth, and Fourteenth Amendments to the United States Constitution as well as 42 U.S.C. § 1983.

16.     This Court also has original jurisdiction under 28 U.S.C. § 1332(a)(1) because this case is between citizens of different States and the amount in controversy exceeds $75,000.

## BACKGROUND

## I.     GEORGE FLOYD IS KILLED BY MINNEAPOLIS POLICE AND THE PUBLIC RESPONDS

17.     On May 25, 2020, George Floyd, a 46-year-old black man, died in Minneapolis, Minnesota after Minneapolis Police Officer Derek Chauvin rested his knee on Mr. Floyd's neck and upper back until long after Mr. Floyd lost consciousness.  In addition to Officer Chauvin, Minneapolis Police Officers Thomas Lane and J. Alexander Keung continued to pin Mr. Floyd to the ground, ignoring the sixteen times Mr. Floyd cried "I can't breathe" before losing consciousness.[1]

18.     While Officer Chauvin and the two other officers ensured that the unconscious Mr. Floyd could not move, a third Minneapolis Police Officer, Tou

---

[1] Evan Hill et al., *8 Minutes and 46 Seconds: How George Floyd Was Killed in Police Custody*, NY Times (June 8, 2020), https://www.nytimes.com/2020/05/31/us/george-floyd-investigation.html.

Thao, kept a watchful eye on the individuals recording Officer Chauvin killing Mr. Floyd.

19.     During the eight minutes and forty-six seconds that Officer Chauvin was killing Mr. Floyd, a small number of people began to gather and attempted to de-escalate Officer Chauvin by telling Officer Chauvin to "Get off of him!" and asking "Did they [expletive] kill him, bro?"  The group of observers also recorded the interaction.  At one point, in apparent fear of young adults with recording devices, Officer Chauvin reached for his mace and pointed it towards the observers.  A little over twenty minutes into the arrest, Mr. Floyd was loaded into an ambulance.  Mr. Floyd was pronounced dead at a nearby hospital around 9:25 pm.

20.     Video recordings of Officer Chauvin's killing of Mr. Floyd soon went viral, and were spread across social media platforms and played on primetime network as breaking news.

21.     Protests ignited across the United States.  Eventually, at least one protest occurred in every state in the country.[2]  The protests even spread internationally, as citizens of other countries began to protest in solidarity with the

---

[2] Jiachuan Wu et al., *Map: Protests and rallies for George Floyd spread across the country*, NBC News (June 12, 2020), https://www.nbcnews.com/news/us-news/map-protests-rallies-george-floyd-spread-across-country-n1220976.

Black Lives Matter movement.[3]   All four officers involved were fired by the Minneapolis Police Department.   On May 29, 2020, Officer Chauvin was charged with third-degree murder and second-degree manslaughter.   On June 3, 2020, the charge against Officer Chauvin was elevated to second-degree murder.   On that same day, Officers Lane, Keung, and Thao were charged with aiding and abetting murder.[4]

22.     The protests against police brutality only seemed to grow in size over the next several days, which correspondingly attracted additional attention from the media, which, in turn, led to more on the ground journalists covering the story of the protests.

23.     Minneapolis in particular experienced a surge in protests and press coverage, as thousands flocked to the scene of the crime.

## II.     GOVERNOR WALZ IMPOSES A CURFEW EXEMPTING THE PRESS

24.     In response to the growing tensions between law enforcement and the protestors and the press, the Governor signed Executive Order 20-64, and declared

---

[3] Damien Cave et al., *Huge Crowds Around the Globe March in Solidarity Against Police Brutality*, NY Times (June 8, 2020), https://www.nytimes.com/2020/06/06/world/george-floyd-global-protests.html.

[4] *George Floyd death: New charges for all four sacked officers*, BBC (June 3, 2020), https://www.bbc.com/news/world-us-canada-52915019.

a peacetime state of emergency which activated the National Guard.[5]  The National

Guard confirmed that more than 500 soldiers would respond to Minneapolis,

St. Paul, and surrounding communities.[6]

25.    Over the next few days, the Governor issued a series of executive

orders, on May 29,[7] May 31,[8] June 1,[9] and June 3,[10] all implementing curfews for the

cities of Minneapolis and St. Paul (the "Executive Orders").

---

[5] Emergency Executive Order 20-64, Activating the Minnesota National Guard and Declaring a Peacetime Emergency to Provide Safety and Protection to the People of Minneapolis, St. Paul, and Surrounding Communities, May 28, 2020, https://mn.gov/governor/assets/EO%2020-64%20Final_tcm1055-433855.pdf.

[6] *Over 500 National Guard soldiers activated to amid protests regarding George Floyd's death; Frey declares a state of emergency in Minneapolis,* KSTP Eyewitness News (May 28, 2020), https://kstp.com/news/minnesota-national-guard-activated-to-control-protests-following-george-floyds-death/5743967/.

[7] Emergency Executive Order 20-65, Implementing a Temporary Nighttime Curfew in the Cities of Minneapolis and Saint Paul, May 29, 2020, https://mn.gov/governor/assets/EO%2020-65%20Final_tcm1055-434635.pdf.

[8] Emergency Executive Order 20-68, Extending the Temporary Nighttime Curfew in the Cities of Minneapolis and Saint Paul, May 31, 2020, https://mn.gov/governor/assets/EO%2020-68%20Final_tcm1055-434305.pdf.

[9] Emergency Executive Order 20-69, Extending the Temporary Nighttime Curfew in the Cities of Minneapolis and Saint Paul, June 1, 2020, https://mn.gov/governor/assets/EO%2020-69%20Final_tcm1055-434605.pdf.

[10] Emergency Executive Order 20-71, Extending the Temporary Nighttime Curfew in the Cities of Minneapolis and Saint Paul, June 3, 2020, https://mn.gov/governor/assets/EO%2020-71%20Final_tcm1055-434632.pdf.

26.     Notably, each of the Executive Orders exempted "[*a*]*ll...members of the news media*" from the nighttime curfew prohibiting persons from travel on any public street or place.

27.     Upon information and belief, there is no system in place for members of the media to apply for or obtain official credentials from the State of Minnesota and the Minneapolis Police Department.

## III.    LESS-LETHAL PROJECTILE FIRED BY LAW ENFORCEMENT BLINDS TIRADO

### MS. TIRADO'S EXPERIENCE DURING PROTEST

28.     On May 29, 2020, the first night of the curfew, Ms. Tirado ventured out in the evening to observe the protests.

29.     Ms. Tirado has extensive experience covering similar protests and took several steps to ensure that any observer would know she was a member of the press and not a protestor.

30.     Ms. Tirado had a standard, reflective press credential around her neck.

31.     Ms. Tirado was also carrying her professional-grade Nikon D3500 camera and lens, which when combined with its flash was about nine inches tall and six inches deep.

32.     Ms. Tirado also was wearing her high-grade respirator and goggles, which protestors do not ordinarily wear.

33.     Ms. Tirado's interactions with others confirmed that, so attired, she was readily recognizable as a member of the press.  Multiple law enforcement officers, firefighters, members of the National Guard, and protestors asked Ms. Tirado which news outlet she was working with.

34.     Shortly after midnight on the morning of May 30, 2020, while standing in the parking lot of a bank, Ms. Tirado heard several protestors shouting that police had deployed tear gas.  No dispersal order had been given.

35.     After ensuring that her press credential was displayed, and securing her respirator and goggles, Ms. Tirado moved in the direction of the Minneapolis Police Department's Fifth Precinct, which was headquartered at the intersection of Nicollet Avenue and 31st Street.

36.     Near the Fifth Precinct, Ms. Tirado found a crowd of protestors standing across from a group of Minneapolis Police Department officers.

37.     Ms. Tirado did not see any protestors carrying weapons, but they occasionally threw water bottles at the police.  In response to being pelted with water bottles and chanting, the officers became progressively more aggressive in their tactics.

38.     The Minneapolis Police Department officers on the scene were armed with, *inter alia*, launchers configured to fire 40mm crushable foam bullets, and 40mm crushable foam bullets manufactured by Defense Technology.

39.     Defense Technology warns purchasers of its foam bullets that users "should be adequately trained in the use of Less Lethal Impact Munitions and have a thorough understanding of the round and considerations for selecting shot placement such as level of threat, target distance, size and clothing."[11]

40.     Defense Technology also warns that its foam bullets should be aimed at "the large muscle groups of the buttocks, thigh, and even the knees of the subject," and that aiming outside that area will "greatly" increase the risk of "serious or life-threatening injuries."[12]

41.     To enable accurate use of foam bullets and avoid unnecessary injury, the Minneapolis Police Department equips its 40mm launchers with sufficiently precise aiming devices that a trained officer can reliably hit the area of a human body that he or she intends to target.

42.     The Minneapolis Police Department's use of force policy also demonstrates the Department's awareness of the dangers of 40mm foam bullets, and the limited circumstances under which their use is appropriate.

---

[11] *See, e.g.* Defense Technology, *Product Specifications: 40mm eXact iMpact Sponge Round* (rev. June 2020), *available at* https://www.defense-technology.com/wp-content/uploads/2020/06/40mm-eXact-iMpact-Sponge-Round-6325.pdf.

[12] *Id.*

43.     The use of 40mm foam bullets is subject to § 5-317 of the Minneapolis Police Department Policy and Procedure Manual.[13]

44.     Section 5-317 provides, *inter alia*, that only officers trained in their use may carry or use 40mm launchers, that 40mm foam bullets are only authorized for the purpose of "incapacitat[ing] a violent or potentially violent subject," and that "[o]fficers shall not deploy 40mm launchers for crowd management purposes."[14]

45.     Section 5-317 also instructs that "[t]he primary target areas" for foam bullets "should be the large muscle groups in the lower extremities," directs officers to "avoid" using foam bullets against the head and neck, and specifically warns that "the delivery of the 40mm impact projectiles to certain parts of the human body can cause grievous injury that can lead to a permanent physical or mental incapacity or possible death.  Areas susceptible to death or possible severe injury are the head, neck, throat and chest . . . . Unless deadly force is justified, officers should avoid the delivery of 40mm impact projectiles to any of the above-described areas."[15]

46.     At approximately 12:34 am on May 30, 2020, Ms. Tirado approached the opposing groups of protestors and police from the side, such that she did not appear to the police to be emerging from or part of the group of protestors.

---

[13] Minneapolis Police Department, *Policy and Procedure Manual* § 5-317, *available at* http://www2.minneapolismn.gov/police/policy/mpdpolicy_5-300_5-300.

[14] *Id.* § 5-317(III)(C), (III)(D), (IV)(C)(1).

[15] *Id.* § 5-317(IV)(B).

47.     Ms. Tirado stood between the protestors and the police to line up her shot of the police line.

48.     Ms. Tirado did not stand alongside the protestors, and was careful to remain separate and distinct from this group in order to make clear she was a member of the press.

49.     Ms. Tirado's reflective press credential remained visible while she took photos from this position.

50.     Ms. Tirado took dozens of photos of both protestors and the police from this position without incident.

51.     The flash from Ms. Tirado's camera was visible from the police line, and distinguished her as a journalist rather than a protestor.

52.     As Ms. Tirado aimed her camera to continue photographing the police, one or more of John Does #1-4, officers of the Minneapolis Police Department, intentionally aimed and fired, and/or caused to be aimed and fired, a foam bullet at her head.

53.     The decision to fire a foam bullet at Ms. Tirado's head violated the Minneapolis Police Department's policy governing the use of such weapons.

54.     A foam bullet fired and/or caused to be fired by one of John Does #1-4 hit Ms. Tirado in the left side of the face.

55.     Despite listening carefully for any police orders, Ms. Tirado had not heard any instructions, warnings, or communications prior to being hit with the foam bullet.

56.     Ms. Tirado instantly felt blood rushing down her face and tear gas in her eyes. Realizing that the impact had knocked her goggles off her face, she quickly squeezed her eyes shut.

57.     Ms. Tirado had been tear gassed and hit with pepperballs during protests in the past, and knew that putting her hands in the air and re-asserting her status as a member of the press was the appropriate means to prevent any further use of weapons.  But this time, it was too late—the damage was already done.

58.     Below are two photos taken moments before Minneapolis Police Department officers shot Ms. Tirado.  They show the distance Ms. Tirado kept between herself and the police, as well as police aiming 40mm launchers directly at

her despite the fact that she was clearly identifiable as a member of the press.  The

insignia of the Minneapolis Police Department is visible on each officer's shoulder.





59.    The officers depicted in these photos, including John Does #1-4, were not acting in a manner consistent with a belief that they were under imminent threat from Ms. Tirado.  Most of the officers depicted are not paying attention to Ms. Tirado at all, and are not positioned in a manner consistent with reacting to an immediate threat from her direction or any other.

60.    Upon seeing that Ms. Tirado was in need of medical attention, protestors assisted her in reaching medics.  The medics put a bandage on Ms. Tirado's left eye, and eventually coordinated her transportation to the hospital.

61.    At the hospital, Ms. Tirado realized that at some point during the protest her backpack had been hit with a ballistic tracking round.

62.    A ballistic tracking round is a less-lethal munition designed to leave a bright dye mark on its target.  It is a standard counter-protest policing tactic to designate individuals for arrest by marking them with a ballistic tracking round.

63.    The dye mark on Ms. Tirado's backpack was bright green.

64.    Defense Technology, the provider of 40mm foam bullets to the Minneapolis Police Department, manufactures a marking round loaded with a green marking agent.[16]

---

[16] *See* Defense Technology, *Direct Impact LE 40 MM Extended Range Marking Crushable Foam Round*, (2020), https://www.defense-technology.com/product/direct-impact-le-40-mm-extended-range-marking-crushable-foam-round/ ("When loaded with a green marking agent, the Direct

65.     On information and belief, the ballistic tracking round was intentionally fired and/or caused to be fired at Ms. Tirado by one or more of John Does #1-4, officers of the Minneapolis Police Department.

66.     Below is an image of Ms. Tirado's backpack after being marked with the ballistic tracking round, as well as her Nikon camera lens.



67.     Weeks later, when Ms. Tirado took them out of her camera bag for the first time since May 30, she realized the Nikon camera and lens she had been using when she was shot in Minneapolis were covered in blood.

_____

Impact LE can be used to indicate the aggressor in a crowd or riot situation to the team on the ground.").

68.     As Ms. Tirado had been holding the camera near her face at the time she was shot, the eruption of blood permanently damaged her camera.

69.     Below is an image of the damage to Ms. Tirado's camera:



MS. TIRADO'S MEDICAL CONDITION

20

70.     Ms. Tirado was quickly sent into surgery upon entering the hospital.

71.      As a direct result of the foam bullet hitting her face, Ms. Tirado was told by doctors that she is now permanently blind in her left eye.  In connection with her injury, she now has a flat aspect and no depth perception.

72.    Below is an image of Ms. Tirado's injuries after being shot with a foam
bullet.



73.    Ms. Tirado has since undergone a second eye surgery.  Her physicians
have informed her that additional surgeries may be necessary depending on her
recovery.  In the meantime, Ms. Tirado has been seen by medical personnel on

approximately four occasions and is required to have regular visits in order to address ongoing complications.

<u>MS. TIRADO'S OUTLOOK & FEAR OF FUTURE HARM FROM DEFENDANTS</u>

74.     Being blind in her left eye has permanently altered Ms. Tirado's life.

75.     A substantial part of Ms. Tirado's journalistic work has been at flashpoints of civil unrest and potential violence, and she expects to be hampered in that work by the loss of half her field of vision.

76.     Of course, these vision-related issues are not limited to journalistic endeavors, but have marked effects on her everyday life as well.

77.     Ms. Tirado's ability to drive has been compromised by her injuries. Because she is unable to adapt to changes in brightness around her, Ms. Tirado has been forced to wear a sleeping mask while riding in the passenger seat of cars.  This is an ongoing concern that will prevent her from driving in the near future, as the sun shining through a cloud or the reflection from a white truck can functionally blind Ms. Tirado for an extensive period of time.  Of course, her ability to drive is further limited by the fact that her natural blind spot is now considerably larger.

78.     Ms. Tirado also continues to experience other physical ailments.  The simple act of trying to focus her eyesight causes severe headaches, which leads to constant migraine-like pain that lingers throughout the day.  In addition, Ms. Tirado now becomes tired very easily, which requires her to sleep or close her eyes for

prolonged periods of time every 4-5 hours.  As a journalist whose work requires intense focus on cameras, computer screens and documents, the inability to focus or remain alert for long periods of time is a serious concern.

79.     Ms. Tirado is a mother of two, and this injury will impose a long-term effect on her children as well.  Ms. Tirado's oldest child, ten, is autistic and will need therapy to work through her trauma associated with her mother's injury.   The youngest child, seven, similarly is in need of therapy.  Both children have developed a profound fear of law enforcement.  Her children have struggled to adapt to their mother's constant head pains and inability to stay awake for more than 4-5 hours at a time.  To date, this has had a devastating effect on Ms. Tirado and her children's well-being.

80.     Despite her significant injuries, Ms. Tirado has already returned—with considerable difficulty—to covering protest activities.

81.     On July 18, 2020 Ms. Tirado documented (with considerable difficulty due to her injuries) a series of overlapping protests at the state capitol building in Columbus, Ohio.

82.     Ms. Tirado intends to continue covering protests and civil unrest to the maximum extent her health allows.

83.     Ms. Tirado retains a significant journalistic interest in covering the George Floyd protests in Minneapolis, and would like to return to Minneapolis to document their aftermath.

84.     She cannot do so, however, while there is still a significant risk that she will be subject to retaliation by Defendants based on her First Amendment Activities, or grossly excessive force in violation of the Fourth Amendment.

85.     Ms. Tirado reasonably fears such retaliation and/or excessive force based on her first-hand experience of how Defendants treat members of the press who document police misconduct.

## IV.    DEFENDANTS' POLICY OR CUSTOM OF RETALIATION AGAINST THE PRESS

86.     Throughout the George Floyd protests, the Minneapolis Police Department enforced a policy or custom of intentionally targeting members of the press with unjustified arrests, excessive force, and other retaliatory actions, as demonstrated by the following very similar incidents.

87.     In the alternative, throughout the George Floyd protests, the Minneapolis Police Department had a policy or custom of indiscriminately using less-lethal munitions without legal justification, as demonstrated by the following very similar incidents.

88.     On May 26, 2020, three days before Minneapolis Police shot Ms. Tirado, officers of the Minneapolis Police Department shot Andy Mannix, the

federal courts reporter for the *Star Tribune*, in the thigh with a foam bullet.  Mr. Mannix was leaning against a tree a block away from the Third Precinct attempting to post a video to Twitter when he was hit, and tweeted at 8:00 pm that evening a photograph of the projectile with the caption "I was just shot with this in the thigh." That tweet was retweeted over 1,000 times.[17]  The next day he posted a photo of the large bruise on his thigh, which was retweeted over 11,000 times.[18]  His story was picked up by Time Magazine and covered in an online article dated May 27, 2020, two days before Minneapolis Police shot Ms. Tirado.[19]

89.    On May 26, 2020, three days before Minneapolis Police shot Ms. Tirado, officers of the Minneapolis Police Department shot reporter Niko Georgiades in the arm with a less-lethal munition as he approached an injured protester who was laying on the ground.[20]

---

[17] Andrew Mannix (@AndrewMannix), Twitter, (May 26, 2020 8:00 pm), https://twitter.com/AndrewMannix/status/1265447846079315973.

[18] Andrew Mannix (@AndrewMannix), Twitter, (May 27, 2020 5:25 pm), https://twitter.com/AndrewMannix/status/1265756101057957890.

[19] Mahita Gajanan, *Minneapolis Police Fire Tear Gas, Rubber Bullets as Crowds Protesting George Floyd Killing*, Time Magazine (May 27, 2020), https://time.com/5843070/george-floyd-minneapolis-protest-police-death/ ("A Minneapolis Star Tribune reporter said he was shot in the thigh with what appeared to be a foam bullet.").

[20] Unicorn Riot (@UR_Ninja), Twitter, (May 26, 2020 9:16pm) https://twitter.com/UR_Ninja/status/1265466767440261120; Unicorn Riot (@UR_Ninja), Twitter, (May 26, 2020 9:17pm) https://twitter.com/UR_Ninja/status/1265466767440261120.

90.     On May 26, 2020, three days before Minneapolis Police shot Ms. Tirado, an officer of the Minneapolis Police Department was live-streamed using a baton to strike an unidentified camera-carrying journalist, unprovoked, in the throat and stomach as onlookers screamed that the victim was with the press.[21]

91.     On May 27, 2020, two days before Minneapolis Police shot Ms. Tirado, freelance journalist Jared Goyette was struck in the eye by a less-lethal projectile fired by an officer of the Minneapolis Police Department.[22]   Just prior to shooting Mr. Goyette, Minneapolis Police had shot a young protester in the side of the head, also using less-lethal ammunition.[23]

92.     On May 27, 2020, two days before Minneapolis Police shot Ms. Tirado, a Minneapolis Police officer shot *Minnesota Reformer* reporter Max Nesterak in the chest with a less-lethal projectile.[24]   Like Ms. Tirado, Mr. Nesterak took a photograph of the police immediately before they shot him, showing a group of

---

[21] *#Live: Minneapolis Responds to Police Murder of George Floyd* (at 1:40:35), YouTube, https://youtu.be/XAa5xb6JitI?t=6035 (May 26, 2020).

[22] Jared Goyette (@JaredGoyette), Twitter, (May 27, 2020 6:27 pm), https://twitter.com/JaredGoyette/status/1265786797650558976.

[23] Jared Goyette (@JaredGoyette), Twitter, (May 27, 2020 5:59pm), https://twitter.com/jaredgoyette/status/1265779746153078793.

[24] Max Nesterak (@maxnesterak), Twitter, (May 27, 2020 11:32pm), https://twitter.com/maxnesterak/status/1265863514754813952.

about 10 officers standing in a manner inconsistent with a belief in the existence of an imminent threat.[25]

93.     The policymaking officials of the City of Minneapolis and Minneapolis Police Department were on notice of the Minneapolis Police Department's custom(s) of unlawful retaliation against journalists and/or the indiscriminate use of less-lethal weapons during the George Floyd protests.

94.     For at least three days before the Minneapolis Police shot Ms. Tirado, the Department's pattern(s) of using unlawful force against journalists and others had been widely shared on social media.

95.     The Minneapolis Police Department maintains an intelligence arm, named the "Strategic Information Center," which continually monitors social media activity, live streams, and other digital sources of information.  The Department and the City of Minneapolis were on notice from that monitoring that its officers had developed a custom of constitutional violations of the type that injured Ms. Tirado.

96.     In addition to social media, the pattern of violence against journalists by Minneapolis Police Department Officers had also garnered significant traditional media attention by the time Ms. Tirado was shot.  The Department and the City of

---

[25]   Max Nesterak (@maxnesterak), Twitter, (May 27, 2020 11:34pm), https://twitter.com/maxnesterak/status/1265863873825058816.

Minneapolis were on notice from that news coverage that its officers had developed a custom of constitutional violations of the type that injured Ms. Tirado.

97.    In addition, on at least two occasions before Ms. Tirado was shot, reporters working for the Freedom of the Press Foundation's "U.S. Press Freedom Tracker" contacted the Minneapolis Police Department seeking comment on four of the specific instances of violence against journalists detailed above.  Although the Department did not respond to these inquiries, they put the Department and the City of Minneapolis on notice of a custom of constitutional violations of the type that injured Ms. Tirado.[26]

98.    The Minneapolis Police Department's actions in the wake of shooting Ms. Tirado further confirm its custom of targeting journalists for retaliation during the George Floyd protests.

99.    Early in the morning of May 30, 2020, Reuters cameraman Julio-Cesar Chavez was struck in the arm and neck by less-lethal projectiles fired by one or more

---

[26] U.S. Press Freedom Tracker, *Journalists struck by projectiles while covering Minneapolis protest* (May 26, 2020), https://pressfreedomtracker.us/all-incidents/journalists-struck-projectiles-while-covering-minneapolis-protest/ ("A request for comment [on the Mannix, Georgiades, and unidentified journalist incidents] sent to Minneapolis Police Department Public Information Officer John Elder was not answered as of press time."); U.S. Press Freedom Tracker, *Journalists hit with 'less lethal' rounds during second day of Minnesota protests,* (May 27, 2020), https://pressfreedomtracker.us/all-incidents/journalists-hit-less-lethal-rounds-during-second-day-minnesota-protests/.

officers of the Minneapolis Police Department as he took cover at a gas station in southwest Minneapolis.[27]

100.   On the night of May 30, 2020, officers of the Minneapolis Police Department fired multiple less-lethal projectiles at CBS reporter Michael George and his news crew, injuring a sound engineer.[28]  At the time they were attacked, crew members had credentials displayed, were carrying camera and sound equipment, and were more than 500 feet from any protesters.[29]

101.   On the night of May 30, 2020, officers of the Minneapolis Police Department shot Canadian Broadcasting Corporation correspondent Susan Ormiston in the shoulder with a less-lethal projectile as she stood in a parking lot that had already been cleared of protestors.  Ormiston's crew had their television camera clearly visible at the time.[30]

---

[27] Reuters, *Reuters camera crew hit by rubber bullets as more journalists attacked at U.S. protests* (May 31, 2020), https://www.reuters.com/article/us-minneapolis-police-protest-update/reuters-camera-crew-hit-by-rubber-bullets-as-more-journalists-attacked-at-us-protests-idUSKBN237050.

[28] Michael George (@MikeGeorgeCBS), Twitter, (May 30, 2020 9:28pm), https://twitter.com/MikeGeorgeCBS/status/1266919447970942986.

[29] Michael George (@MikeGeorgeCBS), Twitter, (May 30, 2020 9:15pm), https://twitter.com/MikeGeorgeCBS/status/1266916104951214080.

[30] Natasha Fatah (@NatashaFatah), Twitter, (May 30, 2020 9:29pm), https://twitter.com/NatashaFatah/status/1266919824556535808.

102. On the night of May 30, 2020, officers of the Minneapolis Police Department attacked Vice News correspondent Michael Anthony Adams as he was sheltering at a gas station in Minneapolis. Video of the incident shows one officer pointing a 40mm foam bullet launcher at Mr. Adams from point-plank range as he lies face down on the ground. Moments later, in response to Mr. Adams—still prone and compliant—holding up his press credentials and announcing "I'm press," another Minneapolis Police Department officer sprayed him in the face with a chemical irritant.[31]

103. Multiple public statements by Minneapolis Police Department officers demonstrate the culture of hostility to journalists that imbued the Department's response to the George Floyd Protests.

104. In particular, Department officers consistently disregarded the curfew order's explicit exemption for members of the press. For example, when *Star Tribune* reporter Chao Xiong displayed her press credentials to inform Minneapolis Police officers that she was media just after midnight on May 31, 2020, one officer replied that "your cards are bullshit."[32]

---

[31] Michael Anthony Adams (@MichaelAdams317), Twitter, (May 30, 2020 11:11pm), https://twitter.com/MichaelAdams317/status/1266945268567678976; Michael Anthony Adams (@MichaelAdams317), Twitter, (May 31, 2020 4:18pm), https://twitter.com/MichaelAdams317/status/1267203751913422849.

[32] Chao Xiong (@ChaoStrib), Twitter, (May 31, 2020 12:06am), https://twitter.com/ChaoStrib/status/1266959110265856000.

105.    Another *Star Tribune* reporter, Liz Sawyer, had a similar experience later in the morning of May 31, 2020 when a Minneapolis Police Department officer informed her that "[w]e don't care" about the press exemption from curfew, and that "we'll arrest you" anyway.  Ms. Sawyer indicated that other journalists had similar experiences as well, and that "[b]ased on my own and my colleagues' interactions with law enforcement . . . you'd never know that journalists were exempt from the curfew."[33]

106.    Reuters photographer Lucas Jackson summarized the Minneapolis Police Department's approach to journalists during the George Floyd protests:  "It's not that we were being shot because we were between cops and protesters.  Its [sic] that we were shot at [with less-lethal munitions] if we were anywhere in line of sight.  I've been hit [by less-lethal munitions] because I was in the wrong place before.  I've never been aimed at so deliberately so many times when I was avoiding it."[34]

107.    Even prior to the George Floyd Protests, the Minneapolis Police Department had a history of unconstitutionally targeting journalists reporting on civil disturbances.

---

[33]  Liz   Sawyer   (@ByLizSawyer),   Twitter,   (May   31,   2020   1:45am), https://twitter.com/ByLizSawyer/status/1266984068765409280.

[34]  Lucas  Jackson  (@Lucas_Jackson_),  Twitter,  (May  31,  2020  10:22am), https://twitter.com/Lucas_Jackson_/status/1267114291532046338.

108.    In April 2002, Minneapolis Police Department officers used excessive force against journalists after a victory celebration became a riot at or near the University of Minnesota campus.

109.    Mike Wereschagin, then the editor of the Minnesota Daily, said one Minnesota Daily reporter and three of its photographers were singled out and sprayed with a chemical irritant, and that Minneapolis police hit them with batons. As he explained at the time, "journalists were being targeted as if [they had] thrown a bottle at police officers." "They were taking pictures and notes, talking to people; just doing their jobs," and "they were stopped from doing their jobs by police officers."

110.    The City of Minneapolis and Minneapolis Police Department were on notice of this because they met with Wereschagin about these incidents.[35]

111.    The complaint filed by the newspaper with the Minneapolis Police's Internal Affairs Unit also indicated that two photographers had press passes displayed in the middle of their chests, and others told police officers they were members of the press.

---

[35] Chris Graves, Mary Jane Smetanka, "Growing fire drove chief's order to act," at Minneapolis Star Tribune, at A1, 2002 WLNR 12194995 (Apr. 9, 2002); Chris Graves, "5 charged in hockey celebration melee," Minneapolis Star Tribune, at 2B, 2002 WLNR 12195226 (Apr. 10, 2002); Rochelle Olson, "City reviewing use of force by police," Minneapolis Star Tribune at 1b, 2002 WLNR 12195426 (Apr. 11, 2002).

112.     On information and belief, none of the officers involved in this conduct were disciplined pursuant to the Wereschagin investigation.

## V.     DEFENDANT KROLL'S *DE FACTO* CONTROL OVER THE MINNEAPOLIS POLICE DEPARTMENT AND ITS INDIVIDUAL OFFICERS

113.     Defendant Robert Kroll is both a Lieutenant in the Minneapolis Police Department and President of the Police Officers' Federation of Minneapolis (the "Federation")—the police union representing the Department's sworn personnel.

114.     In his role as Federation President (which he has held since 2015), Kroll exerts tremendous power over the culture, actions, and professional standards of the Department's officers.

115.     Indeed, according to Janee Harteau—who served as Chief of the Minneapolis Police Department from 2012 to 2017—"[t]he police federation has historically had more influence over police culture than any police chief ever could," and successfully worked to block reform of the Department.[36]

116.     Even though the Federation is adversarial to the Department in some respects, its membership structure—which includes most of the Department's supervisory personnel—means that "some of the people directing and disciplining

---

[36] Chris McGreal, *Hopeful that Minneapolis policing will change? Meet the police union's chief…*, The Guardian (June 5, 2020), https://www.theguardian.com/us-news/2020/jun/05/minneapolis-police-union-bob-kroll-us.

officers, and developing the union contract, are actually negotiating with the union of which they are a member."[37]

117.    Kroll's influence over the Department and its personnel extends to policies and customs governing the use of force.  When Minneapolis Mayor Jacob Frey announced in February 2020 a prohibition on so-called "warrior training" for Department officers—which "teaches officers that every encounter with a citizen is fraught with danger and could be fatal,"[38] Kroll caused the Federation to partner with Law Officer—a provider of warrior training—to make online training materials available "to every member of the Minneapolis police department for free."[39]  With Kroll's encouragement, these "warrior-style training videos were shared among the force to blunt reforms."[40]

---

[37] R.T. Rybak, *I Was Mayor of Minneapolis. I Know Why Police Reforms Fail,* The Atlantic (June 18, 2020), https://www.theatlantic.com/ideas/archive/2020/06/i-know-why-police-reforms-fail/613189/.

[38] Kimberly Kindy and Mark Berman, *Police chiefs and mayors push for reform. Then they run into veteran officers, unions, and 'how culture is created',* The Washington Post (June 28, 2020), https://www.washingtonpost.com/national/police-chiefs-and-mayors-push-for-reform-then-they-run-into-veteran-officers-unions-and-how-culture-is-created/2020/06/28/7d2ff812-b2ef-11ea-8f56-63f38c990077_story.html.

[39] *See* Law Officer, *Following the Banning of 'Warrior Training' – Minneapolis Police Are Provided Free Training by Law Officer* (Feb. 2, 2020), https://www.lawofficer.com/free-training-to-minneapolis/.

[40] Kimberly Kindy and Mark Berman, *Police chiefs and mayors push for reform. Then they run into veteran officers, unions, and 'how culture is created',* The Washington Post (June 28, 2020),

118.    On the evening of May 29, 2020—only hours before Minneapolis Police shot Ms. Tirado—Kroll used his direct access to senior Department policymakers, including defendant Chief Medaria Arradondo, to demand that they loosen what he termed "restrictions on use of . . . less lethal" force, and communicated that rank-and-file officers had "lost faith in [Department] leadership."[41]

119.    Kroll's conduct during the George Floyd protests also showed his engagement in the tactical details of policing them.  As he explained in a letter to Federation members sent on or about June 1, 2020, during the protests Kroll "had numerous conversations with politicians at the state level," in which he proposed "a detailed plan of action including a range of 2000 to 3000 National Guard."[42]  On information and belief, Kroll gave similarly detailed tactical input, through formal and/or informal channels, into the protest response of the Minneapolis Police Department and its individual officers.

-----

https://www.washingtonpost.com/national/police-chiefs-and-mayors-push-for-reform-then-they-run-into-veteran-officers-unions-and-how-culture-is-created/2020/06/28/7d2ff812-b2ef-11ea-8f56-63f38c990077_story.html.

[41] KSTP Eyewitness News, *1-on-1 interview with Minneapolis Police Union chief Lt. Bob Kroll, and how the union is responding to George Floyd's death*, https://kstp.com/news/minneapolis-police-union-blames-failed-leadership-for-riots-violence-june-23-2020/5769384/.

[42] Janee Harteau (@ChiefHarteau), Twitter, (June 1, 2020 9:19am), https://twitter.com/ChiefHarteau/status/1267460683408564225.

120.    Kroll's hostility to the press is a matter of public record.

121.    In April 2016, Kroll blamed rising crime in Minneapolis on "greater scrutiny of police that has left some officers disengaged."[43]

122.    On or about June 1, 2020, Kroll grouped the "liberal media" among other opponents that were purportedly "targeting" him, including "the groups conducting this riot," and the "politicians on the left allowing it and encouraging it."[44]

123.    On information and belief, Kroll acted on that hostility by conspiring with the City of Minneapolis, the Minneapolis Police Department, and and/or one or more individual officers of the Minneapolis Police Department to vindicate his anti-press views by depriving Ms. Tirado, in retaliation for her coverage of the George Floyd protests, of rights protected by the First, Fourth, and Fourteenth Amendments.

124.    In the alternative, on information and belief, Kroll conspired with the City of Minneapolis, the Minneapolis Police Department, and/or one or more individual officers of the Minneapolis Police Department to vindicate his anti-protestor views by depriving Ms. Tirado, in retaliation for her presence at the George

---

[43] Libor Jany, *Minneapolis shootings up sharply, particularly on North Side,* The Star Tribune (April 16, 2016), https://www.startribune.com/minneapolis-shootings-up-sharply-particularly-on-north-side/375952531/.

[44] Janee Harteau (@ChiefHarteau), Twitter, (June 1, 2020 9:19am), https://twitter.com/ChiefHarteau/status/1267460683408564225.

Floyd protests, of rights protected by the First, Fourth, and Fourteenth Amendments.

## COUNT I

### *42 U.S.C. § 1983 – First Amendment Free Speech, Free Press, Free Assembly*

125.    Ms. Tirado restates and realleges the preceding paragraphs as if fully set forth again.

126.    At the time she was shot, Ms. Tirado was engaged in activity protected by the First Amendment's guarantees of freedom of speech, press, and assembly.

127.    One or more of John Does #1-4 shot or caused to be shot Ms. Tirado in the face with a foam bullet—an adverse action, taken under color of law, that would chill a person of ordinary firmness from continuing to speak, report, and/or assemble.

128.    One or more of John Does #1-4 was motivated to shoot and/or cause to be shot Ms. Tirado at least in part by Ms. Tirado's exercise of her First Amendment rights.

129.    Shooting and/or causing to be shot Ms. Tirado was objectively unreasonable under the circumstances.  In the alternative, John Does #1-4 lacked probable cause to shoot and/or cause to be shot Ms. Tirado.

130.    One or more of John Does #1-4 shot and/or caused to be shot Ms. Tirado pursuant to the Minneapolis Police Department's custom of targeting journalists for unlawful reprisals during the George Floyd protests.

131.    In the alternative, one or more of John Does #1-4 shot and/or caused to be shot Ms. Tirado pursuant to the Minneapolis Police Department's custom of unlawful indiscriminate use of less-lethal munitions during the George Floyd protests.

132.    The relevant custom or customs were continuing, persistent, and widespread within the Department's response to the civil disturbances that followed the death of George Floyd.

133.    By the time Ms. Tirado was shot, a pre-existing pattern of unlawful conduct had put policymaking officials for the City of Minneapolis and Minneapolis Police Department on notice that the Department's unlawful custom or customs were substantially certain to result in violations of First Amendment rights.

134.    The policymaking officials of the City of Minneapolis and Minneapolis Police Department, with deliberate indifference to the constitutional violations they had notice would follow, failed to supervise, train and correct the wrongful conduct.

135.    Ms. Tirado suffered significant physical and emotional injuries as a direct and proximate result of the foregoing unlawful conduct.

## COUNT II

### *42 U.S.C. § 1983 – Fourth Amendment Excessive Force*

136.    Ms. Tirado restates and realleges the preceding paragraphs as if fully set forth again.

137.   One or more of John Does #1-4, acting under color of law, intentionally applied and/or caused to be applied physical force to Ms. Tirado by shooting her in the face with a foam bullet, restraining her freedom of movement such that she was unable to leave the scene without the assistance of others, and thereby effected a seizure under the Fourth Amendment.

138.   The force used was objectively excessive because under the circumstances—in which Ms. Tirado was peacefully documenting protest and police activity—it was not reasonably necessary for any purpose.  The Executive Order exempted Plaintiff and other members of the press from the curfew.  Plaintiff was not posing a threat to the safety of Defendants or others, had not committed any severe or violent crime, and was neither actively resisting arrest nor attempting to evade arrest by flight.  In light of the relationship between the need, if any, for the use of force to the amount of force used, the extent of the injuries to Plaintiff, the inadequacy of the efforts, if any, by Defendants to temper or limit the amount of force used against members of the press, the absence of a security problem posed by Plaintiff, the absence of conduct from Plaintiff that was capable of being reasonably perceived by Defendants as a threat, and the absence of efforts by Defendants to arrest Plaintiff met with active resistance, the Defendants' use of excessive force against Plaintiff was objectively unreasonable.

139.   One or more of John Does #1-4 shot Ms. Tirado and/or caused her to be shot pursuant to the Minneapolis Police Department's custom of targeting journalists for unlawful reprisals during the George Floyd protests.

140.   In the alternative, one or more of John Does #1-4 shot Ms. Tirado and/or caused her to be shot pursuant to the Minneapolis Police Department's custom of unlawful indiscriminate use of less-lethal munitions during the George Floyd protests.

141.   The relevant custom or customs were continuing, persistent, and widespread within the Department's response to the civil disturbances that followed the death of George Floyd.

142.   By the time Ms. Tirado was shot, a pre-existing pattern of unlawful conduct had put policymaking officials for the City of Minneapolis and Minneapolis Police Department on notice that the Department's unlawful custom or customs were substantially certain to result in violations of First Amendment rights.

143.   The policymaking officials of the City of Minneapolis and Minneapolis Police Department, with deliberate indifference to the constitutional violations they had notice would follow, failed to supervise, train and correct the wrongful conduct.

144.   Ms. Tirado suffered significant physical and emotional injuries as a direct and proximate result of the foregoing unlawful conduct.

## COUNT III

### *42 U.S.C. § 1983 – Fourteenth Amendment Excessive Force*

145.    Ms. Tirado restates and realleges the preceding paragraphs as if fully set forth again.

146.    One or more of John Does #1-4, acting under color of law, applied or caused to be applied physical force to Ms. Tirado maliciously, sadistically, and for the purpose of causing harm.

147.    One or more of John Does #1-4 shot or caused to be shot Ms. Tirado pursuant to the Minneapolis Police Department's custom of targeting journalists for unlawful reprisals during the George Floyd protests.

148.    In the alternative, one or more of John Does #1-4 shot or caused to be shot Ms. Tirado pursuant to the Minneapolis Police Department's custom of unlawful indiscriminate use of less-lethal munitions during the George Floyd protests.

149.    The relevant custom or customs were continuing, persistent, and widespread within the Department's response to the civil disturbances that followed the death of George Floyd.

150.    By the time Ms. Tirado was shot, a pre-existing pattern of unlawful conduct had put policymaking officials for the City of Minneapolis and Minneapolis Police Department on notice that the Department's unlawful custom or customs were substantially certain to result in violations of First Amendment rights.

151.     The policymaking officials of the City of Minneapolis and Minneapolis Police Department, with deliberate indifference to the constitutional violations they had notice would follow, failed to supervise, train and correct the wrongful conduct.

152.     Ms. Tirado suffered significant physical and emotional injuries as a direct and proximate result of the foregoing unlawful conduct.

## COUNT IV

### *42 U.S.C. § 1983 – Conspiracy Against Constitutional Rights*

153.     Ms. Tirado restates and realleges the preceding paragraphs as if fully set forth again.

154.     Defendants conspired, under color of law, to deprive Plaintiff of her First, Fourth, and Fourteenth Amendment rights as set forth in Counts I, II, and III.

155.     Defendants reached an agreement, acted in concert, and committed overt acts in furtherance of the conspiracy.  Defendants targeted members of the press and repeatedly utilized excessive force to interfere with their exercise of the constitutionally protected right to record the protests and law enforcement response.  In the alternative, Defendants engaged in indiscriminate unlawful use of less-lethal munitions throughout the course of the George Floyd protests.

156.     One of those overt acts—one or more of John Does #1-4 shooting or causing to be shot Ms. Tirado in the face with a foam bullet—directly and proximately caused Ms. Tirado significant physical and emotional injury.

157.    As set forth in Counts I, II, and III, Defendants did, in fact, violate Plaintiff's First, Fourth, and Fourteenth Amendment rights.

## COUNT V

### *Common-Law Battery*

158.    Plaintiff restates and realleges the preceding paragraphs as though fully set forth again.

159.    One or more of John Does #1-4 intentionally caused physical contact with Ms. Tirado by shooting her in the face with a foam bullet.

160.    One or more of John Does #1-4 intentionally caused physical contact with Ms. Tirado's backpack, which she wore closely connected to her body, by shooting it with a ballistic tracking round.

161.    Objectively, the use of a foam bullet and/or ballistic tracking round against Ms. Tirado's person was excessive and unreasonable force under the circumstances.

162.    Being struck in the face with a foam bullet is a contact that a reasonable person would find harmful and/or offensive.

163.    Being struck and marked with a ballistic tracking round is a contact that a reasonable person would find harmful and/or offensive.

164.    As a direct and proximate result of Defendants' offensive and unreasonably forceful contacts, Ms. Tirado suffered significant physical and emotional injuries.

165.    Defendant City of Minneapolis is liable for the batteries committed by one or more of John Does #1-4 because they were committed in the course and scope of their employment as Minneapolis police officers. *See* Minn. Stat. § 466.02.

166.    Defendant Kroll is liable as a co-conspirator in the batteries committed by one or more of John Does #1-4 because, as alleged above, he combined with one or more of John Does #1-4 and/or the City of Minneapolis to accomplish the unlawful purpose of retaliation against journalists and protestors for the exercise of their First Amendment rights. In the alternative, Kroll combined with one or more of John Does #1-4 and/or the City of Minneapolis to accomplish the lawful purpose of maintaining public order by the unlawful means of violating constitutional rights and committing batteries, as set out above. *See Harding v. Ohio Cas. Ins. Co. of Hamilton, Ohio*, 41 N.W.2d 818, 824-25 (Minn. 1950).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief as follows:

1.  A declaration that Defendants' actions violated Ms. Tirado's rights under the 1st, 4th, and 14th Amendments;

2.  A permanent injunction prohibiting Defendants from violating her 1st, 4th, and 14th Amendment rights by retaliating against her newsgathering activities and/or the use of excessive force.

3.  Damages compensating Plaintiff for her injuries against all Defendants, jointly and severally;

4.  Punitive damages;

5.  Prejudgment interest;

6.  Reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

7.  Such other further relief as this Court may deem just and proper.

Dated:  July 29, 2020                    **GREENE ESPEL PLLP**

/s/ John M. Baker
John M. Baker, Reg. No. 0174403
Davida S. McGhee, Reg. No. 0400175
222 S. Ninth Street, Suite 2200
Minneapolis, MN  55402
(612) 373-0830
jbaker@greeneespel.com
dwilliams@greeneespel.com

-and-

Tai-Heng Cheng (admitted *pro hac vice*)
Gaëlle E. Tribié (*pro hac vice* pending)
**SIDLEY AUSTIN LLP**
787 Seventh Avenue
New York, NY 10019
(212) 839-5661
tcheng@sidley.com
gtribie@sidley.com

Margaret Hope Allen (admitted *pro hac vice*)
**SIDLEY AUSTIN LLP**
2021 McKinney Ave, Ste. 2000
Dallas, TX 75201
(214) 969-3506
margaret.allen@sidley.com

Gabriel Schonfeld (*pro hac vice* pending)
**SIDLEY AUSTIN LLP**
1501 K Street NW
Washington, DC 20005
(202) 736-8483
gschonfeld@gmail.com

*Attorneys for Plaintiff Linda Tirado*