UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Linda Tirado,

        Plaintiff,

vs.

City of Minneapolis; Minneapolis Chief of
Police Medaria Arradondo, *in his official
capacity*; Robert Kroll, *in his individual
capacity*; and Minneapolis Police
Department Officers John Does 1-4, *in
their official and individual capacities*,

        Defendants.

Case No. 20-CV-01338 (JRT-ECW)

**MEMORANDUM OF LAW IN
SUPPORT OF MOTION TO DISMISS
BY DEFENDANTS
CITY OF MINNEAPOLIS AND
MEDARIA ARRADONDO**

---

Plaintiff alleges that one or more John Does struck her with a foam bullet and a ballistic tracking round. The City of Minneapolis and Medaria Arradondo, who is sued only in his official capacity as Chief of Police (collectively "City Defendants"), cannot be held liable merely because the John Does are employed by the Minneapolis Police Department. The City Defendants may only be held liable for their own conduct. Plaintiff's Amended Complaint, however, fails to plead sufficient facts to hold the City Defendants liable under the Count IV Conspiracy claim, or to hold the City Defendants liable under any other Count based on Plaintiff's unpled *Monell* claim. Therefore, the City Defendants respectfully move the Court to dismiss Count IV and to further dismiss the City Defendants from this lawsuit.

<u>**FACTS**</u>

The City Defendants accept as true the Amended Complaint's allegations solely for the purpose of this motion.

## I. MAY 30, 2020, INCIDENT INVOLVING PLAINTIFF LINDA TIRADO

According to the Amended Complaint, Plaintiff Linda Tirado traveled from Tennessee to take pictures of and cover the civil uprisings and protests in Minneapolis. (ECF 33 at ¶5, ¶10).  She is a freelance journalist, and alleges that she was recognizable as a member of the press during the George Floyd protests. (*Id*. at ¶¶10, 33).  Near the Fifth Precinct on May 30, 2020, Plaintiff alleges she saw protestors pelting Minneapolis Police Department ("MPD") officers with water bottles.  (*Id*. at ¶37). At approximately 12:34 a.m., on May 30, while standing between the protestors and a lineup of officers, Plaintiff alleges she felt an impact on the left side of her face. (*Id*. at ¶¶7, 47).   According to the Amended Complaint, she had been hit with a foam bullet.  (*Id*. at ¶54).  Later, Plaintiff claims she observed that her backpack had been hit with a ballistic tracking round, a policing measure used to designate people for arrest.  (*Id*. at ¶¶61-62).  The Amended Complaint alleges that one or more of the John Does fired the foam bullet and tracking round at Plaintiff.  (*Id*. at ¶¶52, 65).

## II. *MONELL*-STYLE ALLEGATIONS AGAINST THE CITY DEFENDANTS

### A. <u>Policy</u>

The Amended Complaint alleges that the MPD has a policy of targeting members of the press that covered the George Floyd protests or, in the alternative, of indiscriminately using less-lethal projectiles without legal justifications.  (ECF 33 at ¶¶2, 86-87).  The

MPD's "use of force policy" demonstrates the "Department's awareness of the dangers of 40mm foam bullets, and the limited circumstances under which their use is appropriate." (*Id.* at ¶42). Section 5-317 of the MPD's Policy and Procedure Manual states:

- Only officers trained in the use of the 40mm less-lethal round are authorized to carry and use them. (*See id*. at ¶44, fn. 14 (citing to Section 5-317(III)(C) of the Policy and Procedure Manual).

- The 40 mm launcher can be used when the incapacitation of a violent or potentially violent subject is desired. (*Id.*) (Section 5-317 IV(C)(1)).

- Officers shall not deploy 40mm launchers for crowd management purposes. (*Id*.) (Section 5-317 III(D)).

- The primary target areas for the 40mm less-lethal round should be the large muscle groups in the lower extremities including the buttocks, thigh, knees. Alternative target areas include the ribcage area to the waist, and the larger muscle areas of the shoulder areas. Areas to avoid when using the 40mm less-lethal round are the head, neck, spinal cord, groin and kidneys. (*Id.* at ¶45) (Section 5-317 IV(B)(1)).

- Officers shall be aware that the delivery of the 40mm impact projectiles to certain parts of the human body can cause grievous injury that can lead to a permanent physical or mental incapacity or possible death. Areas susceptible to death or possible severe injury are the head, neck, throat and chest (in vicinity of the heart). Unless deadly force is justified, officers should avoid the delivery of 40mm impact projectiles to any of the above-described areas. (*Id.* at ¶45) (Section 5-317 IV(B)(2)).

According to the Amended Complaint, the decision to fire a foam bullet at the Plaintiff's head "violated the [MPD'S] policy governing the use of such weapons." (*Id*. at ¶53).

## B. <u>Custom</u>

The Amended Complaint alleges that the MPD had a custom of targeting reporters covering the George Floyd protests. (*Id*. at ¶¶2, 86). According to the Plaintiff, this custom

is continuing, persistent, and widespread. (*Id*. at ¶132). To support this allegation, Plaintiff cites to an incident more than eighteen years ago and a handful of incidents that took place in the two-day period leading up to the May 30, 2020, incident involving the Plaintiff.

Specifically, in April 2002, it is alleged that one reporter and three photographers claimed they were singled out and sprayed with a chemical irritant and hit with batons during a riot near the University of Minnesota, and that journalists were targeted during the riot. (*Id*. at ¶108-109). The Amended Complaint further alleges the following five incidents prior to the May 30, 2020, incident involving the Plaintiff: on May 26, 2020, one reporter was shot in the thigh with a foam bullet, another reporter was shot in the arm with a less-lethal munition, and another journalist was struck with a baton (*Id*. at ¶¶88-90); and on May 27, 2020, a journalist was struck in the eye with a less-lethal projectile and a reporter was struck in the chest with a less-lethal projectile. (*Id*. at ¶¶91-92).[1]

In the alternative, the Amended Complaint alleges that even if there was not a custom of targeting members of the press, the MPD had a custom of indiscriminately using less-lethal projectiles during the protests. (*Id*. at ¶87). In addition to the above, the

---

[1] Plaintiff also alleges that events occurring after Plaintiff's May 30, 2020, incident depict a custom of MPD officers targeting journalists. (ECF Doc. 33 at ¶98). In the early morning hours of May 30, 2020, it is alleged that a cameraman was struck in the arm and neck by projectiles, and on the night of May 30, 2020, a reporter and news crew were fired on with projectiles, a correspondent was struck in the shoulder with a projectile, and a correspondent was sprayed with chemical irritant. (*Id*. at ¶¶99-102). Plaintiff also alleges that on May 31, 2020, MPD officers made disparaging comments to reporters. (*Id*. at ¶¶104-105).

Amended Complaint alleges the following single incident: on May 27, 2020, a protestor was struck on the side of the head with a projectile. (*Id*. at ¶91).

According to the Plaintiff, the single incident over eighteen years ago and the six incidents occurring over a two-day period put the City's policymaking officials "on notice of the [MPD's] custom(s) of unlawful retaliation against journalists and/or the indiscriminate use of less-lethal weapons during the George Floyd protests." (*Id*. at ¶¶93, 133). The 2002 riot incident was allegedly known to the City because an editor met with representatives of the City and MPD, and a newspaper filed a complaint with Internal Affairs regarding the incident. (*Id*. at ¶¶110-111). It is alleged that the City knew of the May 26 and May 27 incidents, or could have monitored the incidents, because of "social media activity," "other digital sources of information," "news coverage," and inquiries from reporters. (*Id*. at ¶¶95-97). Plaintiff alleges that the City and MPD were deliberately indifferent to the alleged constitutional violations. (*Id*. at ¶134).

### C. <u>Supervision, Training and Discipline</u>

Plaintiff alleges that City policymaking officials "failed to supervise, train and correct the wrongful conduct" alleged above. (*Id*. at ¶¶134, 143, 151). The Amended Complaint alleges, on information and belief, that none of the officers involved in the 2002 University of Minnesota riot were disciplined following an Internal Affairs Unit investigation. (*Id*. at ¶¶111-112).

## III. ROBERT KROLL

Plaintiff's Amended Complaint alleges that Robert Kroll, who holds the rank of Lieutenant and is the President of the Police Officers' Federation of Minneapolis

("Union"), exerts tremendous power over the culture, actions, and professional standards of MPD officers, including policies and customs governing the use of force. (*Id*. at ¶¶113-114). After the City prohibited "warrior training" for MPD officers, Mr. Kroll caused the Union to make "warrior training" materials available to officers online for free. (*Id*. at ¶117).

Plaintiff alleges that on May 29, 2020, Mr. Kroll demanded that the MPD Chief of Police and other MPD policymakers loosen restrictions on the use of less-lethal force. (*Id*. at ¶118). On June 1, 2020, Mr. Kroll wrote a letter to Union members indicating that he had numerous conversations with state-level politicians in which he proposed a detailed plan of action relating to National Guard member response. (*Id*. at ¶119). "On information and belief," Plaintiff alleges that Mr. Kroll provided similar "tactical input" into the "protest response of the [MPD] and its individual officers." (*Id*.)

According to Plaintiff, Mr. Kroll is hostile to the press, noting that, in 2016, he generally criticized scrutiny of the police. (*Id*. at ¶¶120-21). And, around June 1, 2020, Mr. Kroll accused the liberal media of targeting him. (*Id*. at ¶122).

## IV.    CONSPIRACY ALLEGATIONS

Plaintiff pleads, "Defendants reached an agreement, acted in concert, and committed overt acts in furtherance of [a] conspiracy." (*Id*. at ¶155). The Amended Complaint alleges on information and belief, that Mr. Kroll conspired with the City, MPD, and/or one more MPD officers to deprive Plaintiff and other members of the press of their First, Fourth and Fourteenth Amendment rights because they were covering the protests or present at the protests, or to maintain public order through unlawful means. (*Id*. at ¶¶123-24, 154-55,

166).  Plaintiff being struck by the foam bullet constitutes an "overt act" of the conspiracy, according to Plaintiff.  (*Id*. at ¶156).

## **ARGUMENT**

### **I.    STANDARD OF REVIEW**

A motion to dismiss under Rule 12(b)(6) tests whether the plaintiff has pleaded a cognizable claim.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Wartman v. United Food & Commercial Workers Local 653*, 871 F.3d 638, 640 (8th Cir. 2017).  A claim is facially plausible if its factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Braden v. Wal–Mart Stores, Inc.,* 588 F.3d 585, 594 (8th Cir. 2009).

"[A] Complaint need not contain 'detailed factual allegations,' but "it must contain facts with enough specificity 'to raise a right to relief above the speculative level.'" *Minnesota Majority v. Mansky*, 708 F.3d 1051, 1055 (8th Cir. 2013) (quoting *Bell Atl. Corp. v. Twom*bly, 550 U.S. 544, 555 (2007)).  "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).  The court need not accept as true wholly conclusory allegations or legal conclusions drawn by the pleader.  *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th Cir. 1999) (conclusory allegations); *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990) (legal conclusions).

**II. THE COURT SHOULD DISMISS COUNT IV BECAUSE PLAINTIFF FAILS TO PLEAD SUFFICENT FACTS TO ESTABLISH THAT THE CITY DEFENDANTS CONSPIRED FOR THE PURPOSE OF DENYING HER OR ANYONE ELSE OF THEIR CONSTITUTIONAL RIGHTS**

To prove a 42 U.S.C. § 1983 conspiracy claim, a plaintiff must show: (1) that the defendant conspired with others to deprive her of constitutional rights; (2) that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) that the overt act injured the plaintiff. *White v. McKinley*, 519 F.3d 806, 814 (8th Cir. 2008).

**A. There was no "meeting of the minds" between the City Defendants and the alleged co-conspirators.**

The Amended Complaint wholly fails to satisfy the first element of a conspiracy claim against the City Defendants – that the City Defendants conspired with others for the purpose of depriving Plaintiff or others of their constitutional rights. "[T]he plaintiff must allege with particularity and specifically demonstrate with material facts that the defendants reached an agreement." *Bonenberger v. St. Louis Metropolitan Police Dept.*, 810 F.3d 1103, 1109 (8th Cir. 2016); *see also Reasonover v. St. Louis Cty.*, 447 F.3d 569, 582 (8th Cir. 2006) (explaining plaintiff must allege with particularity "facts that the defendants reached an agreement"). Put another way, a conspiracy claim "requires allegations of specific facts tending to show a 'meeting of the minds' among the alleged conspirators." *Murray v. Lene*, 595 F.3d 868, 870 (8th Cir. 2010). Plaintiff "must at least allege that 'the defendants had directed themselves toward an unconstitutional action by virtue of a mutual understanding[.]'" *Deck v. Leftridge*, 771 F.2d 1168, 1170 (8th Cir. 1985).

The factual allegations in Plaintiff's Amended Complaint do not directly or indirectly suggest a meeting of the minds between any of the alleged co-conspirators, let alone with the City Defendants. Plaintiff offers the conclusory allegation that the Defendants "reached an agreement" and "acted in concert". (ECF 33 at 155). But these allegations amount to no more than a recitation of the elements of a conspiracy claim, and, consequently, fail to meet basic pleading requirements. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (stating that conclusory allegations are insufficient to withstand a Rule 12 motion); *Spencer v. Federal Prison Camp Duluth*, 2016 WL 4942037, at *30 (D. Minn. 2016) ("Conclusory allegations [for a conspiracy claim] do not suffice.")(citing to *Manis v. Sterling*, 862 F.2d 679, 681 (8th Cir. 1988)); *Murrin v. Fischer*, 2008 WL 540857, at *23 (D. Minn. 2008) ("[W]here a plaintiff offers only conclusory allegations of a conspiracy against a party, the claim is adjudged to have been insufficiently pled, and is subject to dismissal.")(citing to *Snelling v. Westhoff*, 972 F.2d 199, 200-01 (8th Cir. 1992)).

Here, the Amended Complaint does not contain any facts suggesting that the City Defendants reached an agreement or had a "meeting of the minds" with Mr. Kroll. At most, Plaintiff alleges that Mr. Kroll demanded that the City loosen restrictions on the use of less-lethal force. But the Amended Complaint does not plead any facts showing that the City Defendants agreed to, complied with, acted upon, or even responded to Mr. Kroll's purported demand. (*See generally* ECF 33). An unobliged, one-sided demand does not qualify as a "meeting of the minds." Notably, the MPD's policy provisions pertaining to the use of projectiles, which were cited by Plaintiff in her Amended Complaint, remained unchanged notwithstanding Mr. Kroll's alleged demand.

And, although Plaintiff alleges that Mr. Kroll provided tactical "input" into the "protest response of the [MPD] and its individual officers," Plaintiff does not plead any facts showing that the input was of consequence. The mere offering of suggestions does not qualify as a conspiratorial "meeting of the minds." *See Shimota v. Wegner*, 2016 WL 1254240, at *10 (D. Minn. 2016) (dismissing conspiracy claim alleging that a prosecutor's "advice" led county officials to keep plaintiff detained notwithstanding a court order requiring her release because the allegations did not include "specific facts tending to show a meeting of the minds among the alleged conspirators" and, at most, suggested that the parties "acted in a manner that was consistent with the existence of a conspiracy." ) Again, the Amended Complaint does not plead any facts showing that the City Defendants agreed to, complied with, acted upon or even responded to Mr. Kroll's purported tactical "input."

The mere allegation that Mr. Kroll holds significant power or influence over officers in the MPD is immaterial to a determination of whether the City Defendants – or even the John Does – actually agreed to conspire to deprive Plaintiff or others of their constitutional rights during the recent George Floyd protests. *See Magee v. Trustees of the Hamline University, Minn.*, 957 F.Supp.2d 1047, 1057 (D. Minn. 2013)("Magee alleges generally that Titus was able to influence police policy through his position as an officer and president of the [St. Paul Police Federation]. That Titus may have been able to influence policy says nothing about whether Titus did so with respect to the present allegations.")(internal citation omitted).

Plaintiff's conspiracy claim is erroneously premised on the notion that the City Defendants' mere awareness of Mr. Kroll's suggestions can be interpreted as having a

conspiratorial meaning. Surely this cannot be true because Plaintiff alleges that Mr. Kroll provided similar tactical input to state-level leaders, but she no longer asserts a conspiracy claim against the State. In *Manis v. Sterling*, 862 F.2d 679 (8th Cir. 1988), the Eighth Circuit rejected the notion that knowledge of another's purportedly wrongful conduct gives rise to a conspiracy. There, the plaintiff alleged that his attorney conspired with state court judges to delay his post-conviction relief. *Id*. at 681. In support of that claim, the plaintiff alleged that state court judges knew his attorney was not vigorously prosecuting his post-convictions actions yet did nothing to rectify the situation. *Id.* This failed to satisfy the requirement that conspiracy allegations "must be pled with sufficient specificity and factual support to suggest a 'meeting of the minds.'" *Id.* The Eighth Circuit held that the state court judges' purported knowledge of the attorney's dilatory efforts failed to support an inference that the state court judges "had reached any agreement to delay or hinder the adjudication of [plaintiff's] state post-conviction lawsuits." *Id*.

Similarly, in *Boone v. PCL Const. Services, Inc.*, 2005 WL 1843354 (D. Minn. Aug. 2, 2005), the Court rejected the notion that knowledge – or even approval – of another party's separate, wrongful conduct satisfies the "meeting of the minds" pleading requirement. The plaintiff in *Boone* alleged that the City refused to enforce its affirmative action ordinance to foster the inclusion of minority-owned subcontractors on City projects by failing to hold multiple general contractors accountable under the ordinance, resulting in an unabated custom or policy permitting discrimination against minority-owned businesses. Case No. 05-CV-00024 at ECF 19, ¶¶12-13. The plaintiff pled that the City and contractors conspired to violate plaintiff's civil rights under 42 U.S.C. §§ 1983 and

1985 when they "engaged in, consented to, ratified, acquiesced in, approved, and financed racial discrimination in the terms and conditions of awarding contracts for work" on two particular City projects. *Id*. at ¶42. Dismissing the conspiracy claim on a Rule 12(b)(6) motion, Judge Davis reasoned that these allegations failed to plead a meeting of the minds to sustain a conspiracy claim:

> [E]ven under the liberal pleading standards, nothing in the Complaint could be construed as alleging a meeting of the minds. Plaintiffs have alleged a variety of acts by each of the Defendants. Then, Plaintiffs allege that the City knew of, acquiesced in, and/or approved of the Contractor defendants' discriminatory actions. There is no link between the two sets of allegations that suggest there was a meeting of the mind between either of the Defendant contractors and the City.

*Boone*, 2005 WL 1843354, *7 (internal citations omitted). Likewise, here, there is a gap too wide to hurdle between allegations showing Mr. Kroll's communications and the speculative assumption that City Defendants then agreed to a course of action to deprive members of the press or protestors of their constitutional rights.

Being generous, Plaintiff merely alludes to the possibility of a conspiracy. However, as this Court has noted, "[m]ere allusion to such a conspiracy is insufficient; the conspiracy, or meeting of the minds, must be pleaded with specificity and factual support." *Magee v. Trustees of the Hamline University, Minn.*, 957 F.Supp.2d 1047, 1058 (D. Minn. 2013); *see also Doe v. North Homes, Inc.*, 2019 WL 3766380, at *3 (D. Minn. 2019) (explaining "it is not sufficient merely to allude to such a meeting of the minds or joint activity between the state and a private party").

This Court's decision in *Magee* squarely warrants dismissal of Plaintiff's conspiracy claim here. In that case, the conspiracy claim was dismissed on multiple grounds, most

importantly to this case, based on the plaintiff's failure to plead specific facts demonstrating a meeting of the minds. Robin Magee was a tenured law professor who taught classes on policing. *Magee,* 957 F.Supp.2d 1047, 1053. A local newspaper published a letter written by Magee in which she criticized a state court's decision not to investigate allegations of racism related to a case involving the alleged killing of a St. Paul Police Officer. *Id.* David Titus, a police officer with the City of St. Paul and President of the St. Paul Police Federation, wrote a response to Magee's letter, questioning her "fitness to teach," and had the letter published on the Federation's website. *Id.* Titus also called the law school, allegedly with the intent to have Magee fired in retaliation for her critical editorial, and allegedly worked with the school's dean to secure her firing. *Id.* Magee was subsequently suspended from her position after being charged with various tax law violations, and her employment was terminated upon being convicted of those charges. *Id.*

Magee sued Titus, alleging he conspired with state actors to deprive her of her constitutional rights, including organizing other police officers to inundate the law school with communications "demanding" that she be removed from her tenured position for her speech and viewpoint. *Id.* at 1057. Magee pled that Titus had a close relationship with the St. Paul Police Chief. *Id.* Yet this Court held that the existence of a close relationship "amounts only to a suggestion that Titus may have had an opportunity to conspire, which 'is obviously not sufficient to nudge a conspiracy claim across the line from conceivable to plausible.'" *Id.* at 1058.

Magee also alleged that Titus had circulated a resolution requesting that the St. Paul Police Department boycott the law school until Magee's employment was terminated. *Id.*

The mere request to the Police Department was insufficient to support a finding of a conspiracy. This Court explained:

> Although these allegations, accepted as true, may show that Titus attempted to conspire with the St. Paul Police Department, they do not plausibly indicate that the St. Paul Police Department and Titus had a meeting of the minds where both the Department and Titus jointly agreed to violate Magee's constitutional rights. Instead Magee's complaint contains only the legal conclusion that Titus "acted in concert with the public defendants to effectuate a common scheme or plan." These allegations are insufficient to overcome a motion to dismiss.

*Id.* (internal references omitted). The Eighth Circuit affirmed this Court's determination that there was no meeting of the minds to support Magee's conspiracy claim. 747 F.3d 532, 537 (8th Cir. 2014) ("The multiple contacts between Titus, the SPPF's members, and the university do not, without more, reasonably infer that they conspired to terminate Magee.")

Here, too, Mr. Kroll's demand and input alone do not give rise to a meeting of the minds. *Mershon v. Beasley*, 994 F.2d 449, 452 (8th Cir. 1993) ("contacts, by themselves and without more" do not allow the inference of "any mutual understanding" in a § 1983 action). And, Plaintiff offers no explanation of how the City Defendants purportedly acted in concert with Mr. Kroll. Simply put, the Amended Complaint is devoid of any specific, material facts tending to show that the City Defendants in any manner agreed to Mr. Kroll's demands and input, let alone a more specific plan to deprive the press or protestors of their constitutional rights. It is noteworthy that while Plaintiff fails to plead any material facts with specificity or particularity to demonstrate the existence of an agreement involving the City Defendants, Plaintiff specifically pleads disagreement between the City Defendants

and Mr. Kroll.  Indeed, Plaintiff notes that Mr. Kroll caused the Union to offer so-called warrior training to MPD officers after that same training had been banned by the City Defendants.  Such discord negates any suggestion of a mutual understanding or conspiracy.

Finally, the Amended Complaint does not plead any specific facts to establish an agreement between the City Defendants and John Doe Defendants.  To the contrary, Plaintiff pleads that the John Does' use of a foam bullet and tracking round on Plaintiff "violated the [MPD'S] policy governing the use of such weapons."  (ECF 33 at ¶53). Again, this apparent discord negates any finding of a conspiratorial agreement or meeting of the minds.

B. **The City Defendants and the alleged co-conspirators did not reach an agreement for the purpose of depriving Plaintiff of her constitutional rights.**

Even if the Plaintiff sufficiently pled the existence of an agreement, the Amended Complaint is devoid of any facts showing that the agreement was designed to deprive Plaintiff or others of their constitutional rights.  While Plaintiff may disagree with Mr. Kroll's demand to lessen restrictions on the use of less-lethal munitions or that Mr. Kroll offered input on officer responses, Plaintiff does not plead any facts to demonstrate that Mr. Kroll's various suggestions called for officers to violate the constitutional rights of members of the press or protestors.  Although Plaintiff generally contends that Mr. Kroll was hostile to the press, neither the demand nor input offered by Mr. Kroll specifically pertain to members of the press.  Additionally, there are no material facts pled from which this Court could conclude that Mr. Kroll's unsolicited suggestions were made with the intent to infringe on anyone's constitutional rights versus an intent to improve law

enforcement's capacity to respond to the looting, arson, property destruction, attacks on officers and other criminal acts that became widespread during the civil unrest.[2]  More importantly, Plaintiff does not plead even a single fact showing that the City Defendants were intent on depriving members of the press or protestors of their constitutional rights whether it be the right to freedom of speech, the right to be free of excessive force, or any other constitutional right.  That is dispositive.  Plaintiff must show that the City Defendants conspired "*for the purpose* of depriving one of a constitutional right."  *Shimota v. Wegner*, 2016 WL 1254240, at *10 (D. Minn.  2016)(emphasis in original).  She has not.

As other Courts have done, and this Court did in *Magee* and *Shimota*, this Court should dismiss Plaintiff's Count IV conspiracy claim for failing to sufficiently plead facts demonstrating an agreement, involving the City Defendants, to deprive Plaintiff, members of the press, or protestors of their constitutional rights. *See e.g., Palesch v. Missouri Com'n on Human Rights*, 233 F.3d 560, 570 (8th Cir. 2000) (allegation that the individual defendants were "out to get" the plaintiff failed to "support a finding of purposeful discrimination" and conspiracy); *Williamson v. Mo. Dep't of Corr.*, 740 F. App'x 513, 514 (8th Cir. 2018) (stating that conclusory allegations of "obstruction" and "cover-up" insufficient to state a conspiracy claim); *Smithson v. Aldrich*, 235 F.3d 1058, 1063 (8th Cir.

---

[2]  Paragraph 25 and Footnote 7 of the Amended Complaint cite to the Governor's Emergency Executive Order 20-65, which states, "Destructive and dangerous activity has continued. Individuals have looted businesses, destroyed residential buildings, and set a precinct police station on fire. This senseless violence tears at the fabric of our society. . . . We must restore peace and safety immediately."

2000) (holding that an allegation of a conspiracy to provide false testimony is conclusory and therefore fails to state a claim).

### III. PLAINTIFF'S UNPLED *MONELL* CLAIM FAILS AS A MATTER OF LAW AND THE CITY DEFENDANTS SHOULD BE DISMISSED ENTIRELY FROM THIS SUIT

With no viable conspiracy claim, the Amended Complaint does not enumerate any other explicit claim against the City Defendants. The City Defendants cannot be held liable merely because the John Does are purportedly employed by the MPD. *Bolderson v. City of Wentzville, Missouri*, 840 F.3d 982, 985 (8th Cir. 2016). Rather, the City Defendants may only be held liable if their own conduct served as the moving force behind the Plaintiff's constitutional violation. *Atkinson v. City of Mountain View*, 709 F.3d 1201, 1214 (8th Cir. 2013) (explaining that a municipality may only be found liable for plaintiff's constitutional rights resulting from an official policy, unofficial custom, or deliberate indifferent to train or supervise); *Monell v. Dep't of Soc. Servs. of N.Y.,* 436 U.S. 658, 690–91 (1978). To the extent that Plaintiff attempts to keep the City Defendants in this suit based on an unpled *Monell* claim, the Amended Complaint fails in that regard too.

#### A.     The City's Policy on the Use of Projectiles is Constitutional

The Amended Complaint fails to establish that a City policy was the moving force behind the purported constitutional violations. A municipality is liable under Section 1983 only where its policy is the moving force behind a constitutional violation. *Slaven v. Engstrom*, 848 F.Supp.2d 994, 1002 (D. Minn. 2012) (citing *Monell*, 436 U.S. at 694–95). A "policy" is an official policy, a deliberate choice of a guiding principle, or procedure made by the municipal official who has final authority regarding such

matters. *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999). Only "deliberate" actions by a municipality can meet the "moving force" requirement. *Bd. of Cnty. Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 400 (1997). Additionally, a "policy is not unconstitutional if it might allow for unconstitutional conduct in some instances[,] rather, such a policy is unconstitutional only if it requires its officer to act in such an unconstitutional manner." *Peroceski v. Tarr,* 2009 WL 3202463, at \*12 (D. Minn. Sept. 30, 2009); *Conley v. City of Minneapolis*, 2009 WL 1562756, \*4 (D. Minn. 2009).

Here, Plaintiff does not identify an affirmative policy that she claims caused her alleged constitutional violations. Plaintiff only cites to Section 5-317 of the MPD Policy and Procedure Manual pertaining to the use of projectiles. But Plaintiff does not identify any purported shortfall in this policy, let alone one that requires MPD officers to act in an unconstitutional manner. To the contrary, Plaintiff observes that the MPD's "use of force policy" demonstrates the "Department's awareness of the dangers of 40mm foam bullets, and the limited circumstances under which their use is appropriate." (ECF 3 at ¶42). Further, Plaintiff implicitly suggests that the policy is constitutionally firm by pleading that the John Does' use of a foam bullet and tracking round with respect to her violated policy Section 5-317. Plaintiff cannot hold the City Defendants liable for her constitutional violations based on Section 5-317, or any other unidentified policy.

### B. There is No Custom of Targeting Members of the Press or Protestors with the Use of Projectiles

The Amended Complaint does not contain sufficient facts to establish that the City Defendants had a custom of targeting members of the press or protestors with projectiles. To establish the existence of a municipal "custom," a plaintiff must show:

(1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;

(2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and

(3) Th[e] plaintiff['s] injur[y] by acts pursuant to the governmental entity's custom, i.e., [proof] that the custom was the moving force behind the constitutional violation.

*Ware v. Jackson County,* 150 F.3d 873, 880 (8th Cir. 1998). Plaintiff's Amended Complaint fails to establish the first two elements.

Plaintiff baldly asserts that the City has a custom of unlawfully targeting members of the press or protestors with projectiles, relying on three categories of allegations to support her claim: (1) the 2002 University of Minnesota Riot, (2) the two-day period over May 26 and May 27, and (3) post May 30 incident allegations. Each one fails as a matter of law.

#### 1. 2002 Riot

The 2002 riot incident is immaterial to Plaintiff's assertion that the City has a custom of allowing officers to target members of the press with projectiles or, in the alternative, allowing the indiscriminate use of projectiles against protestors. Initially, the 2002 incident is too dissimilar to the custom actually alleged by Plaintiff. Plaintiff does not allege that

reporters were targeted with or struck by projectiles during the 2002 riot. Rather, she alleges that they were sprayed with chemical irritant or hit with batons. These uses of force are substantially different from projectiles. Notably, Section 5-317 of the MPD policy and Procedure Manual does not govern the use of chemical irritants or batons. Other than the 2002 incident generally involved reporters, Plaintiff does not plead any similarities between her May 30, 2020, incident and the April 2002 incident. Consequently, this incident cannot establish an unlawful custom. *Mettler v. Whitledge*, 165 F.3d 1197, 1205 (8th Cir. 1999) (dismissing custom claim because plaintiff did not show "that the incidents giving rise to these complaints bear any factual similarity to the January 22, 1994, confrontation with her son").

Additionally, Plaintiff fails to identify any facts suggesting that the investigation of the 2002 riot incident by MPD's Internal Affairs Unit was deficient, negating a finding that the City Defendants were deliberately indifferent to or tacitly approved of the alleged uses of force. Given the absence of any factual allegations identifying specific deficiencies with the MPD's investigation of that matter, the 2002 incident does not support the existence of an unconstitutional custom. *See id.* (dismissing custom claim because plaintiff "failed to produce evidence that the investigations into these complaints, or investigations into any complaints filed against other Ramsey County Sheriff's deputies, were inadequate.")

Moreover, the 2002 incident is simply too old to provide notice of a persistent and widespread unconstitutional pattern. *See Moore v. District of Columbia,* 79 F.Supp.3d 121 (D.C. 2015)(finding eight-year-old study showing pattern of lack of probable cause for disorderly conduct arrests too remote in time to support notice of potential

custom).   Notably, another 18 years pass before Plaintiff alleges that members of the press were targeted by the MPD.  The isolated 2002 incident does not establish a widespread and persistent unconstitutional custom, or provide notice of such a custom.

## 2.   The May 26 to May 27 Period Just Before Plaintiff's Incident

Plaintiff alleges that over a two-day period from May 26 to 27, 2020, four members of the press and one protestor were struck with some type of projectile.  These incidents do not support the imposition of *Monell* liability for multiple reasons.

To begin, the use of projectiles on five occasions is simply not enough to establish the existence of a widespread and persistent pattern. For a municipality "to be held liable on the basis of custom, there must have been a pattern of 'persistent and widespread' unconstitutional practices which became so 'permanent and well settled' as to have the effect and force of law." *Jane Doe A By & Through Jane Doe B v. Special Sch. Dist.*, 901 F.2d 642, 646 (8th Cir. 1990) (citing *Monell*, 436 U.S. at 691).  Five uses of a projectile cannot fairly be described as evidencing a practice that is "persistent and widespread."   In fact, courts have routinely rejected custom claims premised on more frequent conduct.  *See e.g., Mettler*, 165 F.3d at 1204 (noting that fifteen citizen complaints against deputies failed to establish an unofficial custom); *Brewington v. Keener*, 902 F.3d 796, 802 (8th Cir. 2018) (citing favorably to *Pineda v. City of Houston*, 291 F.3d 325, 329 (5th Cir. 2002) as concluding that eleven incidents of police misconduct were insufficient to establish an unconstitutional pattern).

Additionally, the five incidents occurred in such close proximity to one another that they cannot be viewed as establishing a "persistent and widespread" pattern.  The first

misuse of a projectile alleged by Plaintiff occurred at 8:00 p.m. on May 26, and the last pre-Plaintiff incident use of a projectile occurred on May 27 around 11:32 p.m. (ECF 3 at ¶88, fn. 24). This represents an approximately 15-hour period. Plaintiff does not allege any other misuses of a projectile between the last May 27 incident at 11:32 p.m. and the Plaintiff's May 30 incident at 12:34 a.m. In other words, approximately 71 hours passed without any alleged misuses of projectiles before Plaintiff's incident. Plaintiff's allegations show an isolated period with limited instances of alleged misuse followed by a longer cessation of any alleged misuse of projectiles. This pattern does not give rise to a custom. *See Appel v. City of St. Louis*, 2007 WL 9808053, at *15 (E.D. Mo. 2007) (custom may arise from unwritten understandings "intended to ... establish fixed plans of action to be followed under similar circumstances *consistently and over time*")(emphasis added)(quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986)).

Moreover, even if the Court determined that the five alleged misuses could be considered persistent and widespread, or permanent and well settled, Plaintiff does not allege any specific facts showing that the City Defendants were deliberately indifferent to or tacitly approved of the alleged misuses. *See Mick v. Raines*, 883 F.3d 1075, 1080 (8th Cir. 2018) (dismissing custom claim because plaintiff did not "identify a sufficient number of unconstitutional acts to support an inference of deliberate indifference to employee misconduct" or to meet the "heavy burden required to establish municipal liability through an unofficial custom"). To be sure, the Amended Complaint formulaically asserts that the City Defendants were "deliberately indifferent." However, the conclusory legal assertions are insufficient to make out a custom claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

It appears that Plaintiff's sole basis for her conclusory allegation is that the City Defendants knew or could have known of these incidents through various social media outlets or reporting. At most, those allegations suggest the possibility of constructive notice, not deliberate indifference or tacit approval by policymaking officials.

The Amended Complaint is simply devoid of any facts showing that the City Defendants tacitly approved of the alleged misuse of the projectiles. In fact, Plaintiff implicitly pleads otherwise by affirmatively alleging that the John Does' actions violated City policy. This clearly denotes disapproval of the alleged misuse.

Likewise, the Amended Complaint is wholly devoid of any facts showing that the City Defendants "made a deliberate choice" to ignore the alleged misuses of projectiles. *Johnson v. Douglas County Medical Dept.*, 725 F.3d 825, 829 (8th Cir. 2013); *see also Board of Comm'rs v. Brown,* 520 U.S. 397, 400 (1997) (holding that only "deliberate" action by a municipality can meet the "moving force" requirement). The 15-hour period is so short that it cannot furnish proof of deliberate indifference.

Indeed, it would be pure speculation to assume that the City Defendants accepted the alleged custom based exclusively on the passage of 15 hours or even a failure to intervene in that limited time. *See Hoekstra By and Through Hoekstra v. Independent School Dist. No. 283, St. Louis Park, Minn.,* 916 F.Supp. 941, 947 (D. Minn. 1996) ("Mere delay" did not establish "actionable deliberate indifference" and could not establish a custom). Such speculation is legally insufficient to maintain any claim, let alone establish the stringent standard of fault required to show deliberate indifference. *Minnesota Majority*, 708 F.3d at 1055 (8th Cir. 2013) (explaining that a complaint must "contain facts

with enough specificity 'to raise a right to relief above the speculative level.'"); *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (explaining that deliberate indifference is a "stringent standard of fault"); *Shrum ex rel. Kelly v. Kluck*, 249 F.3d 773, 780 (8th Cir. 2001) (applying a stringent standard of fault to the deliberate indifference requirement of a custom claim). Plaintiff's speculation is particularly ill-founded given the circumstances at the time. During this time period, there was significant civil unrest that required the MPD to exhaust all its resources to respond to unprecedented public safety threats.[3] In the absence of any specific factual allegations to the contrary, the fact that the City Defendants were addressing a state of emergency during the limited 15-hour period negates any contention of deliberate indifference or tacit approval based on the five alleged incidents.

The City Defendants are not aware of any instance where a municipality has been held liable for having an unconstitutional custom because they purportedly did not correct isolated conduct in less than a day – here, a mere 15 hours. *See Johnson v. Douglas County Medical Dept.*, 725 F.3d at 829 (custom claim failed where plaintiffs offered no evidence that policymaking officials made a deliberate choice to ignore an alleged violation "all in the course of [a] few hours"); *Burbridge v. City of St. Louis, Missouri*, 430 F.Supp.3d 595, 620 (E.D. Mo. 2019) (holding that numerous incidents of officers pepper spraying protestors over a two-day weekend could not establish "deliberate indifference" or "tacit authorization" because the "incidents are simply too close in time to" the plaintiffs' own

_____

[3] Paragraph 14 and Footnote 5 of the Amended Complaint cite to the Governor's Emergency Executive Order 20-64, which states, "The City of Minneapolis has exhausted its resources and called for assistance from mutual aid partners to ensure immediate response to protect life, safety, and property." *See also supra* fn. 2.

incident); *Ball-Bey v. Chandler*, 415 F.Supp.3d 884, 895 (E.D. Mo. 2019) (citing to *Webster v. Houston*, 735 F.2d 838, 842 (5th Cir. 1984)) ("The prior incidents 'must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of [the municipality's] employees.'") Simply put, five incidents occurring over a 15-hour period marked by massive and dangerous civil unrest do not support the existence of an unlawful custom.

### 3.    Post-Incident Conduct

Plaintiff's post-incident allegations also do not support the existence of an unconstitutional custom. Following her incident, Plaintiff alleges three additional incidents involving the use of projectiles and one use of a baton. Even if added to the May 26 to 27 incidents, the collective number of incidents is neither widespread, continuing nor persistent. *See id.* Indeed, only nine incidents, two of which do not involve projectiles, during a time of massive civil unrest that gave way to a state of emergency cannot fairly be described as "so pervasive" to "trigger municipal liability based on unofficial custom." *Bolderson v. City of Wentzville, Missouri*, 840 F.3d 982, 986 (8th Cir. 2016).

Additionally, it is self-evident that any incidents after 12:34 a.m. on May 30 could not have put the City Defendants on notice of an unconstitutional custom prior to the Plaintiff's incident. *Evenstad v. County of Hennepin*, 2006 WL 8445284, at *7 (D. Minn. 2006)("grievances filed after the period of Plaintiff's detention do not establish the element of notice to the policymakers required to attribute *Monell* liability to the county").

Likewise, an alleged failure to address these subsequent incidents cannot qualify as the "moving force" behind Plaintiff's alleged constitutional violation.

**C.** **Plaintiff's Training, Supervision and Discipline Claims are Patently Insufficient**

Plaintiff alleges that the City Defendants failed to train, supervise and correct the wrongful conduct of officers. These allegations lack sufficient factual enhancement. Plaintiff does not plead a single fact in support of her contention that the City's supervision of officers was deficient. As such, the pleading amounts to no more than an unadorned legal conclusion which this Court should not accept. *DuBois,* 276 F.3d 1019, 1022 (8th Cir. 2002). As the United States Supreme Court advised in *Ashcroft v. Iqbal*, "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" 556 U.S. 662, 678 (2009) (internal citations omitted).

Plaintiff suggests, but does not outright plead, that officers must not have been properly trained with the 40mm launcher because she and one other individual were struck in the head. But Plaintiff offers no facts about training deficiencies to support her ipso facto conclusion that because she was struck in the head the training must be insufficient. This is fatal to a training claim. *Birkeland as trustee for Birkeland v. Jorgenson*, 2019 WL 1936736, at *10 (D. Minn. May 1, 2019) (citing *Andrews v. Fowler*, 98 F.3d 1069, 1076 (8th Cir. 1996) (noting that a failure to train claim must identify a specific deficiency in the training program). Likewise, having pled only two instances in which individuals had been struck in the head clearly fails to "establish that policymakers acted with deliberate

indifference in failing to train employees." *Id*. The first incident – within mere days of Plaintiff's incident – is not sufficient in terms of numerosity or timeliness to have put the City on notice regarding an alleged training deficiency. *Thelma D. By & Through Delores A. v. Bd. of Educ. of City of St. Louis*, 934 F.2d 929, 934 (8th Cir. 1991)(requiring plaintiff to establish facts showing the municipality was on notice). Failure to train claims are the most tenuous of the claims seeking to impose municipal liability, and the Plaintiff's allegations have failed to cement a claim to withstand Rule 12. *See Connick v. Thompson*, 563 U.S. 51, 61 (2011).

Plaintiff offers only one allegation in support of her contention that the City did not correct wrongful conduct: on information and belief, following an Internal Affairs Unit investigation, no officers were disciplined related to the 2002 riot. No other allegations are offered in support of Plaintiff's claim. A single alleged incident, over 18 years ago, fails to establish a failure to correct wrongful conduct, particularly since Plaintiff does not plead any specific facts tending to show that the City's investigation of that matter or its determination was improper in any manner.

Quite simply, the Plaintiff has failed to plead sufficient facts to maintain an unpled *Monell* claim.

## **CONCLUSION**

For the foregoing reasons, the City Defendants respectfully request that the Court dismiss Count IV of the Amended Complaint with prejudice and dismiss the City Defendants entirely from this suit with prejudice.

Dated: August 24, 2020

JAMES R. ROWADER, JR.
City Attorney
By */s Kristin R. Sarff*
KRISTIN R. SARFF (0388003)
SHARDA ENSLIN (0389370)
HEATHER ROBERTSON (0390470)
Assistant City Attorneys
Minneapolis City Attorney's Office
350 South Fifth Street, Room 210
Minneapolis, MN 55415
(612) 673-3919
kristin.sarff@minneapolismn.gov
sharda.enslin@minneapolismn.gov
heather.robertson@minneapolismn.gov

*Attorneys for Defendants City of
Minneapolis and Minneapolis Chief of
Police Medaria Arradondo*