IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| Linda Tirado, | Case No. 0:20-cv-01338-JRT-ECW |
| | |
| Plaintiff, | **PLAINTIFF'S CONSOLIDATED MEMORANDUM OF LAW OPPOSING DEFENDANTS' MOTIONS TO DISMISS THE FIRST AMENDED COMPLAINT** |
| v. | |
| City of Minneapolis; Minneapolis Chief of Police Medaria Arradondo, *in his official capacity*; Robert Kroll, *in his individual capacity*; and Minneapolis Police Department Officers John Does 1-4, *in their official and individual capacities*, | |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

Introduction......................................................................................................1

Factual Background......................................................................................... 2

    A.    Minneapolis Police Officers Intentionally Shot Plaintiff Linda Tirado in the Face. ............................................................................. 3

    B.    Officers Shot Ms. Tirado as Part of a Pattern of Illegal Violence Against Journalists Covering the George Floyd Protests.................. 5

    C.    The Minneapolis Police Department Deliberately Ignored the Pattern of Illegal Violence that Injured Ms. Tirado.......................... 11

Legal Standard ................................................................................................ 13

Argument ........................................................................................................ 14

    I.    Defendants Do Not Dispute That Ms. Tirado Alleges a Grossly Excessive Use of Force, in Violation of Federal and Minnesota Law. ......................... 15

        A.    Intentionally Shooting Ms. Tirado in the Face Violated the First, Fourth, and Fourteenth Amendments. ............................................. 15

            1.    Police Shot Ms. Tirado in The Face in Retaliation for Exercising Her First Amendment Rights. ............................... 15

            2.    Shooting Ms. Tirado in the Face Was an Objectively Unreasonable Seizure Under the Fourth Amendment......... 19

            3.    Intentionally Shooting Ms. Tirado For the Purpose of Causing Harm Violated the Due Process Clause of the Fourteenth Amendment........................................................ 20

        B.    Intentionally Shooting Ms. Tirado in the Face Was a Battery Under Minnesota Law. ................................................................................ 21

    II.    The City is Liable for Its Police Officers' Illegal Use of Force. .................. 22

        A.    The City is Vicariously Liable for Battery Under Minnesota Law. 23

B.     The City Is Liable Under 42 U.S.C. § 1983 for Its Deliberate Indifference to Police Violence Against the Press. ........................ 24

       1.     Minneapolis Police Responded to the George Floyd Protests With a Pattern of Violent Retaliation Against Journalists. . 27

       2.     The City Was Deliberately Indifferent to a Pattern of Police Violence Against Journalists .................................................. 37

III.     Kroll and the City are Jointly Liable Under § 1983 for Conspiring to Use Excessive Force Against Journalists Like Ms. Tirado. ............................... 41

    A.     The Complaint Pleads a Prima Facie Conspiracy Claim Under Federal and Minnesota Law. .......................................................... 42

    B.     Kroll Has No First Amendment Defense to Conspiracy. .............. 50

Conclusion ............................................................................................................ 51

**INTRODUCTION**

On the fourth night of unrest after George Floyd's murder, one or more officers of the Minneapolis Police Department ("the Department") intentionally shot journalist Linda Tirado in the face as she photographed police and protestors. Ms. Tirado was clearly identifiable as a working member of the press, was committing no crime, and posed no threat to anyone. Nevertheless, one or more John Doe police officers ("the Officer Defendants"), purposefully aimed and fired a 40mm foam bullet at her head—an area of the body which Department policy specifically warns should never be targeted except as a form of deadly force. That unprovoked attack left Ms. Tirado blind in one eye, violated her rights under the First, Fourth, and Fourteenth Amendments, and constituted a battery under Minnesota law. *See infra* Part I.

Defendants City of Minneapolis, Minneapolis Chief of Police Medaria Arradondo (collectively, "the City") and Robert Kroll do not dispute that those allegations state direct claims against the Officer Defendants. Instead, they move to dismiss based solely on Ms. Tirado's purported failure to establish their own derivative liability for that misconduct. Those arguments fail.

The Amended Complaint pleads three plausible bases on which Defendants may be liable. First, under Minnesota law the City is vicariously liable for batteries committed by its police. The City does not—and could not—make any attempt to argue otherwise. *See infra* Part II.A. Second, under 42 U.S.C. § 1983 and *Monell v.*

1

*Department of Social Services*, 436 U.S. 658 (1978), the City is liable because the Officer Defendants shot Ms. Tirado pursuant to a Minneapolis Police Department custom of violent retaliation against press covering the George Floyd protests. Ms. Tirado was neither the first nor the last journalist so attacked, and although the City had notice of that custom in time to prevent her injuries, it deliberately failed to do so. *See infra* Part II.B. Finally, Kroll and the City are jointly liable for conspiring to foment a crackdown on journalists who covered civil unrest in Minneapolis. Kroll is president of Minneapolis's police union, whose deep influence over the Department and hostility towards the press are matters of public record. In the wake of George Floyd's death, Kroll—with the City as his willing partner—seized the opportunity to turn that hostility to action. *See infra* Part III. For these reasons, the motions to dismiss should be denied in their entirety.

## FACTUAL BACKGROUND

Plaintiff Linda Tirado is an internationally-renowned journalist with significant experience covering demonstrations and other civil unrest. Am. Compl. ¶¶ 1, 29, 75. As protests against the killing of George Floyd roiled Minneapolis, Ms. Tirado joined press from across the country in rushing to cover them. *Id.* ¶ 5. She did so for only a few hours before Minneapolis police officers, acting intentionally and pursuant to Department custom, retaliated by shooting her in the face.

### A. Minneapolis Police Officers Intentionally Shot Plaintiff Linda Tirado in the Face.

Ms. Tirado set out to document the protests in the evening of Friday, May 29.[1] *Id.* ¶ 28. Although Governor Tim Walz had earlier that day announced an 8:00 p.m. curfew for Minneapolis and St. Paul, his order expressly exempted "[a]ll . . . members of the news media." *Id.* ¶ 25.[2] There was no mistaking Ms. Tirado for anything other than a member of the news media.

Based on her experience covering similar protests, Ms. Tirado dressed in a way that clearly showed she was press. *Id.* ¶ 29. She wore a reflective press credential around her neck, *id.* ¶ 30, carried a large professional camera, *id.* ¶ 31, and wore a high-grade respirator and goggles (well beyond the protective equipment ordinarily worn by demonstrators), *id.* ¶ 32. Any observer would have recognized Ms. Tirado as press—and indeed, many of them did. Multiple law enforcement officers, firefighters, members of the National Guard, and protesters asked Ms. Tirado which news outlet she was working with. *Id.* ¶ 33.

Around 12:34 a.m. (now Saturday, May 30), Ms. Tirado approached a crowd of protesters standing opposite a group of Minneapolis police near the Department's

---

[1] All dates are 2020 unless otherwise noted.

[2] *See also* Emergency Executive Order 20-65, *Implementing a Temporary Nighttime Curfew in the Cities of Minneapolis and Saint Paul*, at 2 (May 29, 2020), *available at* https://mn.gov/governor/assets/EO%2020-65%20Final_tcm1055-434635.pdf.

Fifth Precinct. *Id.* ¶¶ 36, 46, 58. Ms. Tirado had heard protesters shouting that police had deployed tear gas without warning, and before she made her approach had ensured that her press credential was displayed and her respirator and goggles were secured. *Id.* ¶¶ 34-35, 49.

In addition to her appearance, Ms. Tirado's behavior on location also marked her as a member of the media. She held herself physically separate from the protesters—approaching from the side rather than through the crowd—and stood apart from them as she framed her shot of the police line. *Id.* ¶¶ 46-48. Working from a position between police and protesters, Ms. Tirado took dozens of photographs prior to being shot. *Id.* ¶¶ 47, 50. She did so using bulky professional equipment, including an almost foot-tall camera rig and a flash that would have been plainly visible to the police. *Id.* ¶¶ 31, 51. It was obvious that Ms. Tirado was breaking no law and posed no threat.

Nevertheless, as Ms. Tirado aimed her camera to continue photographing the police, one or more Department officers intentionally and without warning shot her (or caused her to be shot) in the face with a 40mm crushable foam bullet. *Id.* ¶¶ 41, 52, 54-55, 58-59. The shooting was not random—officers had earlier marked Ms. Tirado with a bright green tracking round, Am. Compl. ¶¶ 61-66—was intended as retaliation against Ms. Tirado's exercise of her First Amendment rights, and was not otherwise justified or reasonable. *Id.* ¶¶ 128-29, 138, 146, 161. Photos that Ms. Tirado

took at the time suggest that officers did not believe they were under imminent threat. *Id.* ¶ 59. Moreover, the deliberate decision to fire at Ms. Tirado's head violated both the Department's stated use-of-force policy and warnings provided by the weapon's manufacturer, *id.* ¶¶ 38-45.

The foam bullet struck the left side of Ms. Tirado's face, causing an eruption of blood, knocking off her goggles, and requiring her to shut her now-unprotected eyes against the tear gas floating in the air. *Id.* ¶¶ 54, 56, 68-69. Ms. Tirado was functionally immobilized and required the assistance of protesters to leave the scene and find medical attention. *Id.* ¶¶ 60, 137. As a direct result, she is now permanently blind in her left eye after undergoing two surgeries (with potentially more to come), and suffers from other serious physical ailments including intense headaches, deep fatigue, and a severe light sensitivity. *Id.* ¶¶ 70-73, 77-78. She has begun to return to journalistic work and wishes to document the aftermath of the George Floyd protests, but fears further retaliation by Minneapolis police if she returns to Minneapolis to do so. *Id.* ¶¶ 80-85.

### B. Officers Shot Ms. Tirado as Part of a Pattern of Illegal Violence Against Journalists Covering the George Floyd Protests.

Ms. Tirado was neither the first nor the last journalist who Minneapolis police attacked during the George Floyd protests. Far from it. As the Amended Complaint alleges—and as City officials knew at the time—Ms. Tirado's shooting was only one instance in a widespread and continuous pattern of illegal violence against members

of the press who reported on those protests. Minneapolis experienced five nights of significant unrest—May 26, 27, 28, 29, and 30—in the wake of George Floyd's death. On *at least four out of five* nights, Minneapolis police carried out unlawful attacks on one or more journalists. On *at least three* of those nights, moreover, police attacked *multiple* journalists.

On the night of Tuesday, May 26—three days before they shot Ms. Tirado—Minneapolis police attacked at least three different journalists:

- Around 8:00 p.m. that night, Minneapolis police officers shot Andy Mannix—the federal courts reporter for the *Star Tribune*—in the thigh with a foam bullet. At the time he was shot, Mannix was about a block away from Minneapolis's Third Precinct, doing nothing more threatening than leaning against a tree. *Id.* ¶ 88.

- Shortly after 9:00 p.m., Minneapolis police officers shot reporter Niko Georgiades in the arm with an unknown less-lethal projectile. Georgiades was documenting the Department response to demonstrators when he saw a protester fall down after being shot by police. When Georgiades approached the injured man, police shot Georgiades as well. *Id.* ¶ 89.[3]

---

[3] *See also* Unicorn Riot (@UR_Ninja), Twitter, (May 26, 2020 9:16pm) https://twitter.com/UR_Ninja/status/1265466767440261120 (incorporated by

- That same evening, a Minneapolis police officer was filmed using a baton, unprovoked, to strike a camera-carrying journalist in the throat. During the assault, onlookers screamed—to no apparent effect—that the victim was with the press. *Id.* ¶ 90.[4]

The same pattern continued on the night of Wednesday, May 27, when Minneapolis police shot at least two more journalists with less-lethal projectiles:

- At about 6:30 p.m., officers shot freelance reporter Jared Goyette in the eye with a less-lethal munition. *Id.* ¶ 91. Goyette has since filed his own lawsuit against the City, alleging that he was shot under circumstances remarkably similar to Ms. Tirado's. *See generally* Second Amended Complaint, *Goyette v. City of Minneapolis*, No. 20-CV-01302 (WMW/DTS) (D. Minn. July 30, 2020), ECF No. 53. Specifically, Goyette alleges that he was standing apart from protesters, carrying equipment that visibly marked him as a journalist, when Minneapolis police shot him in the face without warning. *Id.* ¶¶ 80, 82.[5]

---

reference at Am. Compl. ¶ 89 n.20); Unicorn Riot (@UR_Ninja), Twitter, (May 26, 2020 9:17pm) https://twitter.com/UR_Ninja/status/1265466767440261120 (same).

[4] *See also #Live: Minneapolis Responds to Police Murder of George Floyd* (at 1:40:35), YouTube, https://youtu.be/XAa5xb6JitI?t=6035 (May 26, 2020) (incorporated by reference at Am. Compl. ¶ 90 n.21).

[5] Court records are judicially noticeable at the motion-to-dismiss stage, *see, e.g., Levy v. Ohl*, 477 F.3d 988, 991-92 (8th Cir. 2007), and courts determining the

- Late that night, Minneapolis police shot *Minnesota Reformer* reporter Max Nesterak in the chest with a less-lethal projectile. Like Ms. Tirado, Nesterak took a photo immediately before police shot him—and like Ms. Tirado's photo, Nesterak's shows a group of officers standing in a manner plainly inconsistent with any belief that they were under imminent threat. Am. Compl. ¶ 92.[6]

Minneapolis police shot Ms. Tirado during a night of unrest that began Friday, May 29. She was at least the sixth journalist Minneapolis police had attacked in four days, but the Department's pattern of violence against the media did not stop there. On Saturday, May 30—the final night of serious unrest after George Floyd's death—Minneapolis police carried out at least four more unprovoked attacks on members of the press:

- Shortly after 8:00 p.m., Minneapolis police shot Reuters cameraman Julio-Cesar Chavez in the arm and neck with less-lethal projectiles. *Id.* ¶ 99.[7] At the time he was shot, Chavez was wearing a press credential,

---

plausibility of a pattern-and-practice claim under § 1983 may consider the fact that similar behavior has been alleged in other pending civil actions, *see infra* at 29 n.22.

[6] *See also* Max Nesterak (@maxnesterak), Twitter, (May 27, 2020 11:34pm), https://twitter.com/maxnesterak/status/1265863873825058816 (incorporated by reference at Am. Compl. ¶ 92 n.25).

[7] Reuters, *Reuters camera crew hit by rubber bullets as more journalists attacked at U.S. protests* (May 31, 2020), https://www.reuters.com/article/us-minneapolis-police-protest-update/reuters-camera-crew-hit-by-rubber-bullets-as-

holding a camera, and taking cover at a nearby gas station.[8]  Minutes

beforehand, he had captured footage of a Minneapolis police officer

aiming a 40mm launcher directly at him as he filmed.[9]

- Later that night, Minneapolis police officers fired multiple less-lethal

  projectiles at CBS reporter Michael George and his crew, injuring a

  sound engineer.  *Id.* ¶ 100.  At the time they were attacked, crew

  members were displaying press credentials, carrying camera and sound

  equipment, and standing more than 500 feet from any protesters.  *Id.*

- Minneapolis police shot Canadian Broadcasting Corporation

  correspondent Susan Ormiston under similar circumstances and

  around the same time.  *Id.* ¶ 101.  Ormiston was shot with a less-lethal

  munition in the shoulder as she stood with her crew (and their clearly

  visible television camera) in a parking lot that had already been cleared

  of protesters.  *Id.*

- Minneapolis police attacked Vice News correspondent Michael

  Anthony Adams as he sheltered at a Minneapolis gas station just before

---

more-journalists-attacked-at-us-protests-idUSKBN237050 (incorporated by
reference at Am. Compl. ¶ 99 n.27).  The Amended Complaint inadvertently states
that Cesar-Chavez was shot early in the morning of May 30.

[8] *Id.*

[9] *Id.*

midnight. *Id.* ¶ 102. Video of the incident shows one officer pointing a 40mm launcher at Mr. Adams—who was lying face down on the ground—at point-blank range. *Id.* Moments later, in response to Mr. Adams announcing "I'm press" and displaying his credentials, another officer sprayed him in the face with a chemical irritant. *Id.*

Those incidents—ten *reported* attacks on journalists over the space of five days—illustrate a broader pattern of violence against members of the press covering the George Floyd protests. Reporters are "usually" injured accidentally when they are "taking the risk" by putting themselves "between the police and the protesters."[10] Press in Minneapolis, however, "appeared to be targeted" for harm,[11] and "shot at if [they] were anywhere in line of sight."[12] As one experienced photographer put it: "I've been hit because I was in the wrong place before. I've never been aimed at so deliberately so many times [as in Minneapolis during the George Floyd protests]." *Id.* ¶ 106.

---

[10] *Id.*

[11] *Id.*

[12] Lucas Jackson (@Lucas_Jackson_), Twitter, (May 31, 2020 10:22am), https://twitter.com/Lucas_Jackson_/status/1267114291532046338 (incorporated by reference at Am. Compl. ¶ 106 n.34).

**C.   The Minneapolis Police Department Deliberately Ignored the Pattern of Illegal Violence that Injured Ms. Tirado.**

From the beginning of the George Floyd protests, City officials knew of—and intentionally failed to curtail—the above-described pattern of illegal attacks against journalists by Minneapolis police. The City was aware of those and other reports because it continually monitors social media activity and live streams through the "Strategic Information Center"—the Department's intelligence arm. *Id.* ¶ 95. The City learned of that pervasive violence through at least two different channels:

First, a pattern of attacks on journalists unsurprisingly attracted significant press coverage. The shooting of *Star Tribune* reporter Andy Mannix, *see supra* at 6, was covered in *Time* magazine on May 27—two days before police shot Ms. Tirado. *Id.* ¶ 88 & n.19. The Freedom of the Press Foundation's *U.S. Press Freedom Tracker* also reported on the Mannix attack, along with four others from the nights of May 26 and 27, *see supra* at 6-8, before Ms. Tirado's. *Id.* ¶ 97 & n.26. The *Press Freedom Tracker* published its stories before Ms. Tirado was attacked, and sought comment from the Department before publication. *Id.* ¶ 97.[13] Although the City did not

---

[13] *See also* U.S. Press Freedom Tracker, *Journalists struck by projectiles while covering Minneapolis protest* (May 29, 2020), https://pressfreedomtracker.us/all-incidents/journalists-struck-projectiles-while-covering-minneapolis-protest/ (incorporated by reference at Am. Compl. ¶ 97 n.26); U.S. Press Freedom Tracker, *Journalists hit with 'less lethal' rounds during second day of Minnesota protests*, (May 29, 2020), https://pressfreedomtracker.us/all-incidents/journalists-hit-less-lethal-rounds-during-second-day-minnesota-protests/ (same).

respond to those inquiries and articles, it was put on actual notice of a pattern of unlawful behavior.

Second, reports of Minneapolis police officers attacking journalists were shared widely and continuously on social media for days before Ms. Tirado was shot early in the morning of May 30. *Id.* ¶ 94. Andy Mannix tweeted about being shot on May 26 and 27, in posts that were shared over 1,000 and 11,000 times, respectively. *Id.* ¶ 88 & nn.17-18. Independent media organization Unicorn Riot tweeted the attack on Niko Georgiades on May 26, *id.* ¶ 89 & n.20, and live-streamed a Minneapolis officer nightsticking a journalist in the throat the same day, *id.* ¶ 90 & n.21. Jared Goyette and Max Nesterak also tweeted about their attacks on the evening of May 27. *Id.* ¶¶ 91-92 & nn.23-25. The City was aware of those and other reports through continuous monitoring of social media and live streams by its "Strategic Information Center." *Id.* ¶ 95.

The City was actually aware of a widespread pattern of illegal violence, carried out by Minneapolis police officers, on a continuing basis throughout the George Floyd protests. *Id.* ¶¶ 93-97. It had a duty to take steps to address and correct that pattern, but failed to do so before Ms. Tirado was shot. Instead—as evidenced by the fact that the same pattern of attacks subsequently continued unabated, *id.* ¶¶ 98-102—it deliberately failed to act, *id.* ¶¶ 134, 143, 151.

## LEGAL STANDARD

At the pleading stage, Ms. Tirado "must satisfy only the simple requirements of Rule 8(a)," *Atem v. Accurate Homecare, LLC*, No. 13-CV-903 (JRT/JJK), 2013 WL 5406687, at *4 (D. Minn. Sept. 25, 2013) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002)), by providing "a short and plain statement" of her claims for relief, Fed. R. Civ. P. 8(a)(2). Under that standard, the Amended Complaint survives a motion to dismiss so long as it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Ms. Tirado is entitled to have the Court not only "accept as true all factual allegations in the complaint," but also "draw all reasonable inferences" in her favor. *McDonough v. Anoka Cty.*, 799 F.3d 931, 945 (8th Cir. 2015). "[T]he factual allegations [supporting those inferences] may be circumstantial and need only be enough to nudge the claim "across the line from conceivable to plausible." *Id.* (citation omitted) While "threadbare recitals" and naked "legal conclusions" are disregarded, pleading a plausible claim does not require "direct evidence," or a showing that success on the merits is more likely than not. *Id.* (quoting *Cardigan Mountain Sch. v. N.H. Ins. Co.*, 787 F.3d 82, 88 (1st Cir. 2015)). "Ferreting out the *most* likely reason for the defendants' actions is not appropriate at the pleadings stage"—a claim is plausible so long as the defendant's liability is *one* "reasonable inference" from the facts alleged. *Id.* at 945-46 (emphasis added).

## ARGUMENT

Neither Kroll nor the City argues that Ms. Tirado has failed to plead a direct violation of federal and state law. They do not challenge, in other words, the Amended Complaint's allegations that Minneapolis police intentionally shot Ms. Tirado in the face, and that doing so was both a constitutional violation and a Minnesota battery. *See infra* Part I. Rather, Defendants argue *only* that Ms. Tirado has failed to allege how they are derivatively liable for that illegal attack. Their arguments are unavailing and the motions to dismiss should be denied.

The City's request for complete dismissal fails at the outset because it flatly ignores Ms. Tirado's Minnesota battery claim. *See* Am. Compl. Count V (¶¶ 158-66). To be sure, the City cannot be held liable *under § 1983* "merely because the John Does are [Minneapolis police officers]." City Mem. at 1, 17. But Ms. Tirado's battery claim does not arise under § 1983, and *under Minnesota law* "every municipality is subject to liability for its torts and those of its . . . employees." Minn. Stat. § 466.02. The Amended Complaint adequately alleges the City's vicarious liability for battery, and the City's failure to respond is dispositive. *See infra* Part II.A.

The City's challenges to Ms. Tirado's *Monell* claims fare no better. *See* Am. Compl. Counts I, II, III (¶¶ 125-52). The Complaint contains substantial allegations that Minneapolis police targeted the press for violent retaliation throughout the George Floyd protests, and the City intentionally ignored that pattern of unconstitutional behavior. Notwithstanding the City's efforts to reduce analysis

under *Monell* to a bare exercise in counting incidents, the Complaint's allegations are clearly plausible.  *See infra* Part II.B.

Defendants' arguments regarding Ms. Tirado's conspiracy claim also lack merit.  *See* Am. Compl. Count IV (¶¶ 153-57).  The Complaint plausibly alleges an agreement between Kroll and the City to foment an unlawful crackdown on journalists, *see infra* Part III.A, and the First Amendment does not preclude using Kroll's words as evidence of the same, *see infra* Part III.B.

## I. Defendants Do Not Dispute That Ms. Tirado Alleges a Grossly Excessive Use of Force, in Violation of Federal and Minnesota Law.

### A. Intentionally Shooting Ms. Tirado in the Face Violated the First, Fourth, and Fourteenth Amendments.

Neither Kroll nor the City disputes that the Amended Complaint states viable constitutional claims directly against the Officer Defendants.  Nor could they—Ms. Tirado has clearly alleged that Minneapolis police intentionally shot her in the face, and that doing so violated her First, Fourth, and Fourteenth Amendment rights.

#### 1. Police Shot Ms. Tirado in The Face in Retaliation for Exercising Her First Amendment Rights.

"[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out."  *Graham v. Barnette*, 970 F.3d 1075, 1091 (8th Cir. 2020) (alteration in original) (quoting *Hoyland v. McMenomy*, 869 F.3d 644, 655 (8th Cir. 2017)).  Here, the Officer Defendants violated the First Amendment when they shot Ms.

Tirado, without justification, based on her protected newsgathering activity. *See* Am. Compl. Count I (¶¶ 125-35).

The elements of a First Amendment retaliation claim are well-settled in the Eighth Circuit. Plaintiffs must show that (1) they engaged in activity protected by the First Amendment, (2) a government official subjected them to adverse action that would "chill a person of ordinary firmness from continuing in the activity," and (3) the adverse action was at least partly motivated by the protected activity. *See, e.g.*, *Peterson v. Kopp*, 754 F.3d 594, 602 (8th Cir. 2014) (quoting *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004)).[14]

The Amended Complaint alleges facts that make each of those elements plausible. First, there is no dispute that Ms. Tirado was engaged in protected activity when Minneapolis police shot her in the face. She was wearing press credentials, carrying a camera, and standing apart from both police and protestors as she photographed events of obvious public importance. *See supra* at 3-4; *Snyder v.*

_____

[14] In a retaliatory *arrest* case, the Eighth Circuit and the Supreme Court require a fourth element: "the lack of probable cause or arguable probable cause." *Graham*, 970 F.3d at 1091; *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019). That element was derived from retaliatory prosecution cases, and "'like retaliatory prosecution cases, evidence of the presence or absence of probable cause for the arrest will be available in virtually every retaliatory arrest case.'" *Nieves*, 139 S. Ct. at 1724 (quoting *Reichle v. Howards*, 566 U.S. 658, 668 (2012)). Here, Ms. Tirado was shot rather than arrested. But even if this Court were to extend the no-probable-cause requirement to claims of retaliation by excessive force, the Amended Complaint plausibly alleges that element as well. *See* Am. Compl. ¶ 129; *see also infra* 18-20 (explaining why police had no basis to shoot Ms. Tirado).

*Phelps*, 562 U.S. 443, 451-42 (2011) ("[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection.") (citation omitted). The First Amendment protects a free press, and that is plainly the capacity in which Ms. Tirado was acting. *See* U.S. Const. amend. I.

Second, being shot in the face with a foam bullet would clearly chill a reasonable journalist from continuing to report on protests over the death of George Floyd. Am. Compl. ¶ 127. That is the point of the weapon—"incapacitation of an aggressive, non-compliant subject" through "pain stimulus" and "psychological deterren[ce]."[15] Where state officers actually "engage[] the punitive machinery of government" against protected activity, the effect "need not be great" in order to state a retaliation claim. *Garcia v. City of Trenton*, 348 F.3d 726, 729 (8th Cir. 2003). If $35 in parking tickets satisfies that standard (and the Eighth Circuit has held that it does), *see id.*, then a shot to the face from a "pain compliance device"[16] doubtless does as well, *see Index Newspapers LLC v. City of Portland*, — F. Supp. 3d —, No. 3:20-CV-1035-SI, 2020 WL 4883017, at *16 (D. Or. Aug. 20, 2020) (finding likelihood of success as to chilling element based on showing that unjustified use of

---

[15] Defense Technology, Product Specifications: 40mm eXact iMpact Sponge Round (rev. June 2020), available at https://www.defense-technology.com/wp-content/uploads/2020/06/40mm-eXact-iMpact-Sponge-Round-6325.pdf (incorporated by reference at Am. Compl. ¶ 39 n.11).

[16] *Id.*

less-lethal munitions had in fact chilled coverage of protests by reporters who feared for their physical safety), *appeal docketed*, No. 20-35739 (9th Cir. Aug. 24, 2020).

Third, the Amended Complaint alleges facts demonstrating that Ms. Tirado's newsgathering was the reason the Defendant Officers shot her in the face. At the time she was shot, police knew Ms. Tirado was a working journalist because she was clearly identifiable as such—she wore a press credential, carried a bulky professional camera, and stood apart from protestors while taking photographs with the aid of a bright flash. *See supra* at 3-4. Nor was she shot at random—the Officer Defendants had used a tracking round to mark her as a target for arrest or other adverse action. Am. Compl. ¶¶ 61-66. In light of the pattern of police attacks on journalists throughout the protests following George Floyd's murder, *see supra at* 5-10, and the clear culture of hostility to the media animating the Minneapolis Police Department at the time, *see* Am. Compl. ¶¶ 103-05, 114-15, 120-22, Ms. Tirado has plausibly pled that the Defendant Officers targeted her *because* they knew she was a member of the press, *see id.* ¶ 128; *Index Newspapers*, 2020 WL 4883017, at *17-18 (finding that physical attacks on journalists who were standing apart from protestors, wearing credentials, and using cameras was sufficient circumstantial evidence of retaliatory motive to establish a likelihood of success on that issue).

### 2. Shooting Ms. Tirado in the Face Was an Objectively Unreasonable Seizure Under the Fourth Amendment.

The Amended Complaint also pleads a plausible Fourth Amendment excessive force claim. *See* Am. Compl. Count II (¶¶ 145-52). Shooting Ms. Tirado in the face was a "seizure" for Fourth Amendment purposes because it was an intentional action that restrained her freedom of movement. *See, e.g., Atkinson v. City of Mountain View*, 709 F.3d 1201, 1207-08 (8th Cir. 2013). The impact knocked Ms. Tirado's goggles off her face, forcing her to shut her eyes against swirling tear gas and rendering her helpless to leave the scene without assistance from protestors. Am. Compl. ¶¶ 56, 60, 137; *see also Jurkowski v. City of Seattle*, No. C15-1155, 2017 WL 4472859, at *9 (W.D. Wash. Oct. 5, 2017) (finding a question of fact existed as to whether a plaintiff who sought refuge in a nearby bar after being shot with "less-lethal munition" before retreating to a friend's home rather than continue demonstrating experienced an unreasonable seizure under the Fourth Amendment); *Pluma v. City of New York*, No. 13-cv-2017, 2015 WL 1623828, at *4 (S.D.N.Y. Mar. 31, 2015) (holding that the deployment of pepper spray which temporarily blinded Plaintiff and caused him to fall and vomit constituted a "real, if brief, restriction of his movement" and was therefore a seizure).

The seizure of Ms. Tirado was unconstitutional, in turn, because it was objectively unreasonable under the circumstances. *Atkinson*, 709 F.3d at 1210 (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Ms. Tirado was not

committing any "severe or violent crime," did not "pose an immediate threat" to the safety of police or others, and was neither resisting nor attempting to flee arrest. *Id.* Indeed, she was clearly committing no crime at all. Nothing in her actions—standing apart from protestors and taking photographs—suggested participation in a riot, *see* Minn. Stat. § 609.71 (defining criminal riot as requiring an "intentional act or threat of unlawful force or violence"), or an unlawful assembly, *see* Minn. Stat. § 609.705 (defining criminal unlawful assembly as requiring an unlawful purpose or actual disorderly conduct). Nor was she violating Governor Walz's curfew (from which she was exempt as a member of the press), *see* Emergency Executive Order 20-65, *supra* n.2, or refusing to leave "the place of an unlawful assembly" (since no law enforcement officer ever directed her to do so), *see* Minn. Stat. § 609.715. There was no legal basis to shoot Ms. Tirado in the face, and doing so violated the Fourth Amendment.

> **3.** **Intentionally Shooting Ms. Tirado For the Purpose of Causing Harm Violated the Due Process Clause of the Fourteenth Amendment.**

Separate and apart from their Fourth Amendment obligations, police officers are required to "restore and maintain lawful order, while not exacerbating disorder more than necessary to do their jobs." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 853 (1998). The due process clause of the Fourteenth Amendment enforces that requirement by prohibiting the use of force "maliciously and sadistically for the very purpose of causing harm," rather than as "a good faith effort to maintain or restore

discipline." *Id.* at 852-54. Shooting Ms. Tirado in the face violated that prohibition. *See* Am. Compl. Count III (¶¶ 145-52).

As discussed above, the Officer Defendants had no reasonable basis to believe shooting Ms. Tirado was justified, but did so anyway against a backdrop of department-wide hostility to the press. Moreover, rather than shoot Ms. Tirado in her lower body—the relatively-safe "primary target area" for foam bullets intended to induce compliance—the Officer Defendants intentionally targeted her head, which Department procedures warn should be treated as a form of "deadly force." Am. Compl. ¶¶ 39-45 (Citing Minneapolis Police Department Policy and Procedure Manual § 5-317). The choice to target Ms. Tirado's head—combined with a plausible allegation of animus and the lack of any legitimate alternative motivation for shooting her at all—supports an inference that police acted with malicious and sadistic intent to harm.

### B. Intentionally Shooting Ms. Tirado in the Face Was a Battery Under Minnesota Law.

Similarly, the Amended Complaint adequately alleges common-law battery. *See* Am. Compl. Count V (¶¶ 158-66). Under Minnesota law, police officers are liable for battery if they commit an intentional touching, using unreasonable force, which would be offensive to a reasonable person. *See, e.g., Joseph v. Donahue,* 392 F. Supp. 3d 973, 992 (D. Minn. 2019) (discussing limited law enforcement privilege to use reasonable force under Minn. Stat. § 609.06).

The Officer Defendants acted intentionally when they shot Ms. Tirado in the face. *See* Am. Compl. ¶ 41. The resulting contact was plainly one that would be offensive to an ordinary person. *See id.* ¶ 45. And as previously explained, there was no reasonable justification for that extraordinary degree of force. *See supra* at 18-20.

## II. The City is Liable for Its Police Officers' Illegal Use of Force.

The City does not dispute that the Amended Complaint states valid claims against the Officer Defendants. Instead, it argues that it cannot be held derivatively liable for their misconduct. Those arguments are wrong.

The City is individually subject to municipal liability on two grounds.[17] First, the Officer Defendants committed battery, *see generally* Am. Compl. Count V (¶¶ 158-66), and under Minnesota law, the City is vicariously liable for torts committed by on-duty police, *id.* ¶ 165 (citing Minn. Stat. § 466.02). Second, the City is subject to *Monell* liability under 42 U.S.C. § 1983 because it deliberately failed to correct the illegal custom pursuant to which the Officer Defendants shot Ms. Tirado in the face. *See generally* Am. Compl. Counts I (¶¶ 130-34) (First Amendment), II (¶¶ 139-43) (Fourth Amendment), III (¶¶ 147-51) (Fourteenth Amendment).

The City's responses to those claims are either incorrect or non-existent. It ignores Ms. Tirado's battery claim altogether, and its efforts to avoid *Monell* liability

---

[17] The City is also jointly liable as a co-conspirator with Kroll. *See infra* Part III.

are meritless.  The Court should therefore deny the City's motion to dismiss as to Counts I, II, III, and V.

### A. The City is Vicariously Liable for Battery Under Minnesota Law.

The City's failure to address Ms. Tirado's battery claim is telling.  Although the Complaint explicitly alleges the City's liability for battery, Am. Compl. ¶ 165 (citing Minn. Stat. § 466.02), the City's motion to dismiss offers no response.

Nor could it.  Minnesota's Municipal Tort Liability Act provides that every municipality is responsible for "its torts and those of its . . . employees . . . acting within the scope of their employment or duties," Minn. Stat. § 466.02, and Minnesota courts have held that this language imposes *respondeat superior* liability, *see, e.g., Watson ex rel. Hanson v. Metropolitan Transit Commission,* 553 N.W.2d 406, 414 (Minn. 1996); *Hixon v. City of Golden Valley,* No. 06-cv-1548, 2007 WL 2914532, at *1 (D. Minn. Oct. 3, 2007).  The rule is simple:  "municipalities are generally liable for the torts of their employees if the tort is committed within the scope of employment." *Schroeder v. St. Louis Cty.,* 708 N.W. 2d 497, 503 (Minn. 2006).

The Amended Complaint pleads that the Officer Defendants were acting in the scope of their City employment when they shot Ms. Tirado in the face.  Am. Compl. ¶ 165.  The City neither disputes that Ms. Tirado states a claim for battery against the Officer Defendants, *see supra* Part I.A, nor raises any objection to its own

vicarious liability.[18] So even if the Court accepts every argument the City *does* makes (and it should not), Ms. Tirado is still entitled to proceed on her battery claim. The Court should deny the City's motion to dismiss as to Count V, along with its request to be "dismiss[ed] . . . entirely from this suit."[19]

## B. The City Is Liable Under 42 U.S.C. § 1983 for Its Deliberate Indifference to Police Violence Against the Press.

The City's attacks on Ms. Tirado's *Monell* claims fare no better. *Monell* imposes municipal liability under § 1983 for constitutional violations committed pursuant to municipal policy or custom. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-95 (1978). In addition to an underlying constitutional violation, a *Monell*

---

[18] To the extent it could have done so at all under Rule 12(b)(6), for purposes of the motion-to-dismiss stage, the City has waived any right to assert statutory or common-law immunities under Minnesota law by failing to raise those arguments in its opening memorandum. *See* LR 7.1(c)(3)(B) ("a reply memorandum must not raise new grounds for relief . . . ."). "Issues raised for the first time in a reply brief are generally deemed to have been waived," *Hodges v. Dep't of Corrections*, No. 20-CV-90 (WMW/KMM), 2020 WL 4459275, at *5 (D. Minn. May 28, 2020), *report & recommendation adopted* 2020 WL 4432951 (D. Minn. July 31, 2020), and governmental immunities are no exception, *see, e.g.*, *Schuessler v. Ft. Madison Community Sch. Dist.*, No. 3:17-CV-39 (RGE/HCA), 2018 WL 10345327, *5 (S.D. Iowa Mar. 23, 2018).

[19] Because the parties are completely diverse and the amount in controversy exceeds $75,000, the Court's subject-matter jurisdiction over the battery claim alleged in Count V is independent of Ms. Tirado's federal claims. *See* Am. Compl. ¶ 16 (invoking diversity jurisdiction under 28 U.S.C. § 1332(a)(1)).

claim based on custom[20] has three elements: (1) a pattern of unconstitutional misconduct by municipal employees; (2) deliberate indifference to or tacit authorization of that conduct by the municipality's policymaking officials; and (3) injury to the plaintiff pursuant to that municipal custom. *Brewington v. Keener*, 902 F.3d 796, 801 (8th Cir. 2018) (quoting *Corwin v. City of Independence*, 829 F.3d 695, 700 (8th Cir. 2016)); *Sagehorn v. Indep. Sch. Dist. No. 728*, 122 F. Supp. 3d 842, 866 (D. Minn. 2015) (Tunheim, J.). The City challenges the sufficiency of the Amended Complaint only as to the first two elements. City Mem. at 19.

At the threshold, however, the City slights Ms. Tirado's *Monell* claims as "unpled" because the Amended Complaint purportedly "does not enumerate" them "explicit[ly]." City Mem. at 17. To the extent the City argues the Court should dismiss those claims on that basis, it is incorrect. The Amended Complaint alleges that Ms. Tirado was injured by police officers who violated specific constitutional rights pursuant to City custom. *See* Am. Compl. ¶¶ 86-111, 130-35, 139-44, 147-52. No more is necessary to give the City notice it faces a *Monell* claim arising out of the same "transaction or occurrence" as those asserted directly against the Officer Defendants. *See* Fed. R. Civ. P. 10(b) (requiring statement of claims in separate counts only to the extent they are "founded on . . . *separate* transaction[s] or

---

[20] Part III.A of the City's Memorandum of Law addresses the constitutionality of its formal use-of-force policies. *See* City Mem. at 17. The Amended Complaint does not challenge the legality of those policies as written.

occurrence[s]") (emphasis added). Indeed, pleading municipal liability as the City appears to demand—in its own count, separate from the underlying constitutional violations by municipal employees—would arguably be inconsistent with *Monell*'s basic conceptual structure. "*Monell* does not provide a separate cause of action for . . . [policymaking] failure by the government . . . ; it *extends* liability to a municipal organization where that organization's . . . policies or customs . . . led to an independent constitutional violation." *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006).

The City's arguments as to the substance of Ms. Tirado's *Monell* claim also fail, because the Amended Complaint sets out a straightforwardly plausible theory of municipal liability under § 1983: Numerous eyewitness accounts describe a pattern of police violence against journalists throughout the protests following George Floyd's death. That pattern emerged and was publicized widely well before Ms. Tirado was shot. The City learned of that pattern through multiple channels over several days, but—as evidenced by the fact that police violence against the press continued unabated—deliberately took no corrective action before it caused Ms. Tirado's injuries.

The City does not engage in a "context-specific" analysis, or apply "experience and common sense" to the question of whether that claim is plausible. *See Iqbal*, 556 U.S. at 679. It argues instead that Ms. Tirado's *Monell* claims should be

dismissed based almost exclusively on the number of incidents identified in the Amended Complaint, and the number of hours that elapsed between them. The City insists—relying on out-of-context selections from inapposite cases—that the other specific instances of unconstitutional conduct Ms. Tirado alleges are either too few, too concentrated, or too close in time to her own injuries for her *Monell* claim to survive a motion to dismiss. The Court should reject the City's invitation to treat pleading under *Monell* as a rote counting exercise, and deny its motion to dismiss as to Counts I, II, and II.

> **1.** **Minneapolis Police Responded to the George Floyd Protests With a Pattern of Violent Retaliation Against Journalists.**

The Amended Complaint plausibly alleges a pattern of police violence against journalists that was "continuing, widespread, [and] persistent" throughout the protests following George Floyd's murder. *See Ware v. Jackson Cty.*, 150 F.3d 873, 880 (8th Cir. 1998). As discussed in more detail *supra*, at 5-10, Minneapolis experienced five nights of serious civil unrest from May 26 and May 31. On at least four of those nights, Minneapolis police unlawfully attacked working journalists—including at least three nights with *multiple* attacks. *Id.* In total, the Amended Complaint alleges ten such incidents in only five nights. *Id.* Either independently or in combination with other facts pled in the Amended Complaint, they plausibly show a pattern of misconduct under *Monell*.

*(i)*     *The Amended Complaint Plausibly Alleges a Pattern of Misconduct.*

Allegations of numerous similar constitutional violations committed in the course of a single police operation are sufficient to state a *Monell* claim.   For example, the Eastern District of Missouri in *White v. Jackson*, No, 4:17-CV-1490, 2015 WL 1189963 (E.D. Mo. Mar. 16, 2015), denied a motion to dismiss § 1983 claims against law enforcement officers and the local governments that employed them, arising from three days of civil unrest in Ferguson, Missouri.   Like Ms. Tirado, the *White* plaintiffs alleged that police enforced a custom of "wanton and excessive force" in response to a single set of civil disturbances.   *White*, 2015 WL 1189963, at *3; *see also* Am. Compl. ¶ 86 ("Throughout the George Floyd protests, the Minneapolis Police Department enforced a policy or custom of intentionally targeting members of the press with unjustified arrests, excessive force, and other retaliatory actions . . . .").[21]   Their complaint also included a *Monell* claim based on alleged instances of individuals "being shot with rubber bullets . . . , physically assaulted . . . , [and] sprayed with mace."   *White*, 2015 WL 1189963, at *3.

---

[21] The City incorrectly describes the Amended Complaint as alleging "a custom of targeting members of the press . . . *with projectiles*."   City Mem. at 19 (emphasis added).   The Amended Complaint alleges more broadly that members of the press were targeted "with unjustified arrests, excessive force, and other retaliatory actions."   Am. Compl. ¶ 86.   To the extent the City's position is that attacks on journalists must involve the same weapon to form a single pattern, that argument is inconsistent with *White*, which recognized a pattern of attacks on protesters carried out by rubber bullet, physical assault, and chemical irritants. *White*, 2015 WL 1189963, at *3.

*White*'s reasoning is fully applicable here. As in *White,* the incidents alleged in the Amended Complaint are similar on their face, have a close "temporal relation[ship]," and were part of a single operation by police officers pursuing "shared objective[s]"—"namely, responding to protests and civil unrest following [George Floyd]'s death." *Id.*; *see also Pembaur v. City of Cincinnati,* 475 U.S. 469, 481 (1986) (noting that a "course of [municipal] action tailored to a particular situation and not intended to control [later] decisions" may support *Monell* liability). Accepted as true, allegations of ten such closely-connected incidents support a plausible inference that Minneapolis police engaged in a "pervasive pattern of civil rights violations during the [five nights] in question." *White,* 2015 WL 1189963, at *4.

Moreover, even if those ten incidents were not sufficient on their own to state a pattern under *Monell* (and they are), additional facts also push that allegation "across the line from conceivable to plausible." *McDonough,* 799 F.3d at 945. Numerous observers noted Minneapolis police's systemic attacks on media during the George Floyd protests. As one experienced photographer stated with respect to the use of less-lethal munitions, police were not aiming at protestors and hitting journalists by mistake. *See* Am. Compl. ¶ 106. Rather, journalists were "aimed at . . . deliberately" and "were shot at if [they] were anywhere in line of sight," even if they were avoiding putting themselves in the line of fire. *Id.* Nor are the incidents alleged in the Amended Complaint the only pending accusations that Minneapolis police

habitually targeted journalists during the George Floyd protests. The plaintiffs in *Goyette v. City of Minneapolis*, now pending before Judge Wright, have alleged an additional ten examples. *See* Second Amended Complaint at ¶¶ 57-59, 68, 73, 84, 85, 87, 88, 120, 121, 125-28, *Goyette v. City of Minneapolis*, No. 20-CV-01302 (WMW/DTS) (D. Minn. July 30, 2020), ECF No. 53.[22] The ten incidents alleged in the Amended Complaint were not, in other words, isolated events—they were part of a clear custom and pattern that drove the City's response to the protests following George Floyd's death.

Multiple accounts also describe Minneapolis police's culture of hostility toward the media during the George Floyd protests. Officers told reporters their press credentials were "bullshit," *id.* ¶ 104, and threatened them with arrest based on a curfew that exempted them, *id.* ¶ 105. When informed of that exemption, officers told one reporter that they simply "d[idn't] care." *Id.* Other journalists reported similar experiences. *Id.* These reports of hostile *attitudes* towards

---

[22] Recognizing the "'formidable hurdle' plaintiffs face at the pleading stage" of a *Monell* claim, courts assessing the plausibility of an alleged pattern of misconduct have considered the existence of other suits raising similar accusations. *Case v. City of New York*, 233 F. Supp. 3d 372, 405-06 (S.D.N.Y. 2017). "[I]n the context of Rule 12, where plausibility is in issue, it is hard to ignore these cases, which suggest that the conduct complained of is not limited to the four corners of [the plaintiff's] complaint." *Osterhoudt v. City of New York*, No. 10-CV-3173, 2012 WL 4481927, at *1 (E.D.N.Y. Sept. 27, 2012).

journalists lend further plausibility to Ms. Tirado's allegation that Minneapolis police engaged in a corresponding pattern of hostile *actions*.

### (ii)     The City's Responses Are Meritless

The City makes four arguments against Ms. Tirado's allegations of pervasive police misconduct during the George Floyd protests.  Each one falls short.

The City's first line of defense is a baseless distinction between examples of misbehavior preceding Ms. Tirado's injuries and those that came after.  *Compare* City Mem. Part III.B.2 (addressing only prior incidents), *with* City Mem. Part III.B.3 (addressing only subsequent incidents).  As the Eighth Circuit has explained, complaints "should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible."  *McDonough*, 799 F.3d at 946 (quoting *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009)).  The Amended Complaint does not allege separate "categories" of misconduct.  *See* City Mem at 19.  Nor does it assert that the City is subject to liability because of a "failure to address" particular "*incidents*."  *Id.* at 26 (emphasis added).  Rather, the Amended Complaint alleges deliberate indifference to a single *pattern* of misconduct, by a single police department, in response to a single period of civil unrest.

Nevertheless, the City argues that the Court should disregard incidents following Ms. Tirado's injuries because they could not have put the City on notice of a need for corrective action.  City Mem. at 25.  Those incidents, however, are not offered to show *notice* of a pattern of misconduct.  Rather, they are meant to show

such a pattern's *existence*.  Their relevance for that purpose is well-settled.[23]  *See, e.g.*, *Abdur-Rahim v. City of Columbus*, No. 2:17-cv-601, 2019 WL 1873222, at *2-3 (S.D. Ohio Apr. 26, 2019) (collecting cases including, *inter alia, Richmond v. City of Brooklyn Center*, No. 03-3195, 2005 WL 6763198, at *6 (D. Minn. Apr. 12, 2005)) ("Similar subsequent incidents can be probative . . . of what policies, practices, or accepted customs existed at the time of the incident at issue."); *Henry v. Cty. of Shasta*, 132 F.3d 512, 519 (9th Cir. 1997) ("[P]ost-event evidence is not only admissible for purposes of proving the existence of a municipal defendant's . . . custom, but is highly probative with respect to that inquiry.").

The City's second and third challenges to that alleged pattern's plausibility also miss the mark.  The City argues that Ms. Tirado alleges too few incidents of misconduct to make out a pattern, *see* City Mem. at 21, 25, and that those she does allege were separated from her own injuries by too many hours to qualify, *see id.* Each argument fails, because pleading under *Monell* is not a counting game.

---

[23] The clear relevance of those incidents—which stretched over nearly a full week of protests—to show a pattern of misconduct also belies the City's throwaway assertion that Ms. Tirado alleges only "an isolated period" of misconduct over two nights.  *See* City Mem. at 21-22 (incorrectly stating that 15—not 27.5—hours elapsed between 8:00 p.m. on one night and 11:27 p.m. the next).  But even if the Court were to disregard all incidents subsequent to Ms. Tirado's own injuries, two nights of habitual misconduct during a single police operation is sufficient to support a *Monell* claim.  *See White*, 2015 WL 1189963, at *1 (denying motion to dismiss *Monell* claim based on "violations of various rights between August 11 and August 13, 2014").

The City's second argument appears to be that ten or fewer alleged incidents of misconduct cannot support a *Monell* claim as a matter of law. *See id.* at 21, 25. But that is simply wrong. *See, e.g., Ware*, 150 F.3d at 881-82 (affirming jury verdict based on pattern of four incidents); *Sagehorn*, 122 F. Supp. 3d at 866-67 (denying motion to dismiss claim based on three alleged incidents).

The City's suggestion to the contrary is based on inapposite authorities taken out of context. Both *Mettler v. Whitledge*, 165 F.3d 1197 (8th Cir. 1999) (cited by City Mem. at 21), and *Pineda v. City of Houston*, 291 F.3d 325 (5th Cir. 2002) (same), were decided on summary judgment rather than at the pleading stage. As this Court has previously held, that is "an important distinction." *Sagehorn*, 122 F. Supp. 3d at 867. Unlike at summary judgment, when the evidence reflects the complete set of facts unearthed in discovery, at the pleading stage a plaintiff is unlikely to have enough facts to "identify the full scope of an alleged custom or policy." *Id.* Put another way, where the *Mettler* and *Pineda* plaintiffs were at the stage of having to actually proffer evidence sufficient to prove their claims, Ms. Tirado need only allege enough facts to "raise a reasonable expectation" that such proof will be forthcoming based on following discovery. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007).

Moreover, even at the summary judgment stage, neither *Mettler* nor *Pineda* purports to condition *Monell* claims on a simple numeric threshold. *Mettler* affirmed summary judgment based on numerous evidentiary shortcomings—not

because fifteen complaints was a *per se* inadequate showing. 165 F.3d at 1204-05 (noting *inter alia* that plaintiff had not shown "that the incidents giving rise to the [citizen's] complaints [against the police officer defendants] bear any factual similarity to" the incident at issue in plaintiffs' case). Nor did the Fifth Circuit in *Pineda* announce a general rule that eleven incidents is too small a sample. *See* 291 F.3d at 329. Rather, it concluded that these incidents were "equivocal" as to compliance with the Fourth Amendment, and more was needed to "support a pattern of illegality [stretching over six years] in one of the Nation's largest cities and police forces." *Id.* at 329 & 331 n.24; *accord Ball-Bey v. Chandler,* 415 F. Supp. 3d 884 (E.D. Mo. 2019) (cited by City Mem. at 25) (granting motion to dismiss where plaintiff identified fewer than 2.5 alleged constitutional violations per year for the entire city of St. Louis).

The City's third objection—that too many hours passed between the earlier incidents of misconduct and Ms. Tirado's own injuries to make out a continuous pattern—fails for similar reasons. *See* City Mem. at 21-22. Again, Ms. Tirado's burden at the pleading stage is only to allege the plausible existence of a continuous custom—not "identify [its] full scope." *Sagehorn,* 122 F. Supp. 3d at 867. The Amended Complaint alleges a custom of violence against the press "[t]hroughout the George Floyd protests," Am. Compl. ¶ 86, exemplified by (but not limited to) three attacks the night of May 26, two the night of May 27, one the night of May 29,

and four the night of May 30.  *See supra* at 5-10.  Under Rule 8's liberal standard, "the failure . . . to specifically plead" an attack on one night (May 28) "is not fatal" to Ms. Tirado's facially-plausible claim of a continuing pattern of police misconduct which embraced that night as well.  *Sagehorn*, 122 F. Supp. 3d at 867 (holding that plaintiff pleaded a *Monell* custom by alleging that there were "*at least* two other [incidents] and *perhaps more*") (emphasis added).

And even if a substantial gap in time between specific incidents *could* defeat *Monell* claims at the pleading stage, the City has not identified one here.  As a threshold matter, the sole authority cited by the City provides no support for its argument.  *See* City Mem. at 22.  The district court in *Appel v. City of St. Louis*— another summary-judgment ruling—rejected a *Monell* claim, not for lack of a continuous pattern of events leading up to the plaintiff's injuries, but because there was no evidence that municipal policymakers had ordered the one-day police operation challenged in that case.  No. 4:05-CV-772 SNL, 2007 WL 9808053, at *16 (E.D. Mo. Aug. 15, 2007).  Nor does *Pembaur*, 475 U.S. 469, state that municipalities are liable only for their long-term behavior.  Just the opposite—as that decision explains immediately following the portion quoted by the City, "a government frequently chooses a course of action tailored to a particular situation and not intended to control decisions in later situations.  If the decision to adopt that

35

particular course of action is properly made by that government's authorized decisionmakers, it surely [supports *Monell* liability]." *Pembaur*, 475 U.S. at 481.

The City is likewise wrong to define the issue in terms of simple hours elapsed between incidents. *See* City Mem. at 22. It focuses on what it incorrectly describes as a 71-hour period between the shootings of Max Nesterak on the night of May 27 and Ms. Tirado on the night of May 29.[24] *Id.* That framing, however, fails to reflect the clear pattern of *nightly* civil unrest met by police violence that developed during the George Floyd protests. *See supra* at 5-10; *see also Iqbal*, 556 U.S. at 679 (assessing plausibility is "context-specific"); *McDonough*, 799 F.3d at 948 (pleading analysis must take account of each case's "unique context"). The relevant question is whether a one-night gap—not a 49-hour one—would be sufficient to negate an otherwise-plausible five-night pattern of police misconduct. The answer is no. *See, e.g., Ware*, 150 F.3d at 881-82 ("That there was a gap of *three years* between CO Toomer's misconduct and that of other officers does not amount to a series of isolated incidents so far apart in time that CO Toomer's misconduct may be considered a single act upon which custom or usage cannot be based.") (emphasis added).

---

[24] The City states that 71 hours passed between those events, *see* City Mem. at 22, but its math is incorrect. 11:32 p.m. on May 27 is only 49 hours before 12:34am on May 30.

### 2. The City Was Deliberately Indifferent to a Pattern of Police Violence Against Journalists.

Even before a Minneapolis officer shot Ms. Tirado, the City's policymakers knew that Minneapolis police were attacking journalists covering the George Floyd protests as a matter of "standard operating procedure," *see Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989), that its existing policies were "not prevent[ing] constitutional violations," and that a "new program [was] called for," *Bd. of Cnty. Comm'rs of Byran Cnty. v. Brown*, 520 U.S. 397, 407 (1997). Despite that notice, however, policymakers took no corrective action. "Their continued adherence to an approach" they knew or should have known had "failed to prevent tortious conduct . . . establish[es] the conscious disregard for the consequences of their actions—the 'deliberate indifference'—necessary to trigger municipal liability." *Id.*

The Amended Complaint provides ample support. As explained above, Minneapolis police illegally attacked at least five journalists within the first two nights of protests after George Floyd's death. *Supra* at 5-10. Each of those attacks, moreover, was reported through a channel monitored by the City—either traditional news outlets, social media, or direct contact with City officials. *Supra* at 11-12. Those reports plausibly notified the City of a pattern of misconduct by the evening of May 27—two full days before police shot Ms. Tirado. *Id.* But the constitutional violations did not stop at that point. They continued unabated, through the night that Ms. Tirado was shot and through the end of the nightly

protests in Minneapolis.  *Supra* at 8-10 (alleging at least four attacks on the night of May 30).

On their face, those allegations make out a plausible case of deliberate indifference.  Where an illegal practice persists *despite policymakers' knowledge*, it is reasonable to infer that it does so because policymakers have deliberately failed to take corrective action.  As the Supreme Court has explained, a "policy of inaction in light of notice that [the status quo] will cause constitutional violations is the functional equivalent of a decision . . . to violate the Constitution."  *Connick v. Thompson*, 563 U.S. 51, 61-62 (2011); *see also Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007) ("*Monell*'s policy or custom requirement is satisfied where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions."); *Brown v. City of Ft. Lauderdale.*, 923 F.2d 1474, 1481 (11th Cir. 1991) ("[A] practice is deemed authorized by [municipal] policymaking officials [when] they must have known about it but failed to stop it.").

The City fails to show otherwise.  Its argument that the Amended Complaint fails to allege "specific facts showing" deliberate indifference is a red herring.  *See* City Mem. at 22.  Circumstantial allegations may support a plausible claim, *McDonough*, 799 F.3d at 945, and there is no requirement under Rule 8 to "allege facts *establishing* each element of a prima facie case," *Alexander v. Hunt*, No. 5:16-

cv-192, 2018 WL 3801240, at *4 (D. Vt. Aug. 9, 2018) (emphasis added). Indeed, prior to discovery plaintiffs will likely "not be privy to the facts" of internal municipal deliberation, *see Sagehorn*, 122 F. Supp. 3d at 867, and "cannot be expected at this stage to make particularized assertions about the[ir] details," *Alexander*, 2018 WL 3801240, at *5 (citing *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 130 n.10 (2d Cir. 2004); *see also Osterhoudt*, 2012 WL 4481927, at *2 (noting that de facto policies or customs "will not likely be shown by direct evidence").

The City is also incorrect that it did not have enough time to plausibly adopt a posture of deliberate indifference before police shot Ms. Tirado in the face. *See* City Mem. at 23-25. The Amended Complaint specifically alleges that City officials monitored multiple channels—including through the Department's own intelligence arm—that reported on police action during the civil unrest in Minneapolis. Am. Compl. ¶¶ 95-96. Indeed, as the City points out, it focused (and exhausted) "all its resources" on responding to those disturbances. City Mem. at 24. Common sense suggests that policymakers fixated on an unprecedented emergency and aware of a clear pattern of constitutional violations permeating their response, would have deliberately decided what to do about it—here, nothing. *See McDonough*, 799 F.3d at 945 (quoting *Iqbal*, 556 U.S. at 679) (noting the importance of applying "common sense" and "judicial experience" when evaluating a complaint).

The decisions cited by the City are inapposite. Importantly, each one arose on summary judgment, *see Johnson v. Douglas Cty. Med. Dep't.*, 725 F.3d 825 (8th Cir. 2013); *Burbridge v. City of St. Louis*, 430 F. Supp. 3d 595 (E.D. Mo. 2019), *appeal docketed*, No. 20-1029 (8th Cir. Jan. 6, 2020); *Hoekstra ex rel. Hoekstra v. Indep. Sch. Dist. No. 283*, 916 F. Supp. 941 (D. Minn. 1996), and are therefore of limited value for the reasons explained *supra*, at 33. But even if those cases were not inapposite at the pleading stage, they would still be distinguishable on other grounds. In *Johnson*, for example, the Eighth Circuit affirmed the denial of summary judgment where there was "no evidence to suggest" that policymaking officials would have learned and approved of jail guards' denying medication to a single inmate for only several hours. 725 F.3d at 829. Here, however, Ms. Tirado alleges explicitly how, when, and why City policymakers learned of and decided to ignore attacks on journalists. *See supra* at 11-12. Put in the Eighth Circuit's terms, Ms. Tirado's allegations plausibly suggest "that the incidents occurred over a course of time sufficiently long to permit notice of, and then deliberate indifference to" systemic misconduct. *Johnson*, 725 F.3d at 829. *Burbridge* and *Hoekstra* are distinguishable for essentially the same reason. *See Burbridge*, 430 F. Supp. 3d at 619-20 (granting summary judgment in part because plaintiffs failed to produce "evidence that policymaking officials had notice" of any of the alleged plaintiff cited as showing a

custom of misconduct)[25]; *Hoekstra*, 916 F. Supp. at 946-47 ("Plaintiff has presented not one scintilla of evidence that the District was deliberately indifferent.").

Unlike the *Johnson, Burbridge*, and *Hoekstra* plaintiffs, Ms. Tirado need not *prove* at this stage that the City acted with deliberate indifference. The question, rather, is whether the Amended Complaint supports a *plausible inference* that it did. As in *White*, 2015 WL 1189963, the answer here is yes. The Court should deny the City's motion to dismiss as to Counts, I, II, and III.

## III. Kroll and the City are Jointly Liable Under § 1983 for Conspiring to Use Excessive Force Against Journalists Like Ms. Tirado.

Kroll and the City argue that they cannot be held liable for conspiracy under § 1983 because Ms. Tirado failed to plead a meeting of the minds. Kroll also argues that he cannot be held liable in his individual capacity and that holding him liable for conspiracy would violate the First Amendment. Those arguments fail. First, the Amended Complaint adequately alleges that Kroll and the City reached an

---

[25] Plaintiffs rely on one sentence in *Burbridge*, citing *Johnson* to suggest that "even if evidence of notice existed," the incidents were "too close in time" to show deliberate indifference. As shown, however, *Johnson* does not support the notion that incidents that are close in time as insufficient as a matter of law to demonstrate deliberate indifference. Rather, the question is whether in the context of a particular case, they "occurred over *a course of time sufficiently long to permit* . . . deliberate indifference." *Johnson*, 725 F.3d at 829 (emphasis added). Here, unlike in *Burbridge*, the Amended Complaint explicitly alleges how the City—which carefully monitored traditional and social media through its own intelligence arm, and whose policymakers were completely focused on responding to the George Floyd protests—plausibly would have learned of and deliberately determined to ignore the Department's misconduct before Ms. Tirado was shot..

agreement and acted in concert. Second, private individuals may be held liable for conspiring with state actors to violate civil rights. Finally, the First Amendment does not bar Ms. Tirado's conspiracy claim against Kroll because the Amended Complaint does not seek to impose liability based on any protected speech. The Court should deny Defendants' motions to dismiss as to Count IV (Am. Compl. ¶¶ 153-57).

### A. The Complaint Pleads a *Prima Facie* Conspiracy Claim Under Federal and Minnesota Law.

To plead a § 1983 conspiracy claim, a plaintiff must allege (in addition to an underlying constitutional violation): (1) that the defendant conspired with others to deprive him of constitutional rights; (2) that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) that the overt act injured the plaintiff. *Davis v. Simmons*, 100 F. Supp. 3d 723, 733 (S.D. Iowa 2015) (quoting *Askew v. Millerd*, 191 F.3d 953, 957 (8th Cir. 1999)).

Both Kroll and the City contend that Ms. Tirado fails to properly plead a meeting of the minds. They suggest that the Amended Complaint alleges only that "Mr. Kroll demanded that the City loosen restrictions on the use of less-lethal force," and "does not plead any facts showing that the City Defendants agreed to, complied with, acted upon, or even responded to Mr. Kroll's purported demand" or "any facts showing that [Kroll's] input was of consequence." City Mem. at 9-10.

That is incorrect. The Amended Complaint plausibly alleges that Kroll and the City agreed to foment a violent crackdown on media covering the George Floyd protests. Specifically, Ms. Tirado pleads that:

- As a matter of public record, Kroll has a deep hostility to press scrutiny of police action, and believed the press was "targeting" him for unfair treatment. Am. Compl. ¶¶ 120-22.

- As President of the Police Officers' Federation of Minneapolis, Kroll has access to the highest echelons of the Department's policymakers and "exerts tremendous power over the culture, actions, and professional standards" of the Department, including "policies and customs governing the use of force." *Id.* ¶¶ 114-17.

- In addition, Kroll has tremendous power over the conduct of rank-and-file officers—including conduct relating to use of force. *Id.* ¶¶ 117-19.

- During the George Floyd protests—including just hours before Minneapolis Police shot Ms. Tirado—Kroll used that access to give specific tactical input to senior Department officials and advocate for the more aggressive use of less-lethal munitions. *Id.* ¶¶ 118 & n.41, 119 & n.42. That input was accompanied by veiled threats that a more restrictive policy would affect officers' "faith in leadership." *Id.*

- On information and belief, Kroll gave similar tactical input to the Department and individual officers throughout the George Floyd protests. *Id.* ¶ 119.

- The Department and its officers in fact agreed to act on Kroll's input, as evidence by violence against the press throughout the George Floyd protests. *Id.* ¶¶ 86-106.

In other words, the Amended Complaint supports a plausible inference that Kroll's tactical input amounted to more than a "mere suggestion" and that the City was more than "merely aware" of Kroll's demands. *See* Am. Compl. ¶¶ 113-24. Ms. Tirado alleges that Kroll exerted *de facto* control over Department officers, and that City officials acquiesced to Kroll's demands by permitting or encouraging the unlawful use of less-lethal munitions. *Id.*

Kroll's *de facto* power over the Department distinguishes this case from those cited by Defendants—*Shimota v. Wenger*, No. 15-1590, 2016 WL 1254240 (D. Minn. Mar. 29, 2016) (Tunheim, J.) and *Magee v. Trustees of Hamline University*, 957 F. Supp. 2d 1047 (D. Minn. 2013) (Tunheim, J.). In *Shimota*, the plaintiff asserted that a prosecutor had conspired with county officials to keep her detained despite a court order, but pled no facts beyond alleging that "multiple defendants were involved in her arrest and detention," and that the prosecutor had threatened to bring a motion to continue her detention. 2016 WL 1254240, at *10. In this case, by contrast, the

Amended Complaint alleges that the Federation "has historically had more influence over police culture than any police chief ever could" and that Kroll used his position as President of the Federation to direct the Department's policies and customs regarding the George Floyd protests. Am. Compl. ¶¶ 114-15, 117-19.

In *Magee*, a university professor brought a § 1983 conspiracy claim against a police officer, a police union, and a university, alleging that the officer recruited other officers and solicited the police department to boycott the university until she was terminated. 957 F. Supp. 2d at 1058. Although the professor "allege[d] generally that [the officer] ha[d] a close relationship with the St. Paul Police Chief," she did not also allege any special control over the police department or its policies. *Id.* Without such allegations, the complaint raised only a "suggestion" that the officer "may have had an opportunity to conspire," and the allegations were insufficient to overcome a motion to dismiss. *Id.* Affirming that decision, the Eighth Circuit wrote that "[t]he multiple contacts between [the officer], [the police union's] members, and the university do not, *without more*, reasonably infer that they conspired to terminate [the professor]." 747 F.3d 532, 537 (8th Cir. 2014) (emphasis added).

Based on that text, Defendants argue that "Kroll's demand and input *alone* do not give rise to a meeting of the minds." City Mem. at 14 (emphasis added); *see also* Kroll Mem. at 14-15 (characterizing Kroll's communications as "one-way"). But Defendants overlook a key point. The Amended Complaint offers the "more" that

was missing in *Magee*. Specifically, it alleges that Kroll exercised *de facto* control over the Department, such that the Defendants "directed themselves toward an unconstitutional action by virtue of a mutual understanding" that Kroll's proposed policies would be enacted. *See Smith v. Bacon*, 699 F.2d 434, 436 (8th Cir. 1983); *cf Giron v. City of Alexander*, 693 F. Supp. 2d 904, 942-43 (E.D. Ark. 2010) (holding municipality liable for actions of officer who police leadership had given "de facto control over the Department"). In light of those additional allegations, Defendants' reliance on *Magee* misses the mark.

The City and Kroll's other defenses also fall short. At the outset, Kroll appears to argue that Ms. Tirado must plead that Kroll and the City agreed to "retaliate against [Ms. Tirado] for *her protected First Amendment activity*." *See* Kroll Mem. at 13 (emphasis in original) (quoting *Lawrence v. City of St. Paul*, 740 F. Supp. 2d 1026, 1049 (D. Minn. 2010)). The quote upon which Kroll relies, however, is taken out of context. *Lawrence* says only that the relevant question is whether the conspirators "reached a mutual understanding . . . *concerning the unlawful objective of the conspiracy*," 740 F. Supp. 2d at 1049 (emphasis added), and at the pleading stage Kroll does not get to decide how that objective is defined. Ms. Tirado does not plead that the conspiracy targeted her specifically. Instead, she pleads that its "unlawful objective" was to deprive *journalists, including Ms. Tirado*, of their rights. Am. Compl. ¶ 155; *cf. Andrews v. Fowler*, 98 F.3d 1069, 1079-80 (8th Cir. 1996) ("[T]o

succeed on a civil rights conspiracy claim, the plaintiff must demonstrate . . . that the defendants selected the particular course of action because of, not merely in spite of, its adverse effects upon an *identifiable group*.") (emphasis added) (citations omitted).

Next, the fact that Ms. Tirado no longer asserts a conspiracy claim against the State is wholly unrelated to the plausibility of her conspiracy claim against Kroll and the City. *See* City Mem. at 10-11. Moreover, Ms. Tirado is not alleging that the City had knowledge of wrongdoing by the State, but rather that the City itself agreed to misconduct. Indeed, Kroll communicated his demands not only to State level officials, but also directly to the City. Am. Compl. ¶ 118 & n.41. Therefore, there is no "gap" between Kroll's communications and the City's agreement to concerted action. City Mem. at 12.[26]

---

[26] Kroll also suggests an implausible comparison between Kroll and Governor Walz. *See* Kroll Mem. at 14-16. Kroll suggests that he was not attempting to direct Department policy, but rather "attempt[ing] . . . to voice concerns related to the ongoing protests" and "reiterating examples of available law enforcement policies that had been raised by Governor Walz" who indicated that the tools of martial law are available to law enforcement. *Id.* This comparison ignores Kroll's open hostility towards the media, Kroll's undue influence over Department policy, Kroll's demand to ease restrictions on less-lethal force, the fact that Governor Walz never advocated for the use of less-lethal ammunitions, and the fact that Governor Walz clearly emphasized the importance of protecting journalists. *See* WCCO CBS Minnesota, *'Minneapolis and St. Paul Are On Fire': Gov. Walz Says Order Must Be Restored as Twin Cities Enters 4th Day of George Floyd Unrest* (May 29, 2020 10:38 a.m.), *available at* https://minnesota.cbslocal.com/2020/05/29/minneapolis-and-st-paul-are-on-fire-gov-walz-says-order-must-be-restored-as-twin-cities-enters-4th-day-of-george-floyd-unrest/.

It is also immaterial that "the MPD's policy provisions pertaining to the use of projectiles . . . remained unchanged notwithstanding Mr. Kroll's alleged demand." City Mem. at 9. The absence of an official policy change does not make allegations of an illegal conspiracy any less plausible on their face. After all, "[c]onspirators seldom reduce their agreements to writing." *Reavis v. United States*, 106 F.2d 982, 984 (10th Cir. 1939). At this stage, it is enough that the Amended Complaint pleads facts from which a jury could infer the Kroll and the City agreed to deprive journalists, including Ms. Tirado, of their First Amendment rights.

Finally, Defendants are incorrect that "Plaintiff does not plead any facts to demonstrate that Mr. Kroll's various suggestions called for officers to violate the constitutional rights of members of the press or protestors." City Mem. at 15. The Amended Complaint pleads that Kroll (1) demanded that the City "loosen what he termed 'restrictions on use of . . . less lethal' force" in order to "vindicate his anti-press views," Am. Compl. ¶¶ 118, 123, (2) exerted *de facto* control over the Department such that his requests were complied with, *id.* ¶ 114-15, and (3) heralded police officers for their "outstanding work" in reaction to the protests, *id.* ¶ 122 & n.44—despite numerous reports of journalists being targeted and injured, *id.* ¶¶ 88-92. Allegations of circumstantial facts are more than sufficient to plead a conspiracy. *See White v. McKinley*, 519 F.3d 806, 816 (8th Cir. 2008) ("The elements

of a conspiracy are rarely established through means other than circumstantial evidence.")

"The question of the existence of a conspiracy to deprive the plaintiffs of their constitutional rights should not be taken from the jury if there is a possibility the jury could infer from the circumstances a 'meeting of the minds' or understanding among the conspirators to achieve the conspiracy's aims." *Id.* Given Kroll's influence over the Department, his clear demands, the resulting injuries to journalists, and Kroll's commendation of the police response, there is enough circumstantial evidence from which to infer a conspiracy to deprive journalists— including Ms. Tirado—of their constitutional rights. *See Burbridge,* 430 F. Supp. 3d at 615 (finding enough evidence of conspiracy to deprive constitutional rights to survive summary judgment where "[a]n officer said 'that's him'" before plaintiff was arrested and "[n]one of the Defendant officers completed a 'use of force' report, even though [the plaintiff] was struck, kicked, maced and rendered unconscious").[27]

---

[27] Kroll also objects to being sued in his individual capacity because he "was not present nor supervising any Minneapolis Police Officers at the time of Plaintiff's alleged injuries." Kroll Mem. at 8-12, 21-23. Despite those protestations, it is settled that private individuals may be held liable under § 1983 for conspiring with state actors to violate civil rights. *Gibson v. Regions Fin. Corp.,* 557 F.3d 842, 846 (8th Cir. 2009). Given that Ms. Tirado does not seek to impose § 1983 liability on Kroll on any basis other than conspiracy, the Court only needs to determine whether Kroll was a "willful participant in joint activity." *Id.*

### B.    Kroll Has No First Amendment Defense to Conspiracy.

The First Amendment does not bar Ms. Tirado's conspiracy claim against Kroll, because she does not seek to impose liability based on protected speech. The Amended Complaint does not look to the content of Kroll's speech as the sole basis for liability. Rather, Count IV relies on Kroll's words to the extent they communicated an invitation to conclude an unlawful agreement, or evidenced a conspiratorial state of mind. Use of a defendant's words for those purposes does not violate the First Amendment.

The Supreme Court has made clear that the Constitution does not afford Kroll the protection he seeks. The First Amendment generally "does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993). The Eighth Circuit has similarly held that "evidence of . . . views, behavior, and speech [are] relevant and admissible to show . . . purpose and intent[.]" *United States v. Dunnaway*, 88 F.3d 617, 619 (8th Cir. 1996). Such evidentiary uses are permissible "whether or not [the speech], standing alone, could serve as the basis for liability consistent with the First Amendment." *See, e.g.*, *Rice v. Paladin Enters., Inc.*, 128 F.3d 233, 253 (4th Cir. 1997). Simply put, Kroll's "[First Amendment] rights are not infringed when the things he says are used as evidence against him." *United States v. Farah*, 107 F. Supp. 3d 996, 1001 (D. Minn. 2015).

The use of speech specifically to plead and prove a conspiracy is equally well-settled. "[B]ecause the essence of a conspiracy is an agreement to commit an unlawful act, the supporting evidence may *necessarily* include a defendant's speech." *United States v. Hassan* 742 F.3d 104, 127 (4th Cir. 2014) (emphasis added) (internal citations and quotation marks omitted); *see also United States v. Salameh*, 152 F.3d 88, 111-12 (2d Cir. 1998) (per curiam) (holding that use of terrorist literature to prove the existence and motive of a conspiracy was not the equivalent of "prosecut[ion] for possessing or reading" those materials). The Amended Complaint is a prototypical example. To paraphrase the Second Circuit, Ms. Tirado is "free to demonstrate [Kroll's] resentment and hostility toward the [media] in order to show his motive for soliciting and procuring illegal attacks against [members of the press]." *United States v. Rahman*, 189 F.3d 88, 118 (2d Cir. 1999) (per curiam). The Court should reject his meritless First Amendment defense and deny his motion to dismiss.

## CONCLUSION

For these reasons, the Court should deny the motions to dismiss in their entirety.

Dated: September 28, 2020          Respectfully Submitted,

**GREENE ESPEL PLLP**

/s/ John M. Baker
John M. Baker, Reg. No. 0174403
Davida S. McGhee, Reg. No. 0400175
222 S. Ninth Street, Suite 2200
Minneapolis, MN  55402
(612) 373-0830
jbaker@greeneespel.com
dwilliams@greeneespel.com

-and-

Tai-Heng Cheng (admitted *pro hac vice*)
Gaëlle E. Tribié (admitted *pro hac vice*)
**SIDLEY AUSTIN LLP**
787 Seventh Avenue
New York, NY 10019
(212) 839-5661
tcheng@sidley.com
gtribie@sidley.com

Margaret Hope Allen (admitted *pro hac vice*)
**SIDLEY AUSTIN LLP**
2021 McKinney Ave, Ste. 2000
Dallas, TX 75201
(214) 969-3506
margaret.allen@sidley.com

Gabriel Schonfeld (admitted *pro hac vice*)
**SIDLEY AUSTIN LLP**
1501 K Street NW
Washington, DC 20005
(202) 736-8483
gschonfeld@gmail.com

*Attorneys for Plaintiff Linda Tirado*