# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

LINDA TIRADO,

                              Plaintiff,              No. 20-1338 (JRT/ECW)

v.

CITY OF MINNEAPOLIS, MEDARIA          **MEMORANDUM OPINION AND ORDER**
ARRADONDO, *in his official capacity as*          **DENYING DEFENDANTS' MOTIONS TO**
*Minneapolis Chief of Police*, ROBERT              **DISMISS**
KROLL, *in his individual capacity*, and
MINNEAPOLIS POLICE OFFICERS JOHN
DOES 1–4, *in their official and individual*
*capacities*,

                              Defendants.

---

Tai-Heng Cheng, Gaelle Tribie, Kierstin S. Fowler, and Patricia Butler, **SIDLEY AUSTIN LLP**, 787 Seventh Avenue, New York, NY 10019; Gabriel Schonfeld, **SIDLEY AUSTIN LLP**, 1501 K Street Northwest, Washington, DC 20005; Davida Sheri McGhee and John M. Baker, **GREENE ESPEL PLLP**, 222 South Ninth Street, Suite 2200, Minneapolis, MN 55402; Margaret Allen, **SIDLEY AUSTIN LLP**, 2021 McKenney Avenue, Suite 2000, Dallas, TX 75201; and Stacy Horth-Neubert, **SIDLEY AUSTIN LLP**, 555 West Fifth Street, Los Angeles, CA 90013, for plaintiff.

Kristin R. Sarff, Heather Passe Robertson, and Sharda R. Enslin, **CITY OF MINNEAPOLIS ATTORNEY'S OFFICE**, 350 South Fifth Street, Suite 210, Minneapolis, MN 55415, for defendants City of Minneapolis and Medaria Arradondo.

Joseph A. Kelly and Kevin M. Beck, **KELLY & LEMMONS PA**, 2350 Wycliff Street, Suite 200, Saint Paul, MN 55114, for defendant Robert Kroll.

Linda Tirado traveled to Minneapolis to report on the protests and civil unrest that followed George Floyd's death in the custody of the Minneapolis Police Department ("MPD"). While covering the protests, Tirado was injured by a foam bullet fired by an MPD officer and is now permanently blind in one eye.

Tirado initiated this 42 U.S.C. § 1983 action against the City of Minneapolis and MPD Chief Medaria Arradondo (collectively, "the City"), police union president Robert Kroll in his individual capacity, and four John Doe MPD Officers. Tirado asserts municipal liability for violations of her First, Fourth, and Fourteenth Amendment rights pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) based on an unofficial custom of unlawful conduct toward journalists during the George Floyd protests. Tirado also alleges a civil conspiracy between the City, Kroll, and the John Does to deprive journalists of constitutional rights. The City has filed a Motion to Dismiss with respect to the municipal liability and civil conspiracy claims, and Kroll has filed a Motion to Dismiss with respect to the civil conspiracy claim.

Because Tirado has alleged numerous instances of MPD officers similarly targeting journalists during the George Floyd protests and has plausibly alleged that the City knew of, yet failed to address, such incidents, the Court will deny the City's Motion with respect to the *Monell*-based claims. Likewise, the Court will deny the City's and Kroll's Motions with respect to the civil conspiracy claim because Tirado has presented circumstantial

allegations that support an inference of a willful conspiracy among Kroll, the City, and the John Doe defendants.

**BACKGROUND**

I.    **FACTS**

     A.    **The Protests and Tirado's Reporting**

Following George Floyd's death while in MPD custody on May 25, 2020, protests and civil unrest rapidly expanded across the city, state, and country. (Am. Compl. ¶¶ 17, 21–22, July 29, 2020, Docket No. 33.) In response to the unrest, Minnesota Governor Tim Walz issued a series of executive orders implementing curfews in Minneapolis for the nights of May 29, 31, June 1, and 3, (*id.* ¶ 25), which prohibited persons from traveling on any public street or place. (*id.* ¶ 26.) The executive orders exempted all members of the news media from the restrictions, (*id.*), but there was no system in place for members of the press to obtain official credentials from the State of Minnesota or MPD. (*id.* ¶ 27.)

Amid a surge of press coverage, Plaintiff Linda Tirado, a freelance journalist with extensive experience covering protests, traveled to Minneapolis to cover the protests and civil unrest. (*Id.* ¶¶ 5, 10, 23, 29, 75.) She ventured out to observe protests on the evening of May 29, the first night of the curfew. (*Id.* ¶ 28.) Tirado was identifiable as a member of the press because she wore a standard reflective press credential around her neck, carried a professional-grade camera and lens, and wore a high-grade respirator and goggles. (*Id.* ¶¶ 30–33.)

Shortly after midnight on May 30, 2020, Tirado approached the MPD Fifth Precinct, where a crowd of protestors stood across from a group of MPD officers. (*Id.* ¶¶ 34–36.) Protestors did not appear to be armed, but they were occasionally throwing water bottles at the police. (*Id.* ¶ 37.) The officers were armed with 40mm foam bullets, a type of "less-lethal" munition, and launchers equipped with aiming devices. (*Id.* ¶ 38–39, 41.) The use of 40mm foam bullets is governed by the MPD Policy and Procedure Manual, which provides that foam bullets are only authorized for the purpose of incapacitating an aggressive, non-compliant subject—not for crowd control; the primary target should be the large muscle group in the lower extremities; and officers should avoid using foam bullets against the head and neck unless use of deadly force is justified. (*Id.* ¶¶ 43–45.)

At approximately 12:34 a.m., Tirado approached the opposing groups of protestors and police from the side, such that she did not appear to be part of the group of protestors, and stood between the groups, separately from the protestors, to take photos of the police line. (*Id.* ¶¶ 46–48.) Tirado states that her reflective press credential remained visible while taking photos and that the flash from her camera was visible from the police line. (*Id.* ¶¶ 49, 51.) Tirado took dozens of photos of both protestors and police from her vantage point. (*Id.* ¶ 50.) Tirado did not hear any instructions, warnings, or communication from police while taking photos. (*Id.* ¶¶ 34, 55.)

Then, as Tirado aimed her camera to take more photos, one or more of the MPD officers, John Does # 1–4, aimed and fired a foam bullet at her head, in violation of MPD

policy, which hit Tirado in the left side of the face and knocked off her goggles. (*Id.* ¶¶ 52–54, 56.)

Two photos taken by Tirado moments before the officer(s) shot the foam bullet(s) show police aiming 40mm launchers toward Tirado, despite allegedly being identifiable as press and being some distance away from police at the time. (*See id.* ¶ 58.) According to Tirado, the officers in the photos do not appear to be under imminent threat from Tirado, and some are not paying attention to her. (*Id.* ¶ 59.)

B.    **Tirado's Injury and Ongoing Impact**

Protestors saw that Tirado was shot and helped her reach on-site medics. (*Id.* ¶ 60.) Medics put a bandage on her eye and coordinated transportation to the hospital.[1] (*Id.*) When Tirado arrived at the hospital, she was sent into surgery. (*Id.* ¶ 70.) Tirado was told by doctors that she is now permanently blind in her left eye. (*Id.* ¶ 71.) Since May 30, Tirado underwent a second eye surgery, and she has been told that additional surgeries may be necessary and has had regular medical visits to address ongoing complications. (*Id.* ¶ 73.)

---

[1] At the hospital, Tirado realized her backpack was hit with a bright green ballistic tracking round at some point, which is a less-lethal munition designed to leave a mark on a target. (*Id.* ¶¶ 61–62, 66.) Ballistic tracking rounds are used to designate individuals for arrest. (*Id.* ¶ 62.) Tirado alleges that the ballistic tracking round was also intentionally fired at her by one of more of John Does # 1–4. (*Id.* ¶ 65.)

Tirado's blindness has altered her professional and everyday life. (*Id.* ¶¶ 74–85) For example, her ability to drive and ride in a car is limited, she experiences severe headaches, and tires easily. (*E.g.*, *id.* ¶¶ 77–78.) Tirado's two children have also been affected. (*Id.* ¶ 79.) Professionally, Tirado has limited ability to focus on cameras, computer screens, or documents for long periods of time. (*Id.* ¶ 78.) However, Tirado has already returned to covering protests, such as a series of protests at the state capitol in Columbus, Ohio. (*Id.* ¶¶ 80–81.) Tirado intends to continue covering protests and civil unrest, and is interested in returning to Minneapolis to document the aftermath of the George Floyd protests, but she fears retaliation or use of excessive force by MPD. (*Id.* ¶¶ 82–85.)

### C.   Other Journalists' Experiences Covering the George Floyd Protests

Tirado alleges that numerous other journalists were subject to use of force and threats by MPD while covering the protests and civil unrest, despite being identifiable as press. (*See id.* ¶¶ 86–106.) Tirado identifies incidents that occurred both before and after she was shot.

On May 26, 2020, MPD officers shot StarTribune reporter Andy Mannix in the thigh with a foam bullet while he was leaning against a tree a block away from the MPD Third Precinct. (*Id.* ¶ 88.) When he was shot, Mannix was posting a video to Twitter. (*Id.*) Mannix tweeted about his experience that night and the following day, and Time Magazine covered the incident on May 27. (*Id.*) The same day, MPD officers shot reporter

Niko Georgiages in the arm with less-lethal munition as he approached an injured protestor lying on the ground, which was documented on Twitter. (*Id.* ¶ 89). Additionally, MPD hit an unidentified journalist with a baton in the throat and stomach despite onlookers saying he was press, which was documented on YouTube. (*Id.* ¶ 90.)

On May 27, freelance journalist Jared Goyette was struck in the eye by a less-lethal projectile,[2] (*id.* ¶ 91), and an MPD officer shot Minnesota Reformer reporter Max Nesterak in the chest with a less-lethal projectile immediately after he took a photo of a group of about 10 police officers, (*id.* ¶ 92.) Nesterak tweeted about his experience and posted the photo he took. (*Id.* ¶ 92.)

On May 30, several incidents occurred in addition to Tirado's injury. Reuters cameraman Julio-Cesar Chavez was struck in the arm and neck by less-lethal projectiles. (*Id.* ¶ 99.) MPD fired multiple projectiles at CBS reporter Michael George and his news crew although they had credentials displayed and were carrying equipment 500 feet from protestors. (*Id.* ¶ 100.) MPD also shot Canadian Broadcasting Corporation correspondent Susan Ormiston in the shoulder with a less-lethal projectile while she stood in a parking

---

[2] Jared Goyette initiated a putative class action asserting *Monell* and civil conspiracy claims against the City, Chief Arradondo, Kroll, the State Public Safety Commissioner, the State Patrol Colonel, and two John Does. (ECF No. 20-1302, 2nd Am. Compl, *Goyette v. City of Minneapolis*, July 30, 2020, Docket No. 53.) The Goyette case identifies an additional ten examples of use of force against journalists by MPD, (*see id.* ¶¶ 54–83), of which Tirado suggests the Court should take note, even though they are not included or incorporated by reference in her Amended Complaint, (*see* Pl. Mem. Opp. Mot. Dismiss at 33, Sept. 28, 2020, Docket No. 49.) The Court finds that Tirado's allegations alone state a *Monell* custom claim and therefore declines to consider the *Goyette* allegations at this time.

lot with her television crew.  (*Id.* ¶ 101.)  Additionally, MPD pointed a 40mm foam bullet launcher at Vice News correspondent Michael Anthony Adams from point-blank range while he laid face-down on the ground, and then sprayed him in the face with a chemical irritant.  (*Id.* ¶ 102.)

Tirado also alleges that MPD officers made comments to press showing a disregard for the media exemption from the curfews.  (*See id.* ¶¶ 103–05.)  Tirado further identifies at least one journalist who stated that they were shot at if they were anywhere in police line of sight during the protests and unrest.  (*Id.* ¶ 106.)

Based on the identified events prior to May 29, Tirado contends that MPD was on notice of these incidents.[3]  (*Id.* ¶¶ 93–97.)  Tirado alleges that the MPD maintains an intelligence arm called the Strategic Information Center that monitors social media and other digital sources of information.  (*Id.* ¶ 95.)  More directly, Tirado alleges reporters from the Freedom of the Press Foundation's U.S. Press Freedom Tracker contacted MPD for comment on the instances of violence against journalists, to which the MPD did not respond.  (*Id.* ¶ 97.)

---

[3] Tirado also alleges that MPD has a history of unconstitutionally targeting journalists because of an excessive force incident that occurred in April 2002 involving reporters from the Minnesota Daily.  (*See id.* ¶¶ 107–12.)

### D.   Robert Kroll's Statements and Alleged Conspiracy

Tirado alleges that Robert Kroll, President of the Police Officers' Federation of Minneapolis ("POFM"), the police union which represents MPD officers, (*id.* ¶ 113), exerts tremendous control over the culture, actions, and professional standards of MPD officers, including customs governing use of force,[4] (*id.* ¶¶ 114–17.)

On May 29, Kroll contacted senior MPD policymakers, including Defendant MPD Chief of Police Medaria Arradondo, to demand that they loosen restrictions on the use of less-lethal force and to express that rank-and-file officers had lost faith in MPD leadership. (*Id.* ¶ 118.) Kroll also sent a letter to POFM members, which was shared on social media on June 1, 2020, stating that he had conversations with politicians at the state level during the protests, and proposed a detailed plan of action including thousands of National Guard troops. (*Id.* ¶ 119.) Tirado alleges, on information and belief, that Kroll gave similar tactical input through formal and informal channels into MPD's protest response. (*Id.*)

Tirado alleges that Kroll acted on his publicly documented hostility toward the press, (*see id.* ¶¶ 120–22), by conspiring with the City of Minneapolis, MPD, and/or one or more individual officers to vindicate his anti-press views by depriving Tirado of her

---

[4] For example, when Minneapolis Mayor Jacob Frey announced a prohibition on "warrior training" for the MPD, Kroll led the POFM to partner with a provider of warrior training to make online training materials available to every member of the MPD for free. (*Id.* ¶ 117.)

First, Fourth, and Fourteenth Amendment rights in retaliation for her coverage of the protests or her presence there. (*id.* ¶ 123–24.)

## II.   PROCEDURAL HISTORY

On June 10, 2020, Tirado initiated this action against the City, John Does 1–4 in their official and individual capacities, and Robert Kroll in his individual capacity. (Compl., June 10, 2020, Docket No. 1.) Tirado filed her operative Amended Complaint on July 29, 2020. (Am. Compl.) Tirado states claims pursuant to 42 U.S.C. § 1983 for violations of the First, Fourth, and Fourteenth Amendments, and Conspiracy Against Constitutional Rights, and a claim for Common-Law Battery. (*See* Am. Compl. ¶¶ 125–66.)

On August 24, 2020, Kroll filed a Motion to Dismiss the Amended Complaint. (Kroll Mot. Dismiss, Aug. 24, 2020, Docket No. 38.) Defendants Chief Arradondo and the City of Minneapolis also filed a Motion to Dismiss the Amended Complaint on August 24, 2020.[5] (City Mot. Dismiss, Aug. 24, 2020, Docket No. 43.)

## DISCUSSION

## I.   STANDARD OF REVIEW

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court considers all facts alleged in the complaint as true to determine if the complaint

---

[5] The City does not move to dismiss Tirado's common-law battery claim. Thus, the City has not moved to dismiss the case in full.

states a "claim to relief that is plausible on its face." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  The Court may consider the allegations in the complaint as well as "those materials that are necessarily embraced by the pleadings." *Schriener v. Quicken Loans, Inc.*, 774 F.3d 442, 444 (8th Cir. 2014).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  Although the Court accepts the complaint's factual allegations as true and construes the complaint in a light most favorable to the plaintiff, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).  In other words, a complaint "does not need detailed factual allegations" but must include more "than labels and conclusions, and a formulaic recitation of the elements" to meet the plausibility standard.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  At the motion to dismiss stage, "[t]here is no requirement for direct evidence; the factual allegations may be circumstantial[.]" *McDonough v. Anoka Cty.*, 799 F.3d 931, 945 (8th Cir. 2015).

## II.      MUNICIPAL LIABILITY UNDER 42 U.S.C. § 1983

The City does not dispute that Tirado has sufficiently pleaded constitutional violations by the John Doe defendants, but instead moves to dismiss Counts I, II, and III for violations of the First Amendment, Fourth Amendment, and Fourteenth Amendment

on the basis that Tirado has failed to sufficiently allege its liability pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), and *Monell*'s progeny.

Under § 1983, a municipality cannot be held liable "solely because it employs a tortfeasor." *Bolderson v. City of Wentzville*, 840 F.3d 982, 985 (8th Cir. 2016) (citing *Monell*, 436 U.S. at 691). Rather, liability for a constitutional violation attaches only if the violation resulted from an official municipal policy, an unofficial custom, or a deliberately indifferent failure to train or supervise an official or employee. *Id.* (citing *Atkinson v. City of Mountain View*, 709 F.3d 1201, 1214 (8th Cir. 2013)). To maintain a claim for municipal liability based on an unofficial custom, as asserted here, a plaintiff must allege:

(1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;

(2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and

(3) The plaintiff's injury by acts pursuant to the governmental entity's custom, i.e., proof that the custom was the moving force behind the constitutional violation.

*Ware v. Jackson Cty*, 150 F.3d 873, 880 (8th Cir. 1998) (cleaned up). In its Motion to Dismiss, the City argues that Tirado has failed to allege an unofficial custom, focusing on the first two elements of the claim.

## A.   Continuing, Widespread, Persistent Pattern

The Court must first determine whether Tirado has alleged a continuing, widespread, and persistent pattern of misconduct. As an initial matter, the City asks the

Court to consider only "similar" incidents when determining the sufficiency of Tirado's *Monell* allegations, suggesting that only misuse of projectiles should be included, the same conduct Tirado suffered.[6]   In the Court's view, however, all events described in the Amended Complaint bear sufficient factual similarity to Tirado's experience to potentially form a pattern.   Although not every incident involved the use of foam bullets or projectiles, the alleged police misconduct toward journalists occurred under similar circumstances: journalists were identifiable as press, separated from protestors and at a distance from police, and were not engaging in any threatening or unlawful conduct. These incidents fall within the wide parameters of the unconstitutional custom alleged: "targeting journalists for unlawful reprisals during the George Floyd protests."   (Am. Compl. ¶ 130.)   The Court will therefore consider whether these incidents constitute an unlawful custom.

Next, the City contends that the Court must dismiss Tirado's claims on the basis that the allegations are not numerous enough, as a matter of law, to constitute a custom. "To trigger municipal liability based on unofficial municipal custom, the custom must be so pervasive among non-policymaking employees of the municipality that it effectively has the force of law."   *Bolderson*, 840 F.3d at 986 (citing *Ware*, 150 F.3d at 880); *see also*

---

[6] *See, e.g.*, *See Mettler v. Whitledge*, 165 F.3d 1197, 1205 (8th Cir. 1999) (noting that the plaintiff did not show that prior incidents bore any factual similarity to the incident giving rise to the claims); *Ratliff v. City of Columbia*, 1999 WL 1143752, at *1 (8th Cir. 1999) (per curiam) (requiring the plaintiff to establish "a municipal policy or custom of failing to act on earlier similar complaints of unconstitutional conduct.").

*Jane Doe A ex rel. Jane Doe B v. Special Sch. Dist.*, 901 F.2d 642, 646 (8th Cir. 1990) ("[T]o be held liable on the basis of custom, there must have been a pattern of "persistent and widespread" unconstitutional practices which became so "permanent and well settled" as to have the effect and force of law." (quotation omitted)).   Although an unconstitutional custom claim cannot be predicated on a single act, *see, e.g.*, *Bolderson*, 840 F.3d at 986, the Eighth Circuit has not determined whether some other, minimum number of incidents is required as evidence of custom*, see, e.g.*, *Burbridge v. City of St. Louis*, 430 F. Supp. 3d 595, 620 (E.D. Mo. 2019).[7]

A closer look at the threshold for a legally sufficient volume of unconstitutional conduct reveals that, at the summary judgment stage, courts have indeed rejected *Monell* custom claims premised on more frequent conduct than the ten or so incidents identified here.  *See, e.g.*, *Mettler v. Whitledge*, 165 F.3d 1197, 1204–05 (8th Cir. 1999) (finding 15 prior incidents to be insufficient)[8]; *Pineda v. City of Houston*, 291 F.3d 325, 329 (5th Cir.

---

[7] *See also Brewington v. Keener*, 902 F.3d 796, 802 (8th Cir. 2018) ("[I]n the face of an express municipal policy prohibiting excessive force, two incidents of excessive force—even assumed to be true—cannot be considered a pattern of widespread and pervasive unconstitutional conduct."); *Smith v. Watkins*, 159 F.3d 1137, 1138 (8th Cir. 1998) ("We recently held that two specific complaints and various rumors about an officer were not sufficient to establish a policy or custom of condoning unconstitutional conduct." (citing *Andrews v. Fowler*, 98 F.3d 1069, 1076 (8th Cir. 1996))).

[8] Notably, the number of incidents was not itself dispositive for summary judgment in *Mettler*. Rather, the Eighth Circuit found that the plaintiff "produced no evidence regarding the factual background" of previous incidents, and did not "show[] that the incidents giving rise to these complaints bear any factual similarity" to her experience.  *Mettler*, 165 F.3d at 1205.  By contrast, at the pleading stage, Tirado is not required to produce evidence beyond her allegations.

2002) (concluding that eleven incidents were insufficient to establish an unconstitutional pattern).

Yet, the Court declines to dismiss based on only ten or so incidents being identified. There is an important distinction between summary judgment and the pleading stage. *Sagehorn v. Indep. Sch. Dist. No. 728*, 122 F. Supp. 3d 842, 867 (D. Minn. 2015). At summary judgment, a plaintiff's allegations are put to their proof, and if the facts show only a handful of instances of misconduct then, the plaintiff may not be able to prove a pattern or custom as a matter of law. *See id.* (discussing *Andrews v. Fowler*, 98 F.3d 1069, 1075–76 (8th Cir. 1996). On the other hand, at the pleading stage, "[e]ven if a plaintiff cannot identify the full scope of an alleged custom or policy, the key to surviving dismissal is that the 'complaint must allege facts which would support the existence of an unconstitutional policy or custom.'" *Id.* (quoting *Doe ex rel. Doe v. Sch. Dist. of City of Norfolk*, 340 F.3d 605, 614 (8th Cir. 2003)).

Based on the Amended Complaint, the purported pattern of misconduct includes at least Tirado's injury just after midnight on May 30; two journalists shot with less-lethal munitions and one journalist hit with a baton on May 26; two journalists shot with less-lethal projectiles on May 27; three journalists shot with less-lethal projectiles and one journalist targeted by a 40mm foam bullet launcher at point-blank range and sprayed with

---

Moreover, the Court finds that the events bear sufficient factual similarity. Thus, *Mettler* holds little sway over the Court's assessment of Tirado's case at this stage.

a chemical irritant on May 30; disparaging comments made by MPD to two journalists about their press passes and exemption from the curfew; and one journalist's perception of being targeted deliberately by MPD.  These allegations are sufficiently numerous as to plausibly constitute a pattern of unconstitutional conduct at the pleading stage.  As such, Tirado clearly "has gone beyond merely alleging the boilerplate requirements of a *Monell* claim," *id.* at 866, and has plausibly asserted that the MPD engaged in a pattern of targeting journalists for reprisals during the George Floyd protests, as evidenced by the treatment of Tirado and at least nine other journalists.

However, the Court's analysis does not end here.  Beyond the number of incidents of misconduct, courts also consider the timeframe or duration of the incidents when assessing whether the pattern was widespread.  *See Pembaur*, 475 U.S. at 480–81 (stating that unwritten customs arise from understanding "that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time"); *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (holding that an unconstitutional custom exists when a municipality acquiesces in a "longstanding practice or custom which constitutes 'standard operating procedure' of the local government entity" (quotation omitted)).  The Court must therefore decide whether the timeframe of

Tirado's allegations—the period during the George Floyd protests[9]—is of sufficient duration to state an unofficial custom claim pursuant to *Monell*.

The timeframe of the custom claim here is distinct from *Monell* cases in which the practice occurred over the course of months or years.  *See, e.g.*, *Ware*, 150 F.3d at 876–79 (describing conduct between around 1989 to 1993).  However, such a duration is not a strict standard.  Rather, "if some evidence indicates that the incidents occurred over a course of time sufficiently long to permit notice of" their unlawfulness, then a plaintiff could establish a custom.  *See Johnson v. Douglas Cty. Med. Dep't*, 725 F.3d 825, 829 (8th Cir. 2013).  In other words, the period is sufficiently long when it would permit notice of the unlawful practice.  Tirado alleges that the City was aware of unlawful use of force against members of the media during the protests through social media monitoring, news reports, and direct outreach.  The Court finds that, although the timeframe of conduct alleged is isolated insofar as it is a defined period of time and a single, continuous police operation, Tirado has sufficiently alleged that the City was on notice of the practice, and, thus, that the incidents occurred over a sufficiently long period of time.[10]

---

[9] Based on the Amended Complaint, it appears that this period, for purposes of the Motions to Dismiss, is May 26 through June 5.  (*See* Am. Compl. ¶¶ 3–4.)  The Court notes, however, that discovery could reveal a modified timeframe.

[10] The relationship between timeframe and notice appears to be particularly salient in the context of police response to prolonged protests or civil unrest.  For example, addressing a motion to dismiss *Monell* custom claims raised in response to police conduct over the course of three days of protests, the Eastern District of Missouri similarly concluded that:

B.      Deliberate Indifference

Finding that Tirado has alleged sufficiently widespread unlawful conduct over a period of time long enough to put the City on notice, the Court next examines whether Tirado has alleged deliberate indifference.   "Notice is the touchstone of deliberate indifference in the context of § 1983 municipal liability[,]" *Atkinson*, 709 F.3d at 1216, but the complaint must also allege that the defendant "made a deliberate choice" to ignore

---

> Given the temporal relation of these individual allegations (August 11–13, 2013), as well as the alleged shared objective of the officers—namely, responding to protests and civil unrest following Michael Brown's death—Plaintiffs have plausibly alleged that [defendants] knew or should have known of the pattern of unconstitutional acts committed by the John Doe officers and were deliberately indifferent to, or tacitly authorized those acts, which resulted in Plaintiffs suffering various injuries.

*White v. Jackson*, No. 14-1490, 2015 WL 1189963 (E.D. Mo. Mar. 16, 2015).  The City, however, urges the Court to look past *White* because the holding was rejected by *Burbridge v. City of St. Louis* just a few years later.  *See* 430 F. Supp. 3d 595 (E.D. Mo. 2019).

The City overstates the implication of *Burbridge*.  The *Burbridge* court granted summary judgment on municipal liability claims arising from police conduct during protests because "[plaintiffs] failed to produce any evidence that policymaking officials had notice of any of these incidents.  And even if evidence of notice existed, the September 15–17 incidents are simply too close in time to the [plaintiffs'] arrest to show "deliberate indifference" or "tacit authorization." *Id.* at 620.  Aside from the Court not being bound by either *Burbridge* or *White*, it is not inconsistent for a court to find that a complaint "plausibly alleged" deliberate indifference to an unconstitutional custom over a three-day period of protests, and in another instance when facing a motion for summary judgment, find that, based on a complete body of evidence procured through discovery, a plaintiff failed to establish the existence of deliberate indifference to an unconstitutional custom over a durationally-similar three-day period of protests.  Moreover, the factual allegations presented by Tirado are distinguishable.  Unlike the *Burbridge* plaintiffs, Tirado did provide allegations that policymaking officials had notice of the attacks on journalists. Additionally, Tirado alleges that numerous incidents of misconduct occurred three or four days before her injury, making it less likely that the incidents are "simply too close in time" to ultimately show deliberate indifference.

alleged violations, *Douglas Cty.*, 725 F.3d at 829.   The "deliberate indifference" requirement ensures that the city's conduct was the "moving force" behind the constitutional violation.  *See Board of Comm'rs v. Brown*, 520 U.S. 397, 400 (1997).  As such, a "rigorous" or "stringent" standard of fault applies.  *See, e.g.*, *Shrum ex rel. Kelly v. Kluck*, 249 F.3d 773, 778, 780 (8th Cir. 2001).

Tirado has articulated specific allegations that the City knew about constitutional violations by MPD officers in the days before her injuries and took no corrective action.[11] She identifies at least five incidents of use of force against journalists during this time, and explains how the City allegedly became aware of those incidents through broad reporting by news outlets, the City's own social media monitoring efforts, and direct outreach by media.  Although Tirado does not allege specific facts about the City's deliberation or decision to ignore such incidents, this is likely too much to ask at the pleading stage, when all that is required is a "possible custom."  *See Sagehorn*, 122 F. Supp. 3d at 867.  Tirado's deliberate indifference allegations far exceed a mere showing of bare allegations, which would not be sufficient.  *See, e.g., Atkinson*, 709 F.3d at 1216 (finding a "bare allegation" of deliberate indifference to be "patently insufficient").  Additionally, taken as a whole,

---

[11] Although the Court considers every allegation of unconstitutional conduct in the Amended Complaint to determine whether Tirado has alleged a plausible pattern, only the incidents occurring before Tirado's injuries will be weighed in the deliberate indifference analysis, since the City, to be liable, must have been on notice of the conduct before Tirado was injured.  *See, e.g.*, *Douglas Cty.*, 725 F.3d at 829 (examining whether policymaking officials had notice in the time leading up to the plaintiff's alleged constitutional deprivation).

the Amended Complaint supports an inference that the City had the capacity to change MPD tactics over the course of the protests.  Thus, Tirado has plausibly alleged that the City could have, but did not, take any action to curtail violations of journalists' rights, satisfying the deliberate indifference element.

In sum, the policy rationale animating *Monell*'s formulation of municipal liability is to limit liability to those situations in which the city is the "moving force" behind constitutional violations.  *See Board of Cty. Cm'rs v. Brown*, 520 U.S. at 404.  In the Court's view, this principle supports a flexible analysis that allows for the possibility of municipal liability based on a pattern of unconstitutional conduct even in relation to a single police operation spanning ten days.  The alternative is to suggest that, as a matter of law, so long as unconstitutional conduct only occurs during a single police operation—such as in response to a related series of protests—but ceases at the conclusion of the operation, the city or police department can be deliberately indifferent to that unconstitutional conduct, yet escape liability because the conduct did not last long enough.

Such a rule would flout the touchstone of *Monell*—municipal responsibility for unconstitutional conduct, *see Pembaur*, 475 U.S. at 478—and, therefore, the Court finds that the bounded timeframe of the claims at issue here does not preclude liability. Rather, taking the pleaded facts as true and interpreting them most favorably to Tirado as the non-moving party, the Amended Complaint includes allegations of police misconduct at least widespread and similar enough that the City plausibly could have

known about, but ignored, repeated unconstitutional actions toward the press. Accordingly, the Court will deny the City's Motion to Dismiss with respect to Counts I, II, and III.

### III.   CIVIL CONSPIRACY UNDER 42 U.S.C. § 1983

The City and Kroll move to dismiss the civil conspiracy claim in Count IV.  To state a claim of civil conspiracy pursuant to § 1983, a plaintiff must allege that (1) defendants conspired to deprive the plaintiff of her constitutional rights; (2) at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) that the overt act injured the plaintiff.  *White v. McKinley*, 519 F.3d 806, 814 (8th Cir. 2008).  The threshold requirement for a § 1983 conspiracy claim is a deprivation of a constitutional right or privilege, *White*, 519 F.3d at 814, which Defendants do not dispute Tirado has plausibly alleged.

At the outset, Kroll disputes whether he can be held liable for civil conspiracy pursuant to § 1983 since he is sued in his individual, rather than official, capacity. Typically, only state actors may be held liable under § 1983.  *See, e.g.*, *Youngblood v. Hy-Vee Food Stores, Inc.*, 266 F.3d 851, 855 (8th Cir. 2001) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970)).  Yet, when a civil conspiracy claim involves both state and private actors, the private party can be liable for conspiring with state officials if he was a willful participant in the conspiracy.  *White*, 519 F.3d at 816.  When a private party is a participant in the conspiracy, a plaintiff "must allege, at the very least, that there was a

mutual understanding, or a meeting of the minds, between the private party and the state actor," *Mershon v. Beasley*, 994 F.2d 449, 451 (8th Cir. 1993), and the mutual understanding must be about the unlawful objective of a conspiracy, *Dossett v. First State Bank*, 399 F.3d 940, 951 (8th Cir. 2005). Tirado alleges that Kroll initiated contact with senior MPD policymakers to make demands, that he had numerous conversations with politicians, and that he proposed an action plan to which the City agreed, which plausibly establishes that Kroll was a willful participant in any conspiracy entered with state actors.

To state a claim against state or private actors, a complaint must include "specific facts tending to show a meeting of the minds among the alleged conspirators." *Lawrence v. City of St. Paul*, 740 F. Supp. 2d 1026, 1049 (D. Minn. 2010) (quotation omitted). Allegations that the parties had an "opportunity to communicate" or "acted in a manner that was consistent with the existence of a conspiracy" are insufficient alone to suggest a conspiracy. *Id.* at 1050 (D. Minn. 2010) (citing *Twombly*, 550 U.S. at 570). However, the plaintiff need not show that each participant knew the exact limits of the illegal plan. *White*, 519 F.3d at 816. The elements of a conspiracy are often established through circumstantial evidence, and "the question of the existence of a conspiracy to deprive the plaintiffs of their constitutional rights" can be inferred from the circumstances to demonstrate a "'meeting of the minds' or understanding among the conspirators to achieve the conspiracy's aims." *Id.* (citations omitted).

The Amended Complaint includes specific facts about Kroll's communications to the City, but not the City's response.[12]  Although mere suggestions from one party to another are insufficient to establish a meeting of the minds, *Shimota v. Wegner*, No. 15-1590, 2016 WL 1254240, at *10 (D. Minn. Mar. 29, 2016), Tirado's allegations concerning Kroll's position of influence over policies and culture within MPD support an inference that the City and/or the John Doe Defendants acquiesced to Kroll's demands during the George Floyd protests by permitting or encouraging unlawful use of less-lethal munitions. Further, Tirado's allegations that Kroll's influence, in combination with MPD officer conduct, plausibly demonstrate that something more was afoot than mere one-way communications.  Cf. *Magee v. Trustees of Hamline Univ., Minn.*, 747 F.3d 532, 536–37 (8th Cir. 2014) ("The multiple contacts between [defendants] do not, without more, reasonably infer that they conspired to terminate [plaintiff].").  The Court will therefore allow an opportunity for discovery because Tirado has presented circumstantial

---

[12] Kroll argues that imposing liability for civil conspiracy on the basis of his communications because it would equate to imposing liability for the content of protected speech from a union president, which warrants the highest protection under the First Amendment.  However, the First Amendment "does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent."  *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993).  Moreover, because the essence of conspiracy is an agreement to commit an unlawful act, the supporting evidence may necessarily include a defendant's speech.  *Accord United States v. Hassan*, 742 F.3d 104, 127 (4th Cir. 2014).  The content of Kroll's statements is not at issue, but rather the effect or outcome of his speech; that is, whether it led to a "meeting of the minds" for a conspiracy. Therefore, because Kroll's speech is used only as evidence to support the inference of the existence of a conspiracy, rather than as the substance of Tirado's claims, the Court finds that there is no threat to Kroll's First Amendment rights.

allegations that are not entirely one-sided.  *See White*, 519 F.3d at 816.[13]  However, the

Court notes that if, after discovery, Tirado cannot present at least circumstantial evidence

of the City's or John Does' agreement or conduct in response to Kroll's communications,

the claim may be ripe to be disposed of at summary judgment.

As to the remaining elements of the civil conspiracy claim, Tirado plausibly alleges

that the purported conspiracy was for an unlawful purpose—to deprive journalists of

constitutional rights—because she pleads specific facts regarding Kroll's animus toward

the press and that members of the press did, in fact, experience constitutional violations.

Tirado has also identified overt conduct by the John Doe Defendants through specific

allegations of use of force, and alleges that she was injured as a result of the overt actions.

Accordingly, the Court will deny both Motions to Dismiss with respect to Count IV

based on the plausible allegations of a civil conspiracy made in the Amended Complaint.

## CONCLUSION

Plaintiff Tirado's experience as a journalist during the George Floyd protests and

her injuries are serious and troubling.  That numerous other journalists experienced

similar,  seemingly  unjustified  incidents  involving  less-lethal  munitions  and  other

---

[13] *Cf. Burbridge*, 430 F. Supp. 3d 595, 615 (E.D. Mo. 2019) (denying summary judgment on a § 1983 civil conspiracy claim because the circumstantial evidence offered was not "so one-sided that no reasonable jury could infer the existence of a conspiracy").  The circumstantial evidence included an officer saying "that's him" before pulling one of the plaintiffs from the crowd to be arrested, and that none of the officers completed a use of force report about the arrest despite video showing the plaintiff being struck, maced, and rendered unconscious.  *Id.*

measures is even more troubling, as the allegations plausibly suggest an unconstitutional custom carried out by MPD officers of targeting journalists for unlawful reprisals. Although the alleged custom is time-bound to a single police operation surrounding the George Floyd protests, the City cannot escape municipal liability if a plaintiff can plausibly allege that it was deliberately indifferent to widespread, consistent, unlawful use of force against the press. Tirado has done precisely this, and, accordingly, the Court will deny the City's Motion to Dismiss with respect to the *Monell* claims.

Additionally, the Court finds that Tirado has stated a plausible § 1983 civil conspiracy claim against the City and Kroll based on Kroll's alleged influence over the MPD and its rank-and-file officers, his communications during the protests, and the actions taken by MPD officers toward the press. While Tirado will ultimately bear a heavier burden to prove a conspiracy, the Court finds that moving to discovery is merited by the allegations in the Amended Complaint and denies the City's and Kroll's Motions to Dismiss with respect to the civil conspiracy claim as well.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendant Kroll's Motion to Dismiss [Docket No. 38] is **DENIED** and the City of Minneapolis and Medaria Arradondo's Motion to Dismiss [Docket No. 43] is **DENIED**.

-25-

DATED: February 22, 2021
at Minneapolis, Minnesota.

_____
JOHN R. TUNHEIM
Chief Judge
United States District Court