IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| Linda Tirado,<br><br>Plaintiff,<br><br>v.<br><br>City of Minneapolis; Interim Minneapolis Chief of Police Amelia Huffman, *in her official capacity*; Robert Kroll, *in his individual capacity*; Andrew Braun, *in his individual and official capacities*, and Minneapolis Police Department Officer John Doe #1, *in his official and individual capacities*,<br><br>Defendants. | Case No. 0:20-cv-01338-JRT-JFD<br><br>**SECOND AMENDED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

**INTRODUCTION**

1.      Plaintiff Linda Tirado is an internationally renowned journalist who is now blinded in one eye.  She lost her sight because officers of the Minneapolis Police Department shot her as she documented protests against the police killing of George Floyd.  Just before midnight on May 29, 2020, Ms. Tirado stepped in front of a protesting crowd and aimed her professional Nikon camera to photograph the police line.  Ignoring the press credential she wore around her neck and other indications that she was a journalist and not a protestor, police shot her in the face

with a 40mm projectile and marked her with a ballistic tracking round.  With blood dripping down her face, she cried out repeatedly, "I'm press!" while immediately placing her hands in the air, but the police ignored her.  By the time protestors got her to the hospital, Ms. Tirado's left eye was permanently destroyed.

2.     Until recently, few Americans could have imagined police officers shooting at journalists in the act of reporting.  The dark irony of this brutal police attack on the free press is made all the more grim because the media played a key role in bringing the horrific killing of George Floyd to the attention of all Americans.  At issue in this case is Ms. Tirado's irreparable injury, the protections owed the media when journalists report on Americans exercising their free speech rights through protests, and what orders were given to the police officers who targeted Ms. Tirado as part of a policy and custom of targeting reporters covering the George Floyd protests.

3.     On May 25, 2020, Minneapolis Police Department Officer Derek Chauvin pinned George Floyd—an unarmed black man who was becoming increasingly immobile, unresponsive, and eventually unconscious—to the ground with his knee on Mr. Floyd's neck.  Two other Minneapolis Police Department officers continued to hold Mr. Floyd down, and a third Minneapolis Police Department officer stood by to ensure that those recording the altercation did not interfere with Officer Chauvin's killing of Mr. Floyd.  Mr. Floyd pleaded for his life,

gasping: "*I can't breathe.*"  Eight minutes and forty-six seconds later, George Floyd died in the custody of the Minneapolis Police Department.

4.    After a citizen recording of George Floyd's killing spread across the world, protests against police brutality occurred and are still occurring across the country.  Members of the press have been working to cover these protests and are risking their lives to do so.  In a counterproductive approach, various States and the District of Columbia have responded to their citizens' complaints about police brutality by state sanctioned increased police presence, which effectively facilitated more acts of police brutality, including against the press.  In response to building tensions in the Twin Cities, the Governor of the State of Minnesota, Tim Walz, activated the Minnesota National Guard on May 28, 2020.  By 11:30 pm on May 28, 2020, the Minnesota State Patrol announced that its troopers and Department of Natural Resources Conservation officers were actively supporting efforts in Minneapolis and St. Paul.  The next day, the Governor imposed a nighttime curfew in Minneapolis and St. Paul, and later extended the curfew through the morning of June 5, 2020.  The curfew prohibited persons from traveling on any public street or any public place between the hours of 8:00 pm and 6:00 am.  Notably, all news media was exempt from the curfew's restrictions.  Somehow, members of the Minneapolis Police Department did not faithfully honor the news media exemption.

5.     On the evening of May 28, Ms. Tirado, like many journalists across the country, rushed to Minneapolis to cover the civil uprisings.  Ms. Tirado chose to head to the scene of the crime to take pictures of the protest demonstrations and law enforcement.  She did not anticipate being shot instead.  On information and belief, on May 29, law enforcement fired tear gas, unprovoked, in the direction of the nonviolent, peaceful protestors.  Law enforcement did not administer any prior warnings, dispersal orders, or demands for protestors to go home.

6.     As an experienced journalist who has covered similar protests involving law enforcement, when she arrived on location on May 29 Ms. Tirado ensured her press credentials were displayed prominently around her neck, and began to photograph law enforcement's tactics.  Ms. Tirado distanced herself physically from protestors in order to emphasize her status as a member of the press and listened closely for any orders from law enforcement.  Ms. Tirado covered the protests for approximately four hours on May 29.

7.     Shortly before midnight on May 29, Ms. Tirado remained in front of the police line for several minutes while taking dozens of photographs.  Around 11:38 pm, after backing slowly away from the police line, Ms. Tirado felt an impact on the left side of her face and immediately felt blood gushing down her face and the burn of tear gas in her eyes.  Ms. Tirado simultaneously realized that her goggles had been knocked off by a projectile, and began crying out *I'm press! I'm press!*" while

throwing her hands into the air.  She stood there, blinded and bleeding.  No law enforcement personnel helped her.

8.     Instead, protestors assisted her and brought her to the medics on site.  After receiving a bandage from the medics, Ms. Tirado was transported to a local hospital.  Upon arrival, Ms. Tirado went into surgery.  When she awoke from surgery, the doctors told her that she was now permanently blind in her left eye.

9.     Whatever one's view of police conduct in relation to the protestors and of protestors' actions, there can be no doubt that the Constitution prohibits shooting journalists for reporting on protests.  Journalists, like Linda Tirado, cover the protests and capture any tactics employed by law enforcement.  If the press is silenced, the story does not get amplified, and nobody can see the police violence committed against citizens for exercising their First Amendment rights to freedom of speech, freedom of press, and freedom to peacefully assemble.  What is more, the public could not learn about any incidents of law enforcement's deliberate use of excessive force in violation of the Fourth Amendment.  Indeed, the Governor himself recognized that the people of Minneapolis who were exercising their First Amendment rights to protest could rightfully assume that, "if they see a reporter being arrested . . . it's because something's going to happen that they don't want to be seen.  And so that is unacceptable."  Law enforcement must face repercussions for blinding the very people they are supposed to protect.

## PARTIES

10.     Plaintiff Linda Tirado, also known as Linda Eaton, is a citizen of Tennessee, who works as a freelance journalist for international and national media publications.

11.     Defendant City of Minneapolis is a municipality incorporated in the State of Minnesota and is therefore a citizen of Minnesota.  The Minneapolis Police Department (the "Department") is an agency of the City of Minneapolis.

12.     Defendant Amelia Huffman is a citizen of Minnesota.  Huffman serves as Interim Chief of the Minneapolis Police Department and is sued in her official capacity.

13.     Defendant Robert Kroll is a citizen of Minnesota sued in his individual capacity.

14.     Defendant Andrew Braun is an officer of the Minneapolis Police Department sued in his individual and official capacity. On information and belief, he is a citizen of Minnesota.

15.     Defendant John Doe #1 is an as-yet unidentified officer of the Minneapolis Police Department sued in his individual and official capacities.  On information and belief, he is a citizen of Minnesota.

## JURISDICTION

16.     This Court has original jurisdiction under 28 U.S.C. § 1331 because this case arises under the First, Fourth, and Fourteenth Amendments to the United States Constitution as well as 42 U.S.C. § 1983.

17.     This Court also has original jurisdiction under 28 U.S.C. § 1332(a)(1) because this case is between citizens of different States and the amount in controversy exceeds $75,000.

## BACKGROUND

## I.     GEORGE FLOYD IS KILLED BY MINNEAPOLIS POLICE AND THE PUBLIC RESPONDS

18.     On May 25, 2020, George Floyd, a 46-year-old black man, died in Minneapolis, Minnesota after Minneapolis Police Officer Derek Chauvin rested his knee on Mr. Floyd's neck and upper back until long after Mr. Floyd lost consciousness.  In addition to Officer Chauvin, Minneapolis Police Officers Thomas Lane and J. Alexander Keung continued to pin Mr. Floyd to the ground, ignoring the sixteen times Mr. Floyd cried "I can't breathe" before losing consciousness.[1]

19.     While Officer Chauvin and the two other officers ensured that the unconscious Mr. Floyd could not move, a third Minneapolis Police Officer, Tou

---

[1] Evan Hill et al., *8 Minutes and 46 Seconds: How George Floyd Was Killed in Police Custody*, NY Times (June 8, 2020), https://www.nytimes.com/2020/05/31/us/george-floyd-investigation.html.

Thao, kept a watchful eye on the individuals recording Officer Chauvin killing Mr. Floyd.

20.     During the eight minutes and forty-six seconds that Officer Chauvin was killing Mr. Floyd, a small number of people began to gather and attempted to de-escalate Officer Chauvin by telling Officer Chauvin to "Get off of him!" and asking "Did they [expletive] kill him, bro?"  The group of observers also recorded the interaction.  At one point, in apparent fear of young adults with recording devices, Officer Chauvin reached for his mace and pointed it towards the observers.  A little over twenty minutes into the arrest, Mr. Floyd was loaded into an ambulance.  Mr. Floyd was pronounced dead at a nearby hospital around 9:25 pm.

21.     Video recordings of Officer Chauvin's killing of Mr. Floyd soon went viral, and were spread across social media platforms and played on primetime network as breaking news.

22.     Protests ignited across the United States.  Eventually, at least one protest occurred in every state in the country.[2]  The protests even spread internationally, as citizens of other countries began to protest in solidarity with the

---

[2] Jiachuan Wu et al., *Map: Protests and rallies for George Floyd spread across the country*, NBC News (June 12, 2020), https://www.nbcnews.com/news/us-news/map-protests-rallies-george-floyd-spread-across-country-n1220976.

Black Lives Matter movement.[3]   All four officers involved were fired by the Minneapolis Police Department.  On May 29, 2020, Officer Chauvin was charged with third-degree murder and second-degree manslaughter.  On June 3, 2020, the charge against Officer Chauvin was elevated to second-degree murder.  On that same day, Officers Lane, Keung, and Thao were charged with aiding and abetting murder.[4]

23.     The protests against police brutality only grew in size over the next several days, which correspondingly attracted additional attention from the media, which, in turn, led to more on the ground journalists covering the story of the protests.

24.     Minneapolis in particular experienced a surge in protests and press coverage, as thousands flocked to the scene of the crime.

## II.     GOVERNOR WALZ IMPOSES A CURFEW EXEMPTING THE PRESS

25.     In response to the growing tensions between law enforcement and the protestors and the press, the Governor signed Executive Order 20-64, and declared

---

[3] Damien Cave et al., *Huge Crowds Around the Globe March in Solidarity Against Police Brutality*, NY Times (June 8, 2020), https://www.nytimes.com/2020/06/06/world/george-floyd-global-protests.html.

[4] *George Floyd death: New charges for all four sacked officers*, BBC (June 3, 2020), https://www.bbc.com/news/world-us-canada-52915019. Officer Chauvin has since been convicted in the murder of Mr. Floyd. Eric Levenson & Aaron Cooper, *Derek Chauvin found guilty of all three charges for killing George Floyd,* CNN (April 21, 2021), https://www.cnn.com/2021/04/20/us/derek-chauvin-trial-george-floyd-deliberations/index.html?iid=cnn-mobile-app.

a peacetime state of emergency which activated the National Guard.[5]  The National

Guard confirmed that more than 500 soldiers would respond to Minneapolis,

St. Paul, and surrounding communities.[6]

26.    Over the next few days, the Governor issued a series of executive

orders, on May 29,[7] May 31,[8] June 1,[9] and June 3,[10] all implementing curfews for the

cities of Minneapolis and St. Paul (the "Executive Orders").

---

[5] Emergency Executive Order 20-64, Activating the Minnesota National Guard and Declaring a Peacetime Emergency to Provide Safety and Protection to the People of Minneapolis, St. Paul, and Surrounding Communities, May 28, 2020, https://mn.gov/governor/assets/EO%2020-64%20Final_tcm1055-433855.pdf.

[6] *Over 500 National Guard soldiers activated to amid protests regarding George Floyd's death; Frey declares a state of emergency in Minneapolis,* KSTP Eyewitness News (May 28, 2020), https://kstp.com/news/minnesota-national-guard-activated-to-control-protests-following-george-floyds-death/5743967/.

[7] Emergency Executive Order 20-65, Implementing a Temporary Nighttime Curfew in the Cities of Minneapolis and Saint Paul, May 29, 2020, https://mn.gov/governor/assets/EO%2020-65%20Final_tcm1055-434635.pdf.

[8] Emergency Executive Order 20-68, Extending the Temporary Nighttime Curfew in the Cities of Minneapolis and Saint Paul, May 31, 2020, https://mn.gov/governor/assets/EO%2020-68%20Final_tcm1055-434305.pdf.

[9] Emergency Executive Order 20-69, Extending the Temporary Nighttime Curfew in the Cities of Minneapolis and Saint Paul, June 1, 2020, https://mn.gov/governor/assets/EO%2020-69%20Final_tcm1055-434605.pdf.

[10] Emergency Executive Order 20-71, Extending the Temporary Nighttime Curfew in the Cities of Minneapolis and Saint Paul, June 3, 2020, https://mn.gov/governor/assets/EO%2020-71%20Final_tcm1055-434632.pdf.

27.     Notably, each of the Executive Orders exempted "[*a*]*ll...members of the news media*" from the nighttime curfew prohibiting persons from travel on any public street or place.

28.     There was no system in place for members of the media to apply for or obtain official credentials from the State of Minnesota or the Minneapolis Police Department.

## III.   LESS-LETHAL PROJECTILE FIRED BY LAW ENFORCEMENT BLINDS TIRADO

### MS. TIRADO'S EXPERIENCE DURING PROTEST

29.     On May 29, 2020, the first night of the curfew, Ms. Tirado ventured out in the evening to observe the protests.

30.     Ms. Tirado has extensive experience covering similar protests and took several steps to ensure that any observer would know she was a member of the press and not a protestor.

31.     Ms. Tirado had a standard, reflective press credential around her neck.

32.     Ms. Tirado was also carrying her professional-grade Nikon D3500 camera and lens, which when combined with its flash was about nine inches tall and six inches deep.

33.     Ms. Tirado also was carrying her high-grade respirator and goggles, which protestors do not ordinarily carry.

34.     Ms. Tirado's interactions with others confirmed that, so attired, she was readily recognizable as a member of the press.  Multiple law enforcement officers, firefighters, members of the National Guard, and protestors asked Ms. Tirado which news outlet she was working with.

35.     Shortly before midnight on May 29, 2020, while standing in the parking lot of a bank, Ms. Tirado heard several protestors shouting that police had deployed tear gas.  No dispersal order had been given.

36.     After ensuring that her press credential was displayed, and securing her respirator and goggles, Ms. Tirado moved in the direction of the Minneapolis Police Department's Fifth Precinct, which was headquartered at the intersection of Nicollet Avenue and 31st Street.

37.     Near the Fifth Precinct, Ms. Tirado found a crowd of protestors standing across from a group of Minneapolis Police Department officers.

38.     Although Ms. Tirado did not see any protestors carrying weapons, the officers became progressively more aggressive in their tactics.

39.     The Minneapolis Police Department officers on the scene were armed with, *inter alia*, launchers configured to fire 40mm projectiles, and one or more types of 40mm projectiles manufactured by Defense Technology.

40.     Defense Technology warns purchasers of its 40mm projectiles that users "should be adequately trained in the use of Less Lethal Impact Munitions and

have a thorough understanding of the round and considerations for selecting shot placement such as level of threat, target distance, size and clothing."[11]

41.    Defense Technology also warns that its 40mm projectiles should be aimed at "the large muscle groups of the buttocks, thigh, and even the knees of the subject," and that aiming outside that area will "greatly" increase the risk of "serious or life-threatening injuries."[12]

42.    To enable accurate use of 40mm projectiles and avoid unnecessary injury, the Minneapolis Police Department equips its 40mm launchers with sufficiently precise aiming devices that a trained officer can reliably hit the area of a human body that he or she intends to target.

43.    The Minneapolis Police Department's use of force policy also demonstrates the Department's awareness of the dangers of 40mm projectiles, and the limited circumstances under which their use is appropriate.

44.    The use of 40mm projectiles is subject to § 5-317 of the Minneapolis Police Department Policy and Procedure Manual.

45.    At the time Ms. Tirado was shot, Section 5-317 provided, *inter alia*, that only officers trained in their use may carry or use 40mm launchers, and that 40mm

---

[11] *See, e.g.* Defense Technology, *Product Specifications: 40mm eXact iMpact Sponge Round* (rev. June 2020), *available at* https://www.defense-technology.com/wp-content/uploads/2020/06/40mm-eXact-iMpact-Sponge-Round-6325.pdf.

[12] *Id.*

projectiles are only authorized for the purpose of "incapacitat[ing] a violent or potentially violent subject."."

46.     Section 5-317 also instructed that "[t]he primary target areas" for 40mm projectiles "should be the large muscle groups in the lower extremities," directs officers to "avoid" using 40mm projectiles against the head and neck, and specifically warns that "the delivery of the 40mm impact projectiles to certain parts of the human body can cause grievous injury that can lead to a permanent physical or mental incapacity or possible death. Areas susceptible to death or possible severe injury are the head, neck, throat and chest . . . . Unless deadly force is justified, officers should avoid the delivery of 40mm impact projectiles to any of the above-described areas."

47.     Shortly before midnight on May 29, 2020, Ms. Tirado approached the opposing groups of protestors and police at the intersection of 31st Street and Nicollet Avenue.

48.     Ms. Tirado was wearing her high-grade respirator and goggles as she approached.

49.     Defendant Andrew Braun was positioned on the northeast side of the intersection of 31st and Nicollet as Ms. Tirado approached. Additionally and/or in the alternative, John Doe #1 was positioned at or about the intersection of 31st and Nicollet.

50. Braun had approximately seven years of experience as a Minneapolis police officer.

51. That night, Braun was serving that night as part of a Minneapolis Police Department SWAT (special weapons and tactics) team responding to the George Floyd protests.

52. Braun or John Doe #1 was carrying a 40mm launcher and 40mm projectiles, which he had been trained on, issued, and authorized to use by the Minneapolis Police Department.

53. The Minneapolis Police Department trains officers that the optimal range for 40mm projectiles is between 10 and 90 feet, because their accuracy drops dramatically at ranges beyond 90 feet.

54. Braun's or John Doe #1's 40mm launcher was equipped with a top-mounted sight which, on information and belief, he was trained to properly use.

55. On information and belief, Braun or John Doe #1's sight was a "red dot" sight, so named because when an operator looks through it, an illuminated red dot indicates the point of aim.

56. Red dot sights are favored by police operating in fast-moving environments, because their optical properties mean that the apparent position of the aiming dot stays in alignment with the weapon's true point of aim no matter what angle the operator views it from.

57.     That property means that a red dot sight allows an operator to quickly and reliably obtain an accurate sight picture, even in an environment where it would be difficult to precisely align his eyes with the sight—as would be required for other kinds of aiming optics.

58.     The precision of a red dot sight is generally expressed in terms of minutes of angle ("MOA"). MOA measurements are used to describe how much of the target will be covered by the sight's aiming dot at a given range. For example, a 1 MOA red dot sight has a dot that covers a 1 inch circle on a target 100 yards away, a half-inch circle on a target 50 yards away, and a quarter-inch circle on a target 25 yards away.

59.     On information and belief, Braun or John Doe #1's 40mm launcher was equipped with a 3.5 MOA red dot sight.

60.     Ms. Tirado approached from the side of the police line, such that she did not appear to the police to be emerging from or part of the group of protestors.

61.     Ms. Tirado stood on the eastern sidewalk of Nicollet Avenue, between the protestors and the police, to line up her shot of the police line.

62.     Ms. Tirado did not stand alongside the protestors, and was careful to remain separate and distinct from this group in order to make clear she was a member of the press.

63.     At approximately 11:37 pm, Ms. Tirado was standing on the eastern sidewalk of Nicollet Avenue approximately 20 feet in front of the police line that stretched along 31st Street in direct view of the officers. She faced south, with the police in front of her and the body of protestors approximately 60 feet behind her.

64.     Beginning in that position, Ms. Tirado took numerous photographs as she backed slowly north along the eastern sidewalk of Nicollet Avenue, away from the police line.

65.     As she backed away from the police line, Ms. Tirado's hands were visible at all times.

66.     The flash from Ms. Tirado's camera was clearly visible from the police line, and distinguished her as a journalist rather than a protestor.

67.     Ms. Tirado's reflective press credential also remained visible while she retreated.

68.     As she retreated, Ms. Tirado took multiple photographs of the police without incident.

69.     Police made no effort to harm Ms. Tirado while they could see that she was actively documenting their conduct.

70.     Below are two photographs taken shortly before Minneapolis Police Department officers shot Ms. Tirado.  They show the distance Ms. Tirado kept between herself and the police, as well as police wielding 40mm launchers.  The

insignia of the Minneapolis Police Department is visible on each officer's shoulder.

Braun is visible holding a 40mm launcher in both images.  Braun is the officer, on

the left-hand side of each image, with a blue tag hanging from his belt line.





71.    Ms. Tirado retreated northwards on the eastern sidewalk of Nicollet Avenue until she was standing a considerable distance across from the police line, which remained along 31st Street.

72.    Ms. Tirado remained in full view of the police line during her entire walk up Nicollet Avenue.

73.    The main body of protestors had also receded from the police line, and was positioned to the north of Ms. Tirado.

74.    The main body of protestors was positioned in the center of Nicollet Avenue, separated from Ms. Tirado by a semi-truck parked on the eastern side of the street.

75.     At or about 11:38 pm, as Ms. Tirado, in view of and a considerable distance across from the police line, stood peacefully apart from the main body of protestors, Braun intentionally fired a shot from his 40mm launcher.

76.     In the alternative, John Doe #1, standing on the same police line, intentionally fired a shot from his 40mm launcher at that time.

77.     Braun or John Doe #1 aimed and fired intending to hit Ms. Tirado's head, neck, or chest.

78.     In the alternative, Braun or John Doe #1 aimed and fired intending to hit Ms. Tirado elsewhere on her person.

79.     In the alternative, either Braun or John Doe #1 aimed and fired in the direction of Ms. Tirado knowing that she stood more than 90 feet away, knowing that his 40mm launcher's accuracy dropped dramatically at ranges beyond 90 feet, knowing that a shot taken at that range necessarily targeted an area rather than a point, and intending to hit whoever happened to be standing in the path of that shot.

80.     The decision to fire a 40mm projectile with any of the intentions described *supra* violated the Minneapolis Police Department's policy governing the use of such weapons, because Ms. Tirado was not engaging or threating to engage in violence.

81.     The 40mm projectile hit Ms. Tirado in the left side of the face.

82.    Despite listening carefully for any police orders, Ms. Tirado had not heard any instructions, warnings, or communications prior to being hit with the 40mm projectile.

83.    Ms. Tirado instantly felt blood rushing down her face and tear gas in her eyes. Realizing that the impact had knocked her goggles off her face, she quickly squeezed her eyes shut.

84.    Ms. Tirado had been tear gassed and hit with pepperballs during protests in the past, and knew that putting her hands in the air and re-asserting her status as a member of the press was the appropriate means to prevent any further use of weapons.  But this time, it was too late—the damage was already done.

85.    Upon seeing that Ms. Tirado was in need of medical attention, protestors assisted her in reaching medics.  The medics put a bandage on Ms. Tirado's left eye, and eventually coordinated her transportation to the hospital.

86.    At the hospital, Ms. Tirado realized that at some point during the protest her backpack had been hit with a ballistic tracking round.

87.    A ballistic tracking round is a less-lethal projectile designed to leave a bright dye mark on its target.  It is a standard counter-protest policing tactic to designate individuals for arrest by marking them with a ballistic tracking round.

88.    The dye mark on Ms. Tirado's backpack was bright green.

89.     Defense Technology, the provider of 40mm projectiles to the Minneapolis Police Department, manufactures a marking round loaded with a green marking agent.[13]

90.     On information and belief, the ballistic tracking round was intentionally fired and/or caused to be fired at Ms. Tirado by an officer of the Minneapolis Police Department.

---

[13] *See* Defense Technology, *Direct Impact LE 40 MM Extended Range Marking Crushable Foam Round*, (2020), https://www.defense-technology.com/product/direct-impact-le-40-mm-extended-range-marking-crushable-foam-round/ ("When loaded with a green marking agent, the Direct Impact LE can be used to indicate the aggressor in a crowd or riot situation to the team on the ground.").

91.     Below is an image of Ms. Tirado's backpack after being marked with the ballistic tracking round, as well as her Nikon camera lens.



92.     Weeks later, when Ms. Tirado took them out of her camera bag for the first time since May 29, she realized the Nikon camera and lens she had been using when she was shot in Minneapolis were covered in blood.

93.     As Ms. Tirado had been holding the camera near her face at the time she was shot, the eruption of blood permanently damaged her camera.

94.    Below is an image of the damage to Ms. Tirado's camera:



## MS. TIRADO'S MEDICAL CONDITION

95.    Ms. Tirado was quickly sent into surgery upon entering the hospital.

96.     As a direct result of the 40mm projectile hitting her face, Ms. Tirado was told by doctors that she is now permanently blind in her left eye.  In connection with her injury, she now has a flat aspect and no depth perception.

97.     Below is an image of Ms. Tirado's injuries after being shot with a 40mm projectile.



98.    Ms. Tirado has since undergone a second eye surgery.  Her physicians have informed her that additional surgeries may be necessary depending on her recovery.  In the meantime, Ms. Tirado has been seen by medical personnel on approximately eight occasions and is required to have regular visits in order to address ongoing complications.

99.    Ms. Tirado suffers from continued light sensitivity, headaches, and blurred vision in her working right eye.  She has been treated for pain and swelling in her right eye.  Ms. Tirado cannot stare at screens or concentrate for prolonged periods of time.  Further, Ms. Tirado has been unable to return to her normal work schedule, and finds it difficult to complete basic household tasks.

MS. TIRADO'S OUTLOOK & FEAR OF FUTURE HARM FROM DEFENDANTS

100.    Being blind in her left eye has permanently altered Ms. Tirado's life.

101.    A substantial part of Ms. Tirado's journalistic work has been at flashpoints of civil unrest and potential violence, and she expects to be hampered in that work by the loss of half her field of vision.

102.    Of course, these vision-related issues are not limited to journalistic endeavors, but have marked effects on her everyday life as well.

103.    Ms. Tirado's ability to drive has been compromised by her injuries. Because she is unable to adapt to changes in brightness around her, Ms. Tirado has been forced to wear a sleeping mask while riding in the passenger seat of cars.  This

is an ongoing concern that will prevent her from driving in the near future, as the sun shining through a cloud or the reflection from a white truck can functionally blind Ms. Tirado for an extensive period of time. Of course, her ability to drive is further limited by the fact that her natural blind spot is now considerably larger.

104.    Ms. Tirado also continues to experience other physical ailments. The simple act of trying to focus her eyesight causes severe headaches, which leads to constant migraine-like pain that lingers throughout the day. In addition, Ms. Tirado now becomes tired very easily, which requires her to sleep or close her eyes for prolonged periods of time every 4-5 hours. As a journalist whose work requires intense focus on cameras, computer screens and documents, the inability to focus or remain alert for long periods of time is a serious concern.

105.    Ms. Tirado is a mother of two, and this injury will impose a long-term effect on her children as well. Ms. Tirado's oldest child, eleven, is autistic and will need therapy to work through her trauma associated with her mother's injury. The youngest child, nearly nine, similarly is in need of therapy. Both children have developed a profound fear of law enforcement. Her children have struggled to adapt to their mother's constant head pains and inability to stay awake for more than 4-5 hours at a time. To date, this has had a devastating effect on Ms. Tirado and her children's well-being.

106.    Despite her significant injuries, Ms. Tirado has already returned—with considerable difficulty—to covering protest activities.

107.    On July 18, 2020 Ms. Tirado documented (with considerable difficulty due to her injuries) a series of overlapping protests at the state capitol building in Columbus, Ohio.

108.    Ms. Tirado intends to continue covering protests and civil unrest to the maximum extent her health allows.

109.    Ms. Tirado retains a significant journalistic interest in covering the George Floyd protests in Minneapolis, and would like to return to Minneapolis to document their aftermath.

110.    She cannot do so, however, while there is still a significant risk that she will be subject to retaliation by Defendants based on her First Amendment Activities, or grossly excessive force in violation of the Fourth Amendment.

111.    Ms. Tirado reasonably fears such retaliation and/or excessive force based on her first-hand experience of how Defendants treat members of the press who document police misconduct.

## IV.    DEFENDANTS' POLICY OR CUSTOM OF RETALIATION AGAINST THE PRESS

112.    Throughout the George Floyd protests, the Minneapolis Police Department enforced a policy or custom of intentionally targeting members of the

press with unjustified arrests, excessive force, and other retaliatory actions, as demonstrated by the following very similar incidents.

113.    In the alternative, throughout the George Floyd protests, the Minneapolis Police Department had a policy or custom of indiscriminately using less-lethal projectiles without legal justification, as demonstrated by the following very similar incidents.

114.    On May 26, 2020, three days before Minneapolis Police shot Ms. Tirado, officers of the Minneapolis Police Department shot Andy Mannix, the federal courts reporter for the *Star Tribune*, in the thigh with a foam bullet.  Mr. Mannix was leaning against a tree a block away from the Third Precinct attempting to post a video to Twitter when he was hit, and tweeted at 8:00 pm that evening a photograph of the projectile with the caption "I was just shot with this in the thigh." That tweet was retweeted over 1,000 times.[14]  The next day he posted a photo of the large bruise on his thigh, which was retweeted over 11,000 times.[15]  His story was picked up by Time Magazine and covered in an online article dated May 27, 2020, two days before Minneapolis Police shot Ms. Tirado.[16]

---

[14] Andrew Mannix (@AndrewMannix), Twitter, (May 26, 2020 8:00 pm), https://twitter.com/AndrewMannix/status/1265447846079315973.

[15] Andrew Mannix (@AndrewMannix), Twitter, (May 27, 2020 5:25 pm), https://twitter.com/AndrewMannix/status/1265756101057957890.

[16] Mahita Gajanan, *Minneapolis Police Fire Tear Gas, Rubber Bullets as Crowds Protesting George Floyd Killing*, Time Magazine (May 27, 2020),

115.    On May 26, 2020, three days before Minneapolis Police shot Ms. Tirado, officers of the Minneapolis Police Department shot reporter Niko Georgiades in the arm with a less-lethal projectile as he approached an injured protestor who was laying on the ground.[17]

116.    On May 26, 2020, three days before Minneapolis Police shot Ms. Tirado, an officer of the Minneapolis Police Department was live-streamed using a baton to strike an unidentified camera-carrying journalist, unprovoked, in the throat and stomach as onlookers screamed that the victim was with the press.[18]

117.    On May 27, 2020, two days before Minneapolis Police shot Ms. Tirado, freelance journalist Jared Goyette was struck in the eye by a less-lethal projectile fired by an officer of the Minneapolis Police Department.[19]  Just prior to shooting

---

https://time.com/5843070/george-floyd-minneapolis-protest-police-death/   ("A Minneapolis Star Tribune reporter said he was shot in the thigh with what appeared to be a foam bullet.").

[17]    Unicorn Riot (@UR_Ninja), Twitter, (May 26, 2020 9:16pm) https://twitter.com/UR_Ninja/status/1265466767440261120;   Unicorn Riot (@UR_Ninja),   Twitter,   (May   26,   2020   9:17pm) https://twitter.com/UR_Ninja/status/1265466767440261120.

[18]    *#Live: Minneapolis Responds to Police Murder of George Floyd* (at 1:40:35), YouTube, https://youtu.be/XAa5xb6JitI?t=6035 (May 26, 2020).

[19]    Jared Goyette (@JaredGoyette), Twitter, (May 27, 2020 6:27 pm), https://twitter.com/JaredGoyette/status/1265786797650558976.

Mr. Goyette, Minneapolis Police had shot a young protestor in the side of the head, also using less-lethal ammunition.[20]

118.    On May 27, 2020, two days before Minneapolis Police shot Ms. Tirado, a Minneapolis Police officer shot *Minnesota Reformer* reporter Max Nesterak in the chest with a less-lethal projectile.[21]  Like Ms. Tirado, Mr. Nesterak took a photograph of the police immediately before they shot him, showing a group of about 10 officers standing in a manner inconsistent with a belief in the existence of an imminent threat.[22]

119.    The policymaking officials of the City of Minneapolis and Minneapolis Police Department were on notice of the Minneapolis Police Department's custom(s) of unlawful retaliation against journalists and/or the indiscriminate use of less-lethal weapons during the George Floyd protests.

120.    For at least three days before the Minneapolis Police shot Ms. Tirado, the Department's pattern(s) of using unlawful force against journalists and others had been widely shared on social media.

---

[20]    Jared Goyette (@JaredGoyette), Twitter, (May 27, 2020 5:59pm), https://twitter.com/jaredgoyette/status/1265779746153078793.

[21]    Max Nesterak (@maxnesterak), Twitter, (May 27, 2020 11:32pm), https://twitter.com/maxnesterak/status/1265863514754813952.

[22]    Max Nesterak (@maxnesterak), Twitter, (May 27, 2020 11:34pm), https://twitter.com/maxnesterak/status/1265863873825058816.

121.    The Minneapolis Police Department maintains an intelligence arm, named the "Strategic Information Center," which continually monitors social media activity, live streams, and other digital sources of information.  The Department and the City of Minneapolis were on notice from that monitoring that its officers had developed a custom of constitutional violations of the type that injured Ms. Tirado.

122.    In addition to social media, the pattern of violence against journalists by Minneapolis Police Department Officers had also garnered significant traditional media attention by the time Ms. Tirado was shot.  The Department and the City of Minneapolis were on notice from that news coverage that its officers had developed a custom of constitutional violations of the type that injured Ms. Tirado.

123.    In addition, on at least two occasions before Ms. Tirado was shot, reporters working for the Freedom of the Press Foundation's "U.S. Press Freedom Tracker" contacted the Minneapolis Police Department seeking comment on four of the specific instances of violence against journalists detailed above.  Although the Department did not respond to these inquiries, they put the Department and the City of Minneapolis on notice of a custom of constitutional violations of the type that injured Ms. Tirado.[23]

---

[23] U.S. Press Freedom Tracker, *Journalists struck by projectiles while covering Minneapolis protest* (May 26, 2020), https://pressfreedomtracker.us/all-incidents/journalists-struck-projectiles-while-covering-minneapolis-protest/    ("A request for comment [on the Mannix, Georgiades, and unidentified journalist

124.   The Minneapolis Police Department's actions in the wake of shooting Ms. Tirado further confirm its custom of targeting journalists for retaliation during the George Floyd protests.

125.   Early in the morning of May 30, 2020, Reuters cameraman Julio-Cesar Chavez was struck in the arm and neck by less-lethal projectiles fired by one or more officers of the Minneapolis Police Department as he took cover at a gas station in southwest Minneapolis.[24]

126.   On the night of May 30, 2020, officers of the Minneapolis Police Department fired multiple less-lethal projectiles at CBS reporter Michael George and his news crew, injuring a sound engineer.[25]  At the time they were attacked, crew members had credentials displayed, were carrying camera and sound equipment, and were more than 500 feet from any protestors.[26]

---

incidents] sent to Minneapolis Police Department Public Information Officer John Elder was not answered as of press time."); U.S. Press Freedom Tracker, *Journalists hit with 'less lethal' rounds during second day of Minnesota protests*, (May 27, 2020), https://pressfreedomtracker.us/all-incidents/journalists-hit-less-lethal-rounds-during-second-day-minnesota-protests/.

[24] Reuters, *Reuters camera crew hit by rubber bullets as more journalists attacked at U.S. protests* (May 31, 2020), https://www.reuters.com/article/us-minneapolis-police-protest-update/reuters-camera-crew-hit-by-rubber-bullets-as-more-journalists-attacked-at-us-protests-idUSKBN237050.

[25] Michael George (@MikeGeorgeCBS), Twitter, (May 30, 2020 9:28pm), https://twitter.com/MikeGeorgeCBS/status/1266919447970942986.

[26] Michael George (@MikeGeorgeCBS), Twitter, (May 30, 2020 9:15pm), https://twitter.com/MikeGeorgeCBS/status/1266916104951214080.

127.    On the night of May 30, 2020, officers of the Minneapolis Police Department shot Canadian Broadcasting Corporation correspondent Susan Ormiston in the shoulder with a less-lethal projectile as she stood in a parking lot that had already been cleared of protestors.  Ormiston's crew had their television camera clearly visible at the time.[27]

128.    On the night of May 30, 2020, officers of the Minneapolis Police Department attacked Vice News correspondent Michael Anthony Adams as he was sheltering at a gas station in Minneapolis.  Video of the incident shows one officer pointing a 40mm foam bullet launcher at Mr. Adams from point-plank range as he lies face down on the ground.  Moments later, in response to Mr. Adams—still prone and compliant—holding up his press credentials and announcing "I'm press," another Minneapolis Police Department officer sprayed him in the face with a chemical irritant.[28]

129.    Multiple public statements by Minneapolis Police Department officers demonstrate the culture of hostility to journalists that imbued the Department's response to the George Floyd Protests.

---

[27]  Natasha Fatah (@NatashaFatah), Twitter, (May 30, 2020 9:29pm), https://twitter.com/NatashaFatah/status/1266919824556535808.

[28]  Michael Anthony Adams (@MichaelAdams317), Twitter, (May 30, 2020 11:11pm), https://twitter.com/MichaelAdams317/status/1266945268567678976; Michael Anthony Adams (@MichaelAdams317), Twitter, (May 31, 2020 4:18pm), https://twitter.com/MichaelAdams317/status/1267203751913422849.

130.   In particular, Department officers consistently disregarded the curfew order's explicit exemption for members of the press.   For example, when *Star Tribune* reporter Chao Xiong displayed her press credentials to inform Minneapolis Police officers that she was media just after midnight on May 31, 2020, one officer replied that "your cards are bullshit."[29]

131.   Another *Star Tribune* reporter, Liz Sawyer, had a similar experience later in the morning of May 31, 2020 when a Minneapolis Police Department officer informed her that "[w]e don't care" about the press exemption from curfew, and that "we'll arrest you" anyway.   Ms. Sawyer indicated that other journalists had similar experiences as well, and that "[b]ased on my own and my colleagues' interactions with law enforcement . . . you'd never know that journalists were exempt from the curfew."[30]

132.   Reuters photographer Lucas Jackson summarized the Minneapolis Police Department's approach to journalists during the George Floyd protests:  "It's not that we were being shot because we were between cops and protesters.  Its [sic] that we were shot at [with less-lethal projectiles] if we were anywhere in line of sight.

---

[29]   Chao Xiong (@ChaoStrib), Twitter, (May 31, 2020 12:06am), https://twitter.com/ChaoStrib/status/1266959110265856000.

[30]   Liz Sawyer (@ByLizSawyer), Twitter, (May 31, 2020 1:45am), https://twitter.com/ByLizSawyer/status/1266984068765409280.

I've been hit [by less-lethal projectiles] because I was in the wrong place before.  I've never been aimed at so deliberately so many times when I was avoiding it."[31]

133.    Even prior to the George Floyd Protests, the Minneapolis Police Department had a history of unconstitutionally targeting journalists reporting on civil disturbances.

134.    In April 2002, Minneapolis Police Department officers used excessive force against journalists after a victory celebration became a riot at or near the University of Minnesota campus.

135.    Mike Wereschagin, then the editor of the Minnesota Daily, said one Minnesota Daily reporter and three of its photographers were singled out and sprayed with a chemical irritant, and that Minneapolis police hit them with batons. As he explained at the time, "journalists were being targeted as if [they had] thrown a bottle at police officers."'  "They were taking pictures and notes, talking to people; just doing their jobs," and "they were stopped from doing their jobs by police officers."

136.    The City of Minneapolis and Minneapolis Police Department were on notice of this because they met with Wereschagin about these incidents.[32]

---

[31] Lucas Jackson (@Lucas_Jackson_), Twitter, (May 31, 2020 10:22am), https://twitter.com/Lucas_Jackson_/status/1267114291532046338.

[32] Chris Graves, Mary Jane Smetanka, "Growing fire drove chief's order to act," at Minneapolis Star Tribune, at A1, 2002 WLNR 12194995 (Apr. 9, 2002); Chris Graves,

137.    The complaint filed by the newspaper with the Minneapolis Police's Internal Affairs Unit also indicated that two photographers had press passes displayed in the middle of their chests, and others told police officers they were members of the press.

138.    On information and belief, none of the officers involved in this conduct were disciplined pursuant to the Wereschagin investigation.

## V.    DEFENDANT KROLL'S *DE FACTO* CONTROL OVER THE MINNEAPOLIS POLICE DEPARTMENT AND ITS INDIVIDUAL OFFICERS

139.    Defendant Robert Kroll is both a Lieutenant in the Minneapolis Police Department and President of the Police Officers' Federation of Minneapolis (the "Federation")—the police union representing the Department's sworn personnel.

140.    In his role as Federation President (which he has held since 2015), Kroll exerts tremendous power over the culture, actions, and professional standards of the Department's officers.

141.    Indeed, according to Janee Harteau—who served as Chief of the Minneapolis Police Department from 2012 to 2017—"[t]he police federation has

---

"5 charged in hockey celebration melee," Minneapolis Star Tribune, at 2B, 2002 WLNR 12195226 (Apr. 10, 2002); Rochelle Olson, "City reviewing use of force by police," Minneapolis Star Tribune at 1b, 2002 WLNR 12195426 (Apr. 11, 2002).

historically had more influence over police culture than any police chief ever could," and successfully worked to block reform of the Department.[33]

142.    Even though the Federation is adversarial to the Department in some respects, its membership structure—which includes most of the Department's supervisory personnel—means that "some of the people directing and disciplining officers, and developing the union contract, are actually negotiating with the union of which they are a member."[34]

143.    Kroll's influence over the Department and its personnel extends to policies and customs governing the use of force.  When Minneapolis Mayor Jacob Frey announced in February 2020 a prohibition on so-called "warrior training" for Department officers—which "teaches officers that every encounter with a citizen is fraught with danger and could be fatal,"[35] Kroll caused the Federation to partner with Law Officer—a provider of warrior training—to make online training materials

---

[33] Chris McGreal, *Hopeful that Minneapolis policing will change? Meet the police union's chief…*, The Guardian (June 5, 2020), https://www.theguardian.com/us-news/2020/jun/05/minneapolis-police-union-bob-kroll-us.

[34] R.T. Rybak, *I Was Mayor of Minneapolis. I Know Why Police Reforms Fail,* The Atlantic (June 18, 2020), https://www.theatlantic.com/ideas/archive/2020/06/i-know-why-police-reforms-fail/613189/.

[35] Kimberly Kindy and Mark Berman, *Police chiefs and mayors push for reform. Then they run into veteran officers, unions, and 'how culture is created',* The Washington Post (June 28, 2020), https://www.washingtonpost.com/national/police-chiefs-and-mayors-push-for-reform-then-they-run-into-veteran-officers-unions-and-how-culture-is-created/2020/06/28/7d2ff812-b2ef-11ea-8f56-63f38c990077_story.html.

available "to every member of the Minneapolis police department for free."[36]  With Kroll's encouragement, these "warrior-style training videos were shared among the force to blunt reforms."[37]

144.   On the evening of May 29, 2020—only hours before Minneapolis Police shot Ms. Tirado—Kroll used his direct access to senior Department policymakers, including defendant Chief Medaria Arradondo, to demand that they loosen what he termed "restrictions on use of . . . less lethal" force, and communicated that rank-and-file officers had "lost faith in [Department] leadership."[38]

145.   Kroll's conduct during the George Floyd protests also showed his engagement in the tactical details of policing them.  As he explained in a letter to Federation members sent on or about June 1, 2020, during the protests Kroll "had

---

[36] *See* Law Officer, *Following the Banning of 'Warrior Training' – Minneapolis Police Are Provided Free Training by Law Officer* (Feb. 2, 2020), https://www.lawofficer.com/free-training-to-minneapolis/.

[37] Kimberly Kindy and Mark Berman, *Police chiefs and mayors push for reform. Then they run into veteran officers, unions, and 'how culture is created',* The Washington Post (June 28, 2020), https://www.washingtonpost.com/national/police-chiefs-and-mayors-push-for-reform-then-they-run-into-veteran-officers-unions-and-how-culture-is-created/2020/06/28/7d2ff812-b2ef-11ea-8f56-63f38c990077_story.html.

[38] KSTP Eyewitness News, *1-on-1 interview with Minneapolis Police Union chief Lt. Bob Kroll, and how the union is responding to George Floyd's death*, https://kstp.com/news/minneapolis-police-union-blames-failed-leadership-for-riots-violence-june-23-2020/5769384/.

numerous conversations with politicians at the state level," in which he proposed "a detailed plan of action including a range of 2000 to 3000 National Guard."[39]  On information and belief, Kroll gave similarly detailed tactical input, through formal and/or informal channels, into the protest response of the Minneapolis Police Department and its individual officers.

146.    Kroll's hostility to the press is a matter of public record.

147.    In April 2016, Kroll blamed rising crime in Minneapolis on "greater scrutiny of police that has left some officers disengaged."[40]

148.    On or about June 1, 2020, Kroll grouped the "liberal media" among other opponents that were purportedly "targeting" him, including "the groups conducting this riot," and the "politicians on the left allowing it and encouraging it."[41]

149.    On information and belief, Kroll acted on that hostility by conspiring with the City of Minneapolis, the Minneapolis Police Department, and and/or one or more individual officers of the Minneapolis Police Department to vindicate his

---

[39]    Janee Harteau (@ChiefHarteau), Twitter, (June 1, 2020 9:19am), https://twitter.com/ChiefHarteau/status/1267460683408564225.

[40] Libor Jany, *Minneapolis shootings up sharply, particularly on North Side,* The Star Tribune (April 16, 2016), https://www.startribune.com/minneapolis-shootings-up-sharply-particularly-on-north-side/375952531/.

[41]    Janee Harteau (@ChiefHarteau), Twitter, (June 1, 2020 9:19am), https://twitter.com/ChiefHarteau/status/1267460683408564225.

anti-press views by depriving Ms. Tirado, in retaliation for her coverage of the George Floyd protests, of rights protected by the First, Fourth, and Fourteenth Amendments.

150.    In the alternative, on information and belief, Kroll conspired with the City of Minneapolis, the Minneapolis Police Department, and/or one or more individual officers of the Minneapolis Police Department to vindicate his anti-protestor views by depriving Ms. Tirado, in retaliation for her presence at the George Floyd protests, of rights protected by the First, Fourth, and Fourteenth Amendments.

## COUNT I

### *42 U.S.C. § 1983 – First Amendment Free Speech, Free Press, Free Assembly*

151.    Ms. Tirado restates and realleges the preceding paragraphs as if fully set forth again.

152.    At the time she was shot, Ms. Tirado was engaged in activity protected by the First Amendment's guarantees of freedom of speech, press, and assembly.

153.    Braun or John Doe #1 shot Ms. Tirado in the face with a 40mm projectile—an adverse action, taken under color of law, that would chill a person of ordinary firmness from continuing to speak, report, and/or assemble.

154.    Braun or John Doe #1 was motivated to shoot Ms. Tirado at least in part by Ms. Tirado's exercise of her First Amendment rights.

155.   Shooting Ms. Tirado was objectively unreasonable under the circumstances.  In the alternative, Braun or John Doe #1 lacked probable cause to shoot and/or cause to be shot Ms. Tirado.

156.   Braun or John Doe #1 shot Ms. Tirado pursuant to the Minneapolis Police Department's custom of targeting journalists for unlawful reprisals during the George Floyd protests.

157.   In the alternative, Braun or John Doe #1 shot Ms. Tirado pursuant to the Minneapolis Police Department's custom of unlawful indiscriminate use of less-lethal projectiles during the George Floyd protests.

158.   The relevant custom or customs were continuing, persistent, and widespread within the Department's response to the civil disturbances that followed the death of George Floyd.

159.   By the time Ms. Tirado was shot, a pre-existing pattern of unlawful conduct had put policymaking officials for the City of Minneapolis and Minneapolis Police Department on notice that the Department's unlawful custom or customs were substantially certain to result in violations of First Amendment rights.

160.   The policymaking officials of the City of Minneapolis and Minneapolis Police Department, with deliberate indifference to the constitutional violations they had notice would follow, failed to supervise, train and correct the wrongful conduct.

161.   Ms. Tirado suffered significant physical and emotional injuries as a direct and proximate result of the foregoing unlawful conduct.

## COUNT II

### *42 U.S.C. § 1983 – Fourth Amendment Excessive Force*

162.   Ms. Tirado restates and realleges the preceding paragraphs as if fully set forth again.

163.   Braun or John Doe #1, acting under color of law, intentionally applied physical force to Ms. Tirado by shooting her in the face with a 40mm projectile, restraining her freedom of movement such that she was unable to leave the scene without the assistance of others, and thereby effected a seizure under the Fourth Amendment.

164.   The force used was objectively excessive because under the circumstances—in which Ms. Tirado was standing peacefully apart from protestors while reporting on protest and police activity—it was not reasonably necessary for any purpose.  The Executive Order exempted Plaintiff and other members of the press from the curfew.  Plaintiff was not posing a threat to the safety of Defendants or others, had not committed any severe or violent crime, and was neither actively resisting arrest nor attempting to evade arrest by flight.  In light of the relationship between the need, if any, for the use of force to the amount of force used, the extent of the injuries to Plaintiff, the inadequacy of the efforts, if any, by Defendants to temper or limit the amount of force used against members of the press, the absence

of a security problem posed by Plaintiff, the absence of conduct from Plaintiff that was capable of being reasonably perceived by Defendants as a threat, and the absence of efforts by Defendants to arrest Plaintiff met with active resistance, the Defendants' use of excessive force against Plaintiff was objectively unreasonable.

165.    Braun or John Doe #1 shot Ms. Tirado pursuant to the Minneapolis Police Department's custom of targeting journalists for unlawful reprisals during the George Floyd protests.

166.    In the alternative, Braun or John Doe #1 shot Ms. Tirado pursuant to the Minneapolis Police Department's custom of unlawful indiscriminate use of less-lethal projectiles during the George Floyd protests.

167.    The relevant custom or customs were continuing, persistent, and widespread within the Department's response to the civil disturbances that followed the death of George Floyd.

168.    By the time Ms. Tirado was shot, a pre-existing pattern of unlawful conduct had put policymaking officials for the City of Minneapolis and Minneapolis Police Department on notice that the Department's unlawful custom or customs were substantially certain to result in violations of First Amendment rights.

169.    The policymaking officials of the City of Minneapolis and Minneapolis Police Department, with deliberate indifference to the constitutional violations they had notice would follow, failed to supervise, train and correct the wrongful conduct.

170.    Ms. Tirado suffered significant physical and emotional injuries as a direct and proximate result of the foregoing unlawful conduct.

## COUNT III

### 42 U.S.C. § 1983 – Fourteenth Amendment Excessive Force

171.    Ms. Tirado restates and realleges the preceding paragraphs as if fully set forth again.

172.    Braun or John Doe #1, acting under color of law, applied physical force to Ms. Tirado maliciously, sadistically, and for the purpose of causing harm.

173.    Braun or John Doe #1 shot Ms. Tirado pursuant to the Minneapolis Police Department's custom of targeting journalists for unlawful reprisals during the George Floyd protests.

174.    In the alternative, Braun or John Doe #1 Ms. Tirado pursuant to the Minneapolis Police Department's custom of unlawful indiscriminate use of less-lethal projectiles during the George Floyd protests.

175.    The relevant custom or customs were continuing, persistent, and widespread within the Department's response to the civil disturbances that followed the death of George Floyd.

176.    By the time Ms. Tirado was shot, a pre-existing pattern of unlawful conduct had put policymaking officials for the City of Minneapolis and Minneapolis Police Department on notice that the Department's unlawful custom or customs were substantially certain to result in violations of First Amendment rights.

177.    The policymaking officials of the City of Minneapolis and Minneapolis Police Department, with deliberate indifference to the constitutional violations they had notice would follow, failed to supervise, train and correct the wrongful conduct.

178.    Ms. Tirado suffered significant physical and emotional injuries as a direct and proximate result of the foregoing unlawful conduct.

## COUNT IV

### *42 U.S.C. § 1983 – Conspiracy Against Constitutional Rights*

179.    Ms. Tirado restates and realleges the preceding paragraphs as if fully set forth again.

180.    Defendants conspired, under color of law, to deprive Plaintiff of her First, Fourth, and Fourteenth Amendment rights as set forth in Counts I, II, and III.

181.    Defendants reached an agreement, acted in concert, and committed overt acts in furtherance of the conspiracy.  Defendants targeted members of the press and repeatedly utilized excessive force to interfere with their exercise of the constitutionally protected right to record the protests and law enforcement response.  In the alternative, Defendants engaged in indiscriminate unlawful use of less-lethal projectiles throughout the course of the George Floyd protests.

182.    One of those overt acts—Braun or John Doe #1 shooting or causing to be shot Ms. Tirado in the face with a 40mm projectile—directly and proximately caused Ms. Tirado significant physical and emotional injury.

183.   As set forth in Counts I, II, and III, Defendants did, in fact, violate Plaintiff's First, Fourth, and Fourteenth Amendment rights.

## COUNT V

### *Common-Law Battery*

184.   Plaintiff restates and realleges the preceding paragraphs as though fully set forth again.

185.   Braun or John Doe #1 intentionally caused physical contact with Ms. Tirado by shooting her in the face with a 40mm projectile.

186.   An officer of the Minneapolis Police Department intentionally caused physical contact with Ms. Tirado's backpack, which she wore closely connected to her body, by shooting it with a ballistic tracking round.

187.   Objectively, the use of a 40mm projectile and/or ballistic tracking round against Ms. Tirado's person was excessive and unreasonable force under the circumstances.

188.   Being struck in the face with a 40mm projectile is a contact that a reasonable person would find harmful and/or offensive.

189.   Being struck and marked with a ballistic tracking round is a contact that a reasonable person would find harmful and/or offensive.

190.   As a direct and proximate result of Defendants' offensive and unreasonably forceful contacts, Ms. Tirado suffered significant physical and emotional injuries.

191.    Defendant City of Minneapolis is liable for the batteries committed by Braun or John Doe #1 because they were committed in the course and scope of their employment as Minneapolis police officers.  *See* Minn. Stat. § 466.02.

192.    Defendant Kroll is liable as a co-conspirator in the batteries committed by Braun or John Doe #1 because, as alleged above, he combined with Braun or John Doe #1 and/or the City of Minneapolis to accomplish the unlawful purpose of retaliation against journalists and protestors for the exercise of their First Amendment rights.  In the alternative, Kroll combined with Braun or John Doe #1 and/or the City of Minneapolis to accomplish the lawful purpose of maintaining public order by the unlawful means of violating constitutional rights and committing batteries, as set out above.  *See Harding v. Ohio Cas. Ins. Co. of Hamilton, Ohio*, 41 N.W.2d 818, 824-25 (Minn. 1950).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

1.  A declaration that Defendants' actions violated Ms. Tirado's rights under the 1st, 4th, and 14th Amendments;

2.  A permanent injunction prohibiting Defendants from violating her 1st, 4th, and 14th Amendment rights by retaliating against her newsgathering activities and/or the use of excessive force.

3.  A permanent injunction requiring the City of Minneapolis and Interim Chief Huffman to implement additional policies, recurring training, and monitoring mechanisms designed to 1) protect the rights of journalists during crowd control and other police activities, 2) ensure that Minneapolis Police officers respect constitutional limits on the use of less lethal projectiles during crowd control and other police activities, and 3) ensure that individual

Minneapolis Police officers are readily identifiable during crowd control and other police activities;

4. Damages compensating Plaintiff for her injuries against all Defendants, jointly and severally;

5. Punitive damages;

6. Prejudgment interest;

7. Reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

8. Such other further relief as this Court may deem just and proper.


Dated:  February 24, 2022          **GREENE ESPEL PLLP**
/s/ John M. Baker
John M. Baker, Reg. No. 0174403
Davida S. McGhee, Reg. No. 0400175
Nicholas Scheiner, Reg. No. 0402470
222 S. Ninth Street, Suite 2200
Minneapolis, MN  55402
(612) 373-0830
jbaker@greeneespel.com
dwilliams@greeneespel.com
nscheiner@greeneespel.com

-and-

Tai-Heng Cheng (admitted *pro hac vice*)
Gaëlle E. Tribié (admitted *pro hac vice*)
Cassandra Liu (admitted *pro hac vice*)
John G. Plotz (admitted *pro hac vice*)
Alyssa M. Hasbrouck (admitted *pro hac vice*)
**SIDLEY AUSTIN LLP**
787 Seventh Avenue
New York, NY 10019
(212) 839-5661
tcheng@sidley.com
gtribie@sidley.com
cassandra.liu@sidley.com
jplotz@sidley.com

ahasbrouck@sidley.com

Margaret Hope Allen (admitted *pro hac vice*)
**SIDLEY AUSTIN LLP**
2021 McKinney Ave, Ste. 2000
Dallas, TX 75201
(214) 969-3506
margaret.allen@sidley.com

Stacy Horth-Neubert (admitted *pro hac vice*)
**SIDLEY AUSTIN LLP**
555 West Fifth Street
Los Angeles, CA 90013
(213) 896-6018
shorthneubert@sidley.com

Gabriel Schonfeld (admitted *pro hac vice*)
**SIDLEY AUSTIN LLP**
1501 K Street NW
Washington, DC 20005
(202) 736-8483
gschonfeld@sidley.com

*Attorneys for Plaintiff Linda Tirado*