**IN THE UNITED STATES DISTRICT COURT**
**FOR THE**
**DISTRICT OF MINNESOTA**

LINDA TIRADO,

                 **Plaintiff,**

    **v.**

CITY OF MINNEAPOLIS, *et al.*,

                 **Defendants.**

**Case No.: 20-CV-1338 (JRT/JFD)**

---

**JOINT MEMORANDUM OF LAW OF JOURNALISTS**
**ANDREW MANNIX AND MAXWELL NESTERAK IN SUPPORT OF MOTIONS**
**TO QUASH CITY DEFENDANTS' IMPROPER THIRD-PARTY SUBPOENAS**

Andrew ("Andy") Mannix and Maxwell ("Max") Nesterak, by and through undersigned counsel, respectfully move this Court, pursuant to Federal Rule of Civil Procedure 45, for an order quashing the third-party subpoenas directing them to appear for depositions and for the production of documents (the "Subpoenas") served on them by Defendants City of Minneapolis, Interim Chief of Police for the Minneapolis Police Department Amelia Huffman, and Police Officer Andrew Braun ("City Defendants").

**INTRODUCTION**

Nearly two years ago, in the complaint that commenced this action, Plaintiff Linda Tirado alleged that police officers with the Minneapolis Police Department ("MPD") not only blinded her in one eye but also shot Andy Mannix, a reporter for Star Tribune Media Company LLC ("Star Tribune"), in the thigh and Max Nesterak, a reporter with the Minnesota Reformer, in the chest with rubber bullets. Dkt. 1 ¶¶ 32, 33. Tirado went on to list other instances of official violence against journalists and then to allege a "custom and practice" among defendants "of targeting

members of the press using excessive force" and that such "pre-existing pattern" put defendants "on notice that a course of training or supervision was deficient in a particular respect." *Id.* ¶ 64.

The case has now been in litigation for 22 months. During that time, no one called either Mannix or Nesterak to testify or provide other evidence, and both have abstained from bringing claims of their own against the City of Minneapolis, choosing instead to focus on covering issues involving the MPD and other law enforcement agencies as reporters for Star Tribune and the Minnesota Reformer.

Two amended complaints later, discovery in this case closed—for all but a very limited purpose, discussed below—on March 3, 2022. Dkt. 118 at 4 ¶ 2. Then, nearly two weeks later, on March 16, 2022, Mannix and Nesterak both received subpoenas commanding them to appear to be deposed and to disclose virtually *all* materials in their possession related to the George Floyd demonstrations of May 2020, which they attended and observed solely in their capacities as journalists. Suffice to say, in a case alleging that City Defendants violated the civil rights of a journalist who was assaulted and blinded by police, it is more than a little ironic for those same defendants to now use the Court's subpoena power to strong arm other journalists who have studiously avoided involvement in this and other, similar cases so they can do their jobs without the distraction of litigation and without jeopardizing their professional reputations or the trust of their sources and readers.

The Subpoenas tread on Mannix's and Nesterak's First Amendment rights to gather and report news free from government interference. For this reason, they would be improper even if they were timely and narrowly tailored and sought documents and testimony relevant to the issues before the Court. But the Subpoenas are none of these things. Rather, they are untimely, incredibly (and admittedly) overbroad, and in no way relevant to the one issue for which the Court recently

extended the discovery deadline: Tirado's right to pursue a supposedly new claim for affirmative, injunctive relief. Further, City Defendants have made clear that they do not even dispute that Mannix was shot and seemingly concede Nesterak was shot, too. Instead, City Defendants claim to seek discovery on how the "experience" of being shot "affected" Mannix and Nesterak—information that goes to their state of mind toward the very individuals and agencies they are tasked with covering fairly and objectively. Such information is squarely protected by the reporter's privilege recognized by the First Amendment, common law, and Minnesota Free Flow of Information Act, Minn. Stat. §§ 595.021 *et seq*.

City Defendants also agreed during the meet and confer process to drop their document requests to Mannix—including their ludicrous request for the actual, physical "projectile" that hit Mannix—*only* if he would voluntarily appear to testify.[1] This bullying of journalists into costly motion practice while tacitly admitting the Subpoenas' overbreadth is the epitome of bad faith and cannot go unchecked. Thus, for all the reasons provided herein, Mannix and Nesterak respectfully request that this Court grant this motion and quash the Subpoenas, award them their reasonable attorneys' fees and costs, and grant all such other relief that this Court deems fair and just.

## FACTS

This case is one of several arising from the week-long demonstrations that erupted after the murder of George Floyd by former MPD officer Derek Chauvin on May 25, 2020. While the eyes of the world were trained on Minneapolis, journalists such as Mannix and Nesterak were on the ground each day, providing live, minute-by-minute coverage of the clash between protesters

---

[1] Initially, Ballard Spahr LLP also represented Nesterak. He subsequently retained separate counsel. The meet and confer on March 25 was only between counsel for City Defendants and counsel for Mannix and did not include Nesterak's new counsel, but the undersigned presume City Defendants would have taken the same position as to both journalists.

and law enforcement. But that reporting—of utmost public importance—came at grave risk to the media. Several journalists, including the plaintiff in this action, were targeted and severely injured by members of law enforcement.

According to her complaint, on May 29, 2020, Linda Tirado, a renowned photojournalist, was shot in the face with a less-lethal munition by an MPD officer, leaving her permanently blind in one eye. *See* Dkt. 1 ¶ 1. She instituted this civil rights lawsuit against the City of Minneapolis, then Chief of Police Medaria Arradondo, and unnamed John Doe officers ("City Defendants"), and others, nearly two years ago on June 10, 2020. *Id*. Her complaint included a municipal liability claim and, in pursuit of that claim, she alleged that City Defendants were deliberately indifferent to the violations of the constitutional rights of members of the press. Tirado provided several examples of law enforcement attacks on journalists in her complaint: She alleged that, on May 26, 2020, an MPD officer shot Mannix in the thigh with a projectile. *Id*. ¶ 32. On May 27, 2020, she alleged, police shot freelance journalist Jared Goyette with a less-lethal munition, hitting him in the eye, and then tear gassed him. *Id*. ¶ 33. That same evening, she alleged, law enforcement shot Nesterak in the chest with a rubber bullet. *Id*.

In the operative scheduling order for this matter, the Court set February 3, 2022 as the deadline for Tirado to amend the pleadings and March 3, 2022 as the close of fact discovery. *See* Dkt. 118 at 4-5 ¶¶ 3, 6. On February 3, Tirado moved for leave to file a second amended complaint, joining as a named defendant Andrew Braun, the officer alleged to have shot her in the face, and including a further request for injunctive relief. *See* Dkt. 126; Dkt. 128 at 1-2. City Defendants objected to Tirado's motion "only in so far as it relates to [Tirado]'s addition of a prayer for relief for a permanent mandatory, affirmative injunction" against the City of Minneapolis. Dkt. 135 at 1. Specifically, City Defendants argued that, because the proposed amendment was coming at or

near the close of fact discovery, they were "foreclosed from conducting discovery about whether Plaintiff *lacks standing to seek the injunction*." *Id*. at 6 (emphasis added).

Tirado's motion to amend came before this Court for a hearing on February 24, during which City Defendants again claimed their sole issue with Tirado's motion was the addition of what City Defendants contend is an entirely new form of relief. Feb. 24 Hr'g Tr. ("Tr.") 15:9-10. To cure any resulting prejudice, City Defendants stated they would need additional discovery on "standing, futility, and the merits of the proposed injunction." *Id*. at 23:25–24:1. In the same hearing, City Defendants agreed with the Court that "the *Monell* issues have been in the case since the start" of the case (*i.e.*, going on two years) and that "there is some overlap with" Tirado's municipal liability claim and the "merits" of her new claim for injunctive relief. *Id*. at 22:22-23; *id*. at 23:5-8.

Ruling from the bench, this Court granted City Defendants until April 4 to conduct additional discovery "limit[ed] . . . to the newest iteration of injunctive relief in this amended complaint." *Id*. at 37:7-10. It noted explicitly:

> I also want to say specifically that Ms. Tirado's deposition may be reopened and depositions, if appropriate, ***of other journalists who claim that they are deterred from visiting Minneapolis because of fear of police*** can also be taken with regard to the limit on the depositions set forth in the Court's pretrial scheduling order.

*Id*. at 37:15-20 (emphasis added); *see also id*. at 23:14-18 ("What I'm hearing you say is that the discovery you would need would be of other journalists who allege that they are deterred from returning from the City of Minneapolis because they were injured by the police."); Dkt. 147 (reflecting that "the Court's oral ruling shall serve as the Court's formal order").

On March 16, 2022, City Defendants served Mannix and Nesterak at their *Minneapolis* residences—both of them, unlike Tirado, live *here*—with third-party subpoenas pursuant to Rule 45. *See* Declaration of Leita Walker ("Walker Decl.") Ex. A at 1 (listing Mannix's address in

Minneapolis); Declaration of Megan Renslow ("Renslow Decl.") Ex. A at 1 (listing Nesterak's

address in Minneapolis). The Subpoena served on Mannix commanded that he appear at a virtual

deposition on March 30, and bring with him the following materials:

> All videos photographs, recordings, communications, or other documents in your
> possession (including social media posts) that are related to you being hit in the thigh as
> explained in your tweet from 8:00 p.m. on May 26, 2020, available at
> https://twitter.com/AndrewMannix/status/126547846079315973;   if   the   projectile
> pictured in your tweet is still in your possession please bring that as well; all videos,
> recordings, emails, texts, and documents in your possession relating to any protests, riots,
> members of the press, or law enforcement actions between May 26, 2020 and May 31,
> 2020. All videos, recording, emails, texts, and documents in your possession that reflect
> communications with or relating to Plaintiff Linda Tirado or her counsel.

Walker Decl. Ex. A at 1. The Subpoena closed with this instruction: "Please note that this subpoena

is *not* requesting any items or documents for which you have a good faith basis to assert is protected

by a legally recognized journalistic privilege." *Id*. (emphasis added). Nesterak was served with a

nearly identical subpoena, setting his deposition for March 29. Renslow Decl. Ex. A at 1.

Mannix and Nesterak, through undersigned counsel, responded to City Defendants'

Subpoenas on March 23. Walker Decl. Ex. B. They provided City Defendants more than 20 links

to publicly available articles and social media posts responsive to City Defendants' document

requests. *Id*. at 1-3. With respect to all other, unpublished information, both journalists asserted a

good faith belief that those materials were protected by the reporter's privilege and therefore were

not responsive to City Defendants' Subpoenas, given that the Subpoenas themselves carved out

"items or documents for which you have a good faith basis to assert is protected by a legally

recognized journalistic privilege." *Id*. at 3 (citing *Keefe v. City of Minneapolis*, No. 09-2941

DSD/SER, 2012 U.S. Dist. LEXIS 187017, at *9 (D. Minn. May 25, 2012); *J.J.C. v. Fridell*, 165

F.R.D. 513, 515-16 (D. Minn. 1995) (both recognizing a reporter's privilege over unpublished

information collected while newsgathering)). Without any context provided by City Defendants

for their need to depose Mannix or Nesterak beyond what could be gleaned from the Subpoenas'

document requests, both journalists further informed City Defendants that any testimony by them would involve unpublished, privileged (and therefore non-responsive) information and that they therefore did not plan to appear for the noticed depositions. *Id*. at 3.

City Defendants responded to counsel's letter later that same day on March 23 claiming— despite the Subpoenas' plain requests for "all videos, recordings, emails, texts, and documents in your possession relating to any protests, riots, members of the press, or law enforcement actions"— that they were "not inquiring into Mr. Mannix's or Mr. Nesterak's sources or work product." Walker Decl. Ex. C. Rather, according to City Defendants, the Subpoenas to Mannix and Nesterak "seek[] information that they possess because they were first-hand witnesses to their own treatment as journalists by law enforcement during this period of civil unrest." *Id*. City Defendants requested to meet and confer with counsel regarding Mannix's and Nesterak's appearances for their depositions. *Id*. The conference with counsel for Mannix took place on March 25; the conference with counsel for Nesterak took place on March 24. Walker Decl. ¶ 5; Renslow Decl. ¶ 5.

At counsels' meet and confer regarding the Subpoena to Mannix, the undersigned attempted to discern what information the City Defendants could possibly hope to obtain from him that would be both relevant to Tirado's new claim for injunctive relief and within the limited scope of discovery permitted by the Court's February 24 decision, given that (1) Mannix is neither a plaintiff nor a putative class member in this case (which is not a class action), (2) he is not an out-of-town journalist "deterred" from "visiting" Minneapolis, and (3) despite being shot by Minneapolis police, he continues to work full time for Star Tribune as a journalist, primarily covering local law enforcement. Walker Decl. ¶¶ 6, 7. City Defendants in fact agreed that they did not need Mannix to attest that he was shot—that fact is apparently undisputed—but that they wanted to depose him about his "experience" of being shot and how this "affected him." *Id*. ¶¶ 10,

11. Pointing to the February 24 hearing transcript and the Court's clear expectation that third-party discovery would be limited to out-of-town journalists, the undersigned explained that Mannix continues to live and work in Minneapolis, as evident from both the Subpoena itself and the hundreds of news reports published under his byline and publicly available on Star Tribune's website since the murder of George Floyd, and that he has not been (indeed, could not possibly be) "deterred" from "visiting" the City because of the injury he sustained at the hands of Minneapolis police. *Id.* ¶ 8. The undersigned proposed that, in lieu of testimony or document production by Mannix, Star Tribune could provide a declaration attesting to the fact that Mannix remains in its employ. *Id.* ¶ 9. City Defendants countered that they would withdraw their document requests in exchange for Mannix's deposition testimony. *Id.* ¶ 10. City Defendants also acknowledged that, notwithstanding the Court's statements on February 24, the *only* journalists they have subpoenaed with respect to this new injunctive relief claim—Mannix, Goyette, and Nesterak—are all local Minneapolis residents. *Id*. ¶ 12[2]

The undersigned memorialized the discussion among counsel in an email sent March 25. Walker Decl. Ex. D. This email confirmed that Mannix was not willing to voluntarily testify about his "experience" and how it "affected him," even if City Defendants would drop their documents requests in exchange for such testimony. *Id.* The email again raised the possibility that Star Tribune could provide a statement attesting to Mannix's ongoing employment. *Id.* Counsel for City Defendants responded later that day that they did not believe such a statement "would suffice." *Id.* In a final attempt to avoid motion practice, the undersigned clarified that the statement could be a sworn declaration and noted further that it seemed likely Tirado and her counsel would simply

---

[2] These three local journalists were also all named in Tirado's very first filed complaint regarding allegations supportive of her municipal liability claim. *See* Dkt. 1 ¶¶ 32, 33.

stipulate to the fact that Mannix remains a Star Tribune employee, which would obviate the need not only for a deposition but also for a declaration. *Id.* The email ended with a question: "Have you asked them?" Counsel for City Defendants has never responded to this question or provided any information about attempts to discuss with Tirado's counsel a solution that might avoid burdening third-party journalists such as Mannix and Nesterak. Walker Decl. ¶ 16.

At counsels' March 24 meet and confer regarding the Subpoena to Nesterak, his counsel raised similar issues with the scope of City Defendants' Subpoena, informing City Defendants that the requests went well beyond what is relevant to Tirado's new injunctive relief claim in this case. Renslow Decl. ¶ 5. Counsel for City Defendants proposed to narrow the Subpoena request to documents and testimony related to Nesterak's "personal experience" as a journalist interacting with law enforcement during the May 2020 protests. *Id.* At a subsequent meet and confer between counsel the next day, the undersigned objected that City Defendants' proposal to narrow the Subpoena still sought only information quintessentially protected by the reporter's privilege. *Id.* ¶ 6. The undersigned contacted City Defendants once more on March 28—the day before Nesterak was scheduled to be deposed—to inquire whether City Defendants would withdraw the Subpoena. *Id.* ¶ 7. City Defendants declined, and Nesterak moved forward with this motion to quash.

Mannix served City Defendants with objections to the Subpoenas on March 28. Walker Decl. Ex. D. And Nesterak reraised his previous objections. Renslow Decl. Ex. C. The objections served as notice to City Defendants of Mannix's and Nesterak's arguments included herein. The cover email accompanying Mannix's objections informed City Defendants that, if forced to file this motion, he would seek recovery of the attorneys' fees he has incurred as a result of defending against City Defendants' vexatious and unduly burdensome Subpoena. Walker Decl. Ex. D.

A few days later, and while Mannix's and Nesterak's motions to quash were pending, City Defendants proceeded to depose journalist Jared Goyette on April 4. Walker Decl. Ex. E ("Goyette Dep.").[3] While City Defendants ostensibly subpoenaed Goyette for the same purpose as Mannix and Nesterak—to somehow test *Tirado*'s standing to seek affirmative injunctive relief—the transcript of Goyette's deposition reveals City Defendants' questions were wide ranging and invasive and that compelling Mannix and Nesterak to testify would subject them to a completely inappropriate and illegal fishing expedition regarding their journalistic work product and thought processes. In fact, in the nearly *four hours* of questioning, City Defendants asked Goyette *no* questions related to Tirado's standing to seek injunctive relief, *see generally id*. Rather, City Defendants examined him on:

- the ethics of journalism and reporting, *see* Goyette Dep. at 17:9-19:8;

- how to identify journalists who are on the ground covering protests, *see id*. at 21:13-25:11;

- the equipment Goyette used while reporting on the May 2020 protests, *see id*. at 30:19-35:22, 73:10-78:25, 94:15-95:8;

- whether Goyette was visibly identifiable as a member of the press during the May 2020 protests, *see id*. at 35:23-37:13, 73:10-78:25, 87:11-89:25;

- whether Goyette believes he was targeted and shot by police because he is a journalist, *see id*. at 39:8-41:14;

---

[3] Goyette is the named plaintiff in a separate civil rights lawsuit against City Defendants with claims similar to those in this action, though Goyette's case *is* a class action. *See Goyette et al. v. City of Minneapolis et al*., No. 20-cv-1302 (WMW/DTS) (D. Minn.) (filed June 2, 2020). For this reason alone, Goyette is differently situated from Mannix and Nesterak: Goyette has filed his own lawsuit to vindicate his rights while Mannix and Nesterak have deliberately opted not to, and thus Goyette would have likely faced additional arguments from City Defendants had he moved to quash. *See Riley v. Chester*, 612 F.2d 708, 716 (3d Cir. 1979) (explaining that a case in which "a reporter waived the privilege by filing suit to vindicate his own rights" is distinct from "a situation where a journalist has been called as a witness to a civil suit in which neither she nor her employer has any personal interest").

- Goyette's observations while reporting on May 27, 2020, of a protester who was severely injured by police, *see id*. at 47:22-52:23, 57:13-58:15;

- Goyette's observations while reporting on May 27, 2020, generally, *see id*. at 53:12-57:10, 58:16-59:9;

- whether Goyette is certain that he was actually shot by police, *see id*. 65:4-69:18;

- Goyette's observations while reporting of protesters and law enforcement, *see id*. at 70:19-73:9, 87:4-10, 103:23-106:21;

- whether Goyette could identify another journalist who was also reporting on the May 2020 protests, *see id*. at 86:14-87:1;

- whether Goyette identified himself as a journalist to law enforcement, *see id*. at 91:9-92:2, 95:24-96:25;

- the type of weapon law enforcement aimed at Goyette, *see id*. at 92:3-93:17;

- Goyette's observations while reporting of the type of gear law enforcement were wearing, *see id*. at 94:3-14;

- whether Goyette captured footage of the law enforcement officers who aimed a weapon at him while reporting on the May 2020 protests, *see id*. at 97:2-100:5;

- whether Goyette believes there should be a municipal credentialing system for members of the press, *see id*. at 112:3-21; and

- whether, while reporting at the April 2021 (Daunte Wright) protests about which Tirado's lawsuit does not pertain, Goyette had interactions with law enforcement agencies that were not MPD, *see id*. at 114:18-115:18.[4]

City Defendants also asked Goyette a few questions theoretically related to his *own* standing to seek injunctive relief against City Defendants, which (as discussed elsewhere) is not a relevant issue in this case. Even those questions, however—*e.g.*, whether *he* continued reporting after being targeted and shot by Minneapolis police for being a journalist—span less than 10 pages total of the 118-page transcript, *see id*. at 83:15-86:13, 107:16-109:2, 111:21-112:2, 112:22-114:14.

---

[4] Throughout City Defendants' examination, counsel for both Tirado and Goyette repeatedly objected to City Defendants' questions as beyond the scope of the limited discovery permitted by this Court's February 24 decision. *See* Goyette Dep. at 18, 21, 22, 23, 24, 25, 26, 27, 31, 32, 33, 34, 35, 36, 37, 39, 40, 42, 46, 70, 71-72, 81, 110, 112, 114, 115.

Standing in stark contrast to City Defendants' questions are three tailored questions asked by Tirado's counsel directly relevant to *Tirado*'s standing to seek affirmative injunctive relief:

Q. . . . Mr. Goyette, you are aware that Ms. Tirado is a freelance journalist; is that right?

A. Correct.

Q. And to be clear, freelance journalists are still journalists just like a journalist that would work for any news organization; is that right?

A. Correct. Unequivocally. Correct, yes.

Q. Thank you. And are freelance journalists . . . permitted to exercise their First Amendment rights and worthy of First Amendment protections?

A. Yes.

*See id*. at 117:4-16.

It is against this robust backdrop that Mannix and Nesterak now bring this motion to quash the improper Subpoenas served on them by City Defendants.

## ARGUMENT

Federal Rule of Civil Procedure 45 governs how and when discovery can be conducted on third parties. The rule also provides the means by which a non-party to a lawsuit can protect themselves from improper discovery: "On timely motion, the court for the district where compliance is required must quash or modify a subpoena that," among other things, "requires disclosure of privileged or other protected matter . . . or [ ] subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3).

While it is the "party seeking to quash a subpoena [that] bears the burden to demonstrate that compliance would be unreasonable or oppressive," *Gregg v. B&G Transformations, LLC*, No. 4:20-CV-766 RLW, 2021 U.S. Dist. LEXIS 78831, at *5 (E.D. Mo. Apr. 23, 2021),

discovery may not be had on matters irrelevant to the subject matter involved in the pending action, and "even if relevant, discovery is not permitted where no need is shown, or compliance would be unduly burdensome, or where harm to the person

from whom discovery is sought outweighs the need of the person seeking discovery of the information."

*Misc. Docket Matter No. 1 v. Misc. Docket Matter No. 2*, 197 F.3d 922, 925 (8th Cir. 1999) (citation omitted). What's more, "concern for the unwanted burden thrust upon non-parties is a factor entitled to special weight in evaluating the balance of competing needs." *Id*. at 927.

Finally, it is the responsibility of the party or attorney who issues and serves a subpoena on a third party to "avoid imposing undue burden or expense on [the] person." Fed. R. Civ. P. 45(d)(1). Where a party or attorney fails to comply with this directive, "[t]he court for the district where compliance is required *must* enforce this duty and impose an appropriate sanction," including reasonable attorneys' fees. *Id*. (emphasis added).

**I.     The Subpoenas seek testimony and materials that fall beyond the limited scope of additional discovery permitted by the Court and that are disproportionate to the needs of the case.**

City Defendants' Subpoenas disregard this Court's limitations on the discovery permitted to take place after the March 3 deadline: *only* discovery related "to the newest iteration of injunctive relief in the amended complaint." Tr. at 37:9-10. In permitting this discovery, the Court voiced an understanding and expectation that additional discovery against Tirado herself would be permitted, and that "*if appropriate*," discovery of "other journalists who claim that *they are deterred from visiting Minneapolis* because of fear of police" could be taken. *Id.* at 37:15-20 (emphasis added). Both Mannix and Nesterak are local journalists, who cannot possibly be "deterred" from "visiting" Minneapolis. Walker Decl. Ex. A; Renslow Decl. Ex. A. Publicly available records show that both Mannix and Nesterak literally report on their hometown on a near daily basis; indeed, in addition to the hundreds of articles he authored and Star Tribune published on its website, Mannix's online biography says he "covers crime and policing for the Star Tribune," elaborating that he has reported on local law enforcement "[s]ince joining the paper in

2016." *See* https://www.startribune.com/andy-mannix/6370473/ ("Mannix bio"); *see also* https://minnesotareformer.com/author/max-nesterak/ ("Nesterak bio") (showing near daily publications under Nesterak's byline). The Subpoenas thus exceed the scope of permitted discovery and should be quashed on this basis alone. *See, e.g.*, *Webb v. Ethicon Endo-Surgery, Inc.*, No. 13-1947 (JRT/JJG), 2014 U.S. Dist. LEXIS 181426, at *8 (D. Minn. Aug. 8, 2014) (sustaining objections to subpoena to extent it "seeks information outside the scope of discovery" permitted).

But that is not all. Neither Mannix nor Nesterak is in possession of *any* information relevant to Tirado's standing to pursue a claim for prospective injunctive relief. Demanding their documents and testimony is thus disproportionate to the needs of the case. In both their motion papers and before this Court at the February 24 hearing, City Defendants were very clear: Their objection to Tirado's motion to amend was limited to their need to conduct discovery on whether "Plaintiff lacks standing to seek the injunction." Dkt. 135 at 6; Tr. 16:23-25; *id*. at 23:25. To have standing to seek prospective injunctive relief, it is "[t]he *plaintiff* [that] must show that he 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged official conduct and the injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" *City of L.A. v. Lyons*, 461 U.S. 95, 101-02 (1983) (emphasis added); *see also Brazil v. Ark. Dep't of Human Servs.*, 892 F.3d 957, 960 (8th Cir. 2018). Stated differently, for Tirado to have standing to pursue injunctive relief, it is *Tirado* who must demonstrate a "real and immediate threat of injury" by City Defendants' unconstitutional conduct. *Brazil*, 892 F.3d at 960. Indeed, as the Supreme Court of the United States explains in *Lyons*—the seminal case on standing for injunctive relief—cases have been reversed based on standing to seek such relief where, "[a]lthough it was claimed in the case that particular members of the plaintiff

14

class had actually suffered from the alleged unconstitutional practices, . . . the prospect of future injury rested on the likelihood that *plaintiffs* will again be" subjected to the illegal conduct at issue. 461 U.S. at 102 (alterations omitted) (emphasis added).

This case is not even a class action; Mannix and Nesterak are *not* putative class members. Their "experiences" and states of mind have no bearing on *Tirado*'s standing to seek injunctive relief—*i.e.*, *her* ability to establish real and immediate threats of future injury by City Defendants. The discovery City Defendants seek from them is irrelevant and disproportionate to the issue on which City Defendants were permitted to conduct limited additional discovery. As such, the Subpoenas must be quashed.

## II.   The Subpoenas are untimely and invalid because they amount to an attempt to seek discovery on Tirado's *Monell* claim, which has been pending for nearly two years.

Rather than focused on the discrete issue actually subject to discovery at this late date, City Defendants' Subpoenas appear to be a thinly-veiled—but improper and untimely—attempt to further explore the merits of Tirado's municipal liability claim, despite the fact that discovery on that claim has been closed for more than a month. City Defendants' deposition of Goyette confirmed as much.

Tirado instituted this lawsuit against the City of Minneapolis nearly two years ago on June 10, 2020. *See* Dkt. 1. Necessarily, by suing the City, Tirado pled a claim of municipal liability under *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978). City Defendants conceded as much at the February 24 hearing before this Court. *See* Tr. 23:5-8. City Defendants have also been on notice for that same amount of time that Tirado contends the police shootings of Mannix and Nesterak support her *Monell* claim. Both journalists were named in Tirado's very first iteration of her complaint filed on June 10, 2020 as examples of City Defendants' unconstitutional custom of targeting reporters and deliberate indifference toward the same. *See* Dkt. 1 ¶¶ 32, 33. Indeed, in

City Defendants' motion to dismiss Tirado's *Monell* claim, they acknowledged that Tirado had alleged that City Defendants had both a policy and custom "of targeting reporters covering the George Floyd protests" and specifically referenced Tirado's allegations that "on May 26, one reporter [Mannix] was shot in the thigh with a foam bullet . . . and a reporter [Nesterak] was struck in the chest with a less-lethal projectile." *See* Dkt. 45 at 4.

Despite all of this, City Defendants sought *no* discovery from either Mannix or Nesterak on Tirado's *Monell* claim—that is, until serving the Subpoenas on March 16, 2022. Unfortunately for City Defendants, the Subpoenas come too late. Fact discovery on all issues, including Tirado's *Monell* claim, closed on March 3, 2022. *See* Dkt. 118 at 4-5, ¶¶ 3, 6. Perhaps realizing the oversight, City Defendants now characterize their Subpoenas as part of an inquiry into "the merits of the proposed injunction." Tr. 23:25-24:1.

But City Defendants have given away their actual motive in other statements made to the Court and to undersigned counsel. For example, City Defendants admitted to this Court that what they mean by "merits of the proposed injunction" is actually "the underlying cause of action that in theory warrants the new remedy, which is *Monell*," which City Defendants also admit has been part of the case since the initial filing. *See* Tr. 24:10-12. As another example, in an email to undersigned counsel, City Defendants admitted that they seek "information . . . on [the journalists'] own treatment as journalists by law enforcement during this period of civil unrest," *See* Walker Decl. Ex. C.

Perhaps the best indicator of City Defendants' true reason for wanting to depose Mannix and Nesterak, however, is their nearly four-hour-long deposition of Goyette. Specifically, they questioned him on whether he was in fact identifiable as a journalist and whether he audibly identified himself to police as a journalist while he was out reporting on the May 2020 protests,

*see* Goyette Dep. 30:19-37:13, 73:10-78:25, 87:11-89:25, 91:9-92:2, 94:15-95:8, 95:24-96:25;

whether he subjectively believes that he was shot by police *because* he was a member of the press

out reporting on the protests, *id*. at 39:8-41:14; and whether he can be certain he was shot by MPD,

and not injured by some other projectile from another source, *id*. at 65:4-69:18.

Discovery of all of this information makes sense, *for the* Monell *claim*. To succeed on that

claim, Tirado must establish that the City of Minneapolis had a policy, practice, or custom of

targeting journalists, and that this unconstitutional conduct caused her injury. *Monell*, 436 U.S. at

694. And as the Eighth Circuit recently reiterated (just two days before City Defendants served the

Subpoenas), a plaintiff can point to a "municipality's failure to address [past instances of similar]

misconduct and the subsequent violation of the plaintiff's constitutional rights" as proof that the

municipality's pattern of unconstitutional conduct caused the plaintiff's injuries, *Monell*'s third

factor. *See Mitchell v. Kirchmeier*, No. 21-1071, 2022 U.S. App. LEXIS 6398, at *23 (8th Cir.

Mar. 14, 2022).

But discovery of Mannix's and Nesterak's treatment by law enforcement is in no way

relevant to or justified by the one issue that remains fair game for discovery at this point in the

case: Tirado's right to seek affirmative, injunctive relief. Neither journalist's treatment by City

Defendants during the protests has any relation to Tirado's request for injunctive relief, and

especially not Tirado's *standing* to seek such relief, which is the only issue on which discovery is

still permitted at this point in the case.

Put simply, City Defendants failed to seek discovery from Mannix or Nesterak related to

Tirado's *Monell* claim before the discovery cutoff. And City Defendants were expressly limited

by the Court to conducting additional discovery on "the newest iteration of injunctive relief,"

which it further explained as permitting "that Ms. Tirado's deposition may be reopened and

depositions, if appropriate, of other journalists *who claim that they are deterred from visiting Minneapolis* because of fear of police can also be taken." Tr. 37:9-10, 15-19 (emphasis added). No local journalist has anything to provide on this point, and City Defendants should not be permitted to burden third-party journalists as part of their attempt to shoehorn additional *Monell* discovery into this case under the guise that it pertains to Tirado's standing for the injunction. This is particularly true as to *these journalists*, as City Defendants have been on notice of the "underlying merits" of Tirado's injunctive relief—*i.e.*, her *Monell* claim—for nearly two years, including express allegations related to Mannix and Nesterak in support of her municipal liability claim against the City of Minneapolis. City Defendants' Subpoenas are therefore untimely, and must be quashed.

### III.   The Subpoenas seek testimony and materials that are privileged under the First Amendment, and non-responsive according to the terms of City Defendants' own subpoenas.

As an initial matter, the Subpoenas' demand for documents should be quashed because City Defendants have indicated on three separate occasions that they do not actually seek any of Mannix's or Nesterak's unpublished materials: *First*, the Subpoenas themselves state that "this subpoena is not requesting any items or documents for which you have a good faith basis to assert is protected by a legally recognized journalistic privilege." *See, e.g.*, Walker Decl. Ex. A; Renslow Decl. Ex. A. As explained to City Defendants and set forth in detail below, Mannix and Nesterak have a good faith belief that all of their unpublished work product—including their internal thoughts and impressions—are protected by the reporter's privilege, and therefore are not responsive to the Subpoena.[5] Thus, by the plain language of the Subpoena itself, there is no

---

[5] The Subpoenas did not say that an assertion of the privilege had to be uncontested—merely that it had to be made in good faith, which these were. *Id*.

remaining responsive materials to disclose. *Cf. Herzig v. Ark Found. for Med. Care*, No. 2:18-cv-02101-PKH, 2018 U.S. Dist. LEXIS 209437, at \*10 (W.D. Ark. Dec. 12, 2018) (holding that, in response to counsel's "acknowledge[ment] . . . that th[e] request seeks something not sought directly in a specific request for production," "the Court cannot . . . compel the production of something which has not first been sought pursuant to a request for production"). *Second*, in City Defendants' email responding to counsel's initial letter regarding the Subpoenas, they expressly disavowed any interest in the journalists' privileged documents: "[W]e are not inquiring into Mr. Mannix's or Mr. Nesterak's sources or work product." Walker Decl. Ex. C. *Third*, at counsels' March 25 meet and confer on behalf of Mannix, City Defendants agreed to forego their requests for documents as long as Mannix would sit for a deposition. Walker Decl. ¶ 10. City Defendants are not interested in either Mannix's or Nesterak's newsgathering materials, and have said as much repeatedly. They are merely being used as leverage to compel these journalists' participation in an improper deposition. For this additional and independent reason, the portion of the Subpoenas requesting documents should therefore be quashed.

Regardless, both the materials requested by the Subpoenas and the testimony which City Defendants seek are protected from compelled disclosure by the reporter's privilege recognized by the First Amendment, the common law, and the Minnesota Free Flow of Information Act, Minn. Stat. § 595.021 *et seq*. *See* Fed. R. Civ. P. 45(d)(3)(A)(iii).[6]

---

[6] Once the Court determines that the privilege applies, the burden shifts to City Defendants to establish both a "substantial need" for the information and the inability to obtain substantial equivalents "without undue hardship." *Cf.* Fed. R. Civ. P. 26(b)(3)(A)(ii); *U.S. Commodity Futures Trading Comm'n v. Whitney*, 441 F. Supp. 2d 61, 69 (D.D.C. 2006) (finding that the CFTC only met its burden when it "demonstrat[ed] need for the documents *and* that it ha[d] exhausted other sources" (emphasis added)); *Shoen v. Shoen*, 5 F.3d 1289, 1296 (9th Cir. 1993) ("Once the [reporter's] privilege is properly invoked, the burden shifts to the requesting party to demonstrate a sufficiently compelling need for the journalist's materials to overcome the privilege. At a minimum, this requires a showing that the information sought is not obtainable from another

*First*, the Subpoenas' requests for "[a]ll videos, photographs, recording, communications or other documents in your possession (including social media posts) that are related to you being hit in the thigh . . . ; all videos, recordings, emails, texts, and documents in your possession relating to any protests, riots, members of the press, or law enforcement actions between May 26, 2020 and May 31, 2020" clearly seek Mannix's and Nesterak's unpublished materials, thoughts, impressions, interview notes, and the like which they both gathered or formulated through the course of their reporting on the George Floyd protests. And based on the Goyette deposition, Mannix and Nesterak expect any questioning of them by City Defendants to be equally invasive. *See* Goyette Dep. at 97:2-100:5 (seeking to determine whether Goyette had any other footage of the officers who aimed their weapons at him while he was reporting on the May 2020 protests). This type of information is quintessentially protected from compelled disclosure by the reporter's privilege. *See Keefe*, 2012 U.S. Dist. LEXIS 187017, at *9 (recognizing reporter's privilege "against compelled disclosure of information gathered in the news-making process," including the "reporter's underlying [unpublished] work product"); *J.J.C.*, 165 F.R.D. at 515-16 (same); *see also* Minn. Stat. § 595.023.

*Second*, City Defendants' stated interest in deposing Mannix—to procure testimony about his "experience" being shot by City Defendants (a fact which City Defendants do not contest) and how this experience "affected him"—also seeks privileged information. Despite the claims in their counsel's March 23 email, *see* Walker Decl. Ex. C, City Defendants seek not just Mannix's testimony as a percipient witness to—or even victim of—a crime, but also information on Mannix's resulting *state of mind*, nearly two years later, toward the very police department and

_____

source."). For the reasons discussed throughout this brief, they have not and cannot meet that burden.

individual officers he is assigned to cover as a reporter for Star Tribune. Mannix's state of mind, however, is informed by not only what happened in the spring of 2020 but by his experience covering MPD for more than half a decade.[7] *See Riley*, 612 F.2d at 714 ("The interrelationship between newsgathering, news dissemination and the need for a journalist to protect his or her source is too apparent to require belaboring. . . . The role of an untrammeled press as a vital source of public information was one of the primary bases for its First Amendment protection." (internal marks and citations omitted)).

Again, there is perhaps no better insight into the questioning Mannix and Nesterak would face than those City Defendants posed to Goyette. It can hardly be contested that City Defendants intend to examine both journalists on topics squarely protected from compelled disclosure by the reporter's privilege—namely, their observations of protesters and law enforcement gathered while reporting on the May 2020 protests, *see, e.g.*, Goyette Dep. at 47:22-52:23, 53:12-57:10, 57:13-58:15, 58:16-59:9, 70:19-73:9, 87:4-10, 92:3-93:17, 94:3-14, 103:23-106:21; their knowledge, thoughts, and impressions formulated while reporting on the May 2020 protests, *id*. at 39:8-41:14, 65:4-69:18, 86:14-87:1; and their opinions (acquired through their work as members of the press) on journalism and reporting on protests, *id*. at 17:9-19:8, 21:13-25:11, 112:3-21.

No matter how they try to spin it, what City Defendants seek is protected from disclosure. Mannix and Nesterak acquired materials and mental impressions sought by the Subpoenas as a result of their employment as journalists for Star Tribune and the Minnesota Reformer, respectively, including (but not limited to) while they were on assignment covering the George Floyd protests. The Subpoenas must therefore be quashed. Fed. R. Civ. P. 45(d)(3)(A)(iii).

---

[7] See Mannix bio, *supra* at 12.

IV.     **The Subpoenas are overbroad and unduly burdensome.**

By virtue of seeking irrelevant, disproportionate, untimely, and privileged discovery, the Subpoenas are *per se* unduly burdensome. *Misc. Docket Matter No. 1*, 197 F.3d at 925.

To cite an obvious example, there is no connection between City Defendants' need to conduct discovery on Tirado's standing to seek injunctive relief and the Subpoena's command for Mannix to produce "the projectile pictured in your tweet." Walker Decl. Ex. A. City Defendants' requests are further overly broad because they seek "all documents" concerning several categories of materials. *See, e.g.*, *ABC v. Aereo, Inc.*, No. 13-MC-0059, 2013 U.S. Dist. LEXIS 165145, at *15-16 (N.D. Iowa Nov. 19, 2013). In apparent recognition of its overbreadth, City Defendants even agreed to withdraw their request for documents, but only if Mannix and presumably Nesterak would agree to be deposed on the topics noted above. Walker Decl. ¶ 10. On these grounds, too, the Subpoenas should be quashed. *See* Fed. R. Civ. P. 45(d)(3)(A)(iv).

But even if the Subpoenas were more narrowly tailored, they would still be unduly burdensome because Mannix and Nesterak are journalists and, as recognized by several courts throughout the United States, "[t]he compelled production of a reporter's resource materials . . . constitute[s] [such] a significant intrusion into the newsgathering and editorial processes" that "in the ordinary case the civil litigant's interest in disclosure should yield to the journalist's privilege." *See United States v. Cuthbertson*, 630 F.2d 139, 147 (3d Cir. 1980); *Zerilli v. Smith*, 656 F.2d 705, 712 (D.C. Cir.) (stating that in compelling the testimony of journalists "[e]fforts will be taken to minimize impingement upon the reporter's ability to gather news"); *Silkwood v. Kerr-McGee Corp.*, 563 F.2d 433, 437 (10th Cir. 1977) (noting it is inappropriate for litigants to "take personal advantage of [a reporter's] efforts" by "obtaining his investigative work product" to aid their litigation). In other words, subpoenas to journalists are *always* burdensome—and almost always unduly so—for the simple reasons that they distract journalists from their important,

constitutionally protected work of gathering and reporting news; burden journalists and their newsrooms with unnecessary expense; and threaten journalists' independence (and reputations for neutrality) by positioning them as an extension of law enforcement or as mouthpieces for private litigants. *See Cuthbertson*, 630 F.2d at 147; *Zerilli*, 656 F.2d at 712; *Silkwood*, 563 F.2d at 437; *see also Branzburg v. Hayes*, 408 U.S. 665, 709 (1972) (Powell, J. concurring) ("Certainly, we do not hold . . . that state and federal authorities are free to 'annex' the news media as 'an investigative arm of government.'"); *United States v. LaRouche Campaign*, 841 F.2d 1176, 1182 (1st Cir. 1988) ("[F]requency of subpoenas would not only preempt the otherwise productive time of journalists and other employees but measurably increase expenditures for legal fees.").

This is all especially true with regard to the Subpoenas here. Andy Mannix is a journalist, whose assignment is to cover, among other things, the MPD. Similarly, Nesterak regularly reports on the MPD, in addition to his other assigned beats. It is their professional duty to make sure their coverage is accurate, fair, and objective.[8] Any deposition of Mannix or Nesterak in this matter comes with exceptional risk that they are perceived as demonstrating allegiance with or favoritism for one side or the other—a very real problem when one side is comprised of the very government employees and agencies they are assigned to cover. Compelling either journalist's testimony would thus jeopardize not only their ability to effectively do their jobs as reporters for Star Tribune and the Minnesota Reformer, but also their reputation among their readers and sources—all of whom place their trust in these journalists. Indeed, testifying in this matter also comes with substantial risk that City Defendants will later point to Mannix's or Nesterak's testimony in this litigation as a basis to impugn the veracity and objectivity of their future reporting on the MPD when the

---

[8] *See* Code of Ethics, Soc'y of Pro. Journalists, https://www.spj.org/ethicscode.asp ("Ethical journalism should be accurate and fair. . . . Journalists should [ ] [a]void conflicts of interest, real or *perceived*." (emphasis added)).

reporting is not to their liking. These are considerable expenses to them personally and professionally which cannot be so simply discounted, particularly where both journalists deliberately opted not to pursue individual actions against City Defendants for their injuries for these very reasons.

Conversely, City Defendants face no prejudice if their Subpoenas are quashed. City Defendants apparently do not contest that Mannix and Nesterak were shot by Minneapolis police, as their counsel noted at the March 25 meet and confer. Walker Decl. ¶ 11. The remaining evidence they purport to seek—whether being shot has deterred either's work as a journalist—can be confirmed through publicly available documents, most notably the fact that Mannix and Nesterak both continue to reside in Minneapolis and that Mannix and Nesterak have authored hundreds of articles since May 2020, which Star Tribune and the Minnesota Reformer have published on their respective websites.

## V.    Mannix and Nesterak are entitled to reasonable attorneys' fees under Rule 45.

Rule 45 requires the party issuing the subpoena to "take reasonable steps to avoid imposing undue burden or expense on [the] person subject to the subpoena." Fed. R. Civ. P. 45(d)(1). City Defendants did not take such steps here and in fact ignored Mannix's request that they speak with Tirado about whether she might stipulate to the facts that Mannix was (1) shot by police but (2) nevertheless continues to make Minneapolis his home and report on police for Star Tribune. *See* Walker Decl. ¶ 16.

Moreover, City Defendants have repeatedly demonstrated that the document requests included with the Subpoena were a form of leverage to gain these journalists' deposition testimony. First, without any context but the Subpoenas themselves, City Defendants served Mannix and Nesterak a demand to appear to testify and produce documents and then, after receiving their initial response, expressly disavowed any interest in their "work product"—the precise focus of the

document requests—noting they instead sought their testimony on "their own treatment *as journalists* by law enforcement during this period of civil unrest." *Id*. Ex. C (emphasis added). City Defendants later posed an ultimatum to Mannix at counsels' March 25 meet and confer: they would drop the document requests as long as Mannix agreed to testify about his "experience" as a journalist covering the protests and how this "affected him." Walker Decl. ¶ 10. What's more, Mannix objected to City Defendants' Subpoena on the very grounds asserted herein, and City Defendants refused to narrow the Subpoena in any way. This is precisely the gamesmanship, which unnecessarily multiplies the efforts and costs of third-parties and which Rule 45 forbids. *See, e.g.*, *Steinlage v. Mayo Clinic Rochester*, No. 03-6067 (PAM/RLE), 2005 U.S. Dist. LEXIS 54664, at *26-29 (D. Minn. Mar. 18, 2005) (imposing sanctions in the form of costs and attorney's fees where subpoena was issued in violation of the scheduling order, deficiencies with the subpoena were brought to plaintiff's attention and deliberately ignored, and plaintiff's subsequent effort to enforce the subpoena was entirely unreasonable).

Because City Defendants have not taken "reasonable steps," or even acted in good faith, the Court "*must* . . . impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees." Fed. R. Civ. P. 45(d)(1) (emphasis added). The appropriate sanction here is an award for the full amount of attorneys' fees incurred by Mannix and Nesterak for defending against City Defendants' vexatious, overly broad, and unduly burdensome Subpoenas. *Id*; *see also* 28 U.S.C. § 1927; *Precourt v. Fairbank Reconstr. Corp.*, 280 F.R.D. 462, 467 (D.S.D. 2011) ("When a nonparty is subpoenaed, the court is particularly mindful of Rule 45's undue burden and expense cautions."); *ABC*, 2013 U.S. Dist. LEXIS 165145, at *16, *22 (awarding attorney's fees where the subpoenas were overly broad, commanding production of "all documents" in several categories with marginal relevance at best). Indeed, sanctions are

appropriate even if City Defendants were to claim that they were under the mistaken belief that the information sought is relevant to the question of Tirado's standing (it is not). *See ABC*, 2013 U.S. Dist. LEXIS 165145, at *14-15 (collecting cases and stating, "good faith will not avoid sanctions if the party failed to take reasonable steps to avoid imposing an undue burden").

No efforts have been made by City Defendants to spare either Mannix or Nesterak any cost, burden, or expense incurred as a result of City Defendants' Subpoenas. Indeed, it appears harassment was precisely the point. The Court should sanction City Defendants, awarding both journalists their reasonable attorneys' fees and costs and all other relief which this Court deems necessary to enforce the Rule 45 duty City Defendants have deliberately disregarded. *See Branzburg*, 408 U.S. at 707-08 ("[I]nvestigations if instituted or conducted other than in good faith, would pose wholly different issues for resolution under the First Amendment. Official harassment of the press . . . would have no justification."); *United States v. Hale*, No. 03 CR 11, 2004 U.S. Dist. LEXIS 8905, at *6 (N.D. Ind. Apr. 6, 2004) ("[W]hen a subpoena is used for an improper purpose, to harass or otherwise interfere with a reporter's confidential relationships or to use the media as an investigative tool, the courts can step in to quash the subpoena.").

## **CONCLUSION**

For the foregoing reasons, Mannix and Nesterak respectfully request that this Court quash City Defendants' Subpoenas compelling their testimony and the production of documents. Mannix and Nesterak further respectfully request that this Court award them reasonable attorneys' fees pursuant to Federal Rule of Civil Procedure 45(d)(1) as the appropriate sanction for City Defendants' unduly broad and burdensome Subpoenas, as well as all other relief which this Court deems fair and just.

Dated: April 8, 2022                    Respectfully submitted,

                                        *s/Leita Walker*

                                        _____

                                        Leita Walker (No. 0387095)
                                        Isabella Salomão Nascimento (No. 0401408)
                                        Ballard Spahr LLP
                                        2000 IDS Center, 80 South 8th Street
                                        Minneapolis, MN 55402-2119
                                        T: (612) 371-6222
                                        F: (612) 371-3207
                                        walkerl@ballardspahr.com
                                        salomaonascimentoi@ballardspahr.com

                                        *Counsel for Journalist Andrew Mannix and*
                                        *Star Tribune Media Company LLC*

                                        MOSS & BARNETT
                                        A Professional Association

                                        *s/Megan J. Renslow*

                                        _____

                                        Kelly C. Engebretson (#0396327)
                                        Megan J. Renslow (#0399964)
                                        150 South Fifth Street, Suite 1200
                                        Minneapolis, MN 55402
                                        T: (612) 87705000
                                        kelly.engebretson@lawmoss.com
                                        megan.renslow@lawmoss.com

                                        *Counsel for Journalist Maxwell Nesterak and*
                                        *Minnesota Reformer*