UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| Linda Tirado | Case No. 20-CV-01338 (JRT-ECW) |
| Plaintiff, | |
| vs. | **CITY DEFENDANTS'** |
| | **MEMORANDUM OF LAW** |
| City of Minneapolis; Interim Minneapolis Chief of Police Amelia Huffman, in her official capacity; Robert Kroll, in his individual capacity; Andrew Braun, in his individual and official capacities, and Minneapolis Police Department Officer John Doe 1, in his official and individual capacities, | **IN OPPOSITION TO THIRD-PARTIES' MOTION TO QUASH SUBPOENA** |
| Defendants. | |

## INTRODUCTION

When Plaintiff filed her initial Complaint she requested prohibitory injunctive relief that related only to her. During the entire course of litigation that request for injunctive relief remained the same. Defendants never had any notice that mandatory injunctive relief was sought by Plaintiff until February 3, 2022, the last day Plaintiff could file an Amended Complaint, which Plaintiff tried to pass off as "small wording tweaks". The City Defendants opposed the additional request for injunctive relief. This Court, in finding that the amendment was

allowable, sought to cure any prejudice to City Defendants caused by the late amendment to the complaint, by allowing the City Defendants 39 additional days to take discovery on the newly-requested injunctive relief, which included depositions of other journalists.  City Defendants served discovery on Plaintiff, who identified certain journalists whose experiences supported her claim for injunctive relief.  ██████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████  Ultimately, City Defendants were able to successfully serve three journalists, all of whom had publicly stated that they had been shot with a less-lethal projectile by the Minneapolis Police Department: Max Nesterak, Andrew Mannix, and Jared Goyette.  All of the subpoenas specifically exempted any material that the individual journalists believed in good faith was protected by a legally recognized journalistic privilege. Mr. Goyette agreed to be deposed.  Mr. Nesterak and Mr. Mannix have brought the instant motion to quash.

With little time to deal with the Plaintiff's tagged-on request for injunctive relief City Defendants have gone out of their way to attempt to respect the rights of these journalists while at the same time attempting to learn information relevant

to the City's defense to the Plaintiff's new request for injunctive relief.  City
Defendants met with not-unexpected resistance to these requests for depositions
and documents.  However, these requests do not impinge on any recognized
privilege, and they are also clearly contemplated by the Court's order allowing
City Defendants further discovery at the February 24, 2022, hearing.  City
Defendants request that the motion be denied.

## FACTS

Plaintiff Linda Tirado has alleged that she was injured by a projectile fired
either by Officer Andrew Braun of the Minneapolis Police Department, or in the
alternative by an unknown law enforcement officer, while she was covering
rioting going on in the vicinity of the Minneapolis Police Department's Fifth
Precinct on May 29, 2020.  (ECF Doc. 148 ¶¶ 1, 75-81.)  Plaintiff also alleges that
her injury was a result of a policy, custom or practice, or failure to train, on the
part of the City of Minneapolis which resulted in members of the press being
targeted with unlawful force.  (ECF Doc. 148 ¶¶ 112-138.)

In the last version of her complaint, which she moved to amend on the very
last possible date allowed in the scheduling order, and which was less than 30 days
before the close of discovery, Plaintiff for the first time added a request for
injunctive relief, requesting the following:

A permanent injunction requiring the City of Minneapolis and
Interim Chief Huffman to implement additional policies, recurring

3

training, and monitoring mechanisms designed to 1) protect the rights of journalists during crowd control and other police activities, 2) ensure that Minneapolis Police officers respect constitutional limits on the use of less lethal projectiles during crowd control and other police activities, and 3) ensure that individual Minneapolis Police Officers are readily identifiable during crowd control and other police activities.

(ECF Doc. 148 at 48-49.)  City Defendants opposed this late addition to Plaintiff's Complaint arguing that "based on the existing deadline for fact discovery, the City cannot timely serve any written discovery to assess Plaintiff's standing to request such relief *or the merits of Plaintiff's request*."  (ECF Doc. 135 at 1 (emphasis added).)

At the hearing on Plaintiff's motion to amend the Complaint, held on February 24, 2022, the City further argued that if the City had known earlier of the change in the type of injunctive relief sought, from prohibitory to mandatory, "the City would have conducted different discovery, new discovery had it realized that the plaintiff was going to -- to stretch out a *Monell* claim, [into] having the Court [wade] into the internal workings of the City's policymaking, training and monitoring on a recurring, ongoing role with respect to three different separate topics." (ECF Doc. 159 ("Tr.") at 15:15-22.)  City Defendants agreed with the Court that they would need discovery on "other journalists who allege that they are deterred from returning from [sic] the City of Minneapolis because they were injured by the police" but also added that they would need discovery about standing, futility, and the merits of the proposed injunction.  (Tr. at 23:14-24:1.)

4

In ruling on Plaintiff's motion to amend the Complaint, the Court noted that the prejudice to City Defendants was "undeniable" but that the Court would allow the amendment because the prejudice could be cured.  (Tr. at 36:17-22.)  This Court ordered as follows:

> I am going to extend discovery for the City and only for the City to Monday, April 4th. And I'm going to limit the City's discovery to the newest iteration of injunctive relief in this amended complaint.
> I am not going to go into more specifics than that about the subject matter of the discovery. I am going to direct the plaintiffs to respond promptly to the City's discovery requests.
> I also want to say specifically that Ms. Tirado's deposition may be reopened and depositions, if appropriate, of other journalists who claim that they are deterred from visiting Minneapolis because of fear of police can also be taken with regard to the limit on the depositions set forth in the Court's pretrial scheduling order.

(Tr. 37:7-20.)

The Court issued the above order on February 24, 2022.  On March 1, 2022, five days after the hearing (or three business days after the hearing) City Defendants served discovery requests on Plaintiff regarding the proposed injunctive relief.  (Robertson Decl. Ex. A.)  Interrogatory number 6 requested that Plaintiff "[i]dentify all witnesses that have personal knowledge of events or facts that support your request for a Mandatory Injunction, and explain the substance of the information or facts known to the witness."  (Robertson Decl. Ex. B at 3.) City Defendants requested that Plaintiff respond within 7 days.  (*Id.* at 1.) Plaintiff's responses were not received until March 14, 2021 at 9:41 p.m., 13 days

later.   (Robertson  Decl.  Ex.  C.)  ██████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████   ████████   ████████████████████████████████

████████████████████████████████████████████████████████

Additionally, when City Defendants were able to look at the list and choose those

to depose there were only 20 days left in the discovery period.

██████████████████████████████████████████

City Defendants attempted to reach out to one of them, ██████████, who they

believed  had  had  interaction  with  Minneapolis  Police  Officers,  but  he  did  not

respond to the email.  It was also unknown how many national or international

correspondents  were  reporting  from  Ukraine  where  war  had  broken  out  on

February 24, 2022.  City Defendants did not have time to serve subpoenas on

various news agencies to force them to disclose the home addresses of specific

journalists and knew that simply asking a company, especially a news organization, to divulge the contact information of journalists would be fruitless. (Robertson Decl. ¶ 6.) Searching for the addresses of these journalists, based only on their names, who may or may not have lived in the same city or state as the news organization identified, was not useful. (*Id*.) City Defendants attempted service on the address given for Austin Dalton, but were unable to effect service as he was, according to his twitter feed and neighbors, gone on an assignment. (Robertson Decl. ¶ 7.) City Defendants were able to find potential addresses for three local journalists who all had previously stated that they were hit with projectiles by Minneapolis Police Officers before May 29, 2020.

City Defendants served the subpoenas on Mr. Mannix and Mr. Nesterak on March 16, 2022, less than 48 hours after receiving Plaintiff's belated discovery responses. (Robertson Decl. ¶ 8.) The very next day, City Defendants attempted service on Mr. Goyette, and Mr. Dalton. (Robertson Decl. ¶ 9.) Mr. Goyette's attorneys agreed to accept service on his behalf. (*Id*.) Mr. Dalton was never able to be served. (*Id*.)

The deposition for Mr. Nesterak was scheduled for March 29, 2022. (ECF Doc. 174-1.) The deposition for Mr. Mannix was scheduled for March 30, 2022. (ECF Doc. 173-1.) The deposition for Mr. Goyette was scheduled for March 31, 2022. (Robertson Decl. ¶ 10.) On March 23, 2022, counsel for Mr. Mannix, who

was then representing both Mr. Mannix and Mr. Nesterak, sent a letter with objections to the served subpoena. (ECF Doc. 173-2.) Counsel for City Defendants requested a meet-and-confer. (Robertson Decl. Ex. E.) At that point Counsel for City Defendants was informed that Mr. Nesterak had obtained separate counsel. (*Id.*)

### 1. Meet-and-confer process with Mr. Nesterak

Counsel for City Defendants and Counsel for Mr. Nesterak spoke on March 24, 2022, approximately an hour after counsel had sent a letter with objections. (Robertson Decl. ¶ 13, Ex. F.) Counsel for City Defendants was given to understand that Mr. Nesterak would indeed attend the deposition on March 29, 2022 to talk about his personal experiences with law enforcement from May 26-May 31, 2020. (Robertson Decl. ¶ 14.) Additionally, counsel spoke about the scope of document requests and, in order to facilitate agreement, City Defendants noted that they were particularly interested in having native versions of the photographs that Mr. Nesterak posted on Twitter at the time he posted about his injury. (*Id.*) Counsel for Mr. Nesterak agreed to give further information on whether any documents would be produced the next day. (*Id.*) As a follow-up to the meet-and-confer, counsel for City Defendants sent a copy of the governing protective order in this matter to counsel for Mr. Nesterak. (Robertson Decl. Ex. G.)

8

On March 25, 2022, counsel again met-and-conferred by phone.  While counsel represented that Mr. Nesterak did not believe he had any documents responsive to the subpoena he was still going to check if he had anything relevant which was not privileged, additionally the parties discussed the idea of him checking the timestamp of the photographs he posted on Twitter to determine when they were taken.  (Robertson Decl. ¶ 17, Ex. H.)  At the end of the day on March 25, 2022, Counsel for City Defendants fully expected that Mr. Nesterak would appear for his deposition on March 29, 2022.  (Robertson Decl. Ex. I.)

On March 28, 2022, at 1:53 p.m., counsel for Mr. Nesterak called counsel for City Defendants and stated that if the City did not withdraw its subpoena that Mr. Nesterak would be filing a motion to quash.  (Robertson Decl. ¶ 19.) Surprised by this sudden change of course, counsel for City Defendants merely stated that they did not plan to withdraw the subpoena.  (*Id*.)  Mr. Nesterak's counsel had no further compromises to offer or discuss.  (*Id*.)  The entire call lasted 54 seconds. (Robertson Decl. ¶ 20.) At 5:18 p.m. that evening counsel sent a new letter stating that a motion to quash had already been filed.  (Robertson Decl. Ex. J; ECF Doc. 174-3.)

## 2.  Meet-and-confer process with Mr. Mannix

Counsel for City Defendants and Mr. Mannix met-and-conferred on March 25, 2022.  Counsel for Mr. Mannix outlined the positions they have taken in this

motion and proposed, both in the call and in the follow-up email, that in lieu of a deposition of Mr. Mannix that City Defendants "accept a statement from Star Tribune that Mr. Mannix was hit by a rubber bullet and that, despite this deeply troubling assault by police, he remains a full-time Star Tribune employee who reports on the police." (ECF Doc. 173-4 at 4.) Counsel for City Defendants disagreed with the positions taken counsel for Mr. Mannix regarding the legal issues surrounding the subpoena. (ECF Doc. 173-4 at 4.) Counsel for City Defendants explained that, for the purposes of this deposition, City Defendants were not there to debate with Mr. Mannix about whether he was hit with a projectile. (Robertson Decl. ¶ 22.) City Defendants were given information that Mr. Mannix had posted publicly on Twitter that he was hit with a projectile on May 26, 2020, and City Defendants wanted information about that incident and any other experiences that Mr. Mannix had with law enforcement, as a journalist, from May 26, 2020-May 31, 2020, and what effect that had on him, if any. (*Id.*) In order to facilitate resolution of the issue, counsel for City Defendants offered to withdraw the subpoena duces tecum if Mr. Mannix appeared for the deposition. (*Id.*)

After the conclusion of this meet-and-confer, counsel for Mr. Mannix sent an email again outlining Mr. Mannix's position and again proposing that City Defendants accept a statement from the Star Tribune. (ECF Doc. 173-4 at 4.)

Counsel for the City responded to this proposal as follows: "I do not believe that such a statement, unsworn and inadmissible, would suffice. Additionally, based on the language you have proposed to offer for that statement, such as characterizing what happened as an 'assault', it does not seem likely that we could come to an agreement on language." (ECF Doc. 173-4 at 3.) Counsel for Mr. Mannix replied that the statement could be a sworn declaration by a corporate officer of the Star Tribune that stated that Mr. Mannix was hit by a rubber bullet and that he remains employed by the Star Tribune. (ECF Doc. 173-3 at 2.) Counsel for Mr. Mannix also suggested that counsel for City Defendants ask Plaintiff if she would stipulate that Mr. Mannix was hit by a rubber bullet and remains employed by the Star Tribune. (*Id.*) This suggestion was sent after business hours, at 6:30 p.m. on Friday, March 25. On Monday, March 28 at 8:54 a.m., counsel for Mr. Mannix sent written objections to the subpoena and stated that they had commenced work on a motion to quash and asked again if the City Defendants would withdraw the subpoena. (ECF Doc. 173-4.)

At 10:38 a.m. that morning counsel for City Defendants sent the following in response:

> I apologize for not responding to your email Friday night, but I was not able to discuss the issue with my team until this morning. A statement that comes from only the Star Tribune and not from Mr. Mannix is a far short of what might be useful evidence in this case regarding the necessity of or extent of injunctive relief. Unless you wish to discuss other possibilities further, which would be, at the very

least, a sworn statement from Mr. Mannix himself, I will await the motion to quash.

(Robertson Decl. Ex. K.) City Defendants received no reply to this email and Mr. Mannix filed the instant motion to quash that evening.  (ECF Doc. 166.)

### 3. Deposition of Jared Goyette

Mr. Goyette agreed to be deposed, but asked that the deposition take place on April 4, 2022 and indicated that counsel could not continue the deposition beyond 11:45 a.m.  (Robertson Decl. ¶ 24.)  City Defendants agreed to conduct the deposition on that date and under those time constraints.  (*Id.*) Mr. Goyette was deposed on April 4, 2022, from 8:00 a.m. until 11:42 a.m. (ECF Doc. 173-5 ("G.Tr.") at 1, 118.) Counsel for City Defendants asked Mr. Goyette about: his experience and training as a journalist (G.Tr. 10:2-17:8, 19:9-21:21); whether journalists are bound by any particular ethical or professional standards and whether there is any entity that enforces those standards; (G.Tr. 17:9-19:8) how he is able to identify other individuals as journalists; (G.Tr. 21:22-25:11); whether and under what name he posts on social media (G.Tr. 25:16-27:11); how he came to be assigned to report on the aftermath of George Floyd's murder (G.Tr. 27:13-29:6); what equipment he carried with him while reporting on the George Floyd protests (G.Tr. 30:25-35:22; 89:1-25); whether he was wearing press credentials or other items to identify himself as a member of the press (G.Tr. 35:23-37:13, 87:13-88:8); but  the majority

of the time in the deposition was spent on what he remembered about his interactions with law enforcement during the time he spent reporting on the George Floyd protests (G.Tr. 29:7-31:7, 37:14-110:19).  In describing his interactions with law enforcement, counsel went into detail with Mr. Goyette to attempt to understand the exact location and time that the interactions occurred, as well as whatever Mr. Goyette could remember about his perceptions of the events, and whether Mr. Goyette believed he had been targeted by the police and why.  (*See id*.)  Counsel also asked Mr. Goyette about any interactions he had since the George Floyd protests with any Minneapolis Police Officers (G.Tr. 110:20-112:2); whether Mr. Goyette continued to fear for his safety in working as a journalist in Minneapolis; (G.Tr. 112:22-113:7); whether he had covered protests since May of 2020, and whether he had interactions with Minneapolis Police Officers during those protests.  (G.Tr.  114:21-116:20.) Finally, counsel for City Defendants asked Mr. Goyette as to whether he believed there should be credentials for journalists made available by the City of Minneapolis.[1]  (G.Tr. 112:3-21.)

---

[1] In the Rule 30(b)(6) deposition of the City of Minneapolis conducted by Plaintiff's counsel on March 22, 2022, Plaintiff's counsel asked Sgt. Matthew Severance, "Would having the City credential members of the press help prevent situations where members of the press were accidentally shot by 40-millimeter weapons by MPD?"  (Robertson Decl. Ex. L.)

## ARGUMENT

In this case, the Court must balance the broad scope of discovery with the Court's role in protecting third parties from undue burdens. Federal Rule of Civil Procedure 26(b)(1) provides the scope of discovery:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1). Courts generally have construed Rule 26(b)(1) broadly. *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978)*; see also, Hofer v. Mack Trucks, Inc.*, 981 F.2d 377, 380 (8th Cir. 1992) (Rule 26 "is liberal in scope and interpretation, extending to those matters which are relevant"). Rule 26(b) is construed to encompass "any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *In re Milk Prod. Antitrust Litig.*, 84 F. Supp. 2d 1016, 1017 (D. Minn. 1997) (quoting *Oppenheimer*, 437 U.S. at 351).

"Pursuant to a subpoena, a non-party can be compelled to produce evidence regarding any matter relevant to the claim or defense of any party, unless a privilege applies." *Keefe v. City of Minneapolis*, No. CIV. 09-2941 DSD/SER, 2012

WL 7766299, at *3 (D. Minn. May 25, 2012) (citing Fed. R. Civ. P. 26(b)(1), 34(c)). The threshold for relevance is very low.  *See Horace Mann Ins. Co. v. Nationwide Mut. Ins. Co.*, D.C.Conn.2007, 240 F.R.D. 44, 48 (describing necessary threshold of relevancy as "Lilliputian").

Under Fed. R. Civ. P. 45(d)(3), a Court must quash or modify a subpoena that "subjects a person to undue burden." See Rule 45(d)(3)(A).  The Eighth Circuit generally looks to the Court of Appeals for the Federal Circuit to determine whether a third-party subpoena creates an undue burden because of the "dearth of Eighth Circuit case law" on motions to quash.  *DatCard Sys., Inc. v. PacsGear, Inc.*, No. 11-MC-0025 DSD/SER, 2011 WL 2491515, at *1 (D. Minn. Apr. 25, 2011), report and recommendation adopted, No. 11MC25 DSD/SER, 2011 WL 2491366 (D. Minn. June 23, 2011), citing *Truswal Sys. Corp. v. Hydro–Air Eng'g, Inc.*, 813 F.2d 1207, 1209 (Fed. Cir. 1987).

The burden is "particularly heavy" to support a motion to quash as contrasted to some more limited protection. *Truswal* at 1210.  In determining whether to grant a motion to quash, courts must weigh the relevance of the requested materials against the burden to the party subject to the subpoena. *DatCard Sys* at *1, citing, e.g., *Roberts v. Shawnee Mission Ford, Inc.*, 352 F.3d 358, 360–62 (8th Cir.2003); *Plant Genetic Sys. N.V. v. Northrup King Co.*, 6 F.Supp.2d 859, 861 (E.D.Mo.1998) (citing *Heat & Control, Inc. v. Hester Indus., Inc.*, 785 F.2d 1017,

1024 (Fed. Cir. 1986)); *Truswal* at 1210. The moving party bears the burden to demonstrate good cause for the issuance of an order quashing the subpoena, and claims of harm have to be based on more than stereotypical and conclusory statements. *Miscellaneous Docket Matter No. 1 v. Miscellaneous Docket Matter No. 2*, 197 F.3d 922, 926 (8th Cir. 1999).

## A. This Court's February 24, 2022 Order Permitted City Defendants to Seek Discovery on Plaintiff's Newly-Requested Injunctive Relief and the Subpoenas at Issue Do Exactly That.

Third Parties initially argue that depositions of Mr. Nesterak and Mr. Mannix are not permitted under this Court's order allowing additional discovery related to the "newest iteration of injunctive relief in the amended complaint" because they are both local journalists and therefore could not possibly be deterred from visiting Minneapolis because of fear of the police. Additionally, Third Parties erroneously argue that the City Defendants only requested discovery on the issue of Plaintiff's standing to seek an injunction, was only granted discovery related to standing, and therefore the requested discovery from Mr. Mannix and Mr. Nesterak is not relevant. However, considering the full context of both the relief being requested by Plaintiff and the Court's order granting further discovery to

City Defendants on the issue of the injunction, City Defendants submit that the Court's order was not as limited as Third Parties argue.[2]

Plaintiff has alleged that the City of Minneapolis has a policy or custom of retaliation against the press.  (ECF Doc. 148 at ¶¶ 112-138.)  Plaintiff also alleged that this policy or custom or lack of training or supervision caused her injury and seeks monetary damages from both the City and whatever officer may have struck her.  (ECF Doc. 148 at ¶¶ 158-161, p. 49.)  Plaintiff has made similar allegations since the inception of her case. (*See* ECF Doc. 1 at ¶¶ 30-3963-67, p. 34.)  However, in the Second Amended Complaint Plaintiff added a request for a permanent injunction which would require the City to "implement additional policies, recurring training, and monitoring mechanisms" which would "protect the rights of journalists during crowd control and other police activities."  (ECF Doc. 148 at 48.)

In arguing against the Plaintiff adding the request for mandatory injunctive relief, the City Defendants clearly stated that they had been foreclosed from conducting discovery about both standing and the merits of the proposed injunction, and that this included taking depositions on the proposed injunctive

---

[2] As this Court issued the order, clearly it is in the best position to rule on the Court's own meaning and City Defendants fully defer to the Court on this matter. If this Court were to find City Defendants' interpretation is incorrect, these arguments are relevant to the question of Third Parties' Motion for Costs.

relief.  (ECF Doc. 135 at 1, 5.)  During the hearing, the Court posed the following question to Counsel:

> What I'm hearing you say is that the discovery you would need would be of other journalists who allege that they are deterred from returning from the City of Minneapolis because they were injured by the police and also concrete plans by the plaintiff, Ms. Tirado, to return to the City of Minneapolis, over and above what you've outlined was your questions at her deposition. Am I right about that or is there more?

(Tr. 23:14-22.) Counsel for the City clarified that they wanted to seek discovery on standing, futility and the merits of the proposed injunction and that, among other things, this would involve deposing third-party witnesses.  (Tr. 23:23-24:1; 25:23-26:3.)  After arguments the Court took a few minutes and made an oral ruling on the record and stated that the City would be allowed to take additional discovery and that discovery would be "limited to the newest iteration of injunctive relief in this amended complaint" and "depositions, if appropriate, of other journalists who claim that they are deterred from visiting Minneapolis because of fear of police can also be taken . . . ."  (Tr. 35:25-36:7, 37:7-19.)

The question is whether the Court literally meant that while City Defendants were able to pursue discovery on the newly-added request for injunctive relief, depositions of journalists were to be limited only to those who were deterred from "visiting Minneapolis" i.e., any out-of-town journalists. Considering that Ms. Tirado's requested injunctive relief is not limited merely to

out-of-town journalists visiting Minneapolis, and considering what must be proven to obtain injunctive relief, such an interpretation does not make sense. Rather, a more reasonable reading of the Court's ruling would be depositions would be allowed of those journalists whose First Amendment activities, in this case reporting, were allegedly chilled by the actions of the Minneapolis Police Department. Whether a journalist was deterred from "visiting" Minneapolis is not relevant to a question of violation of First Amendment rights. The relevant question is whether there are individuals who believe that they cannot safely engage in reporting in Minneapolis, whether or not they are from the area. Alternatively, there is nothing in the wording of this Court's order that would prohibit depositions beyond journalists deterred from "visiting" Minneapolis as long as those depositions were limited to "the newest iteration of injunctive relief" in Plaintiff's amended complaint. This issue becomes clear upon looking at what must be proven to obtain a permanent injunction.

Before obtaining a permanent injunction, a Plaintiff must first achieve actual success on the merits of the claim. *Oglala Sioux Tribe v. C & W Enterprises, Inc.*, 542 F.3d 224, 229 (8th Cir. 2008). In this case, assuming that Plaintiff legally can seek such broad mandatory injunctive relief in a case where she is suing as an

individual[3], Plaintiff would need to prove her *Monell* claim against the City alleging deficient training or an unconstitutional policy or custom in order to merit injunctive relief that would require additional policies, training, or monitoring mechanisms.

It is, and has been, the City of Minneapolis' position that by suddenly changing the type of relief that she is requesting, Plaintiff changed the calculus on the need for discovery on her *Monell* claims and the extent of what discovery is reasonable.   Fed. R. P. 26(b)(1) directs the parties and the courts to consider whether discovery is relevant and proportional to the needs of the case. "Relevance" is, of course, extremely broad.   However, in considering what is

_____

[3] In Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Leave to File Second Amended Complaint, Plaintiff argues that her amendment was not futile because she could individually seek an injunction on behalf of all journalists, citing *Rodgers v. Bryant*, 942 F.3d 451, 457-60 (8th Cir. 2019), as a non-class action case where the relief applied statewide.   However, that case dealt with a challenge to the constitutionality of a state statute and the injunction issued was prohibitory, one against enforcing the statute statewide.   *Id.* at 457-58.   The Eighth Circuit in *Rodgers* specified that the lower court's findings that the statute was unconstitutional on its face and that prohibiting enforcement would cause no injury "were sufficient to justify the district court's imposition of a statewide preliminary injunction, *particularly because they in no way depended on facts unique to [Plaintiffs]*."   *Id.* at 458 (emphasis added).   That, however, is not the case here as there is no single statute to be scrutinized in the abstract and either enforced or not enforced.   City Defendants do not agree that Plaintiff has standing to seek injunctive relief on behalf of individuals who are not parties to her case.   However, as that issue is not adjudicated, City Defendants must prepare to defend against the possibility of the injunction and is therefore seeking relevant discovery.

proportional to the needs of the case the following should be considered: 1) the importance of the issues at stake; 2) the amount in controversy; 3) the parties' relative access to relevant information; 4) the parties' resources; 5) the importance of the discovery in resolving the issues; and 6) whether the burden or expense of the proposed discovery outweighs its likely benefit.  Fed. R. Civ. P. 26(b)(1).  By changing the nature of the relief sought, Plaintiff altered this calculus when it came to the *Monell*-related discovery.

*Monell* liability is merely a means of holding a municipal entity liable for the constitutional torts of its employees, as normal respondeat superior liability does not apply.  *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978).  That being the case, the issue of *Monell* liability for the City was relatively unimportant.[4]  The amount, if any, recovered by Plaintiff for her injuries would be the same and, if Plaintiff were able to prove that she had been injured by a City of Minneapolis employee, the City would pay the judgment whether or not *Monell* liability was found in this case.  Disproving *Monell* therefore had minimal benefit to the City and certainly that benefit would not outweigh the burden that discovery would impose upon third-party journalists whose information may have helped the City defend itself from those claims.

---

[4] The City has defenses from Plaintiff's *Monell* claims and certainly was never going to concede *Monell* liability.

However, this calculation was monumentally shifted when Plaintiff suddenly transformed her *Monell* claim into the basis for a mandatory injunction. The issue of the merits of the *Monell* claim have become centrally important in this matter. Mandatory injunctive relief is said to be a "harsh remedy not favored by the courts" and the City has a strong interest is fully advocating against such an imposition. *See Jackson v. National Football League*, 802 F.Supp.226 (D. Minn. 1992). The requested relief also shifts "the amount in controversy" as mandatory injunctive relief would require significant City resources to ensure compliance. It also increases the discovery's importance in resolving the issues in this case.

The City was loath to take the depositions of journalists as it seemed certain that litigation would be the result; it also unleashed a storm of criticism of the City from the media itself.[5] However, after Plaintiff changed the relief she was seeking, and sought to impose mandatory injunctive relief on the City and have MPD policies, training, and monitoring be decided by a court rather than the normal executive and legislative processes, obtaining further discovery on the *Monell*

---

[5] On March 18, 2022, Minnesota Public Radio reported that, "In its own statement, the Minnesota Reformer vowed to 'protect our newsgathering rights' from the city's 'ham-handed effort to intimidate journalists with burdensome legal action.'" Matt Sepic, *Minneapolis city attorney subpoenas reporters in police brutality suit*, Minnesota Public Radio, March 18, 2022, https://www.mprnews.org/story/2022/03/18/minneapolis-city-attorney-subpoenas-reporters-in-police-brutality-suit (last visited April 15, 2022)

issues merited the effort involved and the burden on third parties, as discussed *infra*. Under Fed. R. Civ. P. 26(b)(1), the *Monell*-related discovery, including depositions of journalists Plaintiff alleged were targeted by the MPD, suddenly became not only relevant, but also proportional to the needs of the case. The Court's order granting discovery on the injunction recognized this.

Besides being relevant to the issue of the merits of Plaintiff's relief, the first element of obtaining a permanent injunction, the depositions of journalists allegedly injured by the MPD are relevant to the remaining elements of injunctive relief: "(1) the threat of irreparable harm to the moving party; (2) the balance of harms with any injury an injunction might inflict on other parties; and (3) the public interest." *Oglala Sioux Tribe v. C & W Enterprises, Inc.*, 542 F.3d at 229. In addition, the evidence of individual journalists is relevant to helping the Court decide, should it be necessary, what form injunctive relief should take.

### 1. Irreparable Harm

To make a showing of irreparable harm, Plaintiff "must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013). While it is true that loss of First Amendment freedoms can constitute irreparable harm, there still must be the imminent likelihood of that harm. *Latino Officers Ass'n v. Safir*, 170 F.3d 167, 171 (2d Cir. 1999). "Issuing a preliminary

injunction based only on a *possibility* of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (*per curiam*)); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) (where First Amendment interests were threatened or impaired *at the time the motion for injunctive relief was brought and heard* that shows irreparable injury).

Even if Plaintiff were to show that rights of journalists had been violated by City Defendants, she would not necessarily be entitled to injunctive relief if there was no evidence that any alleged violations had continued beyond the George Floyd protests. Certainly, the best source for that kind of information would be local journalists who have been present and the most likely individuals to cover other protests that have occurred since May of 2020. Mr. Goyette, for example, testified in his deposition that he had covered some protest events after May of 2020 and that he had not had any negative encounters with the Minneapolis Police Department.

## 2. Balance of Harms

In deciding the balance of harms factor, courts must "consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Nat.*

*Res. Def. Council, Inc.*, 555 U.S. at 24.  In the past year, in a class action litigation involving members of the press who were present at the George Floyd protests and the protests in Brooklyn Center after the shooting of Daunte Wright, Judge Wright issued a preliminary injunction which enjoined agents of the Department of Public Safety, including the Minnesota State Patrol, from "arresting, threatening to arrest, or using physical force—including through use of flash bang grenades, non-lethal projectiles, riot batons, or any other means—directed against any person whom they know or reasonably should know is a Journalist . . . ." *Jared Goyette, et al v. John Harrington, et al*, No. 20-CV-1302 (WMW/DTS), 2021 WL 5003065, at *15 (D. Minn. Oct. 28, 2021)[6].  There the State argued against injunctive relief on the basis that they had a substantial interest in maintaining law and order and that due to the difficulty in identifying journalists in a crowd it impeded that important interest.  *Id.* at *10. In assessing the balance of harms, that court found that the balance of harms favored the journalists because the evidence indicated that the State Defendants were "willfully disregarding indicia that a person was a member of the press and targeting individuals who were clearly identifiable as members of the press or who were attempting to display their press credentials"

_____

[6] The City of Minneapolis is also a party to this lawsuit but was not a party to the litigation about the Preliminary Injunction which was brought only against agents of the State of Minnesota.

and this undercut the State's position that journalists were difficult to identify in situations of chaotic unrest. *Id.*

Keeping this finding in mind, the City Defendants in this case are seeking information about whether journalists who allege that they were harmed by the MPD were readily identifiable as journalists as this will potentially be a factor weighed by the Court in whether the balance of harms favors the interests of public safety or the interests of having journalists able to freely report, and to what extent it is reasonable to require journalists to make themselves readily identifiable for restrictions on law enforcement to apply.  To that end, City Defendants asked Mr. Goyette how he identifies fellow members of the press and what he has done to make himself identifiable, and whether he was readily identifiable as press during his interactions with MPD officers.  Depositions of journalists on these topics are clearly relevant to the balance of harms factor of injunctive relief.

### 3. Form of Injunctive Relief

What form any injunctive relief in this case ultimately takes is a function of the discretion of the trial court.  *See Rodgers v. Bryant*, 942 F.3d at 458 (decision on scope of injunction reviewed for abuse of discretion)(citing *Lemon v. Kurtzman*, 411 U.S. 192, 200 (1973) (plurality opinion) ("[E]quitable remedies are a special blend of what is necessary, what is fair, and what is workable." (footnote omitted)).  In issuing the injunction in *Goyette*, Judge Wright considered several factors

including to what extent the press should be identifiable, what actions by law enforcement would be enjoined, and what actions would not be enjoined. *Goyette v. Harrington*, 2021 WL 5003065 at *14. For example, unintentional violations involving individuals who are not wearing press credentials or distinctive clothing were not enjoined. *Id.* These requirements were based on the evidence presented to that court and tailored to meet those specific circumstances of the constitutional violations alleged against the State. *Id.* at *13-14. Therefore, it is incumbent upon City Defendants in this case to develop a record regarding the circumstances of alleged past violations of journalists' rights so that any injunctive relief, if granted, would be tailored to meet and solve the issues raised by Plaintiff. For example, Plaintiff has raised the idea of the City credentialing journalists. (Robertson Decl. Ex. L.) City Defendants questioned Mr. Goyette, and would likely question other journalists, whether such a proposal would be helpful in alleviating any identified issues. The extent members of the press were identifiable, and how press attempt to identify themselves, is relevant should the Court need to ultimately craft an injunction that includes methods of identifying the press. Additionally, understanding other circumstances such as what were others around the journalist doing, whether any order were given by the police, whether the journalist made a complaint or otherwise alerted the MPD regarding the incident, are relevant for a Court in deciding what policies, training, or monitoring, would be appropriate to

27

give relief, if any relief were called for.  Deposing individual journalists is especially important for the City to gain an understanding of all these issues in order to respond to Plaintiff's request for injunctive relief.

City Defendants contend that when the Court granted discovery to the City Defendants regarding Plaintiff's newly-requested injunctive relief it allowed City Defendants to take depositions that inquire into each element Plaintiff would have to prove to show that she is entitled to injunctive relief.  Additionally, City Defendants maintain that includes the ability to explore what specific form of injunctive relief would be potentially supported by the evidence and witnesses Plaintiff identifies as supporting her claims.  This would therefore include depositions of journalists who have claimed injury at the hands of the MPD and whether, and why, those journalists' interactions with the MPD chilled their ability to report in Minneapolis, and whether that reaction was reasonable under the circumstances.  This Court allowed City Defendants to take discovery on Plaintiff's request for injunctive relief and City Defendants ask that they be allowed to do so in a meaningful way.

### B. Third-Parties' Contention that Journalist Privilege Extends to Everything Observed or Experienced First Hand by a Journalist While Working is Unsupported by Case Law or Common Sense.

The subpoenas issued in this case specified that they were not calling for any document that the recipient had a good faith basis to believe was covered by

a legally-recognized journalist privilege.  (*See* ECF Doc. 174-1.)  Third Parties make

the confusing argument that the subpoena should be quashed because there are

no responsive documents that are not covered by the privilege.  If no documents

exist that are not privileged then Plaintiff could have responded to the subpoena

and said there were no non-privileged documents.  However, Third Parties seem

to categorize anything that was not published as covered by a journalist privilege.

Merely because an individual was working, whether as a journalist or in any job,

does not foreclose that they sent personal communications regarding what they

were seeing and observing.  If Mr. Mannix or Mr. Nesterak sent a text to a

significant other or family member commenting about being hit by a projectile or

making other personal observations about the protests and law enforcements,

there is no basis to find that this would be covered by a journalist privilege.

*Bredemus v. Int'l Paper Co.*, No. CV 06-1274 (PJS/RLE), 2008 WL 11348492, at *7 (D.

Minn. Aug. 22, 2008) (Third Party moving to quash subpoena "has waived any

applicable [reporter's] privilege—whether statutory or constitutional—by sharing

his materials with the public, and with [his family members].)(citing *In re Venezia*,

922 A.2d 1263, 1271 (N.J. 2007)("Disclosure of information, however, by a

newsperson outside of the newsgathering and news reporting process constitutes

a waiver of the privilege.")).  If either of the Third Parties possess documents that

are part of non-work-related communications, published material, or other items

posted to other social media accounts that contains information about law enforcement, journalists, and protests from May 26, 2020-May 31, 2020, such documents are clearly responsive and not protected by a journalist privilege and should be produced.  No other documents are called for by the subpoena.

Additionally, Third Parties take the position that their personal experiences, states of mind, observations, knowledge, thoughts, impressions, and opinions are all out-of-bounds for deposition topics if any of that came to them through their work as journalists.  (TP Mem. at 20.)  The only source of law that Third Parties rely on for this is a vaguely-defined reporter's privilege in federal law and Minn. Stat. § 595.023.  Even if the state statute granting a reporter's privilege applied to Third Parties personal observations while in a public place observing a public event, the Minnesota Law on journalist privilege in inapplicable in this federal question case.   Additionally, to the extent a federal common law journalist privilege exists it does not cover Third Parties personal observations in this context.

1. **State Law Privilege for Journalists is Inapplicable to this Federal Case.**

Third Parties argue in passing that the subpoena should be quashed because of the Minnesota Free Flow of Information Act, Minn. Stat. § 595.021 *et seq.* However, this a state law privilege and is therefore not applicable to the federal *Monell* claims that are the heart of Plaintiff's request for injunctive relief.  *See* Fed.

R. Evid. 501 ("in a civil case, state law [only] governs privilege regarding a claim or defense for which state law supplies the rule of decision."); *Hageman v. Accenture, LLP*, No. CV 10-1759 (RHK/TNL), 2011 WL 13136510, at *5 (D. Minn. June 7, 2011) (citations omitted)("Federal common law applies to questions of privilege where jurisdiction is based upon 28 U.S.C. § 1331. State law applies to questions of privilege where jurisdiction is based upon 28 U.S.C. § 1332.") Minnesota law cannot be a source of privilege for Third Parties in this federal case.

### 2. Federal law recognizes protection of sources and work product, not a reporter's personal observations and first-hand experiences.

In this case, Plaintiff, a reporter, has made claims that she was specifically targeted by the MPD during the George Floyd protests because of her status as a reporter, has alleged that this was the custom and practice of the MPD, cited to various other instances where she alleges members of the press were targeted, and seeks expansive injunctive relief from the Court on behalf of all journalists. This is not a case where the experience and observations of journalists are peripheral or are being used as "investigative arm of" any party. Rather, Plaintiff has placed the experiences of journalists, as journalists, at the center of her claim and her request for relief. That makes this case fundamentally different than any of the cases cited by Third Parties, and City Defendants are left with no choice but to attempt to investigate those claims by deposing some of the journalists Plaintiff has identified

and learn more about what Plaintiff alleges these journalists experienced from law enforcement from May 26, 2020-May 31, 2020.

Plaintiff cites two cases in support of a reporter's privilege under federal law, *Keefe v. City of Minneapolis*, No. CIV. 09-2941 DSD/SER, 2012 WL 7766299 (D. Minn. May 25, 2012) and *J.J.C. v. Fridell*, 165 F.R.D. 513 (D. Minn. 1995). Neither of these cases create such a robust reporter's privilege that would prevent Third Parties from testifying at a deposition in this case. In fact, "the existence of a qualified reporter's privilege is an open question in this Circuit." *Keefe v. City of Minneapolis*, 2012 WL 7766299, at *3 (citing *In re Grand Jury Subpoena Duces Tecum,* 112 F.3d 910, 918 n. 8 (8th Cir.1997)).

Looking at the type of information that was sought in both *Keefe* and *J.J.C.* it is not clear that a reporter's privilege would extend to the information sought from Plaintiff's in this case, that is, their personal observations and experiences while working at a public protest in a public place.

*Keefe* was a case where a former employee of the City of Minneapolis sued the City alleging that the City and other City employees engaged in a conspiracy which resulted in adverse employment actions in violation of various statutory and constitutional rights. *Id.* at *1. As counsel for Mr. Keefe stated in the Memorandum in Support of Motion to Quash Subpoena, "As a Star Tribune reporter, Chanen has gathered information about and from, and has written

articles about, [Plaintiff] and the [Defendant]. However, he did not participate directly in any dealings between [Plaintiff] and the defendants, did not observe dealings between [Plaintiff] and the defendants, and *therefore has no first-hand knowledge of any events that might have given rise to this litigation*. All of his information was derived from interviews and other sources." *Michael Patrick Keefe v. City of Minneapolis, et al,* 09-2941(DSD/SER) (ECF Doc. 119) (Feb. 15, 2012).  In ruling on the motion to quash, the court found it was relevant that the subpoenaed reporter was, "neither a party nor a witness to any of the underlying facts".  *Keefe v. City of Minneapolis*, No. CIV. 09-2941 DSD/SER, 2012 WL 7766299, at *4.

Similarly, in *J.J.C. v. Fridell*, the Plaintiff subpoenaed two journalists who had written articles based on information from sources to whom they had promised confidentiality and the journalists refused to provide their notes or to identify their sources.  *J.J.C. v. Fridell*, 165 F.R.D. at 515.

Neither the holdings, nor the underlying facts of these two cases, establish that a reporter's privilege should extend to observations and experiences of a reporter in a public place observing public events.  Third Parties can point to no federal caselaw that pushes the reporter's privilege so far that it would cover even a reporter's thoughts and recollections which neither identified any confidential source or otherwise revealed information that would need to be confidential to

advance the interests of the First Amendment.  There is no basis in law to find that a reporter's recollections and thoughts are privileged.

Even if the qualified reporter's privilege described in *Keefe* or *J.J.C. v. Fridell*, were to be applied to this case, it is clear that the reporter's privilege would not apply to the information sought by the subpoena.  "Under a balancing method, the reporter's privilege is defeated only where the information sought is: 1) critical to the maintenance or the heart of the claim; 2) highly material and relevant; and 3) is unobtainable from other sources." *J.J.C. v. Fridell*, 165 F.R.D. at 516.

In this case, the information regarding the experiences of other journalists, especially other journalists who Plaintiff alleges were injured by 40mm projectiles while reporting the same way she alleges she was injured, is critical to the *Monell* claim and therefore critical to Plaintiff's claim for injunctive relief.  In order to prove her *Monell* claim Plaintiff will need to show that the violation of her constitutional rights "resulted from (1) an 'official municipal policy,' (2) an unofficial 'custom,' or (3) a deliberately indifferent failure to train or supervise." *Atkinson v. City of Mountain View*, 709 F.3d 1201, 1214 (8th Cir. 2013) (citations omitted); *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 690–91 (1978). Plaintiff has alleged that there was a custom or deliberate indifference.  To establish a custom or failure to train there would need to be proof of a widespread pattern of misconduct and that City Defendants knew of and tacitly approved of

the conduct. *Ware v. Jackson County,* 150 F.3d 873, 880 (8th Cir. 1998). Therefore it is relevant to the heart of the *Monell* claim whether and under what circumstances these other alleged instances of journalists being struck by projectiles occurred, when they occurred, and whether and when the City of Minneapolis was made aware of the instances. Therefore the information goes to the heart of the Plaintiff's claim in this case.

By the same token the information is highly material and relevant. Mr. Mannix and Mr. Nesterak both publicly stated on social media that they were struck with projectiles by the MPD and that they were reporting. Plaintiff identified that they had information relevant to her claims. Additionally, their injuries were the most similar to the injuries that Plaintiff has alleged as they were also allegedly struck with projectiles. The circumstances under which this occurred is extremely relevant to determine whether Plaintiff can obtain injunctive relief in this case.

Finally, the information cannot be obtained from another source. The public reporting and social media posts do not give the granular information on the exact time and location that these instances occurred. For example, at Mr. Goyette's deposition the City learned for the first time that Mr. Goyette was on the west side of the Auto Zone building. Knowing the information allows the City to attempt to locate if there is video footage of the incident. Without precise information

regarding the time and location of an individual who was hit by a 40mm projectile it is usually impossible to locate the person because the footage from the body camera video is not detailed enough to identify individuals from the normal distance that the 40mm is shot from. It is important to the City's potential defenses to determine what was the totality of the circumstances facing an individual officer who decided to use force, and additionally it is relevant in determining whether that individual officer made any indication that they knew that journalists were present. To get to that crucial information it is necessary to have the information about where the individual was and when the individual was hit with a projectile. Additionally, the only way to get information from the individual journalist about what they were observing, whether an officer was aiming at them, what was happening in the vicinity, whether they were wearing distinctive press clothing, is through questioning them in a deposition. The information that is useful to this litigation cannot be obtained other than through asking these journalists what they saw and experienced.

The discovery that is sought by City Defendants with their subpoena is not covered by any reporter's privilege and therefore there is no basis under Fed. R. Civ. P. 45(d)(3)(A)(iii).

**C. The Subpoena is Neither Overbroad nor Unduly Burdensome as it is Self-Limiting to Non-Privileged Information.**

Third Parties conclude that because the subpoena seeks "irrelevant, disproportionate, untimely, and privileged discovery" that the subpoenas are unduly burdensome. (TP Mem. at 22.) However, this is again premised on Third Parties' erroneous conclusion that the City Defendants only are allowed to seek discovery on Plaintiff's standing to pursue injunctive relief. Nor is it reasonable to argue that because City Defendants were willing to compromise in order to avoid litigating this matter to the Court that they in any way concede that the request for documents was overbroad.

The Subpoena seeks documents directly related to an individual journalist's allegation of being hit with a projectile, any documents relating to protests, riots, members of the press, or law enforcement actions between May 26, 2020 and May 31, 2020, and documents regarding communications with Plaintiff or her counsel. Additionally, it requested that Mr. Mannix bring the projectile that struck him (to his virtual deposition) if it was still in his possession. The subpoenas specifically stated that it was not requesting any items or documents which the recipient had a good faith basis to assert is protected by a legally recognized journalistic privilege. Therefore, it would be limited only to public materials, or to communications that were not had in the journalist's professional capacity. Third Parties confusingly argue that these documents are covered by privilege when

City Defendants have specifically stated that they are not asking for any document that is covered by privilege.

As to the burden imposed by a deposition, Third Parties argue that it is a journalist's "professional duty to make sure their coverage is accurate, fair, and objective." (TP Mem. at 23.) It is unclear how reporting their observations in a deposition, presumably also in an accurate fashion, would in any way give an appearance of partiality. Mr. Mannix and Mr. Nesterak have already stated publicly that they were hit with projectiles by the MPD. It is unclear how giving further information about those instances could impugn any perception of veracity and objectivity, even if there were the slightest risk of the City attempting to do so, which there is not.

Third Parties argue that the City Defendants would suffer no prejudice from having the subpoenas quashed. This is simply untrue. Quashing the subpoena will deprive the City of information that is vital to the defense of Plaintiff's request for injunctive relief. Without knowing more about what Mr. Mannix or Mr. Nesterak observed in the incidents that led Plaintiff to include them in her Complaint and identify them in discovery, the City Defendants cannot defend against allegations that MPD officers targeted members of the press and therefore continues to be prejudiced by Plaintiff's late-added request for injunctive relief.

### D. Third Parties are not Entitled to Attorneys' Fees

Third parties assert in one breath first that the City Defendants refused to negotiate and take reasonable steps to avoid undue burden and also attempted to negotiate by agreeing to drop the document requests as "leverage". Third parties disingenuously assert that "[n]o efforts have been made by City Defendants to spare either Mannix or Nesterak any cost, burden, or expense incurred as a result of City Defendants' Subpoenas. Indeed, it appears harassment was precisely the point." (TP Mem. at 26.) This is simply not true. City Defendants met-and-conferred with counsel for Mr. Mannix and far from not agreeing to narrow the subpoena in any way, proposed dropping the request for documents in exchange for appearance at a deposition. Mr. Mannix's only counter was to provide a statement from the Star Tribune, or that City Defendants seek a stipulation from Plaintiffs. However, the information that Mr. Mannix was struck by a projectile and continues to work as a journalist is not the information that City Defendants were interested in obtaining. The information they sought was that information which was relevant to City Defendants defense, the circumstances surrounding Mr. Mannix's assertion that he was struck by a projectile and whether and why that may or may not have chilled the exercise of his First Amendment rights. The last attempt at a compromise was made by City Defendants who suggested that they would be willing to accept a declaration in lieu of a deposition if it was issued by Mr. Mannix rather than his employer. However, Mr. Mannix never responded

to that idea to explore what information might be provided without a need for deposition.  It was not the City Defendants who were refusing to avoid litigation or to reach a compromise to avoid undue burden, it was Mr. Mannix.

The situation is even more strange regarding Mr. Nesterak who, after meeting and conferring, agreed to appear for deposition and then, the day before the deposition was to take place, suddenly called and stated that unless the subpoena was withdrawn that he would file a motion to quash.  City Defendants had again attempting to reduce any burden on Mr. Nesterak and believed that an agreement had been reached when Mr. Nesterak cut off any further discussion.

As discussed, *supra*, City Defendants have a good faith belief that everything they have asked for with this subpoena is permitted by the Court's order and related to the City's defense of the claim for injunctive relief by Plaintiff.  Under these circumstances, even should this motion to quash be granted, fees are not appropriate.

## **CONCLUSION**

City Defendants' only goal in subpoenaing these journalists is to obtain highly relevant information that is unavailable from any other source to defend themselves against the late-added claim for injunctive relief brought by Plaintiff. City Defendants' were permitted by the Court to seek discovery on Plaintiff's new claim for injunctive relief and the subpoenas for documents and deposition does

40

precisely that.  Given the self-limiting nature of the subpoenas and the focus of the

depositions, the subpoena is neither overbroad nor unduly burdensome.   The

Court should deny Third Parties' motion to quash the subpoena.

Dated:  April 15, 2022          JAMES R. ROWADER, JR.
                                City Attorney
                                By
                                */s/Heather Robertson*
                                KRISTIN R. SARFF (#0388003)
                                SHARDA ENSLIN (#0389370)
                                HEATHER ROBERTSON (#0390470)
                                Assistant City Attorneys
                                350 South Fifth Street, Room 210
                                Minneapolis, MN 55415
                                (612) 673-3949
                                kristin.sarff@minneapolismn.gov
                                sharda.enslin@minneapolismn.gov
                                heather.robertson@minneapolismn.gov

                                *Attorneys for City of Minneapolis and*
                                *Minneapolis Interim Chief of Police Amelia*
                                *Huffman*